UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>TOP LINE GRANITE DESIGN INC. [1]<br><br>Debtor. | Case No. 22-40216 (CJP)<br><br>Chapter 11 |

## DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING USE OF CASH COLLATERAL, (B) GRANTING POST-PETITION REPLACEMENT LIENS AS ADEQUATE PROTECTION, AND (C) SCHEDULING A FINAL HEARING

### (Request for Emergency Determination)

Top Line Granite Design Inc., a debtor in possession (the "**Debtor**") hereby moves this Court for entry of interim and final orders authorizing the Debtor to use its cash on hand, funds in its deposit accounts, revenue from the business, and any further proceeds of its assets, including inventory, and accounts receivable, which may constitute "cash collateral" of lienholders ("**Cash Collateral**") [2] under the terms set forth in this motion (the "**Motion**"). The Debtor specifically seeks to use Cash Collateral in order to continue usual operations and preserve the Debtor's assets. The Debtor specifically seeks, without limitation:

(a) Entry of an order authorizing the interim use of Cash Collateral to maintain and operate its business and avoid irreparable harm.

(b) Authority to grant Post-petition Liens to certain Lienholders (both as defined below) and, to the extent funds are available, to make monthly Adequate Protection Payments to the holders of Senior Claims (both as defined below).

(c) Scheduling of a final hearing on this Motion for entry of a final order regarding the continued use of Cash Collateral through July 31, 2022 to maintain and operate the Debtor's business.

---

[1] A/k/a Design Top Line Granite, and aka Top Line Granite Design. The Debtor's name was changed from Brazil Stones Inc. in November 2005.

[2] Section 363(a) of the Bankruptcy Code provides for a definition of "cash collateral" which the Debtor incorporates by reference, as applicable.

Annexed hereto as <u>Exhibit A</u> is the budget for funding the Debtor's business operations (the "**Budget**") for the period commencing as of the Petition Date (as defined below) and continuing through July 31, 2022 (the "**Budget Period**"). In further support of this Motion, the Debtor states as follows:

### Jurisdiction

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for relief requested herein are sections 105(a), 361, and 363 of Title 11 of the United States Code (the "**Bankruptcy Code**"); Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and MLBR 4001-2, and 9013-1(g).

### Emergency Determination Requested

4. Pursuant to MLBR 9013-1(g), the Debtor requests for an emergency hearing on the Motion. In order to maintain the viability of its business, the Debtor must (i) pay employees, (ii) purchase materials from its suppliers and vendors, the majority of which, if not all, have required cash on delivery, (iii) pay rent and utility charges, (iv) cover other operating expenses, and (v) pay professionals necessary for the successful reorganization of its business. The Debtor will need to utilize Cash Collateral in order to meet these obligations and avoid disruption of the business and attendant economic losses. Unless the Debtor is authorized to use Cash Collateral as set forth in this Motion, the Debtor will be unable to continue business operations and to pay its expenses. In addition, the Debtor will not be able to service its customers. All of these outcomes will cause immediate and irreparable harm to the Debtor's estate and will cause the Debtor to suffer a significant and irreparable loss of enterprise value.

5. Pursuant to Bankruptcy Rule 4001(b) and MLBR 4001-2(e)(2), the Court may conduct a preliminary hearing, pending a final hearing, on a cash collateral motion such as this one to the extent necessary to avoid immediate and irreparable harm.

6. Pursuant to MLBR 9013-1(g)(1)(C), the Debtor has made a reasonable good faith effort to advise all affected parties of the substance of the Motion for relief, and the request for an emergency determination, prior to filing the Motion. The Debtor certifies that it has been in communications with its senior secured creditor (Avidia Bank), the Subchapter V Trustee, and counsel to the United States Trustee about the Motion.

## Background

7. On March 25, 2022 (the "**Petition Date**"), the Debtor commenced this proceeding by filing a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code, as a small business Subchapter V debtor.

8. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtor continues to manage and operate its business as a debtor-in-possession.

9. On March 28, 2022, the Court appointed Steven Weiss as the Subchapter V trustee.

10. The Debtor is a Massachusetts corporation, formed in October 2004, doing business in Tyngsboro, MA.

11. The Debtor sells and fabricates marble, granite, onyx, soapstone, quartzite, quartz, and porcelain. The Debtor also designs and installs countertops for the New England area using state of the art equipment. The Debtor is one of the largest stone fabricators in New England.

12. The Debtor's showroom at 347 Middlesex Rd. Tyngsboro, MA is over 20,000 square feet. The Debtor also has a small Home Design Center in Nashua, NH for displays, in addition to a separate warehouse.

13. The Debtor's owner, Edmilson Ramos ("**Mr. Ramos**") travels around the world to bring and supply the best quality and unique materials.

14. The Debtor currently has approximately 10 employees, plus its sales manager and bookkeeper who is paid as a subcontractor and receives a Form 1099 from the Debtor. The employees includes Mr. Ramos, sales representatives, account managers, quality manager, countertop installer, finance staff, office personnel, and others. The Debtor also uses the services of various subcontractors including individual labor subcontractors though US Construction and Maintenance LLC, an affiliated entity.

### A. *Liabilities*

15. Subject to the filing of the Debtor's bankruptcy schedules, the Debtor's secured creditors with unexpired UCC-1 financing statements filed before February 1, 2021 are as follows (the "**Senior Claims**").[3]

| *Secured Creditors/ Lienholders* | *Claim Amount* (approx.) | *Security Interest* | *Listed Collateral* |
|---|---|---|---|
| Enterprise Bank and Trust Company (2007 loan agreement) | $23,936.00 | UCC statement filed 3/16/2007 (amended 2/7/22) | All assets |
| Avidia Bank (equipment loan) Term Note dated 8/28/19 | $1,086,438.00 | Security Agreement<br><br>UCC statement filed 8/28/19 | Substantially all assets of the Debtor |
| Avidia Bank (inventory loan/ revolving line of credit) Revolving Demand Note dated 8/28/19 | $1,455,643.00 | Security Agreement<br><br>UCC statement filed 8/28/19 | Substantially all assets of the Debtor |
| ENG Commercial Finance 2020 (loan agreement) | $317,387.00 | UCC statement filed 10/8/20 | Equipment loan |

---

[3] This list does not include creditors with expired UCC-1 financing statements, creditors with UCC-1 financing statements that the Debtor believes have been paid, and creditors with UCC -1 financing statements are filed by representatives of unidentified creditors.

4

| | | | |
|---|---|---|---|
| US Small Business Administration (loan agreement dated 1/6/2021 and amended 8/2/21) | $500,000.00 | Security Agreement<br><br>UCC statement filed 1/20/21 | Substantially all assets of the Debtor |

16. In addition to the secured claims listed above, several other creditors, including those with certain Cash Advance Agreements (as defined below), filed UCC-1 financing statements against assets of the Debtor with balance totaling approximately $1,200,000.00, and are set forth below:

| *Creditors*[4] | *Balance* (approx.) | *Security Interest* | *Collateral* |
|---|---|---|---|
| ROC Funding (merchant agreements dated 7/29/21 and 11/4/21) | $387,081.00 | Security interest under agreement | Substantially all assets of the Debtor |
| TVT Capital (agreement for purchase and sale of future receipts dated 11/8/21) | $290,097.50 | Security interest under agreement | Substantially all assets of the Debtor |
| Mercury Funding Group Inc. (merchant cash advance agreement dated 12/9/2021) | $35,600.00 | Security interest under agreement<br><br>UCC-1 financing statement 12/10/21 | Substantially all assets of the Debtor |
| Diverse Capital (merchant agreement dated 3/16/22) | $211,563.00 | Security interest under agreement | Substantially all assets of the Debtor |
| Mr. Advance (future receivables sale and purchase agreement dated 12/23/21) | $0 | Security interest under agreement | Substantially all assets of the Debtor |
| Delta Bridge Funding (2021 agreement) | $22,356.00 | Security Agreement<br><br>UCC statement filed 12/24/21 (by Corporate Service Company, as representative) | Substantially all assets of the Debtor |
| Ultra Funding (revenue purchase agreement dated 1/21/22) | $86,192.50 | Security interest under agreement | Substantially all assets of the Debtor |

---

[4] CT Corporation System and First Corporate Solutions filed UCC-1 financing statements as representatives. The names of the creditors are not disclosed and are presumably for the various creditors with Cash Advance Agreement.

5

| AJ Equity Group (merchant cash advance agreement dated 1/18/22) | $33,681.70 | Security interest under agreement<br><br>UCC statement filed 1/27/22 | Substantially all assets of the Debtor |
|---|---|---|---|
| Blade Funding (agreement for purchase and sale of future receipts dated 2/3/22) | $75,525.00 | Security interest under agreement | Substantially all assets of the Debtor |
| Brickstone Group (merchant cash advance agreement dated 2/14/22) | $60,159.58 | Security interest under agreement | Substantially all assets of the Debtor |
| Speedy Funding (merchant agreement dated 2/15/22) | $64,816.00 | Security interest under agreement | Substantially all assets of the Debtor |
| *TOTAL* | *$1,267,072.28* | | |

17. The Senior Claims do not include the guaranty claims of Avidia Bank, and Bay Colony Development Corp. (SBA loan) totaling approximately $4,000,000 (the "**Guaranty Claims**"). The primary obligor related to the Guaranty Claims is 347 Middlesex Road Realty Trust (the "**Trust**"). The Trust owns the real property where the Debtor operates its business, namely 347 Middlesex Rd. Tyngsboro, MA (the "**Real Estate**").

18. The Guaranty Claims are secured by a mortgage on the Real Estate,[5] are contingent and unliquidated with respect to the Debtor, and are deemed unsecured with respect to assets of the Debtor.[6]

19. As provided above, Avidia Bank also has two secured claims against assets of the Debtor totaling approximately $2,500,000.00 (not including fees and interests) (the "**Avidia Secured Claims**"). The Trust is a guarantor of the Avidia Secured Claims and the Real Estate also constitutes collateral for such loans.

---

[5] Mr. Ramos, the primary beneficiary of the Trust, is also a guarantor of the loans.
[6] The guaranty documents for the Guaranty Claims do not have security grant provisions, and the creditors do not have separate UCC-1 financing statements recorded with respect to assets of the Debtor.

20. The Debtor estimates that there is approximately $1,500,000 in other unsecured debt outstanding, not including the Guaranty Claims (which are contingent and unliquidated) and insider debts.

*B.  Assets*

21. The Debtor estimates that, as of the Petition Date, the total value of its primary assets, not including goodwill or value as a going concern, is approximately $4,000,000.00 including: (i) accounts receivable, (ii) inventory, (iii) equipment, and (iv) vehicles.

### Events Leading to Bankruptcy Filing

22. The Debtor proceeded with the filing of this case in order to invoke the protections afforded by the Bankruptcy Code and to continue its operations in light of (i) the continued impact of the Covid-19 Pandemic, and (ii) certain unfair practices of the Debtor's lenders and creditors, including the short-term lenders with the Cash Advance Agreements (defined below), and the actions of Merchant Capital (defined below).

23. The Covid-19 Pandemic has led to project and material delays, as well as increased prices within the industry. Despites all efforts, the Debtor has not been able to fully eliminate all of the lingering effects of this Pandemic.

*A.  Cash Advance Agreements*

24. While the Debtor's revenue remained stable during the Covid -19 pandemic, the Debtor needed more working capital to cover the increase in operating and business expenses. In the past, the Debtor's owner has taken personal loans to infuse in the business which became harder to obtain during the Covid-19 pandemic. Starting Summer of 2021, the Debtor entered into several short-term loans which for the most part are similar to factoring contracts pursuant to

which the Debtor received upfront cash in exchange for the sale of certain accounts receivable (the "**Cash Advance Agreements**").

25. The Cash Advance Agreements provide for a grant of security interest on substantially all assets of the Debtor, and most of them require daily ACH payments from the Debtor's bank account and/or credit card. Pursuant to such Cash Advance Agreements, the Debtor is required to pay a certain percentage of the receivables to the creditors until the receivable purchase amount is paid in full. The total for such payments under the Cash Advance Agreements can be approximately $30,000.00 daily. Such daily payments while covering other operating and business expenses became unsustainable for the Debtor.

26. The Debtor reserves all rights with respect to the Cash Advance Agreements, including with respect to the predatory nature of the transactions, the true nature of the Cash Advance Agreements as secured loans which are subject to statutory and regulatory provisions, including but not limited to the Massachusetts usury statute (G.L. c. 271, § 49).

**B.**     ***Damages Caused by Merchant Capital***

27. In addition, in or around January 2022, Merchant Capital solicited the Debtor with respect to providing financing for the Debtor's business operations. Following subsequent communications regarding the offer to provide financing, on January 19, 2022, Mr. Ramos executed a so-called Revenue Purchase Agreement (the "**Merchant Agreement**") as well as a personal guaranty. Under the terms of the Merchant Agreement, Merchant Capital agreed to pay a purchase price of $200,000.00 to the Debtor in return for a percentage of the Debtor's future sales receipts. Specifically, the Merchant Agreement specifies that upon payment of the purchase price, Merchant Capital will be entitled to 45% of the Debtor's future receipts to be paid at a daily rate of $6,500.00 (the "**Remittance**") until the Debtor pays a total purchase

amount of $270,000.00 to Merchant Capital. Although the Merchant Agreement is framed as a "purchase" of future receivables, the Merchant Agreement in reality is simply a secured loan.

28. The next day, on January 20, 2022, the Debtor's bank account received a deposit from Merchant Capital in the amount of $75,000.00. Upon making this deposit which was only a portion of the agreed upon $200,000.00 purchase price, Merchant Capital also immediately debited the Debtor's bank account the amount of $6,500. Based on this activity, the Debtor contacted Merchant Capital to inquire why it had only received a portion of the purchase price while the Debtor's bank account was already debited for a full Remittance payment of $6,500.00.

29. January 21, 2022, Mr. Ramos, on behalf of the Debtor, immediately notified Merchant Capital of its intent to cancel the Merchant Agreement and that the $75,000.00 partial payment of the purchase price was being wired back to Merchant Capital. The return of the $75,000.00 to Merchant Capital was in fact done the same day.

30. Despite this notice and despite the fact that the $75,000.00 payment had been returned, Merchant Capital continued to process the daily Remittance payments by debiting the Debtor's bank account in the amount of $6,500 on January 21st and 24th, causing the Debtor to notify its bank that these debits have not been authorized. Throughout this time, the Debtor repeatedly attempted to contact Merchant Capital regarding the termination of the Merchant Agreement and ceasing collection of the daily remittance, which Merchant Capital ignored.

31. Instead of responding to the Debtor, Merchant Capital began sending correspondence directly to the Debtor's customers via its agent or affiliate Alpha Recovery Partners (as early as January 28, 2022—just nine (9) days after the Merchant Agreement was signed). Through such correspondence, Merchant Capital and/or Alpha Recovery Partners

9

falsely claimed that the Debtor has defaulted on the Merchant Agreement and that a balance is due to Merchant Capital. Despite these false statements, the correspondence requested that said customers direct future payments owed to the Debtor directly to Merchant Capital.

33. On February 7, 2022, the Debtor, through counsel, sent both Merchant Capital and Alpha Recovery Partners a pre-litigation demand letter which included a demand for relief pursuant to Massachusetts General Laws Chapter 93A (the Massachusetts Consumer Protection statute) and a notice to cease and desist all efforts.

33. Thereafter, Alpha Recovery Partners issued a UCC Release Letter dated February 17, 2022, acknowledging that the UCC Notice was "sent in error and should not reflect unfavorably with regards to Top Line Granite Design" and provided confirmation that a UCC Termination had been filed. Alpha Recovery Partners also provided a letter from Merchant Capital dated February 16, 2022, confirming that zero balance is owed from the Debtor to Merchant Capital. Alpha Recovery Partners also provided copies of letters to the Debtor's customers directing them to discard the UCC Notice and to resume business as usual with the Debtor.

34. However, damage had already resulted from the improper collection communications from Alpha Recovery Partners on behalf of Merchant Capital. Despite the Debtor's considerable efforts to mitigate the damages caused by these communications, the Debtor has and continues to lose jobs and/or customers resulting in significant economic harm to the Debtor.

35. The Debtor maintains that Alpha Recovery Partners on behalf of Merchant Capital intentionally sent false and misleading letters to the Debtor's customers incorrectly claiming that the Debtor defaulted on the Merchant Agreement, that the Debtor owed money to

Merchant Capital, and improperly requesting that the customers direct future payments owed to the Debtor directly to Merchant Capital. As a direct and proximate result of the false and misleading letters from Alpha Recovery Partners on behalf of Merchant Capital, Top Line has lost and continues to lose jobs and/or customers and suffer monetary and reputational damages.

36. The Debtor intends to pursue with a complaint against Merchant Capital with respect to such damages.

## Relief Requested

37. Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use "cash collateral" unless (A) each entity that has an interest in such collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of section 363. 11 U.S.C. § 363(c)(2). The Debtor seeks this Court's authorization to utilize the Cash Collateral in the operation of its business pursuant to Section 363(c)(2)(B) of the Bankruptcy Code, substantially in accordance with the Budget.

38. As the Budget evidences, the projected cash flow is for the most part sufficient to pay the expenses necessary to operate the business. The Debtor requests that the approval of the use of Cash Collateral described in this Motion be without prejudice to its rights to seek the further use of Cash Collateral at the conclusion of the Budget Period.

A.   *The Use of Cash Collateral is Necessary And Should be Approved*

39. The Debtor's ability to finance its operations and the availability to the Debtor of sufficient working capital and liquidity through the use of Cash Collateral are vital to both (i) the confidence of, and the relationship with, the Debtor's employees, vendor and suppliers, customers, and post-petition creditors, as well as (ii) to the preservation and maintenance of the going-concern value of the Debtor's estate and its ability to propose a plan. As set forth in the Budget, the Debtor expects to pay in the immediate future, among others: (i) expenses related to

employee payroll and subcontractors, (ii) operating expenses, including materials and supplies, (iii) lease obligations, senior loans, and fees and expenses to Debtor's professionals. Absent the use of Cash Collateral to pay the expenses set forth in the Budget and as set forth in this Motion, the value of the Debtor's assets will diminish.

40. For the above reasons, the Debtor has determined, in the exercise of its sound business judgment, that it requires the use of Cash Collateral for the maintenance and preservation of its property, the operation of its business, and the payment of expenses attendant thereto, including the payment of the costs and expenses of administering its chapter 11 case.

*B.* *The Proposed Adequate Protection is Sufficient and Should be Approved*

41. Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used ... or proposed to be used... by the [debtor in possession], the court ... will prohibit or condition such use ... as is necessary to provide adequate protection of such interest." 11 U.S.C. §363(e). The concept of "adequate protection" is not defined in the Bankruptcy Code; section 361 of the Bankruptcy Code contains a non-exhaustive list of acceptable forms of adequate protection, including a cash payment or periodic cash payments, additional liens, replacement liens, or the "indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361. Sections 361 (1) and (2) of the Bankruptcy Code also provide that adequate protection may be required only to the extent, among others, the use of the property by the Debtor results in a decrease in the value of the secured creditor's interest in the property. 11 U.S.C. § 361(1) and (2).

42. What constitutes adequate protection varied with the facts and circumstances of each particular case. In re Harrington & Richardson, Inc., 48 B.R. 431, 433 (Bankr. D. Mass. 1985) (adequate protection is a flexible concept which requires a court to make decisions on a case-by-case basis). See also, In re Martin, 761 F.2d 472, 474 (8th Cir. 1985); In re Pawtuxet

Valley Prescription & Surgical Ctr., Inc., 2008 Bankr. Lexis 868, at *4 (Bankr. D.R.I. Mar. 10, 2008) (means of providing adequate protection are left to case-by-case interpretation and development).

43.    Adequate protection requires only that the value of the creditor's interest in the Cash Collateral be protected from diminution while the Debtor is using the Cash Collateral. 11 U.S.C. § 361; In re Mullen, 172 B.R. 473, 477-78 (Bankr. D. Mass. 1994) (the value of the creditor's interest in property must be declining if the creditor is to be lacking adequate protection); In re Harrington & Richardson, Inc., 48 B.R. at 433 (the concept of adequate protection requires the debtor to propose some form of relief that will preserve the secured creditor's interest in the collateral); In re Northeast Chick Servs., Inc., 43 B.R. 326, 332 (Bankr. D. Mass. 1984) (the purpose of adequate protection is to provide a secured creditor the benefit of its bargain while enabling a debtor to use secured property). See also, In re Pawtuxet Valley, 2008 Bankr. Lexis 868, at *5 ("It is generally understood that adequate protection relates to maintaining the status quo for the period between filing the petition and before confirmation or rejection of the plan of reorganization."); In re Wrecclesham Grange, Inc., 221 B.R. 978, 981 (Bankr. M.D. Fla. 1997) (adequate protection is designed to assure that a secured creditor does not suffer a decline in the value of its interest in the estate's property while the automatic stay remains in effect). It is "intended by the Bankruptcy Code only to assure that a secured creditor, during the pendency of a bankruptcy case, does not suffer a loss in the value of its interest in property of the bankruptcy estate." In re Markos Gurnee Partnership, 252 B.R. 712, 716 (Bankr. N.D. Ill. 1997). Therefore, an undersecured creditor does not lack adequate protection merely because it is undersecured. Id; Wrecclesham Grange, Inc., 221 B.R. at 981.

13

44. Here, as adequate protection, the Debtor proposes that the Senior Claims and the other secured creditors with valid liens (the "**Lienholders**") be granted post-petition replacement liens and security interests in property of the Debtor's estate (including inventory, equipment, and accounts receivable), in an amount equivalent to the amount of Cash Collateral expended by the Debtor, of the same type, in the same nature and to the same extent as the Lienholders had in such assets pre-petition to the extent the Lienholders held validly perfected liens and security interests as of the Petition Date ("**Post-petition Liens**").[7] The Post-petition Liens shall be recognized only to the extent of diminution in the value of the Lienholders' prepetition collateral constituting Cash Collateral resulting from the Debtor's use thereof in the operation of the Debtor's business in the Post-petition period. The Post-petition Liens shall maintain the same priority, validity, and enforceability as the Lienholders' liens on their pre-petition collateral. See 11 U.S.C. §361(2).

45. Since the receivables continue to accrue at a constant rate, granting the Post-petition Liens suffices as adequate protection. This is because the lien on each month's receivables replaces the lien on the prior month's receivables, so there is a replacement lien of equal value under section 361 of the Bankruptcy Code. In re Xinde Int'l, Inc., 13 B.R. 212, 215 (Bankr. D. Mass. 1981) (allowing use of cash collateral because the debtor is operating at a break-even point or at a small profit, and the cash collateral will be replenished so as to maintain the creditor's secured position). See also, In re Wrecclesham Grange, Inc., 221 B.R. at 981 (the protected cash proceeds are being used to generate new collateral which will be at least equivalent value of those replaced).

---

[7] Section 552 of the Bankruptcy Code provides that "[e]xcept as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a).

14

46. The Debtors' use of Cash Collateral should be allowed because those proceeds will be used to generate new collateral of new proceeds. Id. (as long as the debtor generates a continuous income stream, the debtor's use of the receivables does not diminish the value of the collateral); In re Mullen, 172 B.R. at 477-78 ("Assuming the debtor is operating at no less than a break even, the new collateral and proceeds will be of at least equivalent value of those they replace"); In re T.H.B. Corp., 85 B.R. 192, 195 (Bankr. D. Mass. 1988) (because the proceeds of accounts receivable are being used in a business which is operating at an approximate break-even point, it follows that the stream of cash collateral will likely remain at an approximate even level over a sustained period, with new proceeds replacing old). The Post-Petition Liens will protect the current interest of the Lienholders in the Cash Collateral.

47. In addition, as further adequate protection pursuant to Section 361(a) of the Bankruptcy Code, to the extent funds are available, the Debtor proposes to make monthly payments to the Senior Claims (the "**Adequate Protection Payment**") with respect to their secured claims, as set forth in the Budget.

48. While the Debtor has the burden of proof on the issue of adequate protection, see 11 U.S.C. § 363(p), the Lienholders must show that their collateral value is decreasing in determining whether cash payment is required for adequate protection. Wrecclesham Grange, Inc., 221 B.R. at 980; In re T.H.B. Corp., 85 B.R. at 195 (cash payments required for adequate protection are typically geared to a decreased in the value of the collateral rather than interest on the debt); In re Harrington & Richardson, Inc., 48 B.R. at 434 (adequate protection is to the extent the debtor's use of the collateral results in a decrease in the value of the secured party's interest).

49. The Debtor does not believe that the creditors with the Cash Advance Agreements are entitled to post-petition interest payments under section 506(b) of the Bankruptcy Code. As of the Petition Date, the Debtor believes that such creditors may be undersecured or wholly unsecured as the value of the Debtor's collateral may be less than the total Senior Claims. Also, in connection with the Cash Advance Agreements, Avidia Bank did not subordinate its liens.

50. Moreover, the Debtor will use the cash to operate its business and to preserve the going concern value of that business. By such continued operation, the value of the Lienholders' interests, if any, in the Cash Collateral and their security in general would be far less likely to decline, as would, for example, be obvious if the Debtor were to stop operating the business. The payment of the types of expenses in the Budget will benefit the holders of liens on the Debtor's assets, by preserving the value of the Debtor's assets during the pendency of this case.

51. Accordingly, the adequate protection proposed herein is fair and reasonable and sufficient to satisfy the requirement of sections 363(c)(2) and (e) of the Bankruptcy Code.

C. *The Interim Approval Should be Granted Under Bankruptcy Rule 4001(b)*

52. Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral may not be commenced earlier than fourteen (14) days after the service of such motion.[8] See also MLBR 4001-2(e). Upon request, however, the Court is empowered to conduct a preliminary hearing on a cash collateral motion and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

---

[8] Bankruptcy Rule 6003 provides that a bankruptcy court shall not within twenty-one (21) days after the filing of the petition approve "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition...." However, the Court may grant the relief requested in the Motion within twenty-one (21) days after the Petition Date to the extent relief is necessary to avoid immediate and irreparable harm. Also, this limitation under Bankruptcy Rule 6003 does not seem to apply if the motion for relief falls under Bankruptcy Rule 4001.

53. As described above, the Debtor requires use of Cash Collateral to continue its operations and maintain its value as a going concern. The Debtor submits that the relief requested in this Motion is necessary to avoid irreparable harm to the Debtor's estate, as described herein. Also, the Debtor is seeking immediate authority to use the Cash Collateral as set forth in the Motion pending a final hearing pursuant to Bankruptcy Rule 4001(b).

54. Pursuant to Bankruptcy Rule 4001(b)(2), for the reasons set forth above, the Debtor requests that the Court conduct a preliminary hearing on the Motion and grant such relief requested herein.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

55. To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Disclosure Pursuant to MLBR 4001-2(d)

56. The Debtor represents that none of the provisions of the proposed use of Cash Collateral warrant highlighting pursuant to MLBR 4001-2(d).

### Notice

57. The Debtor will send notice of this Motion to the following parties: (i) the Office of the United States Trustee for the District of Massachusetts, (ii) the Subchapter V trustee, (iii) the secured creditors, (iv) the Debtor's 20 largest unsecured creditors, and (v) any other parties designated in the service list by the Debtor to receive notice. In light of the nature of the relief requested, the Debtor submits that no other or further notice is required.

58. Pursuant to Bankruptcy Rule 4001(b)(2), the Debtor further respectfully requests that the Court schedule a final hearing and authorize the Debtor to serve notice of the entry of the interim order and of the final hearing on (a) the parties given notice of this Motion, and (b) any

party which has filed prior to the date of entry of the interim order a request for notices with the Court.

### Reservation of Rights

59.     Nothing contained herein shall affect in any way the right of the Debtor to dispute the nature, validity, priority and amount of the claim of the Debtor's secured creditors, including the creditors with the Cash Advance Agreements.

### Conclusion

WHEREFORE, the Debtor respectfully requests that this Court: (a) enter an interim order, in substantially the form attached as **Exhibit B**, authorizing the Debtor to use Cash Collateral in an amount necessary to avoid irreparable harm; (b) grant the Post-petition Liens as adequate protection to the Lienholders in accordance with the terms of this Motion; (c) pay the Adequate Protection Payments as contemplated in this Motion and in the Budget; (d) schedule a final hearing on this Motion; (e) enter a final order authorizing the Debtor to use Cash Collateral in an amount necessary to conduct ordinary business operations through July 31, 2022, substantially in accordance with the terms of this Motion, and (f) grant such other and further relief as this Court may deem just and proper.

        Respectfully Submitted,

        TOP LINE GRANITE DESIGN INC.

        By its proposed bankruptcy counsel,

        */s/ Alan L. Braunstein*
        Alan L. Braunstein (BBO #546042)
        Macken Toussaint (BBO# 645076)
        RIEMER & BRAUNSTEIN LLP
        100 Cambridge Street
        Boston, Massachusetts 02114
        Tel: (617) 523-9000
        abraunstein@riemerlaw.com
        mtoussaint@riemerlaw.com

Dated: March 30, 2022