UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

In re:

TOP LINE GRANITE DESIGN INC. [1]

                    Debtor.

Case No. 22-40216 (EDK)

Chapter 11

**DEBTOR'S MOTION FOR ORDER (i) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING, (ii) GRANTING SUPERPRIORITY CLAIM, SECURITY INTEREST, AND PRIMIMG FIRST PRIORITY LIEN TO THE DIP LENDER, AND (iii) SCHEDULING A FINAL HEARING**

**Emergency Determination Requested**

Top Line Granite Design Inc., a debtor in possession (the "**Debtor**") hereby moves this Court for entry of interim and final orders (the "**DIP Orders**") (i) authorizing the Debtor to obtain post-petition financing from Legalist, Inc., as investment adviser and DIP lender (the "**DIP Lender**") on an interim basis in an amount up to $400,000.00 and on a final basis in the aggregate committed amount of up to $1,000,000.00 ("**DIP Financing**"), (ii) granting super-priority claim, security interest, and priming first priority lien, pursuant to section 364(c)(2) and (3) and section 364(d) of the Bankruptcy Code, to the DIP Lender on all existing and after-acquired assets of the Debtor, including new inventory to be purchased with the funds from the DIP Financing and proceeds thereof (the "**DIP Lien**"). A copy of the proposed Debtor-in-Possession Term Loan Credit Agreement between the Debtor and the DIP Lender is attached to this motion (this "**Motion**") as **Exhibit A** (as may be amended and in effect from time to time, the "**DIP Credit Agreement**").[2]

---

[1] A/k/a Design Top Line Granite, and aka Top Line Granite Design. The Debtor's name was changed from Brazil Stones Inc. in November 2005.

[2] Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the DIP Credit Agreement.

**The Debtor's status conference is currently scheduled for May 18, 2022; the Debtor requests that the interim hearing on this Motion be held on May 18, 2022.** In support of this Motion, the Debtor states as follows:

<u>**JURISDICTION**</u>

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of Title 11 of the United States Code (the "**Bankruptcy Code**"); Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and MLBR 4001-2, and 9013-1(g).

<u>**EMERGENCY DETERMINATION REQUESTED**</u>

4.      Pursuant to MLBR 9013-1(g), the Debtor requests for an emergency hearing on the Motion. In order to maintain the viability of its business, as discussed below, the Debtor needs additional working capital to purchase supplies and materials in order to start on new projects and to keep the ongoing relationships with its customers. As further discussed below, due to pre-petition collection actions of certain cash money lenders and the bankruptcy filing, it is much harder for the Debtor to collect from commercial customers the generally required down payment or deposit before starting a new project. Therefore, the Debtor has no other option but to finance the beginning of its new projects in order to keep them. Most of the supplies and materials are manufactured and sourced overseas (such as Malaysia, Taiwan, Vietnam, Brazil, and India) which requires a manufacturing period of four to five weeks after submitting the deposit for the materials. There is also another four to five weeks of freight transit for the Debtor

to receive the needed materials and start the fabrication for the job.  The Debtor currently has

several projects, as listed below and in the budget attached to the DIP Credit Agreement, with

start dates of June through August 2022 that would require such advanced planning.

5.       Pursuant to Bankruptcy Rule 4001(c) and MLBR 4001-2(e)(2), the Court may

conduct a preliminary hearing, pending a final hearing, on DIP financing motions such as this

one to the extent necessary to avoid immediate and irreparable harm.  The Debtor requests that

such interim hearing be held on an emergency basis and seeks immediate authority to borrow

funds from the DIP Lender as set forth in the Motion to prevent immediate and irreparable harm

to the Debtor's estate pending a final hearing.  Without this DIP Financing, the Debtor will not

be able to meet its commitments on certain critical projects this summer which would have a

lasting negative impact on the Debtor's operations and future work estimates.

6.       Pursuant to MLBR 9013-1(g)(1)(C), the Debtor has made a reasonable good faith

effort to advise the U.S. Trustee's office, the Subchapter V trustee, counsel to Avidia Bank, and

counsel to Enterprise Bank & Trust Company of the substance of the Motion for relief, and the

request for an emergency determination, prior to filing the Motion.  A draft of this Motion was

shared with such party on Thursday, May 12, 2022.

## **BACKGROUND**

### *A. Procedural*

7.       On March 25, 2022 (the "**Petition Date**"), the Debtor commenced this proceeding

by filing a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code, as a small

business Subchapter V debtor.

8.       Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtor continues

to manage and operate its business as a debtor-in-possession.

9.       On March 28, 2022, the Court appointed Steven Weiss as the Subchapter V

trustee.

10.     The Debtor incorporates by reference the factual background discussed in its motion for interim and final orders (A) authorizing use of cash collateral, (B) granting post-petition replacement liens as adequate protection, and (C) scheduling a final hearing, filed with the Court on March 30, 2022 [Doc. No. 16] (the "**Cash Collateral Motion**").

11.     On or about April 11-12, 2022, the Debtor filed its bankruptcy schedules and statement of financial affairs (as may be amended) (the "**Schedules**").

12.     On April 29, 2022, pursuant to the Cash Collateral Motion, the Court entered an Order Authorizing Final Use of Cash Collateral [Doc. No. 66] (the "**Cash Collateral Order**"). The continued hearing on the Cash Collateral Motion is scheduled for June 24, 2022.

13.     On May 4, 2022, the Debtor filed the Section 1188(c) Status Conference Report [Doc. No. 72]. The status conference hearing is scheduled for May 18, 2022.

**B. Pre-petition Secured Claims**

14.     As discussed in the Cash Collateral Motion and the Schedules, the Debtor's secured creditors, not including cash money lenders, with unexpired UCC-1 financing statements are as follows (the "**Senior Claims**").

| Secured Creditors/ Lienholders[3] | Claim Amount (approx.) | Security Interest | Listed Collateral |
|---|---|---|---|
| Enterprise Bank and Trust Company (2007 loan agreement) | $23,936.00 | UCC statement filed 3/16/2007 (amended 2/7/22) | All assets |
| Avidia Bank (equipment loan) Term Note dated 8/28/19 | $1,086,438.00 | Security Agreement  UCC statement filed 8/28/19 | Substantially all assets of the Debtor |

---

[3] The Debtor has not determined the extent, priority or validity of any of the prepetition liens asserted against assets of the Debtor or any claims of any creditors.  The discussion of liens and claims in this motion is for descriptive purposes only. The Debtor hereby reserves all of its rights, claims and defenses in this respect.

| Avidia Bank (inventory loan/ revolving line of credit) Revolving Demand Note dated 8/28/19 | $1,455,643.00 | Security Agreement UCC statement filed 8/28/19 | Substantially all assets of the Debtor |
|---|---|---|---|
| ENG Commercial Finance 2020 (loan agreement) | $317,387.00 | UCC statement filed 10/8/20 | Equipment loan |
| US Small Business Administration (loan agreement dated 1/6/2021 and amended 8/2/21) | $500,000.00 | Security Agreement UCC statement filed 1/20/21 | Substantially all assets of the Debtor |
| Total | $3,383,404.00 | | |

15.     The Senior Claims do not include the guaranty claims of Avidia Bank, and Bay Colony Development Corp. (SBA loan) totaling approximately $4,000,000 (the "**Guaranty Claims**").  The primary obligor related to the Guaranty Claims is 347 Middlesex Road Realty Trust (the "**Trust**").  The Trust owns the real property where the Debtor operates its business, namely 347 Middlesex Rd. Tyngsboro, MA.

16.     In addition to the Senior Claims listed above, several other cash money lenders, as discussed in the Cash Collateral Motion, filed UCC-1 financing statements against assets of the Debtor with such claims totaling approximately $1,200,000.00.  As discussed in the Cash Collateral Motion, the Debtor believes that as of the Petition Date such creditors may be undersecured or wholly unsecured, and the holders of the Senior Claims did not subordinate their liens with respect to the cash money lenders. The Debtor also listed the claims of the cash money lenders as disputed on its Schedule D.

17.     In connection with the Cash Collateral Motion, the Debtor proposed and the Court granted pursuant to the Cash Collateral Order (i) as adequate protection, that the Senior Claims and other secured creditors (the "**Lienholders**") be granted certain post-petition replacement liens and security interests in property of the Debtor's estate to the extent the Lienholders held validly perfected liens and security interests as of the Petition Date ("**Post-petition Liens**"), and

5

(ii) as further adequate protection, to the extent funds are available, monthly payments to the

Senior Claims (the "**Adequate Protection Payment**").

**STATEMENT UNDER BANKRUPTCY RULE 4001**

18.     Pursuant to Bankruptcy Rule 4001(c), applicable material provisions of the DIP

Financing are set forth below.  The relevant sections of the DIP Credit Agreement are also

indicated below:

| | |
|---|---|
| *Total Dollar Amount/ Maximum Borrowing Available* | $1,000,000.00 aggregate maximum DIP commitment. Upon entry of the interim DIP Order but prior to the entry of the final DIP Order, the Debtor shall be permitted to draw at least $400,000.00 as set forth in the budget attached to the DIP Credit Agreement.  *See Recitals and Section 3.01 of DIP Credit Agreement; Parag 2  of the proposed interim DIP Order.* |
| *Interest Rate; Default Interest* | Interest shall accrue from the Effective Date at the U.S. prime rate (subject to a 4.00% floor) plus 9.9% per year. <br><br> Default rate is an additional 4.75% in interest per year. *See Section 2.04 of DIP Credit Agreement.* |
| *Other Costs of Borrowing* | Commitment fee of 2.75% of the DIP commitment (payable on maturity date). <br><br> Underwriting fee of 1.75% of the DIP commitment (payable on maturity date). <br><br> Monitoring fee of 1/75% of the DIP commitment (accruing per year and due on maturity date). <br><br> Undrawn line fee of 4/75% per year for any undrawn portion of the DIP commitment. <br><br> The Debtor shall pay, no later than the maturity date, all DIP Lender Expenses (defined below). <br><br> *See Sections 2.04, 2.05, and 11.03 of DIP Credit Agreement.* |
| *Prepayments* | The DIP Loans shall be mandatorily repaid from, and within 10 days of, the Debtor's receipt of, proceeds from any sale or other disposition of DIP Collateral, not including sale of the Debtor's inventory in ordinary course. <br><br> The DIP Loans may be voluntarily repaid prior to the Maturity Date beginning 180 days after the Effective Date; *provided that* voluntary repayments made within 270 days of the Effective Date shall be subject |

| | |
|---|---|
| | to a "Makewhole Fee" of 4.75% of the amount repaid. |
| *Maturity Date* | Maturity Date means the earliest to occur of (w) two years after the Effective Date of the first DIP Draw, (x) the entry of final decree in the case, (y) repayment in full of all outstanding DIP Loans, and (z) the acceleration of the DIP Loans following an Event of Default.<br><br>*See Article I of DIP Credit Agreement.* |
| *Events of Default* | Events of default include (i) any failure to pay the DIP Lender Expenses (defined below) and any other DIP Obligations, and (ii) granting of any Lien on any DIP Collateral.<br>*See Article VIII of DIP Credit Agreement.* |
| *Use of Funds and Limitations*. | The proceeds of the DIP Loans shall be used by the Debtor as working capital and for operating expenses, including to pay DIP Obligations as set forth in the DIP Credit Agreement and amounts permitted under the budget attached to the DIP Credit Agreement.<br>*See Section 2.02 of DIP Credit Agreement.* |
| *DIP Lien / DIP Collateral* | "DIP Claims" means "superpriority" administrative-expense claims with priority over all pre- and post-petition claims against the Debtor, other than administrative expenses for estate professional fees and other administrative expenses in the Case. The DIP Liens shall be automatically perfected without reference to any notice or recordation requirements of non-bankruptcy law.<br><br>The DIP Liens shall comprise:<br><br>(i) Pursuant to Bankruptcy Code section 364(c)(2), an automatically perfected, senior DIP Lien on all DIP Collateral not subject to Existing Liens;<br><br>(ii) Pursuant to Bankruptcy Code section 364(c)(3), an automatically perfected, junior DIP Liens on all DIP Collateral subject to Existing Liens;<br><br>(iii) Pursuant to Bankruptcy Code section 364(d)(1), an automatically perfected, equal DIP Liens on all DIP Collateral subject to Existing Liens; and<br><br>(iv) Pursuant to Bankruptcy Code section 364(d)(1), an automatically perfected, senior DIP Liens on all DIP Collateral subject to Existing Liens.<br><br>DIP Collateral means all assets and properties, whether real, personal, intellectual, or otherwise, whether tangible or intangible, whether |

| | domestic, foreign, or international, that the Debtor now owns or hereafter acquires, or to or in which the Debtor, now or in the future, holds any right, title, or interest (whether fixed, contingent, inchoate, or otherwise), expressly excluding (i) all Avoidance Actions, together with (in each case) all proceeds thereof, and (ii) any financed automobile for which the Debtor has no equity. DIP Collateral shall include any other litigation proceeds; *provided that* such proceeds may be used for distributions or payments to creditors under the chapter 11 plan of the Debtor with the consent of the DIP Lender. *See Sections 10.02 and 10.03 of DIP Credit Agreement.* |
|---|---|
| ***Break-up Fee*** | According to the term sheet related to the DIP Credit Agreement, in the event that, after execution of the term sheet, the DIP Loan transaction should not be timely effected for any reason, other than (i) the Bankruptcy Court denying approval of the DIP Loans, or (ii) the DIP Lender declining to provide the DIP Commitment to the Debtor, then the DIP Lender shall immediately (and without any further action or notice) be entitled to a fee of 4.75% of the DIP Commitment (the "**Break-Up Fee**").[4] There shall be no Break-Up Fee in the event that the transaction described herein closes. |

19.     The above summary of material provisions of the DIP Financing is intended

solely to give the Court and interested parties an overview of the proposed transaction.

Interested parties should refer to the DIP Credit Agreement and this Motion for the complete

terms thereof.

20.     In addition, the provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi) are

set forth or discussed below:

    i.     *Grant of Priority or a Lien on Property of the Estate*.  As mentioned above, the
           DIP Lien is a super-priority lien pursuant to sections 364(c) and (d) of the
           Bankruptcy Code. *See Sections 10.02 and 10.03 of DIP Credit Agreement.*

    ii.    *Adequate Protection for a Secured Claim that Arose before the Petition Date*.  As
           discussed below, the Debtor's Lienholders, including those with Senior Claims
           have the benefit of certain Post-petition Liens.  Also, the Senior Claims would
           now more likely receive Adequate Protection Payments from the Debtor if

---

[4] The Debtor acknowledges that the Break-Up Fee is intended to be an actual, necessary cost and/or expense of preserving its estate and, thus, entitled to priority under Bankruptcy Code section 503(b).  The Break-Up Fee, together with all costs of collection, shall be due and payable (if applicable) from and after execution of this Term Sheet by the Debtor, irrespective of the occurrence of the Effective Date.

working capital is made available to the Debtor so that the Debtor can meet its commitments on projects for its customers and ultimately create more accounts receivable. The Debtor believes that the security interests of the Lienholders, including with respect to the Senior Claims, will not diminish by virtue of the Court approving the DIP Financing and the DIP Lien.

iii. *Determination of the Validity, Enforceability, Priority, or Amount of a Secured Claim that Arose before the Petition Date*. This Motion and DIP Credit Agreement do not address such provision.

iv. *Waiver or Modification of the Automatic Stay*. Pursuant to the DIP Credit Agreement, while any event of default has occurred and is continuing, the DIP Lender may move or apply to the Court for entry of an order terminating the automatic stay with respect to any DIP Collateral. *See Section 8.02(b)(i) of the DIP Credit Agreement.*

v. *Waiver of Right Regarding Filing of Plan and/or to Request Authority to Obtain Credit from Others.* Pursuant to the DIP Credit Agreement, except as set forth therein, the Debtor shall not (directly or indirectly) incur, create, or permit to exist any administrative-expense claim, expense, or cost (x) with priority senior or equal to the DIP Claims or (y) not expressly contemplated by the budget attached to the DIP Credit Agreement. *See Section 6.03 of the DIP Credit Agreement.*

An event of default may include an order of the Court (i) approving any secured credit or debt other than the DIP Loans, and (ii) approving any administrative-expense claim with priority of payment senior or equal to the DIP Claims, except as permitted. *See Section 8.01 (iii)(D) and (E) of the DIP Credit Agreement.*

vi. *Plan Related Deadlines*. This Motion and DIP Credit Agreement do not address such provision.

vii. *Waiver Relating to Non-bankruptcy Law*. Pursuant to the DIP Credit Agreement, the Debtor (x) covenants that it will not at any time in any manner whatsoever claim or take the benefit or advantage of any stay, extension, or usury law (wherever enacted)[5] that may affect the performance in full of the DIP Credit Agreement, and (y) expressly waives the benefit of all such laws, to the extent permitted by applicable law. *See Section 5.13 of the DIP Credit Agreement.*

Under the DIP Credit Agreement, any claim of unenforceability, force majeure, or other claim and/or defense related to certain unforeseeable circumstances is expressly waived. *See Section 11.13 of the DIP Credit Agreement.*

---

[5] Notwithstanding anything to the contrary in the DIP Credit Agreement, in no event shall the amount of interest and other charges for the use of money payable under the agreement exceed the maximum amounts permissible under any law that a court of competent jurisdiction shall, in a final and non-appealable order, deem applicable. *See Section 11.12 of the DIP Credit Agreement.*

    viii.    *Release, Waiver, or Limitation on any Claim or Cause of Action Belonging to the Estate*.  DIP Collateral shall include litigation proceeds, other than Avoidance Actions; *provided that* such proceeds may be used for distributions or payments to creditors under the chapter 11 plan of the Debtor with the consent of the DIP Lender. *See Section 1.01 of the DIP Credit Agreement (DIP Collateral)*.

    ix.    *Indemnification of Any Entity*.  The Debtor shall indemnify the DIP Lender and its Affiliates and others (each an "**Indemnified Person**") harmless from, all liabilities, obligations, losses, damages, penalties, claims, actions, causes of action, judgments, suits, costs, expenses, fees, and disbursements, of any kind or nature whatsoever, whether direct, indirect, special, exemplary, or consequential and whether based on federal, state, foreign, or international laws, statutes, rules, or regulations, that may be imposed on, incurred by, or asserted against such Indemnified Person, in any way arising from, in connection with, or relating to any DIP Loan Document, the transactions contemplated thereby, or any action taken or not taken in connection therewith (collectively, the "**Indemnified Liabilities**"); *provided that* such indemnity shall not be available to an Indemnified Person to the extent that any Indemnified Liability was a direct result, as determined by a court of competent jurisdiction, in a final and non-appealable order, of the gross negligence or willful misconduct of such Indemnified Person.  The Debtor's payment obligations with respect to any Indemnified Liability shall constitute DIP Obligations for all purposes, and each Indemnified Person not a Party shall be a third-party beneficiary of this Agreement for purposes enforcing such obligations.  *See Section 7.01 of the DIP Credit Agreement*.

    x.    *Release, Waiver or Limitation on Rights under Section 506(c)*.  An event of default under the DIP Credit Agreement includes any order surcharging, under Bankruptcy Code section 506(c) or otherwise, any DIP Collateral in any amount. *See Section 8.01(iii)(C) of the DIP Credit Agreement*.

    xi.    *Liens Granted on Claims Arising Under Chapter 5*.  None. DIP Collateral and DIP Liens excludes all Avoidance Actions.  *See Section 10.02 of the DIP Credit Agreement*.

## **STATEMENT UNDER MLBR 4001-2**

21.    The following provisions set forth additional information required to be disclosed

pursuant to MLBR 4001-2(a), as applicable, to the extend not already set forth above:

    (a)    *Loan Funding Amount*.  See Paragraph 18 above.

    (b)    *Use of Funds*.  See Paragraph 18 above.

    (c)    *Proposed Budget for Use of Funds*.  Attached to the DIP Credit Agreement is such proposed budget.

(d)     _Pricing and Economic Terms_.  See Paragraph 18 above.

(e)     _Adequacy of Budget to Pay Administrative Expenses_.  The Debtor expects to pay its administrative expenses pursuant to the budget attached to the Cash Collateral Order. With the additional funding from the DIP Financing, the Debtor expects to have sufficient funds to continue paying accrued and accruing administrative expenses.

(f)     _Prepetition Secured Creditors with Interests in Collateral_.  Such claims are currently listed above and in the Debtor's Schedule D, totaling approximately $5,000,000.00 including the cash money lenders and certain automobile loans.

(g)     _Value of Collateral Securing Prepetition Creditors' Interests_.  Based on Schedule A/B, the Debtor estimates the book value of the existing collateral to be approximately $4,800,000.  Liquidation value of such collateral is expected to be lower.

(h)     _Adequate Protection to the Pre-petition Secured Creditors._ Such issue has been addressed separately in the case pursuant to the Cash Collateral Order.  See Paragraph 17 above.

(i)     _Choice of Law Provision_. The DIP Credit Agreement and related documents shall be governed by the Bankruptcy Code and, to the extent not preempted thereby, New York state law. _See Section 11.08 of the DIP Credit Agreement_.

22.     The Debtor believes that the following provisions of the DIP Credit Agreement

must be highlighted pursuant to MLBR 4001-2(c).

(a)     _Waivers_. As discussed above, an event of default under the DIP Credit Agreement includes any order surcharging, under Bankruptcy Code section 506(c) or otherwise, any DIP Collateral in any amount. _See Section 8.01(iii)(C) of the DIP Credit Agreement._  MLBR 4001-2(c) (4)

(b)     _Right to Relief from Stay_.  As discussed above, upon default, the DIP Lender may move or apply to the Court for entry of an order terminating the automatic stay with respect to any DIP Collateral. _See Section 8.02(b) (i) of the DIP Credit Agreement_. MLBR 4001-2(c) (5)

(c)     _Non-consensual Priming_: The DIP Credit Agreement has provisions that create a lien senior to existing liens without the consent of existing lienholders. The DIP Lien will be senior to all obligations of the Debtor.  As such, the DIP Lien is a priming lien with respect to liens currently held by prepetition secured creditors, including the Senior Claims. _See Article 10 of the DIP Credit Agreement_. MLBR 4001-2(c) (7)

(d )    _Waiver of Right Regarding Authority to Obtain Credit From Others:_ Under the DIP Credit Agreement, the Debtor shall not obtain (i) any secured credit or debt

11

other than the DIP Loans, and (ii) any administrative-expense claim with priority of payment senior or equal to the DIP Claims, except as permitted. *See Section 8.01 (iii)(D) and (E) of the DIP Credit Agreement; Section 6.03 of the DIP Credit Agreement.* MLBR 4001-2(c)(9).

(e)    *Payment of DIP Lender's Expenses*: Under the DIP Credit Agreement, the Debtor agreed to pay all reasonable costs and expenses of the DIP Lender incurred in connection with, arising from, or relating to this Agreement and the DIP Loan Documents, and any exercise of rights or remedies thereunder, whether before or after the date hereof and irrespective of the occurrence of any default or Event of Default, including (without limitation) all costs of in house counsel, advisers, and consultants of DIP Lender, together all fees, expenses, and disbursements of outside counsel or other advisers and consultants retained by the DIP Lender with respect thereto (collectively, the "**DIP Lender Expenses**"), which shall constitute DIP Obligations for all purposes hereunder. Such payments would be paid by the Debtor without any notice or review by the Court and the U.S. Trustee's Office. *See Section 11.03 of the DIP Credit Agreement* MLBR 4001-2(c) (12)

(f)    *Termination; Default; Remedies:* An event of default under the DIP Credit Agreement may be caused (i) by the entry of an order granting relief from the automatic stay, under Bankruptcy Code section 362 or otherwise, to any party, other than the DIP Lender, with respect to any DIP Collateral, and (ii) by the filing of any motion by a party in interest seeking certain relief in Section 8.01(iii) or that could be reasonably expected otherwise to impair the right of the DIP Lender. *See Section 8.01(iii)(B), and 8.01(iv) of the DIP Credit Agreement.* MLBR 4001-2(c) (13)

23.    Pursuant to MLBR 4001-2(d), the DIP Credit Agreement and the proposed DIP Order state where the above-mentioned terms and conditions vary from the requirements of MLBR 4001-2(c).

## RELIEF REQUESTED

24.    By this Motion, the Debtor seeks entry of the DIP Orders (i) authorizing the Debtor to obtain the DIP Financing and use such funds, and (ii) granting the DIP Lien to the DIP Lender. The proposed interim DIP Order, attached hereto as **Exhibit B**, also approves the proposed notice of the final hearing on this Motion and schedules the final hearing.

25.    Under the interim DIP Order, the Debtor would be authorized to draw up to $400,000.00 of the DIP Financing commitment, with the balance to be made available upon

entry of the final DIP Order, all subject to the terms of the DIP Credit Agreement.  The key

terms of the DIP Loans are discussed above, and the DIP Credit Agreement is attached as

**Exhibit A**.

26.    The relief requested herein contemplates a modification of the automatic stay (to

the extent applicable) to permit the Debtor to (i) grant the DIP Lien to the DIP Lender and to

perform such acts as may be requested to assure the perfection and priority of such security

interest and lien; (ii) permit the DIP Lender to exercise, in compliance with the terms of the DIP

Credit Agreement, all rights and remedies under such DIP Credit Agreement; and (iii) implement

the terms of the DIP Orders. Stay modifications of this kind are ordinary and standard features of

post-petition debtor financing facilities and, in the Debtor's business judgment, are reasonable

and fair under the present circumstances.

### BASIS FOR RELIEF

27.    Section 364(c) of the Bankruptcy Code provides, among other things, that if a

debtor is unable to obtain unsecured credit allowable as an administrative expense under section

503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur

debt (a) with priority over any and all administrative expenses, as specified in section 503(b) or

507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not

otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject

to a lien.  11 U.S.C. § 364.

28.    Section 364(d)(1) of the Bankruptcy Code provides that the court may also

authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on

property of the debtor's estate that is subject to a lien if:

(a) the trustee is unable to obtain such credit otherwise; and

(b) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

29.    Under sections 364(c) and (d) of the Bankruptcy Code, courts have considered the following factors in determining whether to approve such post-petition financing:

(a)    The proposed financing is an exercise of sound and reasonable business judgment.

(b)    No alternative financing is available on any other basis or that no better offers or proposals are before the court.

(c)    The financing is in the best interests of the estate and its creditors.

(d)    The credit transaction is necessary to preserve the assets of the estate, or that the financing is necessary, essential, and appropriate for the continued operation of the debtor's business and the preservation of the estate.

(e)    The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender, or that the financing agreement was negotiated in good faith and at arm's length between the debtor and the proposed lender.

In re Farmland Indus., Inc., 294 B.R. 855, 879-81 (Bankr. W.D. Mo. 2003).

**A. Exercise of Business Judgment**

30.    Entry into the DIP Loans is an exercise of the Debtor's business sound and reasonable business judgment.  Courts presume that debtors make financing decisions on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company, and will not "second-guess a business decision, so long as corporate management exercised a minimum level of care in arriving of the decision."  In re Los Angeles Dodgers LLC, 457 B.R. 308, 313 (Bankr. D. Del. 2011).  See also, In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[T]he court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the

financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estates as it is to benefit a party-in-interest.").

31.     The Debtor has several confirmed estimates for new work and pending proposals for future projects, as set forth in the budget attached to the DIP Credit Agreement, including the following upcoming projects, totaling approximately $1,000,000.00, that require immediate attention:

| Quote No. | Project Name | Company | Salesperson | Start Date |
| --- | --- | --- | --- | --- |
| 81529 | Riverside Towners | NEI | Marcelo | Jun-22 |
| 73481 | Terrazza | Power Company | Carolline | Jul-22 |
| 81738 | The Pond Units | Universal Décor | Alysson | Jul-22 |
| 78260 | 249 Corey Rd | Power Company | Carolline | Aug-22 |
| 78160 | 86 Essex | Power Company | Carolline | Aug-22 |
| 75212 | 7 - 9 Central | Power Company | Carolline | Aug-22 |

32.     As discussed in the Cash Collateral Motion, after certain cash money lenders, including Merchant Capital/ Alpha Recovery, contacted the Debtor's customers pre-petition wrongfully requesting that the customers pay them directly, and considering the bankruptcy filing, the Debtor has not been able to reinforce its payment terms for certain commercial multi-unit projects. Such customers feel concerned about the Debtor's financial stability in the industry and are reluctant to make a down payment or 50% deposit that the Debtor would generally require to purchase materials before it starts a new project. The Debtor is left with no other option but to finance the beginning of the projects in order to instill customer confidence, and guaranty the retention of current projects and future partnerships.

33.    The Debtor intends to use the majority of the DIP Financing to purchase supplies and materials so that it can meet its commitments on various projects.  The initial DIP Draw of $400,000.00 will be used primarily for the projects listed above in Paragraph 31.  As discussed above, the needed supplies and materials need to be purchased and inspected in advance.  A proposed use of funds budget related to the DIP Financing amount is attached as Exhibit B to the DIP Credit Agreement.

34.    Moreover, with the DIP Financing, the Debtor expects to have sufficient funds to (i) pay installers and other workers unpaid wages to ensure completion of such new or ongoing projects, (ii) pay for any unpaid rent to the Trust to prevent any foreclosure on the real property where the Debtor operates.[6]  The DIP Credit Agreement reflects the exercise of the Debtor's sound business judgment.

**B.  Unable to Obtain Alternative Financing**

35.    Since prepetition, finding interested parties with the financing capabilities to provide additional funding to the Debtor and its business amidst a nearly unprecedented economic downturn had been challenging.

36.    Post-petition, most of the interested parties had little interest in a proposed debtor-in-possession financing due to the small size of the proposed facility and/or considering the already large amount of debts.  The Debtor, through counsel, had extensive discussions with multiple potential DIP lender's representatives or brokers (at least five not including the DIP Lender which is a direct lender).  The Debtor ultimately entered into negotiations with the DIP Lender regarding specific borrowing terms and term sheet in an effort to obtain a package of financial and legal requirements that the Debtor believes best suits its needs.

---

[6] As of the Petition Date, the unpaid rent (used by the Trust to pay the mortgages for which the Trust us the primary obligor) was for 2 months, totaling $56,000.00, which has been reduced to $15,000.00.

37.    The Debtor has been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b), or in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1).  The Debtor has not received any other formal offer for postpetition financing or other financial accommodations from any alternative prospective lender on more favorable terms and conditions than those for which approval is sought herein.

38.    Furthermore, section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien.  In re Ames, 115 B.R. at 37; In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); In re 495 Central Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most banks lend money only in return for a senior secured position").  See also, In re Reading Tube Indus., 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) (given the "time is of the essence" nature of this type of financing, we would not require this or any debtor to contact a seemingly infinite number of possible lenders).

39.    Substantially all of the Debtor's assets are encumbered and the Debtor has been unable to procure the required funding absent granting the proposed superpriority claim and priming lien.  The Debtor submits that the circumstances of this case require the Debtor to obtain financing pursuant to sections 364(c) (2) and (3), and section 364(d) of the Bankruptcy Code.

**C.  Pre-petition Secured Creditors Are Adequately Protected**

40.     Section 364(d)(1) requires that a debtor provides some form of adequate

protection to the holder of existing liens when the debtor seeks post-petition financing on a

priming basis.  In re Seven Falls, LLC, 2010 Bankr. LEXIS 5228, *18 (Bankr. W.D.N.C. July 6,

2010) (citing to In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986)).  While bankruptcy

courts have recognized the importance of protecting a secured creditor's interest, no brightline

test exists to define the term "adequate protection."  In re Seven Falls, LLC, 2010 Bankr. LEXIS

5228, at *19 (referring to examples of how a secured creditor may be adequately protected under

section 361 of the Bankruptcy Code).

41.     As discussed above, the Cash Collateral Order already provides for adequate

protection to the Lienholders.  Pursuant to the Cash Collateral Order, the Lienholders have the

benefit of, among other things, certain Post-petition Lien.  Also, the Debtor has agreed to pay

Adequate Protection Payments to holders of the Senior Claims to the extent of available funds.

The validity and effectiveness of such existing adequate protection shall not be affected by the

entry of an order approving this Motion, except that the Post-petition Liens will now be subject

to the DIP Lien.

42.     The Lienholders' interests in the existing collateral will not diminish by the Court

approving the DIP Financing and granting the DIP Lien to the DIP Lender.  In fact, the

Lienholders are expected to benefit from the DIP Financing.  First, the proceeds of the DIP

Financing will be used to generate new collateral.  The Debtor expects to use the funds to,

among other things, purchase supplies and materials so that it can satisfy work in progress,

which will ensure more revenue and accounts receivable.  Second, the Debtor will more likely

have a positive cash flow with this cash infusion.  Most importantly, the Lienholders' interests in

18

the existing collateral will be enhanced through the use of the DIP Financing by the Debtor

continuing operation of its business, preserving the enterprise value of the business and the value

of the Debtor's assets while the Debtor pursues more projects that would lead to more revenue to

facilitate its reorganization.

**D. Post-petition Financing is Necessary and in Best Interest of Estate**

43.     Approval of the DIP Loans is necessary, essential, and appropriate for the

continued operations of the Debtor's business and/or the preservation of its estate.  Access to

additional working capital so that the Debtor can continue to complete more work for its

customers and ultimately create more accounts receivable is also in the best interests of the estate

and the Debtor's creditors.  In re Farmland Indus., 294 B.R. at 885 (factor is satisfied where

without the continued financing the debtor would likely be forced into a Chapter 7 or 11

liquidation to the detriment of all creditors); In re Ames Dep't Stores, 115 B.R. at 40 (finding

that the proposed financing was not principally for the benefit of a pre-petition creditor to the

detriment of other parties in interest).

44.     Additional working capital is needed for the Debtor to continue with its ordinary

course operations, to meet customers' needs, and to maintain its relationships with its vendors,

and suppliers.  To do so, this cash infusion through the DIP Financing is necessary.  This DIP

Financing will enable the Debtor to maintain operations while the Debtor restructures its debts

and proposes a Chapter 11 plan of reorganization.

45.     Approval of the DIP Credit Agreement will provide the Debtor with immediate

and ongoing access to borrowing availability to avoid harm to the Debtor's estate and potential

erosion of the enterprise value of the Debtor's business.  As discussed herein, the Debtor does

not have sufficient available sources of working capital and financing to purchase necessary

materials and supplies so that it can meet its commitment on projects, retain available work and pursue others. Unless the Debtor has access to such additional funds, going concern value of the Debtor's business would likely be depleted, and the Debtor's ability to retain its customers and to maximize value may be jeopardized.

46. The proposed funding under the DIP Credit Agreement will enable the Debtor to maintain its on-going business relationships, and continue to satisfy its customers while operating its business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of its estate for the benefit of all stakeholders. Accordingly, the timely approval of the relief requested herein is imperative.

**E. Good Faith Requirement**

47. The Debtor and the DIP Lender have engaged in arms'-length negotiations with respect to the terms and conditions of the DIP Credit Agreement, and no alternative financing is available on equal or better terms. As discussed above, with respect to this factor, a debtor need only demonstrate that it made a "reasonable effort" to obtain alternative financing. In re Ames Dep't Stores, 115 B.R. at 40. The Debtor pursued all sorts of financing options without success in obtaining any loan proposals with equal or better terms. The Debtor received one other term sheet that required guaranty by the Trust, a non-debtor party, and a priming lien on the real estate owned by the Trust without paying in full the existing mortgages.

48. Importantly, the DIP Lender agrees that the Debtor may draw on an interim basis to meet its operational needs and obligations pending final approval of the Motion. It is expected that interest payment of the DIP Financing, if any, may not start until after confirmation of the Debtor's plan which will not affect the budget attached to the Cash Collateral Motion.

49.     The terms and conditions of the DIP Credit Agreement are fair and reasonable

and were negotiated in good faith and at arms' length.  Accordingly, the DIP Lender and all

obligations incurred under the DIP Credit Agreement should be accorded the benefits of section

364(e) of the Bankruptcy Code.

## WAIVER OF BANKRUPTCY RULES 6004

50.     To implement the foregoing successfully, to the extent applicable, the Debtor

seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay

of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## INTERIM APPROVAL

51.     Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit

may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon

request, however, the Court is empowered to conduct a preliminary emergency or expedited

hearing on the Motion and authorize the obtaining of credit to the extent necessary to avoid

immediate and irreparable harm to a debtor's estate pending a final hearing.

52.     Pursuant to Bankruptcy Rule 4001(c), the Debtor requests that the Court conduct

an emergency preliminary hearing on this Motion for the reasons discussed above and (a)

authorize the Debtor to borrow under the DIP Financing on an interim basis, pending entry of a

final order, and (b) schedule a hearing to consider entry of a final order.

53.     Absent authorization from the Court to obtain secured credit, as requested, on an

interim basis pending a final hearing on the Motion, the Debtor may be immediately and

irreparably harmed.  As discussed above, the availability of this funding under the DIP Financing

will provide necessary assurance to the Debtor's customers, suppliers, vendors, and other

interested parties of its ability to not only meet its near-term obligations but also continue

operations.  Failure to meet these obligations and to provide these assurances likely would have a

long-term negative impact on the value of the Debtor's business, to the detriment of all parties in interest.  Accordingly, the interim relief requested is critical to preserving, maintaining and enhancing the enterprise value of the Debtor's business.

## NOTICE

54.    The Debtor will send notice of this Motion and/or the interim hearing to the following parties: (i) the Office of the United States Trustee for the District of Massachusetts, (ii) the Subchapter V trustee, (iii) the DIP Lender, (iv) the scheduled secured creditors, (v) the Debtor's 20 largest unsecured creditors, (vi) any party requesting notice of all pleadings pursuant to Bankruptcy Rule 2002, and (vii) any other parties designated in the service list by the Debtor to receive notice.  In light of the nature of the relief requested, the Debtor submits that no other or further notice is required.

55.    Pursuant to Bankruptcy Rule 4001(c)(2), the Debtor further respectfully requests that the Court authorize the Debtor to serve notice of the entry of the interim DIP Order and of the final hearing on (a) the parties having been given notice of the Motion, and (b) any party which has filed prior to such date a request for notices with this Court. The Debtor requests that the Court approve such notice of the final hearing as sufficient notice under Bankruptcy Rule 4001.

WHEREFORE the Debtor respectfully requests entry of order(s) granting the relief requested herein and such other and further relief as is just.

Respectfully Submitted,

TOP LINE GRANITE DESIGN INC.

By its proposed bankruptcy counsel,

*/s/ Macken Toussaint*
Macken Toussaint (BBO# 645076)
Alan L. Braunstein (BBO #546042)
RIEMER & BRAUNSTEIN LLP
100 Cambridge Street
Boston, Massachusetts 02114
Tel: (617) 523-9000
mtoussaint@riemerlaw.com
abraunstein@riemerlaw.com

Dated: May 16, 2022

## <u>EXHIBIT A</u>

**(DIP Credit Agreement)**

**DEBTOR-IN-POSSESSION
TERM LOAN CREDIT AGREEMENT**

**among**

**TOP LINE GRANITE DESIGN INC.,
as Debtor,**

**and**

**Certain Investment Fund(s) for Which
LEGALIST, INC.
Serves as Investment Adviser,
as DIP Lender**

This DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT (the "**Agreement**"), dated as of May 13, 2022, is entered into among Top Line Granite Design Inc. (the "**Debtor**") and certain investment fund(s) for which Legalist, Inc. serves as investment adviser, as lender, agent, and collateral agent (in such capacities, the "**DIP Lender**").

## RECITALS

WHEREAS, on March 25, 2022 (the "**Petition Date**"), the Debtor filed a voluntary petition in the United States Bankruptcy Court for the District of Massachusetts (the "**Bankruptcy Court**") for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and its chapter 11 case is being administered under the caption *In re Top Line Granite Design Inc.*, No. 22-40216 (the "**Case**");

WHEREAS, the Debtor has continued in possession of its assets and management of its business pursuant to Bankruptcy Code sections 1107 and 1108;

WHEREAS, an immediate and ongoing need exists for the Debtor to obtain funds in order to fund the Case and work toward a successful exit from chapter 11 and, accordingly, the Debtor requested that the DIP Lender extend the DIP Loans;

WHEREAS, the DIP Lender is willing to extend DIP Loans (each a "**DIP Draw**") on the terms hereof in an aggregate maximum amount of $1,000,000 (the "**DIP Commitment**") in accordance with the allocation on Addendum 1; the initial DIP Draw shall be $400,000.00 as set forth in the Budget.

NOW THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto (the "**Parties**") agree as follows:

## ARTICLE I
## DEFINED TERMS

**Section I.01    Definitions.** As used in this Agreement:

"**Affiliate**" has the meaning given to it in the Bankruptcy Code.

"**Agreement**" has the meaning given to it in the preamble hereto.

"**Approved Form**" means in form and substance acceptable to (as evidenced by the prior written consent of) the DIP Lender.

"**Avoidance Actions**" means all claims and causes of action described in Bankruptcy Code chapter 5, or any non-bankruptcy law referenced therein, and all proceeds thereof.

"**Bankruptcy Code**" has the meaning given to it in the Recitals.

"**Bankruptcy Court**" has the meaning given to it in the Recitals.

"**Borrowing Request**" means an executed borrowing request substantially in the form attached hereto as Exhibit A and otherwise in Approved Form.

"**Budget**" means a budget containing detailed line items of the Debtor's projected receipts and uses of the DIP Loans, in Approved Form, including as the same may be revised by the Debtor from time to time in Approved Form. The Budget as of the date hereof is attached hereto as Exhibit B.

"**Business Day**" means every day that is not a Saturday, Sunday, or Legal Holiday (as defined in Federal Rule of Bankruptcy Procedure 9006(a)(6)).

"**Case**" has the meaning given to it in the Recitals.

"**Commitment Fee**" has the meaning given to it in Section 2.05(i).

"**Debt**" has the meaning given to it in the Bankruptcy Code.

"**Debtor**" has the meaning given to it in the preamble hereto.

"**DIP Claims**" means "superpriority" administrative-expense claims with priority over all pre- and post-petition claims against the Debtor, other than administrative expenses for estate professional fees and other administrative expenses in the Case.

"**DIP Collateral**" means all assets and properties, whether real, personal, intellectual, or otherwise, whether tangible or intangible, whether domestic, foreign, or international, that the Debtor now owns or hereafter acquires, or to or in which the Debtor, now or in the future, holds any right, title, or interest (whether fixed, contingent, inchoate, or otherwise), expressly excluding (i) all Avoidance Actions, together with (in each case) all proceeds thereof, and (ii) any financed automobile for which the Debtor has no equity. DIP Collateral shall include any other litigation proceeds; provided that such proceeds may be used for distributions or payments to creditors under the chapter 11 plan of the Debtor with the consent of the DIP Lender.

"**DIP Commitment**" has the meaning given to it in the Recitals.

"**DIP Draw**" has the meaning given to it in the Recitals.

"**DIP Financing Motion**" has the meaning set forth in Section 12.01.

"**DIP Lender**" has the meaning given to it in the preamble hereto.

"**DIP Lender Expenses**" has the meaning given to it in Section 11.03.

"**DIP Liens**" has the meaning given to it in Section 10.02.

"**DIP Loan Documents**" means this Agreement, all Borrowing Requests, the DIP Orders, the Budget and related reporting, and all other agreements, documents, and instruments in any way arising from, related to, or connected with the DIP Commitment, DIP Loans, DIP Claims, and/or DIP Liens, together with all schedules, exhibits, and other addenda thereto, all of which shall be in Approved Form.

"**DIP Loans**" has the meaning given to it in Section 2.01(a).

"**DIP Obligations**" means DIP Lender Expenses, together with all principal of, and interest and fees on (including, without limitation, any applicable Undrawn Line Fee, the Monitoring Fee,

Commitment Fee, Underwriting Fee, and any applicable Makewhole Fee) the DIP Loans, any amount owed to any Indemnified Person, and any other amount owed by the Debtor under any DIP Loan Document.

"**DIP Orders**" means the interim DIP order and/or the final DIP order, as applicable, of the Bankruptcy Court approving the DIP Loans in Approved Form.

"**Effective Date**" has the meaning given to it in Section 3.02.

"**Event of Default**" has the meaning given to it in Section 8.01.

"**Existing Liens**" means the Liens set forth on the Debtor's bankruptcy schedule D, and any post-petition lien and other adequate protection pursuant to the Debtor's cash collateral motion and related order(s).

"**Indemnified Liabilities**" has the meaning set forth in Section 7.01.

"**Indemnified Persons**" has the meaning set forth in Section 7.01.

"**Lien**" has the meaning given to it in the Bankruptcy Code.

"**Makewhole Fee**" has the meaning given to it in Section 2.07(c).

"**Maturity Date**" means the earliest to occur of (w) two years after the Effective Date of the first DIP Draw, (x) the entry of final decree in the Case, (y) repayment in full of all outstanding DIP Loans, and (z) the acceleration of the DIP Loans following an Event of Default.

"**Monitoring Fee**" has the meaning given to it in Section 2.05(iii).

"**Person**" has the meaning given to it in the Bankruptcy Code.

"**Petition Date**" has the meaning given to it in the Recitals.

"**Permitted Variances**" has the meaning given to it in Section 5.01(iii).

"**Underwriting Fee**" has the meaning given to it in Section 2.05(ii).

"**Uniform Commercial Code**" has the meaning given to it in Section 11.08. [1]

## ARTICLE II
## DIP LOANS

**Section II.01    In General.**

(a)    Subject to the terms hereof, the DIP Lender agrees, upon the Effective Date, to make available to the Debtor, in one or more DIP Draws, term loans in the full amount DIP Commitment (such term loans, the "**DIP Loans**").

(b)    Subject to Section 2.7, all amounts owed hereunder with respect to the DIP Loans shall be paid in full no later than the Maturity Date. Any principal amount of the DIP Loans repaid or prepaid may not be reborrowed.

**Section II.02    Use of Proceeds.** The proceeds of the DIP Loans shall be used by the Debtor as working capital and for operating expenses, including for payments under its chapter 11 plan in the Case, including to:

(i)    Pay DIP Lender Expenses;

(ii)    Pay all other DIP Obligations;

(iii)    Pay post-petition administrative expenses in the Case, including professional fees, and pre-petition claims of critical vendors and other parties as approved by the Bankruptcy Court; and .

(iv)    Pay other amounts permitted under the Budget.

In no event shall any portion of the DIP Loans be used for payment of fees, costs, or expenses incurred by any party in (x) investigating or pursuing any claim or cause of action against the DIP Lender, any Affiliate thereof, or any other Indemnified Person or (y) questioning or challenging, or taking any other action that could reasonably be expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender.

**Section II.03    [Omitted].**

**Section II.04    Interest; Undrawn Line Fee.**

(a)    Interest Rate. The outstanding principal amount of the DIP Loans shall accrue interest from the Effective Date at the U.S. prime rate (subject to a 4.00% floor) plus 9.9% per year.

(b)    Default Interest. While an Event of Default has occurred and is continuing, the outstanding principal amount of the DIP Loans shall accrue an additional 4.75% in interest per year, which shall accrue and capitalized monthly. Payment or acceptance of the increased rates of interest provided for in this Section 2.4(b) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the DIP Lender.

(c)    Undrawn Line Fee. Any undrawn portion of the DIP Commitment shall accrue a fee (the "**Undrawn Line Fee**") from after entry of the interim DIP Order at 4.75% per year, which shall accrue and be capitalized monthly.

(d)    Payment Terms. All unpaid interest (including default interest) and any applicable Undrawn Line Fee (which shall be DIP Obligations for all purposes), together with the fees described in Section 2.05, shall be due and payable upon the Maturity Date.

**Section II.05    Fees.** The following fees (i) shall be deemed fully and irrevocably earned upon entry of the DIP Orders (unless the DIP Lender declines to provide the DIP Commitment to the Debtor), and (ii) shall be DIP Obligations for all purposes:

(i)    A one time "**Commitment Fee**" of 2.75% of the DIP Commitment due and payable in cash upon the Maturity Date;

(ii)    A one time "**Underwriting Fee**" of 1.75% of the DIP Commitment due and payable in cash upon the Maturity Date; and

(iii)    A "**Monitoring Fee**" of 1.75% of the DIP Commitment per year, due and payable in cash upon the Maturity Date.

---

[1]    Capitalized terms used but not defined herein have the meanings given to them in the DIP Order.

**Section II.06    Repayment.** Subject to Sections 2.07, the DIP Loans shall be due and payable, and the Debtor unconditionally agrees and promises to repay to the DIP Lender all other outstanding DIP Obligations, in cash on the Maturity Date.

**Section II.07    Prepayments.**

(a)    Voluntary Prepayments. The DIP Loans may be voluntarily repaid prior to the Maturity Date beginning 180 days after the Effective Date, in the minimum amount of $50,000, subject (during the following 90 days) to the contemporaneous payment of the applicable Makewhole Fee.

(b)    Mandatory Repayments. The DIP Loans shall be mandatorily repaid to the extent of, and within 10 Business Days of the Debtor's receipt of, any net proceeds from the sale or other disposition of any DIP Collateral other than sale of the Debtor's inventory in the ordinary course of business; provided that no such sale or disposition of the Debtor's business or substantially all assets shall occur without the DIP Lender's prior written consent and any such sale or disposition shall be conducted solely in Approved Form (unless the sale proceeds will be sufficient to pay the DIP Obligations in full).

(c)    As used in this Section 2.07, "**Makewhole Fee**" means an additional fee of 4.75% of the amount of voluntarily repaid within 270 days of the Effective Date, which fee shall be a DIP Obligation for all purposes.

**Section II.08    General Provisions Regarding Payments.**

(a)    Payments. All payments by or on behalf of the Debtor of principal, interest, fees, or other DIP Obligations shall be made in U.S. dollars in same-day funds, without defense, setoff, or counterclaim of any kind, free of any restriction or condition, and delivered to DIP Lender so as to be actually received by it no later than 1:00 PM New York time. All funds actually received by the DIP Lender after that time shall be deemed to have been paid on the next Business Day.

(b)    Non-Conforming Payments. Any payment not conforming to the foregoing Clause (a) shall be deemed a non-conforming payment and shall not be deemed to have been actually received by the DIP Lender until the later of (x) the time such funds become available funds and (y) the next Business Day. Interest and fees shall continue to accrue on any principal (together with all other due and payable DIP Obligations) until such funds become available funds.

(c)    Payments to Include Accrued Interest. All payments in respect of the principal amount of the DIP Loans shall include payment of accrued and unpaid interest on the principal amount being repaid or prepaid, and all such payments shall be applied in accordance with Section 8.03.

(d)    Business Days. Whenever a payment hereunder is due on a day that is not a Business Day, such payment shall be made on the next Business Day.

**Section II.09    Termination of Commitments.** The DIP Commitment of the DIP Lender shall be automatically and permanently reduced (x) by the principal amount of each DIP Loan made by the DIP Lender pursuant to Section 2.01(b) and (y) in full, upon (i) acceleration of the DIP Loans under Section 8.02(a)(i) or (ii) terminated upon the election of the DIP Lender while an Event of Default has occurred and is continuing.

**ARTICLE III**
**CONDITIONS PRECEDENT**

**Section III.01    Conditions Precedent to DIP Draws.** The obligation of the DIP Lender to make DIP Draws available to the Debtor in the aggregate amount of the DIP Commitment (provided no Event of Default shall have occurred and be continuing), is subject to the occurrence (with respect to each such DIP Draw) of all of:

(i)    The execution of this Agreement, subject to approval of the Bankruptcy Court;

(ii)    The Bankruptcy Court's entry of the applicable DIP Order, which remains in full force and effect as so entered and in Approved Form; provided that upon entry of the interim DIP Order but prior to the entry of the final DIP Order, the initial DIP Draw of $400,000.00 shall be permitted as set forth in the Budget and the interim DIP Order.

(iii)    The Debtor's delivery of an executed Borrowing Request in the amount of such DIP Draw; and

(iv)    Each of the representations and warranties set forth in this Agreement and in each other DIP Loan Document shall be true and correct as of the Effective Date, except to the extent that any such representation or warranty expressly relates to an earlier date, in which case each such representation and warranty shall have been true and correct as of such earlier date.

**Section III.02    Effective Date.** With respect to any DIP Draw, the date on which all of the conditions precedent described in Section 3.01 have been met shall be the "**Effective Date**."

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF DEBTOR**

To induce the DIP Lender to provide the DIP Loans, the Debtor makes to the DIP Lender all of following representations and warranties, which representations and warranties shall (x) be deemed to have been made and remade as of each Effective Date and (y) survive the execution and delivery of this Agreement:

**Section IV.01    Corporate Status; Corporate Authorization.**

(a)    The Debtor is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization and is duly qualified and in good standing in every other jurisdiction where it is doing business, and the execution, delivery, and performance by the Debtor of this Agreement (x) are within its authority, (y) have been duly authorized, and (z) do not conflict with or contravene its corporate-governance or organizational documents.

(b)    Subject to approval of the Bankruptcy Court, the execution, delivery, and performance of obligations under this Agreement by the Debtor (x) do not require any consent that has not been obtained and (y) are not and will not be in conflict with or prohibited or prevented by any (i) law, rule, or regulation, (ii) corporate-governance or organizational document of the Debtor or (iii) other instrument or agreement, in each case binding on the Debtor or affecting its property.

**Section IV.02    Execution and Binding Effect.** Upon execution and delivery hereof, this Agreement shall constitute the legal, valid, and binding obligation of the Debtor, enforceable in accordance with its terms.

3

**Section IV.03    DIP Collateral.** The Debtor has good and marketable title to all DIP Collateral, free of all Liens, security interests, pledges, and other encumbrances, other than the DIP Liens and Existing Liens.

**Section IV.04    Absence of Material Adverse Effect.** There has been no act, condition, or event that has had, or may reasonably be expected to have, a material adverse effect on the Debtor or its operations since the Petition Date.

**Section IV.05    Governmental Approvals and Filings.** Except as has already been obtained, no approval, authorization, or other action by, or filing, recording, or registration with, or notice to, any governmental body is or will be necessary in connection with the execution, delivery, or performance of this Agreement.

**Section IV.06    Misstatements and Omissions.** Since the Petition Date, no information furnished or made available by the Debtor (directly or indirectly) to the DIP Lender (including all information contained in the Case's docket) (x) contains any material misstatement of fact or (y) omits any material fact necessary to make such information not misleading.

## ARTICLE V
## AFFIRMATIVE COVENANTS

So long as any DIP Obligation remains outstanding, the Debtor shall perform all of the following covenants:

**Section V.01    Budget Reporting and Compliance.**

No later than the first Tuesday of each month (or on the 20th day of each month while the Case is pending), the Debtor shall provide the DIP Lender:

(i)    A variance report (certified by an appropriate officer of the Debtor) comparing, on a line-item basis, actual cash receipts and disbursements to those contained in the Budget, for the preceding month, together with detailed explanations of all variances (if any), subject to (iii) below.

(ii)    A rolling 13-week cashflow forecast in relation to the Budget, if applicable, subject to (iii) below. In no event shall actual cash receipts vary downward, or cash disbursements vary upward, from the Budget (on a line-item, monthly, or cumulative basis) by more than 10% (the "**Permitted Variances**"). For the avoidance of doubt, the Permitted Variance restriction is with respect to the Budget and the DIP Loans.

(iii)    Copies of reconciliation statement and any updated budget the Debtor files while the Case is pending.

(iv)    Copies of the monthly operating reports the Debtor files with the Bankruptcy Court or the U.S. Trustee's office while the Case is pending.

**Section V.02    Accounting; Financial Statements.** The Debtor shall keep true and accurate books of record and account in accordance with past practice and the requirements of the Bankruptcy Court and sufficient to permit the preparation of financial statements in accordance with generally accepted accounting principles.

**Section V.03    Maintenance of Existence.** The Debtor shall do all things necessary to maintain (x) its corporate or other existence in accordance with its organizational documents

(which shall not be amended without the prior written consent of the DIP Lender) and (y) all rights, licenses, and franchises.

**Section V.04    Preservation of Assets.** The Debtor shall maintain its assets (including all DIP Collateral) in good operating conditions and shall make such repairs and replacements as are required, in accordance with the Budget; _provided_ that, in no event shall the DIP Lender be surcharged with respect to such maintenance of the DIP Collateral.

**Section V.05    Notice of Material Events.** The Debtor shall notify the DIP Lender promptly in writing of:

(i)    Any threatened or pending litigation or other proceeding or claim materially affecting the Debtor, other than the effect of the bankruptcy; and

(ii)    Any other development that results in, or could reasonably be expected to result in, a material adverse effect on the Debtor or its operations, other than the effect of the bankruptcy.

**Section V.06    Use of Proceeds.** The Debtor shall use the proceeds of the DIP Loans only as permitted by Section 2.02.

**Section V.07    [Omitted].**

**Section V.08    Taxes.** The Debtor will pay its tax liabilities accruing after the Petition Date before the same shall become delinquent or in default, except where the validity or amount thereof is being contested in good faith by appropriate proceedings and the Debtor has set aside on its books adequate reserves in accordance with generally accepted accounting principles.

**Section V.09    [Omitted].**

**Section V.10    Compliance with Laws.** The Debtor shall comply with all applicable laws, rules, and regulations.

**Section V.11    Bankruptcy Court Filings.** After approval of the DIP Financing Motion, the Debtor shall commence all actions in, file all motions, applications, or proposed orders with, and make all other submissions to the Bankruptcy Court with notice to the DIP Lender; _provided that_ the Debtor may continue to file all required monthly operating reports.

**Section V.12    Full Access to Information.** The Debtor shall promptly provide the DIP Lender with all requested information and full and complete access to all executives, directors, and advisors of the Debtor, together with access to inspect any DIP Collateral, when requested by the DIP Lender; provided that, in the event of sale of the Debtor's business, without any prior request from the DIP Lender, the Debtor shall deliver to the DIP Lender in real time copies of any written offer to acquire the Debtor, the DIP Collateral, or any part thereof, together with all related correspondence.

**Section V.13    Stay, Extension, and Usury Laws.** The Debtor (x) covenants that it will not at any time in any manner whatsoever claim or take the benefit or advantage of any stay, extension, or usury law (wherever enacted) that may affect the performance in full of this Agreement and (y) expressly waives the benefit of all such laws, to the extent permitted by applicable law.

**Section V.14    Timely Payment of DIP Lender Expenses, Other DIP Obligations.** The Debtor shall, in addition to

repaying all other DIP Obligations when due and payable hereunder, timely pay all DIP Lender Expenses no later than the Maturity Date.

**Section V.15    Further Assurances.** The Debtor shall fully cooperate with the DIP Lender, and take such actions and execute such documents and instruments as the DIP Lender may request, in furtherance of this Agreement and the transactions contemplated hereby, expressly including all steps necessary or desirable to maintain the priority, validity, and enforceability of the DIP Claims and DIP Liens on the DIP Collateral.

## ARTICLE VI
## NEGATIVE COVENANTS

So long as any DIP Obligation remains outstanding, the Debtor shall perform all of the following covenants:

**Section VI.01    Indebtedness.** The Debtor shall not (directly or indirectly) incur, create, or permit to exist any Debt, other than (x) Debt existing as of the Petition Date, (y) the DIP Obligations, and (z) Debt expressly contemplated by the Budget, provided that such limitation does not apply to trade debt and similar obligations incurred in the ordinary course of business.

**Section VI.02    Liens.** The Debtor shall not (directly or indirectly) incur, create, or permit to exist any Lien other than (x) Existing Liens and (y) the DIP Liens.

**Section VI.03    Superpriority Claims.** Except as set forth herein, the Debtor shall not (directly or indirectly) incur, create, or permit to exist any administrative-expense claim, expense, or cost (x) with priority senior or equal to the DIP Claims or (y) not expressly contemplated by the Budget. **[This provision may vary from the requirements of MLBR 4001-2(c)(9)]**

**Section VI.04    Payments.** The Debtor shall not make any payment (other than in respect of the DIP Obligations) not expressly contemplated by the Budget, provided that such limitation does not apply to trade debt and similar obligations incurred in the ordinary course of business.

**Section VI.05    Merger or Sale.** The Debtor shall not (directly or indirectly) (x) merge or consolidate with another Person or (y) unless the net proceeds thereof shall be sufficient to repay the DIP Obligations (subject to Section 2.07) in full, sell any DIP Collateral; provided any such sale shall be in Approved Form.

**Section VI.06    Business.** The Debtor shall not engage in any business other than its line of business as of the Petition Date.

**Section VI.07    Amendments to Organizational Documents.** The Debtor shall not amend any corporate-governance or organizational document.

**Section VI.08    Bankruptcy Court Filings.** After approval of the DIP Financing Motion, the Debtor shall not commence any action in, file any motion, application, or proposed order with, or make any other submission to the Bankruptcy Court without notice to the DIP Lender; provided that the Debtor may continue to file all required monthly operating reports.

## ARTICLE VII
## INDEMNIFICATION

**Section VII.01    Indemnification by the Debtor.** The Debtor shall indemnify the DIP Lender and its Affiliates (expressly including Legalist, Inc. and Legalist DIP GP, LLC), together with their respective partners, directors, officers, managers, members, partners, investors, employees, contractors, agents, administrators, advisors (including attorneys), and representatives, against, and hold each such Person (each an "**Indemnified Person**") harmless from, all liabilities, obligations, losses, damages, penalties, claims, actions, causes of action, judgments, suits, costs, expenses, fees, and disbursements, of any kind or nature whatsoever, whether direct, indirect, special, exemplary, or consequential and whether based on federal, state, foreign, or international laws, statutes, rules, or regulations, that may be imposed on, incurred by, or asserted against such Indemnified Person, in any way arising from, in connection with, or relating to any DIP Loan Document, the transactions contemplated thereby, or any action taken or not taken in connection therewith (collectively, the "**Indemnified Liabilities**"); provided that such indemnity shall not be available to an Indemnified Person to the extent that any Indemnified Liability was a direct result, as determined by a court of competent jurisdiction, in a final and non-appealable order, of the gross negligence or willful misconduct of such Indemnified Person. The Debtor's payment obligations with respect to any Indemnified Liability shall constitute DIP Obligations for all purposes, and each Indemnified Person not a Party shall be a third-party beneficiary of this Agreement for purposes enforcing such obligations.

## ARTICLE VIII
## EVENTS OF DEFAULT

**Section VIII.01 Events of Default.** The occurrence and continuation of each of the following shall constitute an "**Event of Default**":

(i)    The Debtor shall:

(A)    Fail to timely pay any DIP Lender Expense or other DIP Obligation;

(B)    Grant or permit to exist any Lien on any DIP Collateral, other than the DIP Liens and Existing Liens;

(ii)    Any representation, warranty, certification, or other statement made, or deemed made in or delivered pursuant to any DIP Loan Document, by the Debtor shall be false in any material respect as of the date so made, deemed made, or delivered;

(iii)    The Bankruptcy Court or another court of competent jurisdiction shall enter an order, after approval of the DIP Financing Motion, without the prior written consent of the DIP Lender, and provided the Debtor has not timely filed an objection or opposition to such order:

(A)    Granting adequate protection, under Bankruptcy Code section 361, 362, 363, or 364 or otherwise, to any party, except as set forth in the Budget and related to the Debtor's cash collateral motion;

(B)    Granting relief from the automatic stay, under Bankruptcy Code section 362 or otherwise, to any party, other than the DIP Lender, with respect to any DIP Collateral; **[This**

provision may vary from the requirements of MLBR 4001-2(c)(13)]

(C)    Surcharging, under Bankruptcy Code section 506(c) or otherwise, any DIP Collateral in any amount, or subjecting the DIP Lender or DIP Collateral to the equitable principle of marshaling; **[This provision may vary from the requirements of MLBR 4001-2(c)(4)].**

(D)    Approving credit or debt (other than the DIP Loans) secured by a Lien, under Bankruptcy Code section 364 or otherwise, on any DIP Collateral; **[This provision may vary from the requirements of MLBR 4001-2(c)(9)]**

(E)    Except as permitted herein, approving any administrative-expense claim, expense, or cost against the Debtor (other than the DIP Claims), under Bankruptcy Code section 364, 502, 507, or otherwise, with priority of payment senior or equal to the DIP Claims; **[This provision may vary from the requirements of MLBR 4001-2(c)(9)]**

(F)    Modifying, staying, vacating, or rescinding any part of any DIP Order;

(G)    Holding, adjudicating, or declaring any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender to be invalid, unenforceable, or otherwise subject to question, challenge, or impairment;

(H)    Enjoining, restraining, or in any other way preventing a Debtor from conducting any material part its business affairs;

(I)    Appointing an examiner or trustee in the Debtor's Case, other than the Subchapter V trustee;

(J)    Confirming any chapter 11 plan that does not provide for repayment in full in cash of all outstanding DIP Obligations by the Maturity Date;

(K)    Converting the Debtor's Case to a case under Bankruptcy Code chapter 7; or

(L)    Dismissing or closing the Debtor's Case;

(iv)    The Debtor, or an Affiliate thereof, shall commence any action in, file any motion or application with, or make any other submission to the Bankruptcy Court or another court of competent jurisdiction (or join in or otherwise support the same) (x) seeking entry of any order described in the foregoing Clause (iii) or (y) questioning or challenging, or that could be reasonably expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender; **[This provision may vary from the requirements of MLBR 4001-2(c)(13)]**

(v)    Any party (other than the Debtor or an Affiliate thereof) shall commence any action in, file any motion or application with, or make any other submission to the Bankruptcy Court or another court of competent jurisdiction (x) seeking entry of any order described in the foregoing Clause (iii) or (y) questioning or challenging, or that could be reasonably expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender; provided that the Debtor has not timely filed a reasonable objection or opposition to such action, motion, or other submission; and

(vi)    The Debtor shall fail to perform or comply with any other agreement, covenant, term, or condition in any DIP Loan Document, other than those listed in the preceding Clauses (i)-(v); provided such failure has not been remedied (if capable of remedy) within 21 days of the earlier of (x) the Debtor's becoming aware of such failure or (ii) the Debtor's receipt of written notice from the DIP Lender of such failure.

**Section VIII.02 Remedies.**

(a)    Subject only to the DIP Order, and notwithstanding Bankruptcy Code section 362, while any Event of Default has occurred and is continuing, the DIP Lender may immediately, without further order of, or application to, the Bankruptcy Court:

(i)    Declare the DIP Commitment terminated; and

(ii)    Declare all DIP Obligations immediately due and payable, without the requirement of presentment, demand, protest, or any other notice, all of which are waived by the Debtor.

(b)    While any Event of Default has occurred and is continuing, the DIP Lender may move or apply to the Bankruptcy Court for entry of an order:

(i)    Terminating the automatic stay with respect to any DIP Collateral; **[This provision may vary from the requirements of MLBR 4001-2(c)(5)]**

(ii)    Appointing an examiner or chapter 7 trustee; and

(iii)    Converting the Debtor's Case to chapter 7.

(c)    If the DIP Lender so moves or applies, the Debtor shall be limited to contesting solely whether the Event of Default has occurred and/or is continuing. The Debtor expressly waives the right to contest such relief whatsoever beyond the foregoing limitation.

(d)    In addition to the rights and remedies enumerated in the foregoing Clauses (a) and (b), the DIP Lender shall be entitled, while any Event of Default has occurred and is continuing, to pursue all rights and remedies available to it under the Bankruptcy Code (whether as a creditor, party in interest, or otherwise) or as a secured party under the Uniform Commercial Code.

(e)    For the avoidance of doubt, all costs incurred by the DIP Lender in connection with this Section 8.02 shall constitute DIP Lender Expenses and DIP Obligations for all purposes.

**Section VIII.03 Application of Funds.** If the DIP Lender receives any payment from or on behalf of the Debtor, or collects any money or property pursuant to this Article VIII, it shall pay out the money or property as follows:

(i)    First: To the DIP Lender, for accrued and unpaid DIP Lender Expenses;

(ii)    Second: To the DIP Lender, for accrued and unpaid interest (including default interest) and applicable fees;

(iii)    Third: To the DIP Lender, for unpaid principal outstanding on the DIP Loans;

(iv)    Fourth: To the DIP Lender, for all other unpaid DIP Obligations; and

(v)   Fifth: After all DIP Obligations (including reasonable reserves) have been indefeasibly paid in full in cash and the DIP Commitment has terminated, the DIP Lender shall distribute any surplus to the Debtor.

For the avoidance of doubt, the Debtor shall remain liable for any deficiency.

### ARTICLE IX
### [OMITTED]

### ARTICLE X
### COLLATERAL, SECURITY, AND PRIORITY

**Section X.01    DIP Claims.** The Debtor covenants, represents, and warrants that, upon entry of the DIP Order, all DIP Obligations shall, pursuant to Bankruptcy Code sections 364(c) and (d), as applicable, constitute DIP Claims, payable from and having recourse to all property of the Debtor's estates (expressly including all DIP Collateral).

**Section X.02    Grant of Security Interest.** Subject to the priorities set forth in Section 10.03, as to all DIP Collateral, the Debtor assigns and conveys as security, grants a security interest in and Lien on, hypothecates, mortgages, pledges, and sets over and unto the DIP Lender all right, title, and interest of the Debtor in the DIP Collateral (collectively, the "**DIP Liens**"), excluding all Avoidance Actions. The Debtor acknowledges that, pursuant to the DIP Order, the DIP Liens granted to the DIP Lender in all DIP Collateral shall be automatically perfected without reference to any notice or recordation requirements of non-bankruptcy law.

**Section X.03    DIP Liens.** The Debtor covenants, represents, and warrants that, upon entry of DIP Order, the DIP Liens shall comprise:

(i)    Pursuant to Bankruptcy Code section 364(c)(2), an automatically perfected, senior DIP Lien on all DIP Collateral not subject to Existing Liens;

(ii)   Pursuant to Bankruptcy Code section 364(c)(3), an automatically perfected, junior DIP Liens on all DIP Collateral subject to Existing Liens;

(iii)  Pursuant to Bankruptcy Code section 364(d)(1), an automatically perfected, equal DIP Liens on all DIP Collateral subject to Existing Liens; and

(iv)   Pursuant to Bankruptcy Code section 364(d)(1), an automatically perfected, senior DIP Liens on all DIP Collateral subject to Existing Liens.

**[This provision may vary from the requirements of MLBR 4001-2(c)(7) to the extent of creating priming or senior liens without the consent of existing lienholders.]**

**Section X.04    Further Assurances.** The Debtor further agrees that, if requested by the DIP Lender, it shall enter into any separate security agreement, control agreement, pledge agreement, or other similar documentation or instrument with respect to any DIP Collateral that the DIP Lender may request, all expenses of which incurred by the DIP Lender shall constitute DIP Lender Expenses.

### ARTICLE XI
### MISCELLANEOUS

**Section XI.01    Amendments and Waivers.** No amendment, modification, termination, or waiver of any provision hereof, or consent to any departure by the Debtor therefrom, shall be effective without the express written consent of the DIP Lender. Any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on the Debtor in any given instance shall entitle the Debtor to any other or further notice or demand in similar or other circumstances.

**Section XI.02    Notices.** All notices, requests, demands, and other communications under any DIP Loan Document shall be in writing, delivered by electronic mail as follows, and deemed effective upon delivery:

(i)    If to the Debtor:

Attn: Edmilson Ramos (e.ramos@toplinegranitedesign.com)

With a copy (which shall not constitute notice) to:

Riemer & Braunstein LLP
Attn: Alan Braunstein, Esq. (ABraunstein@riemerlaw.com)

(ii)   If to the DIP Lender:

c/o Legalist, Inc. (dip@legalist.com).

**Section XI.03    DIP Lender Expenses.** The Debtor agrees to pay all reasonable costs and expenses of the DIP Lender incurred in connection with, arising from, or relating to this Agreement and the DIP Loan Documents, and any exercise of rights or remedies thereunder, whether before or after the date hereof and irrespective of the occurrence of any default or Event of Default, including (without limitation) all costs of inhouse counsel, advisers, and consultants of DIP Lender, together all fees, expenses, and disbursements of outside counsel or other advisers and consultants retained by the DIP Lender with respect thereto (collectively, the "**DIP Lender Expenses**"), which shall constitute DIP Obligations for all purposes hereunder. The foregoing shall be in addition to, and shall not limit, any other provision of the DIP Loan Documents regarding DIP Obligations to be paid by the Debtor. **[This provision may vary from the requirements of MLBR 4001-2(c)(12) to the extent such payments are to be made without notice or review by the US Trustee's office and the Bankruptcy Court.]**

**Section XI.04    Enforceability; Successors and Assigns.** This Agreement shall be binding on and inure to the benefit of, and shall be enforceable by, the respective successors and permitted assigns of the Parties. No Debtor may assign any DIP Loan Document without the DIP Lender's prior written consent. Any such alleged assignment shall be void *ab initio* and shall not relieve the Debtor of any obligation thereunder.

**Section XI.05    Integration.** The DIP Loan Documents contain and constitute the entire agreement of the Parties with respect to the subject matter thereof and supersede all prior negotiations, agreements, and understandings, whether written or oral.

**Section XI.06    No Waiver; Remedies Cumulative.** No failure or delay by the DIP Lender in exercising any right, power, or privilege hereunder shall operate as a waiver thereof. A single or partial exercise of any right, power, or privilege shall not preclude any other or further exercise of the same or another

right, power, or privilege. The rights and remedies provided in the DIP Loan Documents shall be cumulative and not exclusive of any right or remedy provided by law or equity or otherwise available.

**Section XI.07    Submission to Jurisdiction.** Each Party agrees that any action with respect to any DIP Loan Document shall be brought exclusively in the Bankruptcy Court and unconditionally submits to the Bankruptcy Court's jurisdiction regarding the same.

**Section XI.08    Governing Law.** The DIP Loan Documents, and any dispute arising therefrom, shall be governed by the Bankruptcy Code and, to the extent not preempted thereby, New York state law. This Agreement constitutes an instrument for the payment of money only, within the meaning of N.Y. C.P.L.R. § 3213. Any reference herein to the "**Uniform Commercial Code**" refers to the New York Uniform Commercial Code as in effect from time to time.

**Section XI.09    WAIVER OF JURY TRIAL.** EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO TRIAL BY JURY IN ANY DISPUTE ARISING FROM THIS AGREEMENT.

**Section XI.10    Severability.** If any term of any DIP Loan Document is held invalid, illegal, or incapable of being enforced by any rule of law or public policy, all terms of such DIP Loan Document shall remain in full force and effect so long as the economic or legal substance of the transactions contemplated thereby is not affected in any manner adverse to any party thereto. Upon such holding, the Parties shall negotiate in good faith to modify the same such that the transactions contemplated thereby are fulfilled to the maximum extent possible.

**Section XI.11    Survival.** All representations, warranties, covenants, and agreements made by the Debtor in any DIP Loan Document shall survive until full and indefeasible payment of all DIP Obligations, irrespective of any earlier default, Event of Default, acceleration, or termination thereunder; *provided* that Article VII and Section 11.3 shall survive such full and indefeasible payment of all DIP Obligations.

**Section XI.12    Maximum Lawful Interest.** Notwithstanding anything to the contrary herein, in no event shall the amount of interest and other charges for the use of money payable under this Agreement exceed the maximum amounts permissible under any law that a court of competent jurisdiction shall, in a final and non-appealable order, deem applicable. The Debtor and the DIP Lender, in executing and delivering this Agreement, intend legally to agree on the rate or rates of interest and other charges for the use of money and manner of payment permitted by such law; *provided* that, if such amount exceeds such maximum allowable amount, then the Debtor is and shall be liable only for the payment of such maximum as allowed by law, and payment received from the Debtor in excess of such legal maximum shall be applied to reduce the principal balance of the DIP Loans to the extent of any such excess.

**Section XI.13    Foreseeable Circumstances.** The Parties acknowledge that (x) the COVID-19 pandemic any/or other instances of pandemic or widespread virus or infection and (y) ongoing riots, insurrections, terrorist acts, and/or other domestic unrest and uncertainty shall not be considered unforeseeable

circumstances for purposes of this Agreement. The Parties agree that any claim of unenforceability, force majeure, or other claim and/or defense related to the foregoing (including with respect to any court closure) is expressly waived; *provided that* the Budget may be adjusted related to any such issues.

**Section XI.14    Execution in Counterparts.** Each DIP Loan Document may be executed, including electronically, in any number of counterparts and by different Parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same DIP Loan Document.

## ARTICLE XII
### BANKRUPTCY COURT APPROVAL

**Section XII.01    DIP Financing Motion.** The approval of the Bankruptcy Court is required for this Agreement and the transaction contemplated herein.  Within three Business Days after execution of this Agreement, the Borrower shall file a motion or motions with the Bankruptcy Court seeking, on an expedited basis, entry of the DIP Orders approving this Agreement and the consummation of the transaction contemplated hereby (the "**DIP Financing Motion**").

**Section XII.02**        The DIP Orders shall be in form and substance acceptable to the Lender, and in all events shall provide for all necessary and customary provisions, findings and holdings, including that the Lender is a good faith party entitled to the protections afforded by Bankruptcy Code Section 364(e). In the event of any inconsistencies or ambiguities between this Agreement and the DIP Orders, the terms of the DIP Orders shall govern.  The interim DIP Order shall be entered by the Bankruptcy Court within fourteen (14) days of the filing of the DIP Financing Motion. The final DIP Order shall be entered within thirty (30) days after the entry of the interim DIP Order.

\*                    \*                    \*

8

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective authorized signatories as of the date first written above.

**DEBTOR:**

TOP LINE GRANITE DESIGN INC.

By: _____

Name: Edmilson Ramos

Title: President

**DIP LENDER:**

LEGALIST, INC., solely in its capacity as investor adviser to the investment fund(s) listed on Addendum 1

By: _____

Name: Brian T. Rice

Title: Chief Operating Officer

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective authorized signatories as of the date first written above.

**DEBTOR:**

TOP LINE GRANITE DESIGN INC.

By: _____
Name: Edmilson Ramos
Title: President

**DIP LENDER:**

LEGALIST, INC., solely in its capacity as investor adviser to the investment fund(s) listed on Addendum 1

By: _____
Name: Brian T. Rice
Title: Chief Operating Officer

**Exhibit A**
**(Form of Borrowing Request)**

Legalist DIP Fund I, LP
c/o      Legalist, Inc. (dip@legalist.com)

RE:      *In re Top Line Granite Design Inc.*, Case No. 22-40216

Ladies and Gentlemen:

This Borrowing Request is delivered to you pursuant to Article III of the Debtor-in-Possession Term Loan Credit Agreement, dated as of _____ (as in effect from time to time, the "Credit Agreement"), among Top Line Granite Design Inc. (the "Debtor") and the addressee(s) hereof (the "DIP Lender"). The Debtor acknowledges that this Borrowing Request is a DIP Loan Document for all purposes. Capitalized term used but not defined herein have the meanings given to them in the Credit Agreement.

The Borrower hereby requests that a DIP Loan be made to it in the aggregate principal amount of $_____ (the "DIP Draw").

The Debtor hereby acknowledges that, pursuant to Credit Agreement Section 3.01(v), each of the representations and warranties set forth in the Credit Agreement and in each other DIP Loan Document shall be true and correct as of the date hereof, except to the extent that any such representation or warranty expressly relates to an earlier date, in which case each such representation and/or warranty shall have been true and correct as of such earlier date. The Debtor agrees that if, at any time prior to the time the DIP Draw is funded by the DIP Lender, any matter certified to herein by it will not be true and correct in all material respects at such time as if then made, it will immediately so notify the DIP Lender.

Please wire transfer the proceeds of the DIP Draw as follows:

Account Name: _____
Bank: _____
ABA (for wires): _____
Account No.: _____

Beneficiary Address: _____
_____

Phone No. (Debtor): _____


Very truly yours,

TOP LINE GRANITE DESIGN INC

By: _____
Name: Edmilson Ramos
Title: President

**Exhibit B**
(Budget)

.

**TOP LINE GRANITE
DESIGN**                          (5/13/22)

DIP Loan Term / Maturity Date: Up to 2 years

**Lender: Legalist**

| DIP Draws | Interim Funding | Final Funding |
|---|---|---|
| **SOURCES** | | |
| DIP proceeds | $        400,000.00 | $      600,000.00 |
| **Total Receipts** | $        400,000.00 | $      600,000.00 |
| **USES** | | |
| Purchase of supplies / materials for new projects (various suppliers) | $        300,000.00 | $      495,278.01 |
| | *See potential work in progress list below* | *See other potential work in progress list below* |
| Pre-Petition - Past Due Payroll | $          50,152.00 | $      104,722.00 |
| Reclamation claim - Hyquality Tools | $            6,722.00 | $                - |
| Cure cost for lease assumption (pre-petition) | $          14,937.60 | $                - |
| Unpaid lease payment post-petition | $          28,188.39 | |
| Working capital | $                    - | $                - |
| | | Balance or unused amount, if any, may be used as working capital as permitted under the DIP Credit Agreement. |
| **Total  Use of DIP Proceeds** | $        399,999.99 | $      600,000.01 |

### *Work in progress list- Interim Funding:*

| Quote No. | Project Name | Company | Salesperson | Expected Start Date |
|---|---|---|---|---|
| 81529 | Riverside Towners | NEI | Marcelo | 22-Jun |
| 73481 | Terrazza - Residences at Wellesley | Power Company | Carolline | 22-Jul |
| 81738 | The Pond Units | Universal Décor | Alysson | 22-Jul |
| 78260 | 249 Corey Rd | Power Company | Carolline | 22-Aug |
| 78160 | 86 Essex | Power Company | Carolline | 22-Aug |
| 75212 | 7 - 9 Central | Power Company | Carolline | 22-Aug |

Total: $978,962.00

### *Other potential work in progress - Final Funding:*

| Quote No. | Project Name | Company | Salesperson | Expected Start Date |
|---|---|---|---|---|
| | Ellis St Commons | KEITH | Marcelo | 22-Nov |
| | Summerfield Townhouses | NEI | Marcelo | 22-Dec |
| 82072 | 2Life - Opus | Dellbrook | Carolline | 22-Dec |
| 80409 | Dale Sardo | Dale Sardo | Lucy | 22-Jul |

3176/803_3

## TOP LINE GRANITE DESIGN

(5/13/22)

DIP Loan Term / Maturity Date: Up to 2 years

**Lender: Legalist**

| | | | | |
|---|---|---|---|---|
| 81161 | Saab | Opechee Construction | Lucy | 22-Jul |
| 33320 | 132 Farlow | DiPierro | Lucy | 22-Jul |
| 82759 | Mazda Portsmouth | Aubin | Marcelo | 22-Oct |

Total: $1,708,000

**<u>Addendum 1</u>**
**(Allocation of DIP Commitment)**

- Legalist DIP Fund I, LP: 100%

3155431.6

## **EXHIBIT B**

**(Proposed Interim DIP Order)**

3114050.9

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**

In re:

TOP LINE GRANITE DESIGN INC.,                     Chapter 11

                                                   Case No. 22-40216 (EDK)

       Debtor.

**INTERIM ORDER (i) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION**
**FINANCING, AND (ii) GRANTING SUPERPRIORITY CLAIM, SECURITY**
**INTEREST, AND PRIMING LIEN TO THE DIP LENDER**

Upon the motion (the "**Motion**")[1] of the above-captioned debtor (the "**Debtor**") in this chapter 11 case (the "**Case**") seeking entry of an interim order (this "**Interim DIP Order**"), *inter alia*:

1.       Authorizing the Debtor (i) to obtain post-petition financing, consisting of senior secured superpriority term loans (the "**DIP Loans**") in an aggregate maximum amount of $1,000,000.00 (the "**DIP Commitment**") from certain investment fund(s) for which Legalist, Inc., as investment adviser and DIP lender (the "**DIP Lender**"), as provided in that certain Debtor-in-Possession Term Loan Credit Agreement, dated as of May 13, 2022, among the Debtor and the DIP Lender (the "**DIP Credit Agreement**"), attached hereto as **Exhibit A**, (ii) to borrow $400,000.00 of the DIP Commitment on an interim basis, and (iii) to incur the DIP Obligations contemplated thereby;

---

[1] Capitalized terms used herein but not defined shall have the meanings given to them in the Motion or the DIP Credit Agreement, as applicable.

2.      Authorizing the Debtor to execute and enter into, and to perform all acts necessary or desirable to consummate the transactions contemplated by, the DIP Credit Agreement and other DIP Loan Documents;

3.      Authorizing the Debtor to use the proceeds of the DIP Loans, as permitted in the DIP Loan Documents;

4.      Providing that all DIP Obligations shall, pursuant to sections 364(c) and (d), as applicable, of title 11 of the United States Code (the "**Bankruptcy Code**") constitute DIP Claims, payable from and having recourse to all property of the Debtor's estate as set forth herein and in the DIP Credit Agreement;

5.      Authorizing the Debtor to grant the DIP Lender automatically perfected DIP Liens (as defined below) in all DIP Collateral to secure pay of all DIP Obligations, comprising:

(i)      Pursuant to Bankruptcy Code section 364(c)(2), senior DIP Liens on all DIP Collateral not subject to Existing Liens;

(ii)     Pursuant to Bankruptcy Code section 364(c)(3), junior DIP Liens on all DIP Collateral subject to Existing Liens;

(iii)    Pursuant to Bankruptcy Code section 364(d)(1), equal DIP Liens on all DIP Collateral subject to Existing Liens; and

(iv)     Pursuant to Bankruptcy Code section 364(d)(1), senior DIP Liens on all DIP Collateral subject to Existing Liens;

6.      Vacating and/or modifying the automatic stay, pursuant to Bankruptcy Code section 362, to the extent necessary to (x) consummate the transactions contemplated by the DIP Loan Documents and (y) permit the DIP Lender to exercise any right or remedy provided therein; and

7.      Granting the Debtor such other and further relief as is just and proper; and

The Court having held an interim hearing on the Motion on May [_____], 2022 [and considered any objection to the Motion], and good cause appearing therefor, it is hereby <u>FOUND</u> and <u>CONCLUDED</u> that:

A.      On March 25, 2022 (the "**Petition Date**"), the Debtor filed a voluntary petition in this Court for relief under Bankruptcy Code chapter 11;

B.      This Court has jurisdiction over the Case and the Motion under 28 U.S.C. §§ 157(b) and 1334, this matter is a core proceeding under 28 U.S.C. § 157(b)(2), venue is proper under 28 U.S.C. §§ 1408 and 1409, and the Court has authority to enter this Interim DIP Order consistent with §§ 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code; Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and MLBR 4001-2, and 9013-1(g) .

C.      An immediate and ongoing need exists for the Debtor to obtain postpetition financing in the amount of the DIP Commitment to reorganize under Bankruptcy Code chapter 11, and the Debtor does not otherwise have sufficient funds available to make certain necessary payments as set forth in the Motion;

D.      The Debtor is unable to obtain unsecured credit under Bankruptcy Code section 503 or other postpetition financing in the amount of the DIP Commitment on terms more favorable than those provided by the DIP Lender;

E.      Sufficient and adequate notice of the Motion and entry of this Interim DIP Order has been given under Bankruptcy Code section 364 and Bankruptcy Rules 2002 and 4001, such that no other or further notice of the Motion or entry of this Interim DIP Order is needed;

F.      The terms of the DIP Loans, as set forth in the DIP Loan Documents, have been negotiated in good faith and at arm's length between the Debtor and DIP Lender, and the DIP

3

Lender is entitled to the protections of Bankruptcy Code section 364(e) with respect to all DIP Loans, DIP Liens, DIP Claims, DIP Obligations, DIP Loan Documents, and rights and remedies of the DIP Lender;

G.     The terms of the DIP Loans, as set forth in the DIP Loan Documents, are fair and reasonable and reflect the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties, and the DIP Lender has provided fair, adequate, and sufficient consideration that constitutes reasonably equivalent value for the DIP Liens, DIP Claims, and all other rights, protections, and benefits obtained by it under any DIP Loan Document;

H.     Entry of this Interim DIP Order is in the best interests of the Debtor's estate and its various stakeholders because it will, *inter alia*, allow the Debtor to reorganize under Bankruptcy Code chapter 11; and

I.     The DIP Lender is willing to provide the DIP Loans to the Debtor, but only on the terms of the DIP Loan Documents.

WHEREFORE, it is hereby <u>ORDERED</u> that the motion is <u>GRANTED</u> in accordance with the terms and conditions set forth in this Order and:

1.     [Any remaining objection to the Motion or entry of this Final order is hereby Overruled.]

2.     The execution and delivery of the DIP Credit Agreement and all other DIP Loan Documents by the Debtor is authorized and approved, and the Debtor is authorized and empowered to (x) execute and deliver to the DIP Lender all other documents and instruments necessary or desirable to consummate the transactions contemplated thereby, (y) take all other actions necessary or desirable to carry out the intent and purpose of the DIP Loan Documents, and (z) otherwise comply with the DIP Loan Documents and all requests of the DIP Lender thereunder.

3.      The Debtor is authorized to borrow on an interim basis $400,000.00 of the DIP Commitment in one or more DIP Draws on the terms of the DIP Loan Documents, without application to or further order by the Court.

4.      All interest, fees, and expenses (expressly including all DIP Lender Expenses) contemplated by the DIP Loan Documents are authorized to be incurred by the Debtor as DIP Obligations and approved for payment as DIP Claims during this interim period, without application to or further order by the Court. **[This provision may vary from the requirements of MLBR 4001-2(c)(12).]**

5.      All DIP Obligations, pursuant to Bankruptcy Code sections 364(c) and (d), as applicable, constitute DIP Claims, payable from and having recourse to all property of the Debtor's estate (expressly including all DIP Collateral); *provided that* the DIP Lien shall not attach to any avoidance powers held by the Debtor or any trustee for the Debtor, including those avoidance power set forth in sections 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code, or to the proceeds of any claims under or actions commenced pursuant to such powers.

6.      The DIP Lender holds security interests in and liens on all DIP Collateral, which the Debtor has (to the extent of its right, title, and interest therein) assigned and conveyed as security, hypothecated, mortgaged, pledged, and set over and unto the DIP Lender, and which have been automatically perfected notwithstanding any notice or recordation requirements of non-bankruptcy law (collectively, the "**DIP Liens**"), comprising:

(i)      Pursuant to Bankruptcy Code section 364(c)(2), senior DIP Liens on all DIP Collateral not subject to Existing Liens;

(ii)      Pursuant to Bankruptcy Code section 364(c)(3), junior DIP Liens on all DIP Collateral subject to Existing Liens;

(iii)      Pursuant to Bankruptcy Code section 364(d)(1), equal DIP Liens on all DIP Collateral subject to Existing Liens; and

(iv)    Pursuant to Bankruptcy Code section 364(d)(1), senior DIP Liens on all DIP Collateral subject to Existing Liens. **[This provision may vary from the requirements of MLBR 4001-2(c)(7) to the extent of creating priming or senior liens without the consent of existing lienholders.]**

7.    The proceeds of the DIP Loans shall be used by the Debtor as set forth in the DIP Credit Agreement; provided that no portion of the DIP Loans shall be used for fees, costs, or expenses incurred by any party in (x) investigating or pursuing any claim or cause of action against the DIP Lender, any Affiliate thereof, or any other Indemnified Person or (y) questioning or challenging, or taking any other action that could reasonably be expected otherwise to impair, any DIP Loan, DIP Lien, DIP Claim, DIP Obligation, DIP Loan Document, or right or remedy of the DIP Lender.

8.    So long as any DIP Obligation remains outstanding, the Debtor shall perform each covenant contained in the DIP Loan Documents (other than those covenants that, under the DIP Loan Documents, shall survive full and indefeasible payment of the DIP Obligations).

9.    The DIP Loans shall mature, and all DIP Obligations shall be immediately due and payable upon the Maturity Date.

10.    An Event of Default shall exist during the occurrence and continuation of each of the events so identified in the DIP Loan Documents. **[This provision may vary from the requirements of MLBR 4001-2(c)(9) and (13).]**

11.    Notwithstanding Bankruptcy Code section 362, while any Event of Default has occurred and is continuing, the DIP Lender may immediately, without further order of or application to the Bankruptcy Court:

(i)    Declare the DIP Commitment terminated; and

(ii)    Declare all DIP Obligations immediately due and payable, without the requirement of presentment, demand, protest, or any other notice, all of which are waived by the Debtor.

12.     Furthermore, while any Event of Default has occurred and is continuing, the DIP Lender may move or apply to the Bankruptcy Court for entry of an order:

(i)     Terminating the automatic stay with respect to any DIP Collateral. **[This provision may vary from the requirements of MLBR 4001-2(c)(5).]**

(ii)    Appointing an examiner or chapter 11 trustee (other than the Subchapter V trustee).

(iii)   Converting the Debtor's Case to chapter 7.

_Provided that_, if the DIP Lender so moves or applies, the Debtor shall be limited to contesting solely whether the Event of Default has occurred and/or is continuing, and the Debtor has expressly waived the right to contest such relief whatsoever beyond the foregoing limitation.

13.     In addition to the rights and remedies enumerated in Paragraphs 11 and 12, the DIP Lender shall be entitled, while any Event of Default has occurred and is continuing, to pursue all rights and remedies available to it under the Bankruptcy Code (whether as a creditor, party in interest, or otherwise) or as a secured party under the Uniform Commercial Code. For the avoidance of doubt, all costs incurred by the DIP Lender in connection with any default or Event of Default under any DIP Loan Document shall constitute DIP Lender Expenses and DIP Obligations for all purposes.

14.     In consideration of the DIP Lender's consent to the payments of certain administrative expenses of the Debtor's estate as set forth in the budget attached to the DIP Financing Agreement, the DIP Lender is entitled to a full and complete waiver, with respect to all parties, of Bankruptcy Code section 506(c) and in no event shall any the DIP Lender or DIP Collateral be subject to any "surcharge" or the doctrine of "marshalling" by any party in any way whatsoever.  **[This provision may vary from the requirements of MLBR 4001-2(c)(4).]**

7

15.     The automatic stay imposed by Bankruptcy Code section 362(a) is and shall remain modified to the extent necessary to implement and effectuate in full this Interim DIP Order and the other DIP Loan Documents (expressly including any exercise of rights and remedies by the DIP Lender) and the transactions contemplated thereby.

16.     Any stay, modification, reversal, or vacation of this Interim DIP Order shall not, in any way whatsoever, affect any DIP Loan, DIP Lien, DIP Claim, DIP Obligation, other DIP Loan Document, or right or remedy of the DIP Lender. Notwithstanding any such stay, modification, reversal, or vacation, all DIP Loans, DIP Liens, DIP Claims, DIP Obligations, other DIP Loan Documents, and rights and remedies of the DIP Lender made, available, and/or in effect prior to the effective date of such stay, modification, reversal, or vacation shall be governed in all respects by this Interim DIP Order as originally entered by the Court. The DIP Lender is entitled to and shall have in all cases the protections of Bankruptcy Code section 364(e) with respect to all DIP Loans, DIP Liens, DIP Claims, DIP Obligations, other DIP Loan Documents, and rights and remedies and shall be so protected notwithstanding any stay, modification, reversal, or vacation of this Interim DIP Order.

17.     This Interim DIP Order shall survive entry of any order, in this Court or any other court of competent jurisdiction, (w) confirming a chapter 11 plan (and, to the extent not satisfied in full in cash on the Maturity Date, the DIP Obligations shall not be discharged under or by entry of such order, notwithstanding Bankruptcy Code section 1141(d)), (x) appointing an examiner or chapter 11 trustee, (y) converting the Case to a case under Bankruptcy Code chapter 7, or (z) dismissing the Case. This Interim DIP Order, together with all DIP Loans, DIP Liens, DIP Claims, DIP Obligations, other DIP Loan Documents, and rights and remedies of the DIP Lender

8

shall continue in full force and effect, notwithstanding the entry of any such order, until full and indefeasible payment of all DIP Obligations.

18.    Nothing on this Order shall affect the Cash Collateral order previously entered by this Court or post-petition liens granted pursuant to such prior order, except that such post-petition liens shall be subject to the DIP Lien.

19.    In the event of any inconsistency between any other DIP Loan Document and this Interim DIP Order, the terms hereof shall govern.

20.    The final hearing on the Motion is hereby scheduled for [_____],    2022    at _____:_____ __.m. Any party in interest objecting to the relief requested in the Motion shall file a written objection with the Clerk of the Court (and serve such objection on counsel to the Debtor, the Subchapter V trustee, and US Trustee's office, and the DIP Lender as set forth in the Debtor's certificate of service) no later than 4:00 p.m. (Eastern time) on May [_____], 2022.  [The    final hearing will be held by telephone. To participate, parties shall **dial [_____]    and enter ACCESS CODE [_____].**

21.    The Debtor shall serve, by United States mail, first-class postage prepaid, or other appropriate method of service, notice of the entry of the interim DIP Order and of the final hearing on (a) the parties having been given notice of the Motion, and (b) any party which has filed prior to such date a request for notices with this Court.

22.    Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 7062, and 9014, or anything else in the Bankruptcy Rules or any other applicable rule of procedure, this Interim DIP Order shall be valid, take full effect, and be enforceable immediately upon entry hereof. There shall be no stay of execution or effectiveness of this Interim DIP Order, all of which are hereby waived for cause shown.

23.    The Court has and shall retain jurisdiction to enforce this Interim DIP Order, including to hear any motion or application by the DIP Lender related hereto or to any other DIP Loan Document, according to its terms.

Dated: May ____, 2022

_____
ELIZABETH D. KATZ
UNITED STATES BANKRUPTCY JUDGE

## **Exhibit A**

(DIP Credit Agreement)

3174484.4