In re:

TOP LINE GRANITE DESIGN INC.[1]

Debtor.

Case No. 22-40216 (EDK)

Chapter 11

## FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION
## FOR SMALL BUSINESS DEBTOR UNDER SUBCHAPTER V[2]

      Top Line Granite Design Inc., the debtor and debtor-in-possession in the above captioned bankruptcy proceeding (the "**Debtor**") and a small business debtor under Subchapter V, hereby proposes the following Chapter 11 plan of reorganization pursuant to section 1189 of the Bankruptcy Code.

## ARTICLE I: CASE BACKGROUND

      On March 25, 2022 (the "**Petition Date**") the Debtor commenced this proceeding by filing a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code, as a small business Subchapter V debtor.  On March 28, 2022, the Bankruptcy Court appointed Steven Weiss as the Subchapter V trustee (the "**Subchapter V Trustee**").  Pursuant to section 1190(1) of the Bankruptcy Code, attached to this Plan are certain background information and various Exhibits in support of the Plan, including (i) a brief history of the Debtor's business operation, (ii) a liquidation analysis attached as ***Exhibit A***, and (iii) the Debtor's financial projections with respect to its ability to make proposed payments under the Plan attached as ***Exhibits B-1 and B-2***.

    1.1    **Description and History of the Debtor's Business**

      The Debtor is a Massachusetts corporation, incorporated in October 2004, doing business in Tyngsboro, MA.  The Debtor sells and fabricates marble, granite, onyx, soapstone, quartzite, quartz, and porcelain.  The Debtor also designs and installs countertops for the New England area using state of the art equipment.  The Debtor is one of the largest stone fabricators in New England.  The Debtor's owner, Edmilson Ramos ("**Mr. Ramos**") travels around the world to bring and supply the best quality and unique materials. More information about the Debtor's products and services can also be found on its website: https://www.toplinegranitedesign.com/

---

[1] A/k/a Design Top Line Granite, and aka Top Line Granite Design.  The Debtor's name was changed from Brazil Stones Inc. in November 2005.

[2] Pursuant to Bankruptcy Rule 3016(d), this Plan conforms with Official Form 425A (Plan of Reorganization for Small Business Under Chapter 11) and includes all Articles.

The Debtor currently has approximately 10 employees, plus its sales manager and bookkeeper who is paid as a subcontractor and receives a Form 1099 from the Debtor. The employees includes Mr. Ramos, sales representatives, account managers, quality manager, countertop installer, finance staff, office personnel, and others.

### (i)    347 Middlesex Road Realty Trust

Mr. Ramos is the grantor under the Declaration of Trust Establishing The 347 Middlesex Road Realty Trust dated July 28, 2014, amended and restated as of August 12, 2019 (the "**Trust**"). Mr. Ramos was the initial trustee; Luciana Oliveira was appointed as trustee in July 2019. Mr. Ramos is the primary beneficiary of the Trust. As discussed below, the Trust is the owner of the Real Estate where the Debtor operates its business in Tyngsboro, MA.

### (ii)    347 Middlesex Road Property

The Trust purchased the land and building thereon located at 347 Middlesex Road, Tyngsboro, MA (the "**Real Estate**") pursuant to a certain quitclaim deed dated July 30, 2015. Mr. Ramos used the Real Estate for the construction of the existing facility at 347 Middlesex Road starting in 2015 through 2017, costing approximately $6.5 million. The Debtor and/or the Trust had a prior lender before the loans from Avidia Bank and Bay Colony.

The facility at 347 Middlesex Road is over 20,000 square feet. The Debtor moved to the new facility in 2017, and currently occupies the Real Estate pursuant to a Commercial Property Lease, effective as of January 1, 2019 (as may be amended) between the Debtor and the Trust (the "**Real Estate Lease**").

In August 2019, the Trust obtained certain mortgage loans from Avidia Bank ($2,064,142.00) and Bay Colony (SBA loan) ($2,123,000.00). The Debtor is a guarantor for such mortgage loans. *See Guaranty Claims discussed in Section 1.4(H)*. Also as discussed in Section 1.4 below, the Trust guaranteed the Avidia Equipment Loan and the Avidia Inventory Loan of the Debtor (total of approx. $2,500,000.00).

The Real Estate Lease payments from the Debtor to the Trust are generally used to pay the two mortgage loans from Avidia Bank and Bay Colony. Also, the Debtor pays in ordinary course the taxes for the Real Estate, which is its principal place of business, and as may be required under the Real Estate Lease and/or the mortgage loans. The accrued and unpaid real estate tax amount (due as of 5/25/22) is $39,724.09, which is incorporated in the Debtor's financial projections. The Debtor intends to continue to pay the real estate taxes going forward in ordinary course.

Pursuant to a March 2022 Market Analysis, the estimated value for the Real Estate is approximately $8,000,000.00. A more formal appraisal report by Avidia Bank and the SBA (December 2018) has an estimated market value of approximately $6,000,000.00. As of the Petition Date, the recorded mortgages are with respect to (i) the two mortgage loans of

approximately $4,000,000.00, (ii) the Avidia's Equipment Loan, and (iii) the Avidia Inventory Loan.[3]

### (iii)   *US Construction and Maintenance LLC*

US Construction and Maintenance LLC ("**US Construction**") was formed in May 2015. Mr. Ramos is the majority owner (97%) of US Construction, with three other individuals owning 1% each.

The Debtor uses the services of various subcontractors including individual labor subcontractors though US Construction.  Prior to the Petition Date, the Debtor owed approximately $250,000.00 to US Construction, as reflected in Schedule F.  In light of the Wage Order, and subject to final approval of the DIP Financing Motion, the Debtor will pay certain pre-petition amounts owed to employees and subcontractors.  If so, the $250,000.00 pre-petition claim owed to US Construction will be reduced to approximately $117,000.00.

Over the years, US Construction has paid the Debtor for use of rental space in the amount of $9,500.00 per month.

### 1.2   **Events Leading to Bankruptcy Filing**

The events that led to the filing of the bankruptcy filing include (i) the Covid-19 pandemic, and (ii) certain actions of the Cash Advance Lenders as described below:

### (i)   *Covid-19 Pandemic*

While the Debtor's revenue remained stable during the Covid -19 pandemic, that was the result of contracts and projects the Debtor was able to line up before Covid-19.  The Covid-19 Pandemic has led to project and material delays, as well as an increase in operating and business expenses.  Despite all efforts, the Debtor has not been able to fully eliminate all of the lingering effects of this Pandemic.

In the past, to help with the need for more working capital, Mr. Ramos has taken personal loans to infuse in the business, including certain payday loans.  Even such payday loans became harder to obtain during the Covid-19 pandemic.

### (ii)   *Cash Advance Lenders*

In 2021 and 2022, the Debtor entered into several short-term loans, which for the most part seem similar to factoring contracts, with various Cash Advance Lenders.

Most, if not all, of the agreements of the Cash Advance Lenders (i) provide for a grant of security interest on substantially all assets of the Debtor, and (ii) require daily ACH payments

---

[3] This does not include the following filings after 2019: (i) recorded mortgage by ROC Funding Group LLC, one of the Cash Advance Lenders, for $260,000.00 which upon information and belief may not be a valid mortgage, and (ii) a notice of betterment assessment.  Another party filed a complaint in April 2022 against the Trust in Middlesex Superior Court in connection with a loan of approximately $200,000 in 2015 related to the initial acquisition or purchase of the Real Estate.

from the Debtor's bank account and/or credit card. The total for such payments to the Cash Advance Lenders was approximately $30,000.00 daily before the bankruptcy filing. Such daily payments, while covering other operating and business expenses, became unsustainable for the Debtor. The Debtor reserves all rights with respect to the Cash Advance Lenders, including with respect to the predatory nature of the transactions, the true nature of the underlying agreements as loans which are subject to statutory and regulatory provisions, including but not limited to the Massachusetts usury statute (G.L. c. 271, § 49).

*(iii)* <u>*Merchant Capital*</u>

As discussed in the Cash Collateral Motion, pre-petition, Alpha Recovery Partners on behalf of Merchant Capital (i) intentionally sent false and misleading letters to the Debtor's customers incorrectly claiming that the Debtor defaulted on certain merchant agreement, (ii) incorrectly claimed that the Debtor owed money to Merchant Capital, and (iii) improperly requested that the customers send future payments owed to the Debtor directly to Merchant Capital.

On February 7, 2022, the Debtor, through counsel, sent both Merchant Capital and Alpha Recovery Partners a pre-litigation demand letter which included a demand for relief pursuant to Massachusetts General Laws Chapter 93A (the Massachusetts Consumer Protection statute) and a notice to cease and desist all efforts.

Thereafter, Alpha Recovery Partners and Merchant Capital issued statements acknowledging the wrongdoing. However, damage had already resulted from the improper collection communications from Alpha Recovery Partners on behalf of Merchant Capital. As a direct and proximate result of the false and misleading letters from Alpha Recovery Partners on behalf of Merchant Capital, the Debtor suffer monetary and reputational damages including lost of customers and work in progress. Despite the Debtor's considerable efforts to mitigate the damages caused by these communications, these actions resulted in significant economic harm to the Debtor. As discussed below, the Debtor intends to pursue a complaint against Merchant Capital / Alpha Recovery Partners with respect to such damages.

### 1.3 **The Debtor's Assets**

The Debtor's assets and estimated value are listed in its Balance Sheet (2021) filed with the Bankruptcy Court on March 28, 2022 [Doc. No. 7], and Schedule B filed on April 11, 2022 [Doc. No. 44], which reflect for the most part book value of the Debtor's assets.

Such assets are also reflected in the Liquidation Analysis attached as **<u>*Exhibit A*</u>**. The Liquidation Analysis includes the scheduled value (with indication if book value is used or if the amount is net of depreciation), the proposed liquidation value, and/or the estimated market value of the Debtor's assets. For example, (i) the estimated value for inventory is 80% of the book value (with 50% used for liquidation value), (ii) the estimated value for equipment is 50% of the equipment book value (with 40% liquidation value),[4] and (iii) the estimated value for accounts

---

[4] For example, the fair market value used by the lender for the equipment that is subject to the FCB Equipment Loan is even less: 40% market value, and 30% or less for liquidation value.

receivable is after deduction of 90-day past due accounts receivable and /or disputed amounts (with a 50% liquidation value).  The Debtor reserves the right to order formal appraisals of the assets, particularly the inventory and the equipment, if necessary and in the event the cost is reasonable and affordable.

For disclosure purposes, the Debtor listed in Schedule B a certain receivable of approximately $2,000,000 due from the Trust.  Such accounting entry reflects certain amounts paid by the Debtor over the years (2015 to 2021) to or on behalf of the Trust, which upon information and belief may include certain rent payments by the Debtor to the Trust in ordinary course for rental or occupancy of the Real Estate.  As discussed above, Mr. Ramos is the primary beneficiary of the Trust.  Mr. Ramos maintains that he is owed approximately $5,000,000.00, including as a result of payday loans and personal loans he took for the benefit of the Debtor (*See Section 1.4(G) below*).

### 1.4  The Debtor's Pre-Petition Debts/ Liabilities

Pursuant to the Order Setting (A) Status Conference; (B) Claims Bar Date; (C) Deadline for Election Under 11 U.S.C. § 1111(b); and (D) Other Deadlines [Doc. No. 23], June 3, 2022 was the general bar date for creditors to file their claims (the deadline for governmental authorities is September 21, 2022 under section 502(b)(9) of the Bankruptcy Code).  The description of the Claims provided below is based on the Debtor's Schedules and the proofs of claim filed by the bar date.  The ultimate amount due to the various holders of Claims will be determined upon completion of the claims objection process.  Attached as ***Exhibit C*** is a preliminary list of pre-petition Claims and creditors.

#### *A.  Senior Secured Claims*

The Debtor's secured creditors, for purposes of this Plan, in addition to the DIP Lender are as follows (the "**Senior Claims**"):

*(i)*      *Enterprise Bank Loan:* According to the proof of claim filed by Enterprise Bank and Trust Company ("**Enterprise Bank**"), the pre-petition Claim amount is $22,729.71 (original loan amount $50,000.00).  The loan documents, dated as of 12/13/16, include a Promissory Note, a Commercial Security Agreement, and a UCC-1 financing statement filed on March 16, 2007 (with continuation filed on 2/7/2022) with respect to substantially all assets of the Debtor.  The maturity date under the promissory note is "on demand".  The loan accrues interest at 1.5 % above the Wall Street Journal Prime Rate with an initial rate of 5% per annum.  Pre-petition, the monthly payment amount was $900.00.

*(ii)*     *Avidia Bank Loans*: The Debtor has the following two business loans with Avidia Bank:

*Revolving Line of Credit / Inventory Loan- 2019:*  According to the proof of claim filed by Avidia Bank, the pre-petition Claim amount is $1,489,414.30 (original loan amount $1,500,000.00, increased from $1,000,000.00) (the "**Avidia Inventory Loan**").  The loan documents, dated as of 8/28/19, include a Revolving Demand Note, a loan and security agreement, and a UCC-1 financing statement filed on August 28, 2019 with respect to

substantially all assets of the Debtor.[5]  The maturity date under the promissory note is "on demand".  The minimum interest rate is 7.25% per year.  Pre-petition, the monthly payment amount was $8,200.00. This loan is guaranteed by US Construction, Mr. Ramos, and the Trust (secured by a mortgage on its Real Estate dated 8/28/19).

*Equipment Loan- 2019 (*SBA (7A) loan): According to the proof of claim filed by Avidia Bank, the pre-petition Claim amount is $1,086,862.44 (original loan amount $1,339,000.00) (the "**Avidia Equipment Loan**").  The loan documents, dated as of 8/28/19, include a Note, a Security Agreement, and a UCC-1 financing statement filed on August 28, 2019 with respect to substantially all assets of the Debtor. According to the commitment letter agreement (dated 8/23/19), the loan term is for 10 years.  The initial interest rate is 7.50% per year.  Pre-petition, the monthly payment amount was $14,320.00.  This loan is guaranteed by US Construction, Mr. Ramos, and the Trust (secured by a mortgage on its Real Estate dated 8/28/19).

*(iii)*     *FCB Equipment Loan:* This loan relates to the purchase and finance of a certain equipment (Northwood NW-127 Raptor CNC Waterjet Cutter (serial number 21257).  The initial financing was from ENGS Commercial Finance Co. Upon information and belief, First Citizens Bank & Trust Company is the successor in interest of ENGS Commercial Finance ("**FCB**"). According to the amended proof of claim filed by FCB, the pre-petition Claim amount is $306,790.93 (original sale price $379,950.00) (the "**FCB Equipment Loan**"), and the secured portion of the Claim is $150,000.[6]  The loan documents include a Commercial Finance Agreement (dated as of 10/7/20) (as may be amended on November 3, 2020), and a UCC-1 financing statement filed on October 8, 2020 with respect to the equipment.  Under the finance agreement, the transaction is for a 5-year term with monthly installment payments of $7,213.33 (totaling approximately $433,000.00). Therefore, the effective interest rate is about 5.2%. This debt is guaranteed by Mr. Ramos.

### B.  SBA EIDL Loan

The Debtor received an Economic Injury Disaster Loan (EIDL) from the SBA pre-petition. According to the proof of claim filed by the SBA, the pre-petition Claim amount is $514,897.26 (original loan amount $500,000.00) (the "**SBA Loan**").[7]  The loan documents include an amended loan authorization and agreement with effective date of 8/2/21 (original date 1/6/21), 1st Modification of Note, Amended Security Agreement, and a UCC-1 financing statement filed on January 20, 2021 with respect to substantially all assets of the Debtor.  The interest rate is 3.75% per annum, with monthly payments of $2,484.00.  The first monthly

---

[5] The UCC-1 financing statement filed by Avidia Bank for this inventory loan was not found in a preliminary unofficial search presumably because of the extra comma after the Debtor's name.  The Debtor reserves all rights to the extent an official UCC search using Debtor's name as required by Article 9 does not locate the financing statement.

[6] The fair market value used by FCB is between $126,874.36 to $149,263.95. The liquidation value used by FCB is between $78,363.57 to $104,487.76.

[7] According to Avidia Bank, the Debtor also received a Paycheck Protection Program (PPP) loan from the SBA pre-petition.  Upon information and belief, a loan forgiveness was approved for this PPP loan.

payment is due in July 2021.[8]  Under the loan documents, the SBA Loan would mature in 30 years.  This loan is guaranteed by Mr. Ramos.

The SBA's Lien may be undersecured due to the insufficient value of collateral securing the SBA Loan, depending on (i) the total Claim amount for the Senior Claims that are oversecured, including any post-petition interest, reasonable fees, costs or other charges to the extent applicable or permitted under Section 506(b) of the Bankruptcy Code, and (ii) the market value of the Debtor's assets as of confirmation of the Plan.  If so, any unsecured portion of the SBA Claim will be treated as a General Unsecured Claim.

### C.  Other Secured Loans

As reflected in Schedule F, the Debtor has several automobile loans in connection with operation of its business.  Pursuant to filed proofs of claim, the financing entities are Toyota Motor Credit Corporation (Toyota Lease Trust), and Ally Bank.  The loan documents are retail installment sale contracts (4 to 6 years).  Mr. Ramos is a guarantor or co-signer for some of the automobile loans.

### D.  Cash Advance Lenders

Several Cash Advance Lenders filed UCC-1 financing statements against assets of the Debtor with scheduled Claims totaling approximately $1,200,000.00 as set forth in **_Exhibit C_** attached hereto.  The Debtor listed the Claims of the Cash Advance Lenders as disputed on its Schedule D.  Some of the Cash Advance Lenders received the guarantees of Mr. Ramos and US Construction.

The Debtor maintains that the underlying agreements for the Cash Advance Lenders are not true factoring agreements, but are loans.  Such loan transactions may be subject to the Massachusetts usury statute (M.G.L. c. 271 § 49) which requires the filing of certain notice with the Attorney General's office if the lender is charging usurious interest rate.  The creditors in question did not.

In any event, the Liens of the Cash Advance Lenders are wholly unsecured due to the insufficient value of collateral securing the Senior Claims and the SBA Loan, depending on (i) the total Claim amount for senior Liens that are oversecured, including any post-petition interest, reasonable fees, costs or other charges, to the extent applicable or permitted under Section 506(b) of the Bankruptcy Code, and (ii) the market value of the Debtor's assets as of confirmation of the Plan.  Also, the holders of the pre-petition Senior Claims and the SBA did not subordinate their liens with respect to the Cash Advance Lenders.  Any Allowed Claim will be treated as a General Unsecured Claim.

The Debtor reserves all rights with respect to potential actions against the Cash Advance Lenders related to Potential Litigation and Avoidance Actions.  Therefore, any payment to be

---

[8] The loan documents provide that monthly payments are to begin 18 months from the date of the original note. Upon information and belief, the original note is dated 1/6/21 in which case the initial payment would be due on 7/6/22.

made under the Plan to such creditors may be subject to setoff, including pursuant to sections 553 and 502(d).

### E.  Administrative Expense Claims (non-Tax)

After the Petition Date, the Debtor for the most part has paid its operating expenses and obligation as they become due.  The Debtor estimates that the accrued and unpaid Administrative Expense Claims (non-tax) as of confirmation hearing may be approximately $250,000.00 (not including Professional Fee Claims), list of which may be filed as a Plan supplement,

The Debtor estimates that the Professional Fee Claims will be approximately $267,000.00 plus expenses (through confirmation of the Plan), including (i) approximately $250,000.00 for Professional Fee Claim of the Debtor's bankruptcy counsel, and (ii) $17,500.00 for fees and expenses related to the Subchapter V Trustee.  It is expected that most of this amount will be paid throughout the term of the Plan.

Administrative Expense Claims and Professional Fee Claims may be paid from proceeds of the Potential Litigation (to the extent permitted by the DIP Lender), and the Avoidance Actions, if any.  In such event, the Debtor will amend the applicable Exhibits to reflect such changes, including the financial projections and proposed plan distribution exhibits.

### F. Priority Claims/ Tax Claims

As mentioned above, the deadline for governmental authorities to file proofs of claims is September 21, 2022.  The Debtor does not expect any substantial unpaid prepetition or post-petition tax related Claims other than as set forth herein. Also, the Debtor does not expect to have any Other Priority Claims to be paid under the Plan.

As discussed above, the accrued and unpaid real estate tax amount for the Real Estate is $39,724.09.  Such amount is incorporated in the financial projections.[9]

Schedule E has few employee related claims. As discussed below, such employee related claims are paid.

Schedule E also has a claim for the Massachusetts Department of Revenue (notice of levy) for sales tax and corporate excise tax) for approximately $100,000.00.  Payment of the Massachusetts DOR Claim is incorporated in the financial projections.

Priority Tax Claims and Other Priority Claims may be paid from proceeds of the Potential Litigation (to the extent permitted by the DIP Lender), and the Avoidance Actions, if any. In such event, the Debtor will amend the applicable Exhibits to reflect such changes, including the financial projections and proposed plan distribution exhibits.

---

[9] Town of Tyngsboro is listed in Schedule F.

### G. General Unsecured Claims

The total for filed and scheduled General Unsecured Claims against the Debtor is approximately $2,000,000.00 as listed in ***Exhibit C***, not including (i) scheduled insider claims of Mr. Ramos for approximately $4,779,657 (the "**Insider Claims**"), (ii) any deficiency amount other than the FCB Equipment Loan, and (iii) the Claims of Cash Advance Lenders (approximately $1.2 million).

The General Unsecured Claims discussed above do not include the Guaranty Claims (discussed below) which are the mortgage loans that will be paid by the Trust through Real Estate Lease payments to be made by the Debtor.

According to Schedule F, the Insider Claims for Mr. Ramos include $1,500,000.00 from home refinancing, and personal / payday loans used for the business ($3,279,657.00). The scheduled Insider Claims may not include other payday loans to Mr. Ramos used in the business, which had a balance of approximately $620,000.00 as of the Petition Date. [10]

### H. Guaranty Claims

The pre-petition Senior Claims do not include the following loans of Avidia Bank, and Bay Colony to the Trust totaling approximately $4,000,000, for which the Debtor is a guarantor (the "**Guaranty Claims**"). [11]

*Bay Colony Mortgage Loan:* This is a SBA (CDC 504) loan. According to the proof of claim filed by the SBA, the prepetition Claim amount is $2,024,508.85 (claim #35) (original loan amount $2,123,000.00). The loan documents, dated 8/28/19, include a Note, and a Mortgage by the Trust to Bay Colony. [12] The maturity date for the loan is October 1, 2044. The interest rate on the note is 2.25% per annum. Pre-petition, the monthly payment amount was $14,937.60. The primary obligor for this loan is the Trust, and the loan is guaranteed by the Debtor, US Construction, and Mr. Ramos.

*Avidia Mortgage Loan:* According to the Debtor's Schedules F, the pre-petition Claim amount is approximately $2,030,570.05 (original loan amount $2,064,142.00). The loan documents, dated 8/28/19, include a Five Year Adjustable Term Note, and a Commercial Mortgage, Security Agreement and Assignment of Leases and Rents by the Trust to Avidia Bank. The amortization term of the loan is 25 years (through August 28, 2044). The minimum interest rate is 5.875% per annum. Pre-petition, the monthly payment amount was $13,250.79. The primary obligor for this loan is the Trust, and the loan is guaranteed by the Debtor, US Construction, and Mr. Ramos.

The Guaranty Claims are not addressed under this Plan as such mortgage loans will be paid by the Trust from Real Estate Lease payments to be made by the Debtor. The Debtor was informed by Avidia Bank, through counsel, on June 15, 2022 that Avidia Bank has decided to

---

[10] Post-petition, Mr. Ramos granted a mortgage on his personal residence for this obligation.

[11] Upon information and belief, Avidia Bank and Bay Colony executed a certain Third Party Lender Agreement, dated as of August 28, 2019.

[12] An Assignment of Mortgage dated August 28, 2019 was signed by Bay Colony to the SBA.

move forward with a foreclosure that it initiated after the filing of the bankruptcy petition, with respect to unpaid real estate taxes, and defaults under the Avidia Bank Equipment Loan, and the Avidia Bank Inventory Loan which are all addressed under this Plan. Avidia Bank is pursuing such foreclosure proceeding after the Debtor made the required payments under the Real Estate Lease so that the Trust can pay (and did pay) the Avidia mortgage loan.

On June 24, 2022, Avidia Bank filed a motion for comfort order that its action to foreclose on non-debtor property does not violate the automatic stay. The Debtor intends to file an objection to such motion, among other things.

Based on the value of the Real Estate, as discussed above, it is expected that there will be sufficient equity in the Real Estate for payment of the Guaranty Claims and for adequate protection of Avidia Bank.

### 1.5 Use of Cash Collateral

In connection with the Cash Collateral Motion, the Debtor proposed (i) as adequate protection, that certain secured creditors (the "**Lienholders**") be granted certain post-petition replacement liens and security interests in property of the Debtor's estate to the extent such Lienholders held validly perfected liens and security interests as of the Petition Date (the "**Post-petition Liens**"), and (ii) as further adequate protection, to the extent funds are available, monthly payments to certain senior claim holders (or adequate protection payments).

The grant of Post-Petition Liens in property of the Debtor's estate is to the extent the Lienholders held validly perfected liens and security interests as of the Petition Date. The Post-petition Liens shall only secure the amount of any diminution in the value of the Lienholders' prepetition collateral constituting cash collateral resulting from the Debtor's use thereof in the operation of the Debtor's business in the post-petition period. The Post-petition Liens shall have the same priority, validity, and enforceability as the Lienholders' liens on their pre-petition collateral. The Post-petition Liens shall not attach to Avoidance Action. The Post-Petition Lien pursuant to the Cash Collateral Order(s) shall not be affected by the DIP Financing Order(s), except that the Post-Petition Liens shall be subject to the DIP Lien.

### 1.6 DIP Financing

Pursuant to the DIP Financing Motion, the Debtor sought approval of a post-petition financing from Legalist, Inc., as investment adviser and DIP lender (the "**DIP Lender**") on an interim basis in an amount up to $400,000.00 and on a final basis in the aggregate committed amount of up to $1,000,000.00 ("**DIP Financing**"). Attached to the DIP Financing Motion is the Debtor-in Possession Term Loan Credit Agreement, dated as of May 13, 2022 (the "**DIP Credit Agreement**") between the Debtor and the DIP Lender.

As discussed in the DIP Financing Motion, due to pre-petition collection actions of certain Cash Advance Lenders and the bankruptcy filing, it is much harder for the Debtor to collect from commercial customers the generally required down payment or deposit before starting a new project. Other than with respect to certain other payments listed in the sources and uses budget attached to the DIP Credit Agreement, and as provided in the DIP Financing Motion,

the Debtor intends to use the DIP Financing proceeds as a source to cover the down payment or 50% deposit that the Debtor would generally require to purchase materials and supplies for certain work in progress or before the Debtor starts a new project.

Pursuant to the DIP Financing Motion, the Debtor sought authority to grant to the DIP Lender a super-priority lien pursuant to sections 364(c) and (d) of the Bankruptcy Code with priority over all pre- and post-petition claims against the Debtor, other than administrative expenses for estate professional fees and other administrative expenses in the case (the "**DIP Lien**").  The DIP collateral in connection with the DIP Financing Motion includes all assets and properties of the Debtor as set forth in the DIP Financing Agreement, excluding all Avoidance Actions.  The DIP collateral shall include any other litigation proceeds; *provided that* such proceeds may be used for distributions or payments to creditors under the chapter 11 plan of the Debtor with the consent of the DIP Lender.

The fees and costs of the DIP Financing are discussed in the DIP Financing Motion. The maturity date is in two years.

### 1.7     **Other Post-Petition Events**

Soon after the Petition Date, on April 1, 2022, the Bankruptcy Court issued the Notice of Chapter 11 Bankruptcy Case [Doc. No. 22] and a Scheduling Order [Doc. No. 23] scheduling the Section 341 meeting of creditors for May 4, 2022, and establishing certain deadlines, including a plan filing date of June 23, 2022.

Post-Petition, the Debtor filed several motions and other pleadings in connection with administration of the bankruptcy estate, including the following:

(i) Application to employ Riemer & Braunstein LLP, as the Debtor's bankruptcy counsel [Doc. No. 13]. The application was approved by the Court on an interim and final basis [Doc. No. 30 and 70].

(ii)     Motion for authority to use cash collateral [Doc. No. 16] (the "**Cash Collateral Motion**"). The Bankruptcy Court entered a Second Order Authorizing Final Use of Cash Collateral on June 24, 2022 [Doc. No. 109] (the "**Cash Collateral Order**").  A continued hearing is scheduled for August 18, 2022.  The Debtor believes that confirmation of the Plan will render moot the request or relief under the Cash Collateral Motion, including any objection.

(iii) Motion for authority to pay pre-petition employee wages, amounts due to subcontractors, and other employment related obligations [Doc No. 35].  This motion was granted and denied in part [Doc. No. 67] (the "**Wage Order**").

(iv) Motion for entry of an Order (i) prohibiting utilities from discontinuing, altering, or refusing service, and (ii) deeming utilities adequately assured of future performance [Doc. No. 36]. The Court granted this utility motion on April 29, 2022 [Doc. No. 68].

(v) Motion for authority to continue using certain existing bank accounts with Avidia Bank and business form [Doc. No. 55].  Both Avidia Bank and the US Trustee's office filed objections to the bank account motion [Doc. No. 64 and Doc. No. 65].  The bank account motion

was granted in part and denied in part on April 29, 2022 [Doc. No. 69]. The Debtor ultimately opened its DIP bank accounts with Chase Bank and closed the pre-petition bank accounts with Avidia Bank.

(vi) Motion for order (i) authorizing the Debtor to obtain postpetition financing, (ii) granting superpriority claim, security interest, and priming first priority lien to the DIP Lender [Doc. No. 76] (the "**DIP Financing Motion**"). The Court entered an order granting the DIP Financing Motion on an interim basis on May 19, 2022 [Doc. No. 87] (the "**DIP Financing Order**"). On June 21, 2022, the US Trustee's office filed a limited objection and reservation of rights [Doc. No. 104]. The final hearing on the DIP Financing Motion, held on June 24, 2022, is continued to July 20, 2022.

(vii) On May 4, 2022, the Debtor filed the Section 1188(c) Status Conference Report with the Bankruptcy Court [Doc No. 72] (the "**Status Report**"); the telephonic status conference was held on May 18, 2022.

The Debtor intends to file (i) a motion to employ special litigation counsel in connection with the potential causes of actions against Merchant Capital / Alpha Recovery Partners (discussed above), (ii) a motion to pay certain critical vendor(s),[13] and (iii) a motion to employ an accountant.

In connection with the filing of this Plan, the Debtor will be filing a separate Motion for Order (i) Approving Form and Content of Plan Filing Notice; (ii) Fixing the Voting and Objection Deadlines; and (iii) Scheduling the Plan Confirmation Hearing (the "**Plan Procedure Motion**").

### 1.8     Potential Post-Petition Litigation, and Avoidance Actions

As discussed in the Status Report, the Debtor reserves all rights with respect to (i) any complaint against Merchant Capital / Alpha Recovery Partners and any other Cash Advance Lenders for damages caused to the Debtor's business pre-petition, and (ii) any potential challenge of the Claims of the Cash Advance Lenders based on violation of the Massachusetts usury law ("**Potential Litigation**"). Any proceeds from such Potential Litigation constitute collateral of the DIP Lender but may be a source of distribution under the Plan, subject to approval of the DIP Lender.

The Debtor will work with the Subchapter V Trustee to determine if any Avoidance Action is appropriate before the applicable deadline[14] in the event of no Disposable Income during the three- year term of the Plan and if no proceeds from the Potential Litigation. Considerations would include (i) the ordinary course nature of pre-petition payments or transfers and any other defenses of the recipients, (ii) the value of such actions versus the cost of pursuing the recovery, (iii) any other reasonable due diligence required under section 547(b) of the Bankruptcy Code for any preference actions, and (iv) the nature of any potential negative impact

---

[13] At least one the Debtor's critical vendors has refused to sell to the Debtor because of pre-petition amounts due and such vendor has required at least a payment plan before doing business with the Debtor.

[14] In the event of Avoidance Actions, the recipients may have the right to file a late claim including pursuant to section 502(h).

or effect on the business going forward if any such action is pursued. Avoidance Actions may include, but not limited to, preference actions and recovery of certain payments made to the Cash Advance Lenders within 90 days of the Petition Date. A list of selected pre-petition payments made by the Debtor within 90 day of the Petition Date has been shared with the Subchapter V Trustee. The Debtor also reserves the right to recover any unauthorized post-petition automatic (or otherwise) payments to a Cash Advance Lender.

Pursuant to section 546(a) of the Bankruptcy Code, the general two-year statute of limitation deadline for filing such actions will be March 25, 2024. The Debtor reserves the right to amend its financial projections and any other relevant Exhibits at least three months before this deadline in the event the Debtor's financial conditions improve.

## ARTICLE II: SUMMARY

2.1 **Plan Payments.** The Plan proposes to pay Allowed Claims of creditors of the Debtor as set forth in Article VII of the Plan. The Plan is for a period of three years.

2.2 **Claims and Interests**. The Plan provides for the following Claims and Interests:

(i) Administrative Expense Claims (including Professional Fee Claims)
(ii) Priority Tax Claims
(iii) Other Priority Claims, if any (Class 1)
(iv) DIP Financing (Class 2)
(v) Enterprise Line of Credit (Class 3)
(vi) Avidia Equipment Loan (Class 4)
(vii) Avidia Inventory Loan (Class 5)
(viii) FCB Equipment Loan (Class 6)
(ix) SBA Loan (Class 7)
(x) Other Secured Loans (Class 8)
(xi) Cash Advance Lenders (Class 9)
(xii) General Unsecured Claims (Class 10)
(xiii) Interests (Class 11)

Administrative Expense Claims and Priority Tax Claims are not classified and will be paid as provided under Article III of the Plan.

Holders of Claims and Interests in Class 1 to Class 11 will receive distributions or will be treated as provided in Article IV of the Plan.

2.3 **Disclosure**. All Claim and Interest holders should refer to Articles 3 through 6 of this Plan for information regarding the precise treatment of their Claims and Interests. **Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.**)

# ARTICLE III: CLAIMS AND INTERESTS

3.1    **The Plan Payments.**   The Plan proposes to pay Allowed Claims of creditors of the Debtor as set forth in Articles IV and V of the Plan.  The Plan is for a period of three years.

3.2    **Non-Classified and Classified Claims and Interests**. Allowed Claims and Interests shall be treated as follows under this Plan:

| Claim/ Class | Impairment | Treatment[*] | Entitled to Vote? |
|---|---|---|---|
| Administrative Expense Claims *(incl. Professional Fee Claims)* | N/A | To be paid in full during the term of the Plan. | N/A |
| Priority Tax Claims | N/A | Installment payments until paid in full. | N/A |
| **Class 1-** Other Priority Claims (if any) | Unimpaired | To be paid in full during the term of the Plan. | No |
| **Class 2-** DIP Financing | Unimpaired | To be paid in full on or before the maturity date of the DIP Financing as required under the DIP Credit Agreement or as agreed with the DIP Lender. | No |
| **Class 3-** Enterprise Line of Credit | Impaired | Monthly principal and interest payments in amount previously paid before the Petition Date. | Yes |
| **Class 4-** Avidia Equipment Loan | Impaired | Initial monthly interest only payments, with principal and interest payments to start after repayment of the DIP Financing based on a new five-year amortization schedule. | Yes |
| **Class 5-** Avidia Inventory Loan | Impaired | Initial monthly interest only payments, with principal and interest payments to start after repayment of the DIP Financing based on a new ten-year amortization schedule. | Yes |

[*] The Section 1188(c) Status Conference Report filed with the Bankruptcy Court on May 4, 2022 [Doc. No. 72] may have contemplated different treatment for certain Claims.  Such assessment was made before preparation of the financial projections.

| Class 6- FCB Equipment Loan | Impaired | Initial monthly interest only payments, with principal and interest payments to start after repayment of the DIP Financing based on a new three-year amortization schedule up to the value of the collateral. | Yes |
|---|---|---|---|
| Class 7- SBA Loan | Impaired | Principal and interest payments to start after repayment in full of the DIP Financing based on the payment schedule under the loan documents up to the value of the collateral. | Yes |
| Class 8- Other Secured Loans | Impaired | Monthly payments in accordance with the terms of the loan documents up to the value of the collateral. | Yes |
| Class 9- Cash Advance Lenders | Impaired | To be classified as General Unsecured Claims and will receive the same treatment provided for Class 10 under the Plan. | Yes |
| Class 10 - General Unsecured Claims | Impaired | Pro rata share in cash distribution from the Remaining Funds, if any. | Yes |
| Class 11 – Interests | Unimpaired | To retain membership interest in the Debtor | No |

3.3 **No Admission**. The description of the Claims and estimation of the recoveries set forth above should not constitute an admission that the Claims are Allowed. The Plan recovery is a projection and the Debtor reserves all of its rights, claims and defenses with respect to any and all Claims.

3.4 **Post-Petition Interest; Fine and Penalties**. Allowed Claims shall not include any interest accrued subsequent to the Petition Date unless specifically provided otherwise under the Plan. As set forth in Section 5.2, Allowed Claims do not include any fines and penalties.

## ARTICLE IV: TREATMENT OF NON-CLASSIFIED CLAIMS

As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims against the Debtor are not classified for the purpose of voting on, or receiving distributions under, the Plan. Such non-classified Claims shall be treated as follows pursuant to sections 1129(a)(9)(A) and (C) and 1191(e) of the Bankruptcy Code.

4.1 **Administrative Expense Claims**. The holders of Allowed Administrative Expenses Claims shall be paid in full in cash on the later of: (i) the date such Allowed

Administrative Expense Claim becomes due in accordance with its terms, and (ii) the Effective Date; *provided that*, (i) the financial projections may provide for monthly payments during the term of the Plan for such Claims, and (ii) early payments may be made pursuant to Section 1.4(E) from proceeds of Potential Litigation and Avoidance Actions, if any. Notwithstanding the foregoing, a holder of an Administrative Expense Claim may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

Within thirty (30) days after the Effective Date, each holder of Administrative Expense Claims (including Professional Fee Claims) shall file a request for payment of administrative expense Claim or final fee application for Professional Fee Claim, if not filed already. Any objection to such filed request or fee application may be filed by the objection deadline to be provided in the Confirmation Order.

All other post-Effective Date Claims and invoices may be paid by the Debtor in ordinary course in such amounts and on such terms as the creditor and the Debtor may agree, or, in the absence of an agreement, as ordered by the Bankruptcy Court.

4.2     **Priority Tax Claims**.  Each holder of an Allowed Priority Tax Claim against the Debtor, if any, shall be paid as follows: installment payments of cash (i) of a total value as of the Effective Date equal to the Allowed amount of such Claim, and (ii) over a period ending five (5) years from the Petition Date, subject to early payments pursuant to Section 1.4(F) from proceeds of Potential Litigation and Avoidance Actions, if any. The Allowed Priority Tax Claim shall include only post-Effective Date interest thereon at the non-default rate determined under applicable non-bankruptcy law as required by 11 U.S.C. § 511(b).

The Debtor will continue to make payment directly to holder of such Claim after the term of the Plan, if applicable, for any unpaid balance. Notwithstanding the foregoing, a holder of a Priority Tax Claim may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

4.3     **Statutory Fees**. Not applicable in Subchapter V cases.

4.4     **Prospective Quarterly Fees**. Not applicable in Subchapter V cases.

## ARTICLE V:  TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

5.1     **Treatment of Claims and Interests**. The categories of Claims and Interests listed below classify such Claims and Interests for all purposes, including voting, confirmation, and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. Claims against the Debtor (except as set forth in Article IV) are classified as follows:

**Class 1 – Other Priority Claims** (if any)

(a)     Treatment. In full and complete satisfaction, settlement, release and discharge of the Class 1 Claims, if any, each holder of the Allowed Class 1 Claim will receive payment in full in cash as promptly as reasonably practicable on the later of (A) the Effective Date and (B) the date on which such Other Priority Claim becomes

an Allowed Claim payable under applicable law or any agreement relating thereto; *provided that*, (i) the financial projections may provide for monthly payments during the term of the Plan for such Claims, and (ii) early payments may be made pursuant to Section 1.4(E) from proceeds of Potential Litigation and Avoidance Actions, if any.  Notwithstanding the foregoing, a holder of an Allowed Class 1 Claim may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

(b) <u>Impairment and Voting</u>: Class 1 is unimpaired under the Plan.  Each holder of an Allowed Claim in Class 1 shall be presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

## Class 2 - DIP Financing

(a) <u>Treatment</u>. In full and complete satisfaction, settlement, release and discharge of the Class 2 Claim, the DIP Lender shall receive payment in full of the DIP Financing, including principal, accrued interests, and fees and expenses, on or before the maturity date of the DIP Financing or as agreed with the DIP Lender, in accordance with the terms of the DIP Financing Order(s).  Notwithstanding the foregoing, the DIP Lender may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

Subject to outcome of Potential Litigation (as defined below), if any, the Debtor reserves the right to refinance the DIP Financing to the extent lower interest rate can be obtained from another lender with extension of the maturity date.[15]  In the event of early repayment of the DIP Financing from proceeds of Potential Litigation, the Debtor will amend the applicable Exhibits to reflect such changes, including the financial projections and proposed plan distribution exhibits.

b) <u>Lien Retention</u>.  The DIP Lender shall retain the Lien securing the Class 2 Claim until payment in full of the Allowed Class 2 Claim.

(c) <u>Impairment and Voting</u>.  Class 2 is unimpaired under the Plan.  The DIP Lender shall be presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan with respect to Class 2 Claim.

## Class 3 - Enterprise Line of Credit

(a) <u>Treatment</u>. In full and complete satisfaction, settlement, release and discharge of the Class 3 Claim, Enterprise Bank shall receive principal and interest payments based on same pre-petition monthly payment of $900.00 per month until paid in

---

[15] Under the DIP Credit Agreement, voluntary repayments made within 270 days of the Effective Date shall be subject to a "Makewhole Fee" of 4.75% of the amount repaid.

full. Notwithstanding the foregoing, Enterprise Bank may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

(b)    <u>Lien Retention</u>. Enterprise Bank shall retain the Lien securing the Class 3 Claim until payment in full of the Allowed Class 3 Claim.

(c)    <u>Impairment and Voting</u>. Class 3 is impaired under the Plan. Enterprise Bank shall be entitled to vote to accept or reject the Plan with respect to the Class 3 Claim.

**Class 4 - Avidia Equipment Loan**

(a)    <u>Treatment</u>. In full and complete satisfaction, settlement, release and discharge of the Class 4 Claim, Avidia Bank shall receive initially interest only payments before the repayment in full of the DIP Financing, and thereafter principal and interest payments based on a new five-year amortization schedule, using the 7.50% interest rate. Notwithstanding the foregoing, Avidia Bank may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

(b)    <u>Lien Retention</u>. Avidia Bank shall retain the Lien securing the Class 4 Claim until payment in full of the Allowed Class 4 Claim.

(c)    <u>Impairment and Voting</u>. Class 4 is impaired under the Plan. Avidia Bank shall be entitled to vote to accept or reject the Plan with respect to the Class 4 Claim.

**Class 5 - Avidia Inventory Loan**

(a)    <u>Treatment</u>. In full and complete satisfaction, settlement, release and discharge of the Class 5 Claim, Avidia Bank shall receive initially interest only payments before the repayment in full of the DIP Financing, and thereafter principal and interest payments based on a new ten-year amortization schedule, using the 7.25% interest rate. Notwithstanding the foregoing, Avidia Bank may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

(b)    <u>Lien Retention</u>. Avidia Bank shall retain the Lien securing the Class 5 Claim until payment in full of the Allowed Class 5 Claim.

(c)    <u>Impairment and Voting</u>. Class 5 is impaired under the Plan. Avidia Bank shall be entitled to vote to accept or reject the Plan with respect to the Class 5 Claim.

**Class 6 - FCB Equipment Loan**

(a)    <u>Treatment</u>. In full and complete satisfaction, settlement, release and discharge of the Class 6 Claim, FCB shall receive interest only payments before the repayment in full of the DIP Financing, and thereafter principal and interest payments based

on a new three-year amortization schedule up, using the 5.2% interest rate up to the value of the collateral as of the Confirmation Date of the Plan. Any balance of the Class 6 Claim shall be re-classified as a General Unsecured Claim to be paid as a Class 10 General Unsecured Claim. Notwithstanding the foregoing, FCB may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

(b)    <u>Lien Retention</u>.  FCB shall retain the Lien securing the Class 6 Claim until payment in full of the Allowed Class 6 Claim.

(c)    <u>Impairment and Voting</u>.  Class 6 is impaired under the Plan.  FCB shall be entitled to vote to accept or reject the Plan with respect to the Class 6 Claim.

## Class 7 - SBA Loan

(a)    <u>Treatment</u>. In full and complete satisfaction, settlement, release and discharge of the Class 7 Claim, the SBA Loan shall receive principal and interest payments based on the payment schedule under the loan documents after the repayment in full of the DIP Financing up to the value of the collateral as of Confirmation Date of the Plan. Any balance of the Class 7 Claim shall be re-classified as a General Unsecured Claim to be paid as a Class 10 General Unsecured Claim. Notwithstanding the foregoing, the SBA may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

(b)    <u>Lien Retention</u>. The SBA shall retain the Lien securing the Class 7 Claim until payment in full of the Allowed Class 7 Claim.

(c)    <u>Impairment and Voting</u>.  Class 7 is impaired under the Plan.  The SBA shall be entitled to vote to accept or reject the Plan with respect to the Class 7 Claim.

## Class 8 - Other Secured Loans

(a)    <u>Treatment</u>. In full and complete satisfaction, settlement, release and discharge of the Class 8 Claims, each holder of the Allowed Class 8 Claim shall receive principal and interest payments in accordance with the terms of the loan documents up to the value of the collateral as of the Confirmation Date. Any balance of the Class 8 Claim shall be re-classified as a General Unsecured Claim to be paid as a Class 10 General Unsecured Claim. Notwithstanding the foregoing, the holders of Class 8 Claim may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

(b)    <u>Lien Retention</u>.  Holders of Class 8 Claim shall retain the Lien securing the Class 8 Claim until payment in full of the Allowed Class 8 Claim.

(c)    <u>Impairment and Voting</u>.  Class 8 is impaired under the Plan.  Holders of Class 8 Claim shall be entitled to vote to accept or reject the Plan with respect to the Class 8 Claim.

**Class 9 - Cash Advance Lenders**

(a)     <u>Treatment</u>. In full and complete satisfaction, settlement, release and discharge of the Class 9 Claims, each loan shall be classified as a General Unsecured Claim to be paid as a General Unsecured Claim. Notwithstanding the foregoing, the holders of Class 9 Claim may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

(b)     <u>Lien Retention</u>. Pursuant to section 1141(c) of the Bankruptcy Code, on the Effective Date, the UCC-1 financing statements shall be terminated and any existing Lien shall be released with respect to the Claims of the Cash Advance Lenders, subject to entry of discharge under Section 9.1.

(c)     <u>Impairment and Voting</u>. Class 9 is impaired under the Plan. Holders of Class 9 Claim shall be entitled to vote to accept or reject the Plan with respect to the Class 9 Claim.

**Class 10 – General Unsecured Claims.**

(a)     <u>Treatment</u>. In full and complete satisfaction, settlement, release and discharge of the Class 10 Claims, each holder of the Allowed Class 10 Claim shall receive a *pro rata* share in cash distribution from the Remaining Funds, if any. Notwithstanding the foregoing, the holder of an Allowed Class 10 Claim may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

As discussed in Section 6.1, any distribution to holders of General Unsecured Claims will be from balance of the Remaining Funds.

As discussed above in Section 1.4(H) above, the Guaranty Claims will be paid by the Trust through Real Estate Lease payments to be made by the Debtor.

(b)     <u>Impairment and Voting</u>. Class 10 is impaired under the Plan. Each holder of a Class 10 Claim shall be entitled to vote to accept or reject the Plan.

**Class 11 – Interests.**

(a)     <u>Treatment</u>. The holders of Class 11 Interests will retain such Interests in the Debtor.

(b)     <u>Impairment and Voting</u>: Class 11 is unimpaired under the Plan. The holder of Class 11 Interests shall be presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

5.2     **Allowed Claims**. "<u>Allowed</u>" shall mean any Claim against the Debtor (a) for which (i) a proof of claim was timely and properly filed or, if no proof of claim was filed, the

Claim is listed by the Debtor in the Schedules as liquidated in amount and not disputed or contingent (and for which no contrary proof of claim has been filed), and (ii) no objection to the allowance of the Claim (including without limitation an objection based on rights of set off or recoupment, or under sections 502(d), 510 or 549 of the Bankruptcy Code) or request to estimate the Claim has been interposed on or before the Claims Objection Deadline, or if any timely objection or request for estimation has been interposed, such Claim has been determined by a final order to be allowed in favor of the respective Claim holder (in which case the Allowed Claim shall equal the allowed amount as determined by such final order); (b) that is allowed pursuant to the terms of an agreement by and between the holder of such Claim and the Debtor; or (c) that is allowed by final order or under the terms of the Plan.

With respect to Administrative Expense Claim, "Allowed" shall mean any Administrative Expense Claim, or any portion thereof, with respect to which both (i) a timely and proper request for payment has been made to the extent required by the Plan, the Confirmation Order, or by any other order of the Bankruptcy Court, and (ii) such Administrative Expense Claim is allowed by the Bankruptcy Court.

Allowed Claims shall not include Disputed Claims or Disallowed Claims. All non-compensatory penalties, fines, punitive damages, exemplary damages, multiple damages, or any other claims or obligations that do not compensate for actual losses incurred shall be deemed subordinated to General Unsecured Claims or disallowed under sections 105(a) and 726(a)(4) of the Bankruptcy Code or otherwise.

5.3     **Impairment of Claims or Interests**. A class of Claims or Interests is deemed unimpaired under section 1124 of the Bankruptcy Code to the extent (i) the Plan leaves the legal, equitable, and contractual rights of such  Claim or Interest unaltered, or (ii) notwithstanding  any contractual provisions in the loan documents or applicable law entitles a creditor to demand or receive accelerated payment of its Claim due to the occurrence of a default, if applicable, the Plan has cured any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, and the other requirements of section 1124(2) are met.

## ARTICLE VI:  DISTRIBUTIONS

6.1     **Plan Distributions**.

All payments of operating expenses of the Debtor, Administrative Expense Claims, Priority Tax Claims, and to creditors in Class 1 to Class 8 will be made in ordinary course by the Debtor as set forth in Article IV of the Plan and in accordance with the proposed payment amounts in the financial projections attached as ***Exhibit B***.

All distributions to creditors in Class 9 and Class 10, if any, will be made as set forth below:

(i)     In the event of a consensual Plan confirmed pursuant to section 1191(a) of the Bankruptcy Code, the Subchapter V Trustee, in his discretion, will act as the disbursing agent and monitor the Debtor's compliance with the requirements of

the Plan. The service of the Subchapter V trustee will terminate pursuant to the terms of section 1183(c).

(ii)     In the event of a nonconsensual Plan confirmed pursuant to section 1191(b) of the Bankruptcy Code, the Subchapter V Trustee, in his discretion, will act as the disbursing agent and monitor the Debtor's compliance with the requirements of the Plan pursuant to the terms of section 1194(b).[16]

(iii)    To the extent applicable, the Subchapter V Trustee, as the disbursing agent, may pay his professionals fees incurred after the Effective Date as an Allowed Claim from the Remaining Funds.

(iv)     The Subchapter V trustee will hold all proceeds of Potential Litigation and Avoidance Action (if any), and any projected Disposable Income amount to be distributed to creditors under the Plan.

(v)      The Debtor will provide to the Subchapter V Trustee copies of all financial statements and reconciliation statements to be submitted to the DIP Lender pursuant to the terms of the DIP Financing Agreement.  After repayment of the DIP Financing, the Debtor will continue to provide such financial statements to the Subchapter V Trustee during the term of the Plan.

The proposed Plan distribution and projected Disposable Income is attached as ***Exhibit D***.  Any distribution to be made from the Remaining Funds will be made as  follows: <u>first</u>, for expense of administering the Debtor's estate before or after the Effective Date (to the extent of such additional expenses are not already included in the estimate for Administrative Expense Claims);  <u>second</u>, to Administrative Expense Claims, including Professional Fee Claim; <u>third</u>, to Priority Tax Claims, and Other Priority Claims (if any); and <u>Fourth</u>, to General Unsecured Claims; *provided that* with respect to the projected Disposable Income portion, if any, the <u>second</u> and <u>third</u> payments would not be applicable.

Plan distributions shall be mailed by first class mail, postage prepaid, to the address of such holder as provided in the Schedules or filed proof of claim, if any, unless the Debtor or the Subchapter V Trustee has been notified in writing of a change of address.  The Debtor and the Subchapter V Trustee shall have no obligation to locate such holders whose distributions or notices are properly mailed but nevertheless returned.

6.2     **Objections to Claims**. Any objection to Claims shall be prosecuted by the Debtor.  Except as otherwise provided by order of the Bankruptcy Court, such objection to a Claim may be filed until the later of: (a) the date that such Claim becomes due and payable in accordance with its terms, and (b) the Claims Objection Deadline.

---

[16] Section 1194(b) provides that the trustee shall make payments to creditors under the plan unless the plan or the confirmation order provides otherwise.

6.3     **Distribution on a Disputed Claim.** No distribution will be made on account of a Disputed Claim unless such claim is an Allowed Claim. If applicable, a reserve may be maintained for such Disputed Claims.

6.4     **Settlement of Disputed Claims.** The Debtor shall have the power and authority to settle and compromise a Disputed Claim with court approval and compliance with Bankruptcy Rule 9019.

6.5     **Uncashed Distributions**. Checks issued by the Debtor or the Subchapter V Trustee as distributions pursuant to the Plan shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof and thereafter shall be treated under the Plan as an unclaimed distribution. The holder of the Allowed Claim to whom such check originally was issued shall make any requests for re-issuance of any check to the Debtor or the Subchapter V Trustee, as applicable. Any requests for re-issuance of such a voided check shall be made on or before forty-five (45) days after the expiration of the ninety (90) day period following the date of issuance of such check. After such date, all funds held on account of any such voided check shall, in the discretion of the Debtor, be used to satisfy the costs of administering and fully consummating the Plan or become available cash for distribution in accordance with the Plan, and the holder of any such Claim shall not be entitled to any other or further distribution under the Plan on account of such Claim and shall be deemed to have waived its Claim and any right to a distribution thereon.

## ARTICLE VII: EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1     **Executory Contracts and Unexpired Leases**. According to Schedule G, the Debtor is a party to several executory contracts and/or unexpired leases.

7.2     **Assumed Executory Contracts and Unexpired Leases.** The Debtor hereby assumes its executory contracts and unexpired leases listed in ***Exhibit E***. The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumption pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code. The cure cots as set forth in ***Exhibit E*** will be paid on the Effective Date of the Plan except with respect to the real estate lease for Blackdog Builder Investment. This landlord has agreed that the Debtor can deduct the required cure costs from open invoices or amounts owed to the Debtor.

7.3     **Rejected Executory Contracts and Unexpired Leases.** The Debtor anticipates there will not be any executory contracts and unexpired leases that that will be rejected as of the Effective Date of the Plan, other than its warehouse space occupancy arrangement with Brattle Development (to the extent section 365 applies). Upon information and belief, Brattle Development has agreed that the Debtor can deduct unpaid post-petition amounts, if any, from open invoices or amounts owed to the Debtor.

Otherwise, all Allowed General Unsecured Claims arising from the rejection of executory contracts or unexpired leases (if any) shall be treated as Claims in Class 10 under the Plan. Any such pre-petition Claim must be filed with the Bankruptcy Court within thirty (30) days after the Effective Date. The Debtor shall have sixty (60) days to object to or seek estimation of any

proof of Claim filed hereunder or such additional time as may be ordered by the Court and may do so on any ground, including without limitation, that the contract or lease in question is not properly regarded as executory or unexpired.

## ARTICLE VIII: MEANS FOR IMPLEMENTATION OF THE PLAN

8.1     **Plan Implementation**. This Plan will be funded with (i) available cash or working capital, (ii) cash flow from ongoing business operation, (iii) Disposable Income, if any, and (iv) proceeds from Potential Litigation and Avoidance Actions, if any.  The Debtor will continue to operate in ordinary course of business.  Pursuant to section 1190(2) of the Bankruptcy Code, the Plan provides for the submission of all or such portion of the future earnings of the Debtor as is necessary for the execution of the Plan.

8.2     **Disposable Income; Best Efforts Test**.  Pursuant to the Debtor's financial projections attached as ***Exhibit B-1*** for the first three years, projected Disposable Income may not be a source of potential distributions to creditors under the Plan. ***Exhibit B-2*** shows some projected Disposable Income in year four to year five but not significant enough to extend the term of the Plan to five years.  As set forth in Sections 1.8 and 5.1 above, the Debtor reserves the right to amend its financial projections and any other relevant Exhibits before the deadline to bring the Avoidance Action in the event the Debtor's financial conditions improve, or after any early repayment of the DIP Financing.

The Debtor believes that its three to five -year forecast is a reasonable reflection of its past performance with proper discount for the anticipated ongoing effect of the COVID-19 pandemic, supply-chain issues, increased costs throughout the construction industry and for shipping expenses, the loss of certain customers and projects pre-petition caused by the unauthorized communications by Merchant Capital and Alpha Recovery Partners, and the loss of customers and projects due to the bankruptcy filing.

For example, according to the tax returns and the Debtor's books and records, the following numbers reflect the Debtor's performance for 2018 to 2021:

- Year 2018: gross receipts or sales of $8,752,768.00 with COGS $2,881,785 (33%) and other business expenses of $5,284,557 (including subcontractor payments of $2,881,785) (60%), resulting in net income of only $626,379.

- Year 2019: gross receipts or sales of $9,240,485.00 with COGS $3,659,114 (40%) and other business expenses of $6,457,079 (including subcontractor payments of $2,993,279.49) (70%), resulting in loss of $-867,648.

- Year 2020: gross receipts or sales of $11,244,187.00 with COGS $4,583,428 (41%) and other business expenses of $8,099,849 (including subcontractor payments of $3,592,976) (72%), resulting in loss of $-1,476,308.

- Year 2021: gross receipts or sale of $10,979,052.00 with COGS $2,861,759 (26%) and other business expenses of $8,196,497 (including subcontractor payments of $4,042,020 (75%), resulting in loss of $-77,258.00.

The financial projections for the next three to five years are within the range for projected gross receipts, cost of goods sold, and other business expenses.

8.3 **Fair and Equitable Analysis**. In the event the impaired classes (Class 3 to Class 10) do not vote to accept the Plan, and the requirements of section 1129(a)(8) and (10) of the Bankruptcy Code are not satisfied, the Bankruptcy Court may still confirm the Plan as part of a non-consensual/ cramdown process under section 1191(b) of the Bankruptcy Code as long as the Plan does not discriminate unfairly, and is fair and equitable, with respect to each impaired class of Claims and Interests that has not accepted the Plan.

Under section 1191(c) of the Bankruptcy Code, the condition that a plan be fair and equitable is different for secured creditors and unsecured claims:

(i) For a secured claim with allowed claim, the provisions under section 1129(b)(2)(A) of the Bankruptcy Code require: (i) lien retention, and payments totally at least the allowed amount of such claim of at least the value of the creditor's interest in the collateral; (ii) in the event of a sale, the creditor's lien to attach to sale proceeds subject to section 363(k), **or** (ii) the realization of the indubitable equivalent of the creditor's claim.

(ii) As a general matter and with respect to unsecured creditors, the fair and equitable requirements include (i) all of the projected disposable income of a debtor to be applied to make payments under the plan, **or** (ii) the value of the property to be distributed under the plan not to be less than the projected disposable income of the debtor. [17] Also, the debtor should be able to make all payments under the plan, **or** there is reasonable likelihood that the debtor will be able to make all payments under the plan (provided the plan provides appropriate remedies to protect the holders of claims or interests in the event that the plan payments are not made).

Based on the above-mentioned requirements of Section 1191(c), the Plan does not discriminate unfairly, and is fair and equitable, with respect to all impaired classes.

---

[17] Similar to section 1129(a)(15) of the Bankruptcy Code, the language of section 1191(c)(2) requires that "the value of the property to be distributed under the plan" cannot be less than the projected disposable income of the debtor. That language does not require that a debtor pay all of its projected disposable income to unsecured creditors but only requires that the value of the property to be distributed under the plan (which would include property distributed to administrative, priority, secured, and unsecured creditors) is not less than the projected disposable income of the debtor. See, In re Pfeifer, 2013 WL 5687512, *2 (Bankr. S.D.N.Y. October 18, 2013) (analysis in the context of section 1129(a)(15)); Baud v. Carroll, 634 F.3d 327, 340 (6th Cir. 2010) (same); In re Angeron, 2018 WL 6601130, *2 (Bankr. E.D. La. December 13, 2018) (same); In re Johnson, 2016 WL 8853601, *15 (Bankr. S.D. Ohio November 10, 2016) (same).

(i)      Under the Plan, each Secured Claim will retain its Lien or security interest and will receive payments totaling at least the allowed amount of its Claim.

(ii)     Whether a claim is secured or unsecured is determined in accordance with section 506(a) of the Bankruptcy Code, which provides that a secured creditor's claim is a "secured claim to the extent of the value of such creditor's interest in the estate's interest in such property… and is an unsecured claim to the extent that the value of such creditor's interest… is less than the amount of such allowed claim."

> (A) Based on the fair market value of the Debtor's assets and expected senior Secured Claims to be Allowed, the SBA Loan may be deemed to be under-secured.  If so, the balance of the SBA Loan will be re-classified as a general Unsecured Claim under the Plan. The security interest and Lien will be released as set forth in the Plan.

> (B)  Pursuant to the amended proof of claim filed for the FCB Equipment Loan, this Claim is undersecured. Therefore, the balance of the FCB Equipment Loan will be re-classified as a general Unsecured Claim under the Plan. The security interest and Lien will be released as set forth in the Plan.

> (C)  Based on the fair market value of the Debtor's assets and expected senior Secured Claims to be Allowed, including the SBA Claim, the Cash Advance Lenders shall be deemed to be wholly unsecured, to the extent they had valid security interests.  Therefore, the Claims of the Cash Advance Lenders shall be re-classified as a general Unsecured Claim under the Plan. The purported security interests and Liens, if any, will be released as set forth in the Plan.

(iii)    The value of the property to be distributed under the Plan is not less than the projected Disposable Income of the Debtor which is minimal.  Also, all proceeds from Potential Litigation and Avoidance Actions, if any, will be used to make distributions under the Plan.

(iv)    Moreover, as required under section 1191(c)(3) of the Bankruptcy Code, the Debtor expects that it will be able to make all payments under the Plan, as set forth in the financial projections attached as ***Exhibit B-1***.  If necessary, Mr. Ramos has agreed to have the Trust grant a mortgage to the Debtor to securing the proposed payments under the Plan, form of which may be filed as a Plan supplement.

8.4    **Execution of Necessary Documents.** Confirmation of the Plan shall constitute authorization for the Debtor, its agents, representatives, partners, affiliates, and successors or

assigns to effectuate the Plan and enter into all documents, instruments and agreements reasonably necessary to effectuate the terms of the Plan.

8.5 **Amendment of Documents.** As of the Effective Date, all pre-Confirmation Date documents and agreements (whether written or oral) between the Debtor and any party, including, without limitation, any instruments, contracts, notes, mortgages, deeds of trust, assignments, bills of sale, leases, property settlement agreements and purchase and sale agreements, shall be deemed to be amended as necessary to effectuate and conform to the terms of the Plan. To the extent that there is any inconsistency between the Plan and any such documents and agreements, the terms of the Plan shall control.

8.6 **Management of the Business.** Mr. Ramos will continue to operate and manage the business after the Effective Date. Before the bankruptcy filing, compensation to Mr. Ramos included salary plus other payments that may be treated as distributions. For the past four years, Mr. Ramos has received approximately $100,000.00 (or less) per year in salary not including distributions. Going forward, Mr. Ramos' compensation package would include approximately $6,000.00 per week, some of which may be taken as distributions. This compensation package reflects reasonable compensation for services being rendered by Mr. Ramos to the Debtor.

8.7 **Vesting of Property; Free and Clear.** Except as otherwise provided in the Plan, as of the Effective Date, all assets of the bankruptcy estate shall vest in the Debtor, and such property shall be free and clear of all claims and interests of creditors or any other interested parties pursuant to sections 1141(b) and (c) of the Bankruptcy Code.

8.8 **Preservation of Causes of Action.** The Debtor will exclusively retain and may enforce, and the Debtor expressly reserves and preserves for these purposes, in accordance with section 1123(a)(5)(A) of the Bankruptcy Code, any Claims, demands, rights and causes of action that the Debtor or it estate may hold against any Person. No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims by virtue of or in connection with the confirmation, consummation of effectiveness of the Plan. The Debtor expects that there are no other causes of action for potential recoveries that would benefit the bankruptcy estate other than as already provided under the Plan. (*See Section 1.8 above*).

## ARTICLE IX: DISCHARGE OF CLAIMS; RELEASE

9.1 **Discharge.** If the Debtor's Plan is confirmed under section 1191(a) of the Bankruptcy Code, on the Effective Date of the Plan, the Debtor will be discharged from any and all debts that arose before confirmation of this Plan, pursuant to section 1141(d)(1)(A). If the Debtor's Plan is confirmed under section 1191(b) of the Bankruptcy Code, the Debtor will be discharged from any and all debts that arose before confirmation of this Plan, subject to completion of all payments proposed under the Plan, pursuant to section 1141(d)(1)(A), as

provided under sections 1181(c ) and 1192 of the Bankruptcy Code.  The Debtor will not be discharged of any debt imposed by this Plan.

9.2     **Injunction Relating to the Plan.**

Upon entry of discharge pursuant to Section 9.1 of the Plan, all Persons are hereby permanently enjoined from commencing, continuing or enforcing in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively or otherwise related to, on account of, or respecting any Claims, debts, rights, obligations, causes of action or liabilities discharged pursuant to the Plan.

During the term of the Plan, all creditors of the Debtor are temporarily enjoined from asserting any actions against the Debtor, Mr. Ramos (as co-debtor or guarantor), any other co-debtors or guarantors of the Debtor's obligations, or their assets and properties.

9.3     **Releases.**  Upon entry of discharge pursuant to Section 9.1 of the Plan, in consideration for, among other things, the obligations of the Debtor under the Plan and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan: (a) each holder of a Claim that votes in favor of the Plan and (b) to the fullest extent permissible under applicable law, each Person that has held, holds or may hold a Claim or at any time was a creditor of the Debtor and that does not vote on the Plan or votes against the Plan, in each case will be deemed to forever release, waive and discharge all Claims, obligations, suits, judgments, damages, demands, rights, causes of action and liabilities (other than the right to enforce the Debtor's obligations under the Plan and the contracts, instruments, releases, agreements and documents delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Bankruptcy Case or the Plan that such entity has, had or may have against the Debtor, the Debtor's estate, and their assets.

9.4     **Exculpation.** Except as otherwise set forth in the Plan, neither the Debtor, nor any of its respective present or former members, officers, directors, employees, general or limited partners, advisors, attorneys, agents, successors or assigns, including the Subchapter V Trustee, shall have or incur any liability to any holder to a Claim, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successor or assigns, for any act or omission in connection with, relating to, or arising out of, the administration of the Chapter 11 bankruptcy proceeding, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan occurring prior to the Effective Date.  Nothing in this Section 9.4 of the Plan shall relieve any of the foregoing parties from carrying out their responsibilities, if any, under the Plan and such exculpation shall not apply to any liability for acts or omissions involving gross negligence or willful misconduct.

9.5     **Cancellation of Existing Indebtedness and Liens.** Upon entry of an order of discharge pursuant to Section 9.1 of the Plan: to the extent applicable, (a) all credit agreements, promissory notes, mortgages, security agreements, invoices, contracts, agreements and any other

documents or instruments evidencing Claims against the Debtor, together with any and all Liens securing same, shall be canceled, discharged, and released without further act or action by any Person under any applicable agreement, law, regulation, order or rule, (b) the obligations of the Debtor thereunder shall be deemed cancelled, discharged, and released, and (c) all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens or other security interests, including any rights to any collateral thereunder, will revert to the Debtor to the extent of applicable law and subject to this Plan.

## ARTICLE XI: GENERAL AND OTHER PROVISIONS

10.1 **Plan Confirmation Hearing; Objection Deadline**. The Bankruptcy Court will schedule a hearing on confirmation of the Plan and to consider whether the Plan satisfies the various requirements of the Bankruptcy Code. Any objection to the Plan shall be filed by the objection deadline to be indicated in a separate notice or Order of the Bankruptcy Court.

10.2 **Voting on the Plan.** All creditors with Allowed Claims and Interests entitled to vote on the Plan, Class 3 (Enterprise Line of Credit), Class 4 (Avidia Equipment Loan), Class 5 (Avidia Equipment Loan), Class 6 (FCB Equipment Loan), Class 7 (SBA Loan), Class 8 (Other Secured Loans), Class 9 (Cash Advance Lenders), and Class 10 (General Unsecured Claims) may cast their votes for or against the Plan by completing, dating, signing and causing the ballot, form of which to be attached to the Plan Procedure Motion, to be returned to the Debtor's counsel by the voting deadline to be indicated in a separate plan filing notice (form of which is attached as an exhibit to the Plan Procedure Motion) or Order of the Bankruptcy Court.

10.3 **Plan Acceptance / Rejection Standard**. Pursuant to section 1126 of the Bankruptcy Code, an impaired class of Claims shall have accepted the Plan if (a) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan, and (b) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan (in both instances, acceptance or rejection by the creditor to be in good faith). If necessary and applicable for confirmation of the Plan, the Debtor reserves the right to request that the Bankruptcy Court address whether the Plan may be deemed accepted or rejected by any impaired Class that does not vote.[18]

---

[18] Courts have adopted the view that although actual acceptance of a plan by at least one class of impaired claims is necessary for a bankruptcy court's confirmation of a plan under section 1129(a)(10), not every creditor is obligated to vote on a plan. See, 11 U.S.C. § 1126(a) (a creditor "may" accept or reject a plan). See, In re Ruti-Sweetwater, Inc., 836 F.2d 1263, 1266 (10th Cir. 1988) (holding that creditor's inaction constituted an acceptance of the plan; a plan is not only presumed confirmable, but is confirmable under § 1129(a) or 1129(b) where only one class of impaired claims has accepted the plan and the other elements of § 1129(a) or §1129(b) are met); In re Cypresswood Land Partners, I, 409 B.R. 396, 430 (Bankr. S.D. Texas 2009) (adopted the view in In re Ruti-Sweetwater and acknowledged the disagreement between courts as to whether a creditor's failure to vote or to object to a plan constitutes acceptance of the plan). But see, In re M. Long Arabians, 103 B.R. 211, 215-216 (BAP 9th Cir. 1989) (holding that the holder of a claim must affirmatively accept the plan). Courts in the First Circuit have cited to In re Ruti-Sweetwater but the First Circuit has not addressed this issue. See, In re Boston Hotel Venture, LLC, 460 B.R. 38, 51 (Bankr. D. Mass. 2011), *vacated on other grounds*, 2012 WL 4513869 (BAP 1st Cir. November 14, 2011) (impaired class that did not vote was deemed to have accepted the plan); In re Fili, 257 B.R. 370, 373 (BAP 1st Cir.

10.4 **Consensual / Nonconsensual Confirmation.** Pursuant to section 1191(a) of the Bankruptcy Code, the Bankruptcy Court shall confirm the Plan if all applicable requirements of section 1129(a) are met. Under section 1191(b) of the Bankruptcy Code, if all of the applicable requirements of section 1129(a) are met other than 1129(a)(8) (each class of claims or interests to accept the plan if impaired) and 1129(a)(10) (if a plan has impaired class of claims, at least one class of claims to accept the plan), the Bankruptcy Court may still confirm the Plan if the Plan does not discriminate unfairly, and is fair and equitable (*See Sections 8.2 and 8.3 above*).

There are eight impaired classes under the Plan: Class 3 (Enterprise Line of Credit), Class 4 (Avidia Equipment Loan), Class 5 (Avidia Inventory Loan), Class 6 (FCB Commercial Finance Loan), Class 7 (SBA Loan), Class 8 (Other Secured Loans), Class 9 (Cash Advance Lenders), and Class 10 (General Unsecured Claims). In the event holders of Claims in any such Class 3 to Class 10 vote to accept the Plan by the requisite majority provided in section 1126(c) of the Bankruptcy Code, section 1129(a)(10) will be satisfied. Section 1129(a)(8) will be satisfied if all eight impaired classes vote to accept the Plan. If the requirements of both sections 1129(a)(8) and (a)(10) are met, the Debtor will seek confirmation of the Plan pursuant to section 1191(a) of the Bankruptcy Code. Otherwise, the Debtor will seek confirmation of the Plan pursuant to section 1191(b) of the Bankruptcy Code.

10.5 **Best Interest Test and Liquidation Alternative**

Section 1129(a)(7)(A)(ii) of the Bankruptcy Code requires that each holder of a claim or an interest in an impaired class of claims must either accept the Plan or receive or retain at least the amount or value it would receive if the Debtor's assets were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. The Debtor believes that this requirement is satisfied under the Plan. Pursuant to sections 1129(a)(7) and 1190(1)(B) of the Bankruptcy Code, a Liquidation Analysis is attached as ***Exhibit A***. Creditors will receive under the Plan more than the amount they would have received if the Debtor's assets were liquidated.

In addition, if the case is converted to Chapter 7 a trustee would be appointed which would result in additional administrative costs as the Chapter 7 trustee would need to hire new professionals to analyze and liquidate the Debtor's assets. The conversion would result in the establishment of a new bar date and would require the new trustee to re-analyze the claims filed against the Debtor.

10.6 **Plan Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that the Plan be feasible (that is, that there be a reasonable prospect that the Debtor will be able to perform its obligations under the Plan without further financial reorganization). As set forth in Section 8.1 above, the sources of payments under the Plan will be (i) available cash or working capital, (ii) cash flow from

---

2001) (citing to In re Ruti-Sweetwater in the context of res judicata effect, stating that chapter 11 plan's discharge provisions bound non-voting, non-objecting creditor with notice).

ongoing business operation, (iii) Disposable Income, if any, and (iv) proceeds from Potential Litigation and Avoidance Actions, if any.

While the net cash flow may be insufficient to have Disposable Income, the Debtor expects the business to have enough revenue to cover the operating business expenses, and other payments contemplated under the Plan going forward. Pursuant to section 1190(1)(C) of the Bankruptcy Code, **_Exhibit B_** attached hereto is the Debtor's financial projections for the next five years. **_Exhibits E_** attached hereto has the Debtor's proposed Plan distributions.

10.7    **Effect of Non-occurrence of Effective Date.** If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against the Debtor, or (b) prejudice in any manner the rights of the Debtor, or constitute an admission, acknowledgement, offer or undertaking by the Debtor.

10.8    **Tax Consequences.** The Debtor has not requested a ruling from the Internal Revenue Service with respect to these matters and no opinion of counsel has been sought or obtained by the Debtor with respect thereto. There can be no assurance that the Internal Revenue Service or any state or local taxing authorities will not challenge any or all of the tax consequences of the Plan, or that such a challenge, if asserted, would not be sustained. FOR THE FOREGOING REASONS, CREDITORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES (FOREIGN, FEDERAL, STATE AND LOCAL) TO THEM OF THE PLAN. THE DEBTOR IS  NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CREDITOR OR EQUITY HOLDER, NOR IS THE DEBTOR RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.

10.9    **Reservation of Rights**. The Debtor reserves the right to, among other things, (i) contest the right of the holder of any Claim to vote on the Plan, or designate the vote of the holder of any Claim (ii) contest the right of the holder of any Claim to receive distributions under the Plan, (iii) contest the validity of a creditor's Lien or security interest, (iv) seek to subordinate any Claim for inequitable conduct or otherwise, and (iv) to pre-pay all or any portion of an Allowed Claim, through refinancing, additional exit financing or otherwise. Except as otherwise provided, no assets shall be deemed abandoned and no defense, set-off, counterclaim or right of recoupment of the Debtor shall be deemed waived, released or compromised.

10.10    **Amendment or Modification of the Plan**. The Debtor shall be permitted to amend, supplement, or modify the Plan at any time, so long as such amendment, supplement, or modification satisfies the restrictions and requirements in section 1193 of the Bankruptcy Code.

10.11    **Substantial Consummation; Case Closure.** If the Plan is confirmed pursuant to section 1191(a), the role of the Subchapter V Trustee will be terminated, pursuant to section 1183(c)(1), after the filing of a notice of substantial consummation of the Plan. Upon substantial consummation of the Plan, the Debtor shall (i) file the notice required under section 1183(c)(2) (ii) file a motion for the case to be closed and for final decree pursuant to MLBR 3022-1, and

(iii), if required, file a motion or request for entry of discharge under section 1192 of the Bankruptcy Code.

10.12 **Risks Associated With Plan Distributions**. Distributions under the Plan rely on the Debtor's revenue going forward. The Debtor or the Subchapter V Trustee, as applicable, may not be able to make the projected distributions under the Plan in the event the actual revenue numbers do not reach the projected amounts during the three-year term of the Plan, or if actual operating expenses are more than the projected amounts, including with respect to price of materials, shipping costs, and labor costs. Other events that could affect proposed distributions under the Plan, particularly to Class 10 (General Unsecured Claims) include:

(i) if there is an increase in Administrative Expense Claims due to further litigation or otherwise;

(ii) any filing of substantial Priority Tax Claims or Other Priority Claims;

(iii) if Potential Litigation, and/or Avoidance Actions are pursued but the bankruptcy estate does not recover sufficient proceeds from such proceedings;

(iv) if the Debtor is not able to timely refinance or pay the DIP Financing;

(v) any downturn in the real estate market or construction industry during the term of the Plan; or

(vi) any further restrictions during the term of the Plan due to any pandemic, including Covid-19.

10.13 **Effective Date**. The effective date of the Plan shall be the first business day following the date that is 14 days after the entry of the Confirmation Order (the "**Effective Date**"). If, however, a stay of the Confirmation Order is in effect on that date, the Effective Date will be the first business day after the date on which the stay expires or is otherwise terminated.

10.14 **Severability.** If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

10.15 **Binding Effect.** The rights and obligations of any Person named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such Person.

10.16 **Captions.** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of the Plan.

10.17 **Controlling Effect.** Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Massachusetts, without giving effect to the principles of conflicts of law of such jurisdiction.

10.18   **Corporate Governance.**  The Debtor's organizational documents do not provide for issuance of non-voting equity securities or any preferred class of equity securities, as referred to under section 1123(a)(6) of the Bankruptcy Code, to the extent applicable.

10.19   **Retention of Jurisdiction**.  Pursuant to sections 105(a) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Plan, the Confirmation Order, and the Bankruptcy Case to the fullest extent permitted by law.

## ARTICLE IX: DEFINITIONS

11.1   **Definitions and Rules of Construction.**  The definitions and rules of construction contained in sections 101 and 102 of the Bankruptcy Code shall apply when the terms defined or construed in the Bankruptcy Code are used in the Plan but not defined.  For purposes of the Plan, the following terms shall have the meanings specified herein:

"Administrative Expense Claim" shall means any cost or expense of administration of the Bankruptcy Case arising on or before the Effective Date allowable under section 503(b) or 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary post-petition expense of preserving the Debtor's estate or operating the business, all Professional Fee Claims, all to the extent not properly paid previously by the Debtor in the ordinary course or pursuant to Bankruptcy Court order.

"Allowed" shall have the meaning set forth in Section 5.2 of the Plan.

"Avidia Equipment Loan" shall have the meaning set forth in Section 1.4 of the Plan (Part A).

"Avidia Inventory Loan" shall have the meaning set forth in Section 1.4 of the Plan (Part A).

"Avoidance Actions" shall mean any avoidance claims or powers held by the Debtor or any trustee for the Debtor, including those avoidance powers set forth in sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, or to the proceeds of any related claims, or actions commenced pursuant to such powers.

"Bankruptcy Case" shall mean the Debtor's Chapter 11 bankruptcy case pending in the Bankruptcy Court, Case No. 22-40216 (EDK).

"Bankruptcy Code" shall mean Title 11 of the United States Code, 11 U.S.C. §§101 et seq., as amended from time to time.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Massachusetts in which the Bankruptcy Case is pending.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure as promulgated under 28 U.S.C. § 2075, and any local rules of the Bankruptcy Court.

"Cash Advance Lenders" shall mean certain creditors with cash advance agreements, such as (i) merchant cash advance agreements, (ii) agreement for purchase and sale of future receipts, (iii) future receivables sale and purchase agreements, and (iv) revenue purchase agreement, including as set forth in **_Exhibit C_** attached to the Plan, and as further identified in the Cash Collateral Motion.

"Cash Collateral Motion" shall have the meaning set forth in Section 1.7 of the Plan.

"Cash Collateral Order" shall have the meaning set forth in Section 1.7 of the Plan.

"Claim" shall mean a claim against a Person or its property as defined in section 101(5) of the Bankruptcy Code, including, without limitation, (a) any right to payment, whether or not such right is reduced to judgment, and whether or not such right is liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy for breach of performance, if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, or is fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

"Claims Objection Deadline" means the later of (i) sixty days after the Effective Date, and (ii) such greater period of limitation for the filing of an objection to any Claim as may be fixed or established by the Bankruptcy Court or by agreement between the Debtor and the Claim holder.

"Confirmation Date" shall mean the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket in this Bankruptcy Case.

"Confirmation Order" shall mean the order of the Bankruptcy Court confirming the Plan pursuant to the provisions of the Bankruptcy Code, and any supplementary orders of the Bankruptcy Court issued in furtherance of the Plan.

"Debtor" shall have the meaning set forth in the preamble to the Plan, and shall include the confirmed Debtor after the Effective Date of the Plan, as applicable.

"DIP Credit Agreement" shall have the meaning set forth in Section 1.4 of the Plan.

"DIP Financing" shall have the meaning set forth in Section 1.4 of the Plan.

"DIP Financing Motion" shall have the meaning set forth in Section 1.7 of the Plan.

"DIP Financing Order" shall have the meaning set forth in Section 1.7 of the Plan.

"DIP Lender" shall have the meaning set forth in Section 1.4 of the Plan.

"DIP Lien" shall have the meaning set forth in Section 1.4 of the Plan.

"Disallowed Claim" shall mean (a) any Claim that has been disallowed or expunged by a final order; (b) any Claim that has been listed by the Debtor in the Schedules in the amount of "$0" or as unliquidated in amount, disputed, contingent, or unknown and for which a bar date has been established but no proof of claim has been timely filed; or (c) unless otherwise specified herein

or by order of the Bankruptcy Court, any interest, fees and other charges, fines, penalties, multiple or punitive damages.

"Disposable Income" shall mean the "disposable income" of the Debtor as defined under section 1191(d) of the Bankruptcy Code. The Debtor's projected Disposable Income, if any, is calculated under ***Exhibit D*** attached to the Plan.

"Disputed Claim" shall mean: (i) all or the portion of any Claim against the Debtor that is neither an Allowed Claim nor Disallowed Claim, including any Claim as to which the Debtor interposed an objection or request for estimation on or before the Claims Objection Deadline, which objection or request for estimation has not been withdrawn or determined by a final order; (ii) a Claim as to which the holder of such Claim is a defendant in a pending Avoidance Action, or has failed to pay or turn over property as required by section 502(d) of the Bankruptcy Code; or (iii) a Claim that is otherwise treated as a "Disputed Claim" pursuant to the Plan, or scheduled as disputed, contingent, or unliquidated, including Claims of the Cash Advance Lenders.

"Effective Date" shall have the meaning set forth in Section 10.14 of the Plan.

"Enterprise Bank" shall have the meaning set forth in Section 1.4 of the Plan (Part A).

"FCB" shall have the meaning set forth in Section 1.4 of the Plan (Part A).

"FCB Equipment Loan" shall have the meaning set forth in Section 1.4 of the Plan (Part A).

"Guaranty Claim" shall have the meaning set forth in Section 1.4 of the Plan (Part H).

"General Unsecured Claim" shall mean a Claim against the Debtor, including any trade vendor claim, that is not an Administrative Expense Claim, a Priority Tax Claim, or a Claim under Classes 1-8. General Unsecured Claims shall include (i) Non-Priority Tax Claims, if any, (ii) any deficiency Claim amount, (iii) the wholly unsecured Claims of the Cash Advance Lenders, ((vi) the Insider Claims, and (vii) any Paycheck Protection Program (PPP) loan to the extent not already forgiven. ***Exhibit C*** provides for a list of the scheduled and/or filed General Unsecured Claims.

"Insider Claims" shall have the meaning set forth in Section 1.4 of the Plan (Part G).

"Interests" means any equity or membership interest in the Debtor, whether in the form of common or preferred stock, stock options, warrants, partnership interests, membership interests, any other right to purchase or otherwise receive any ownership interest in the Debtor, or other interest or related right to payment or compensation based upon such interest, existing on or before the Effective Date.

"Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code and shall include all writs of attachment, and lis pendens; except that (a) a lien that has been avoided in accordance with sections 544, 545, 546, 547, 548, 549 or 553 of the Bankruptcy Code shall not constitute a Lien, and (b) no lien shall be valid unless approved by a final order or by agreement of the Debtor.

"Lienholders" shall have the meaning set forth in Section 1.5 of the Plan.

"Mr. Ramos" shall have the meaning set forth in Section 1.1 of the Plan.

"Non-Priority Tax Claims" means any Claim of a governmental unit not entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

"Other Priority Claims" means an allowed Claim entitle to priority under section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim or Priority Tax Claim.

"Other Secured Loans" means certain vehicle related loans.

"Person" shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated association or organization, governmental agency or political subdivision.

"Petition Date" shall have the meaning set forth in the case background section of the Plan.

"Plan" shall mean the *First Amended Chapter 11 Plan of Reorganization For Small Business Debtor Under Subchapter V*, including, without limitation, any Exhibits and any plan supplement documents, as the same may be altered, amended or modified from time to time.

"Plan Procedure Motion" shall have the meaning set forth in Section 1.7 of the Plan.

"Post-petition Liens" shall have the meaning set forth in Section 1.5 of the Plan.

"Potential Litigation" shall have the meaning set forth in Section 1.8 of the Plan.

"Priority Tax Claims" shall mean any Claim of a governmental unit entitled to priority under section 507(a)(8) of the Bankruptcy Code, including the accrued and unpaid real estate tax obligations for the Real Estate.

"Professional Fee Claims" shall mean the fees and expenses of professionals (employed pursuant to sections 327 and 1183 (a) of the Bankruptcy Code) under sections 328, 329, 330, 331, 503, 507(a) or 1191(e) of the Bankruptcy Code approved by an Order of the Bankruptcy Court.

"Real Estate" shall have the meaning set forth in Section 1.1 of the Plan.

"Real Estate Lease" shall have the meaning set forth in Section 1.1 of the Plan.

"Remaining Funds" shall mean (i) the Debtor's Disposable Income, if any (ii) any portion of the proceeds from Potential Litigation (as permitted to be used by the DIP Lender for distribution to other creditors under the Plan), and (iii) any proceeds of Avoidance Actions.

"SBA" shall mean U.S. Small Business Administration.

"SBA Loan" shall have the meaning set forth in Section 1.4 of the Plan (Part B).

"<u>Schedules</u>" shall mean the bankruptcy schedules of assets and liabilities and the statements of financial affairs filed by the Debtor under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists and statements may be supplemented or amended from time to time.

"<u>Secured Claim</u>" shall mean any Claim that is secured by a Lien on property to the extent of the value of such property, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is a claim of setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

"<u>Senior Claims</u>" shall have the meaning set forth in Section 1.4 of the Plan (Part A).

"<u>Status Report</u>" shall have the meaning set forth in Section 1.7 of the Plan.

"<u>Subchapter V Trustee</u>" shall have the meaning set forth in the case background section of the Plan.

"<u>Trust</u>" shall have the meaning set forth in Section 1.1 of the Plan.

"<u>US Construction</u>" shall have the meaning set forth in Section 1.1 of the Plan.

"<u>Wage Order</u>" shall have the meaning set forth in Section 1.7 of the Plan.

Respectfully submitted,

TOP LINE GRANITE DESIGN INC.

By its bankruptcy counsel

RIEMER & BRAUNSTEIN LLP

*/s/ Macken Toussaint*
Macken Toussaint (BBO # 645067)
Alan L. Braunstein (BBO #546042)
100 Cambridge Street
Boston, Massachusetts 02114
Tel: (617) 523-9000
Fax: (617) 880-3456
mtoussaint@riemerlaw.com
abraunstein@riemerlaw.com

DATED: July 1, 2022

EXHIBITS *


Exhibit A: Liquidation Analysis
Exhibit B-1: Financial Projections (Year 1 to Year 3)
Exhibit B-2: Financial Projections (Year 4 to Year 5)
Exhibit C: Prepetition Claims Analysis

Exhibit D: Projected disposable income and proposed plan distributions
Exhibit E: Assumption / Rejection of Executory Contracts and Unexpired Leases


* The Debtor reserves the right to modify or amend any of the  Exhibits or to add new Exhibits
to the Plan as supplement by filing a notice to that effect.

3280154.3