UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>TOP LINE GRANITE DESIGN INC. [1]<br><br>Debtor. | Case No. 22-40216 (EDK)<br><br>Chapter 11 |

## STATUS REPORT REGARDING (I) SALE OF THE DEBTOR'S ASSETS AND (II) FILED OBJECTIONS

On September 21, 2022, Top line Granite Design Inc. (the "**Debtor**") filed a motion for an order authorizing and approving sale of the Debtor's assets to FGC EPC, LLC, subject to counteroffers [Doc. No. 176] (the "**Sale Motion**"). On October 3, 2021, the Debtor filed a Supplement to Sale Motion [Doc. No. 194] (the "**Sale Motion Supplement**"). On October 4, 2022, the Court entered the Order Approving Sale and Bidding Procedures and Breakup Fee in Connection With Proposed Sale of Assets of the Debtor [Doc. No. 196] (the "**Sale Procedures Order**").[2] Pursuant to the Sale Procedures Order and related Bid Procedures, the Bid Deadline was November 4, 2022 by 5:00 p.m. The sale hearing is scheduled for November 8, 2022.

1.      The Debtor did not receive any counteroffer by the Bid Deadline.

2.      The following three objections or responses to the Sale Motion were filed by the Objection Deadline:

(A)      Ally Bank's response to the Sale Motion [Doc. No. 199]: In its response, Ally Bank objects to the sale of its automobile collateral (2021 GMC SIERRA) unless the sale amount is sufficient to pay the loan balance. Since filing of the response, the Debtor's counsel

---

[1] A/k/a Design Top Line Granite, and aka Top Line Granite Design. The Debtor's name was changed from Brazil Stones Inc. in November 2005.

[2] Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Sale Motion or the Sale Procedures Order.

has clarified to Ally Bank's attorney that the Sale Motion proposed to assume and assign the financing contract, not to sell the collateral. The parties have agreed to exclude the collateral from the list of Assigned Contracts.

(B)     Avidia Bank's Objection to the Sale Motion [Doc. No. 201]: As part of this objection Avidia Bank reserves its rights with respect to any carve out or deduction from the net sale proceeds for professional fees, to the extent necessary. The parties continue to discuss the option for such plan funding and agree that all rights of Avidia Bank and the Debtor are reserved. The Debtor's counsel anticipates such issue may be addressed by the Court in connection with approval of the fee applications to be filed by the Debtor's professionals, hearing on any motion for section 506(c) surcharge, and/ or hearing on confirmation of any amended chapter 11 plan of the Debtor.

(C)     U.S. Trustee's Objection to the Sale Motion [Doc. No. 204]: This objection requests, among other things, information about the terms of certain agreements between the proposed buyer and insiders of the Debtor: (i) proposed commercial lease with 347 Middlesex Road Realty Trust, and (ii)  proposed  consulting agreement with the Debtor's principal, Edmilson Ramos. A copy of the recent draft commercial lease is attached as **Exhibit A**. A copy of the recent draft consulting agreement is attached as **Exhibit B**. The Sale Motion Supplement and the attached consulting agreement discuss the purpose and business reasons for such post-closing consulting services.

Respectfully Submitted,

TOP LINE GRANITE DESIGN INC.

By its bankruptcy counsel,

*/s/ Macken Toussaint*
Macken Toussaint (BBO# 645076)

2

Alan L. Braunstein (BBO #546042)
RIEMER & BRAUNSTEIN LLP
100 Cambridge Street
Boston, Massachusetts 02114
Tel: (617) 523-9000
mtoussaint@riemerlaw.com
abraunstein@riemerlaw.com

Dated: November 7, 2022

**EXHIBIT A**
(Proposed Commercial Lease)

## <u>COMMERCIAL TRIPLE NET LEASE</u>

**THIS LEASE** (the "Lease") is entered into this ____day of _____, 2022, by and between 347 Middlesex Road Realty Trust, a Massachusetts Realty Trust with a principal office address of 347 Middlesex Road, Tyngsboro, MA 01879 ("Landlord"), and FGC EPC, LLC a Massachusetts domestic limited liability company , with a principal business address at 24 Rodman Lane, North Kingstown, RI 02852 ("Tenant").

Article I.    <u>Leased Premises</u>.

A. Landlord hereby leases to the Tenant and Tenant hereby leases from the Landlord 455,000 sq.ft. +/- of land and a 38,500 sq. ft. building (the "Building") located at 347 Middlesex Road, Tyngsboro, MA 01879 as shown on the Plan attached hereto as **<u>Exhibit A</u>** (hereafter collectively refered to as the "Premises").

Article II.    <u>Term</u>.  The initial term shall be a period of five (5) years, which term may be extended pursuant to Article XXIII below.  The initial term and any extension of that term are referred to in this Lease as the "Term."  The Term shall begin on the "Commencement Date" which shall be the date on which the Tenant's purchase of certain assets from Top Line Granite Design Inc. closes under the terms of the Asset Purchase Agreement dated as of September 20, 2022 between the Tenant and Top Line Granite Design Inc. (the "Closing").  If the Closing has not occurred by January 15, 2023 this Lease shall automatically terminate with no financial or other obligation on the part of either the Tenant of the Landlord.

Article III.    <u>Rent</u>.

A. <u>Base Rent</u>.  Installments of Base Rent in the amount of $36,000.00 per month shall be due on the first day of every calendar month beginning on the first day of the first calendar month after the month during which the Commencement Date occurs. Base Rent for partial months at the beginning or end of the Term including, without limitation, the month during which the Commencement Date occurs, shall be <u>pro-rated</u> on a per diem basis, calculated on the basis of a thirty (30) day month.  The <u>pro-rated</u> payment for the month in which the Commencment Date occurs shall be paid on the Commencement Date.  In addition, Tenant shall, on July 15, 2023, pay the $36,000 rent payment due for the final month of the initial Term, provided that the Tenant's gross revenues for the six-month period ended on June 30, 2023 are $600,000.00 or more.

B. Landlord and Tenant agree to execute a Commencement Certificate, that is substantially in the form as attached hereto as **<u>Exhibit B</u>** upon delivery of the premises.

C. <u>Additional Rent</u>.  All obligations payable by Tenant under this Lease other than Base Rent are called "Additional Rent".  Additional Rent for Operating Expenses including Real Estate Taxes, Common Area Maintenance (CAM) and Property Insurance, as provided in Article V below, shall be due and paid in conjunction with Base Rent. Unless otherwise expressly provided herein, any other Additional Rent due hereunder

shall be due and payable to Landlord within thirty (30) days of delivery of an invoice therefore from Landlord to Tenant.

D. <u>Interest, Late Charges, Costs and Attorneys' Fees</u>. If Tenant fails to pay within five (5) days of the date due any Rent which Tenant is obligated to pay under this Lease, such unpaid amount shall bear interest at twelve (12%) percent per annum. Tenant acknowledges that any late payments of Rent shall cause Landlord to lose the use of that money and incur costs and expenses not contemplated under this Lease, including without limitation administrative, collection and accounting costs, the exact amount of which is difficult to ascertain. Therefore, in addition to interest, any payment of Rent not received by Landlord within five (5) days from the date it is due, Tenant shall also pay Landlord a late charge equal to five (5%) percent of the late Rent. Further, as Additional Rent, Tenant shall be liable to Landlord for any costs, including attorneys' fees, incurred by Landlord as a result of late payments or non-payments. Acceptance of any interest, late charge, costs or attorneys' fees shall not constitute a waiver of any default by Tenant nor prevent Landlord from exercising any other rights or remedies under this Lease or at law.

E. The Landlord shall not be obligated to pay any charge nor bear any expense whatsoever against or with respect to the Leased Premises unless specifically stated herein, nor shall the rent payable by Tenant be subject to any reduction or offset at all on account of any charge or for any other reason unless the same is specifically provided for herein.

Article IV.    <u>Use.</u> The Tenant warrants and represents that it shall use and occupy the Premises only for the purpose of operating a retail and wholesale business selling and installing natural stone, cabinets, flooring, other home improvement products, and related services and for no other purpose without Landlords written consent. Tenant shall not do or permit to be done in or about the Premises anything which is prohibited by or in any way in conflict with any and all laws, statutes, zoning by-laws, ordinances, rules and regulations now in force or which may hereafter be enacted or promulgated by any applicable governmental authority or which is prohibited by the standard form of fire insurance policy, or which will increase the existing rate of or affect any fire or other insurance upon the Premises or any of its contents, or cause a cancellation of any insurance policy covering the Premises or any part thereof or any of its contents.

Article V.    <u>Operating Expenses.</u>

A. This Lease is intended to be a triple net (NNN) lease. Throughout the Term of this lease, Tenant shall be responsible for the contracting and management of all Premises services to include maintenance, repairs, utilities and other expenses within the Premises. Tenant shall reimburse Landlord for Real Estate Taxes, Common Area Maintenance (CAM) and Property Insurance. "Common Area Maintenance" shall mean all expenses, costs and disbursements which Tenant shall pay or become obligated to pay in connection with operating, maintaining and repairing the Premises, Common Areas

and Parking Areas, snow removal, landscaping, operation of any common security system, or heating and air conditioning system. The amount of the NNN assessment shall be calculated annually based on actual expenses incurred. Landlord shall provide Tenant with a detailed accounting annually.

B. <u>Dumpster</u>. The Tenant shall provide for its own dumpster and any costs associated therewith shall be the sole responsibility of the Tenant. Tenant shall coordinate with the Landlord with respect to the location of any dumpster and ensure placement of the dumpster does not violate any local zoning by-law or regulation.

C. Tenant agrees not to utilize the upper portion of the undeveloped property as depicted on the attached Plan for any storage or business activities unless authorized by the Landlord and the town of Tyngsboro in writing.

Article VI.        <u>Condition of Premises</u>.

A. The taking of possession of the Premises by Tenant shall be conclusive evidence as against Tenant: (a) that it accepts the Premises "as is" and with all faults, as suitable for the purposes for which same are leased; and (b) that Tenant waives any defects in the Premises. Landlord shall not be liable, except in the event of its gross negligence or willful misconduct, to Tenant or any of its agents, employees, licensees, servants or invitees for any injury or damage to person or property due to the condition or design of or any defect in the Property or its mechanical systems and equipment which may currently exist or hereafter occur.

TENANT HEREBY ACKNOWLEDGES THAT LANDLORD MAKES NO WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, NOT SPECIFICALLY SET FORTH HEREIN, WHETHER WITH RESPECT TO THE PHYSICAL CONDITION OF THE PREMISES OR PROPERTY OR ANY OTHER MATTER. TO THE MAXIMUM EXTENT PERMITTED BY LAW, LANDLORD DISCLAIMS ANY SUCH WARRANTIES, SPECIFICALLY INCLUDING, BUT NOT LIMITED TO, ANY WARRANT OF HABITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. IN NO EVENT SHALL LANDLORD BE LIABLE TO TENANT FOR CONSEQUENTIAL DAMAGES.

B. <u>Tenant's Construction.</u> Tenant shall be responsible, at its sole cost and expense, for all additional construction and build-out to prepare the Premises for the Tenant's intended use. Any and all proposed construction, build-out or sought after alterations of the leased premises in any form or nature must be approved in writing by Landlord prior to undertaking the same. Landlord shall have the full right and discretion to reject any such proposed construction, build-out or alterations of the leased premises. Such improvements shall be made in a good and workmanlike manner and in compliance in all material respects with all applicable laws and at Tenant's sole expense. Prior to the start of such work, Tenant shall furnish Landlord with design and construction plans and specifications prepared at Tenant's sole expense. Tenant shall require any contractor

performing work on the Premises to carry and maintain, at no expense to the Landlord, comprehensive general liability insurance and other insurance in amounts and on terms reasonably determined by the Landlord and provide the Landlord with satisfactory proof of that insurance from time to time. Tenant shall not begin work on such improvements and additions until it obtains Landlord's written approval of the plans, such consent not to be unreasonably withheld or delayed.  The Tenant will save Landlord harmless, and will exonerate and indemnify Landlord from and against any and all claims, liabilities or penalties on account of or based upon any injury to person, or loss of or damage to property sustained in or occurring or emanating from the Tenant's Construction.

Article VII.    Additions, Alterations, and Trade Fixtures.

A. By Landlord.  Landlord hereby reserves the right to make alterations or additions to the Building in which the Premises are contained, provided that it shall undertakte such actions only after notifying Tenant of its plans and consulting with the Tenant with respect to the planned actions and only in a manner that does not interfere in any way with the business of the Tenant.

B. Trade Fixtures.  All trade fixtures and equipment installed by Tenant in the Premises shall be new or completely reconditioned and shall remain the property of Tenant.  Provided Tenant is not in default hereunder, Tenant shall have the right, at the termination of this Lease, to remove any and all trade fixtures, equipment and other items of personal property not constituting a part of the freehold which it may have stored or installed in the Premises, including, but not limited to, counters, shelving, show cases, chairs, and movable machinery purchased or provided by Tenant and which are susceptible to being moved without damage to the Building, provided this right is exercised at the Lease Termination and provided that Tenant shall repair any damage to the Premises caused thereby.  The right granted to Tenant in this Section shall not include the right to remove any plumbing or electrical fixtures or equipment, heating or air-conditioning equipment, floor coverings (including wall to wall carpeting) glued or fastened to the floors or any paneling, tile or other materials fastened or attached to the walls or ceilings, all of which shall be deemed to constitute a part of the freehold, and, as a matter of course, shall not include the right to remove any fixtures or machinery that were furnished or paid for by Landlord.  Buildings shall be left in a broom-clean condition.  If Tenant shall fail to remove its trade fixtures or other property at the termination of this Lease or within ten (10) days thereafter, such fixtures and other property not removed by Tenant shall be deemed abandoned by Tenant, and, at the option of Landlord, shall become the property of Landlord subject, however, to any lien or security interest which may exist with respect to such fixtures or other property.

Article VIII.    Repairs and Maintenance.

A. Unless otherwise specifically provided for in this Lease, Tenant shall be responsible for maintaining the Premises. Tenant shall also keep all windows and doors of the Premises in good order and repair. Landlord shall be responsible for maintaining the roof and structural elements of the property, except that the Tenant shall be responsible for maintaining and repairing structural elements damaged or worn out as a result of the installation or operation of Tenant's leasehold improvements or otherwise as a result of Tenant's negligence or recklessness.

B. Tenant shall, at the end of the Term or sooner termination, peaceably surrender the Premises and all erections, alterations and additions thereon made to or upon the same, to Landlord, broom clean and in the same "as is" condition as specified in Article VI.A above subject only to such erections, alterations and additions were when completed, reasonable wear and tear, fire and other casualty only excepted; and will remove all personal property, goods and effects, including, without limitation, all of its trade fixtures, awnings, canopies and signs, and all lettering, if any, painted on any doors with or without Landlord's consent. Tenant shall be responsible for all damage or injury to the Premises and the Building caused by Tenant's installation or removal of furniture, fixtures or equipment. The parties agree that all leasehold improvements, additions or erections which cannot be reasonably removed shall be deemed fixtures and become Landlord's property at the termination of this Lease, subject, however, to any lien or security interest which may exist with respect to such fixtures or other property; provided, however, Tenant shall retain title to such improvements, additions or erections, until the termination of this Lease.

Article IX.    Tenant's and Landlord's Covenants

A. Utilities. The utilities, including but not necessarily limited to water, sewer, electric, and gas utilities, shall be separately metered and the Tenant shall pay directly to the respective Service Providers for all expenses, costs and disbursements which Tenant shall become obligated to pay from and after the Term Commencement Date in connection with these utility services. Tenant shall also be responsible for Tenant's own telephone, internet, and/or security systems including the installation and equipment associated therewith. At Landlord's request, Tenant shall furnish Landlord with evidence reasonably satisfactory to it that such utilities have been paid. In the event Tenant requires additional utilities or equipment, the installation and maintenance thereof shall be the Tenant's sole obligation; provided, however, Tenant shall obtain Landlord's prior written consent prior to making such installations.

B. Liability Insurance. Tenant shall, at its sole cost and expense, procure and maintain throughout the Term a policy or policies of general comprehensive liability insurance insuring Tenant, Landlord and Landlord's mortgage lender against any and all liability for injury to or death of a person or persons and for damage to or destruction of property occasioned by or arising out of or in connection with the use or occupancy of the Premises or by the condition of the Premises. Such policy or policies shall contain a blanket contractual liability endorsement (including the contractual liability of Tenant to indemnify Landlord contained herein) and shall contain limits of liability of not less than

$1,000,000.00 per occurrence and $2,000,000 aggregate in respect of injuries to or death of any person(s), or property damaged or destroyed, or such other limits as may be required by Landlord or Landlord's mortgage lender, and shall be written by an insurance company or companies satisfactory to Landlord and Landlord's mortgage lender and licensed to do business in the State of Massachusetts, with Landlord and Landlord's mortgage lender named as an additional insured. Tenant shall obtain a written obligation of the part of each insurance company issuing such policy(ies) to notify Landlord at least thirty (30) days prior to cancellation of such insurance. Such policies or duly executed certificates of insurance relating thereto shall be promptly delivered to Landlord and renewals thereof, shall be delivered to Landlord at least thirty (30) days prior to the expiration of the respective policy terms. If Tenant fails to comply with the foregoing requirements, Landlord may, but shall have no obligation to, obtain such insurance for Tenant and Tenant shall pay to Landlord, on demand, the premium cost thereof, as Additional Rent.

      C. <u>Tenant's Taxes</u>. Tenant covenants and agrees to pay promptly when due all Taxes imposed upon its business operation and its personal property situated in the Premises.

      D. <u>Tenant's Permits, Licenses, and Approvals</u>. Tenant shall be responsible for obtaining any and all permits, licenses, and/or approvals which may be applicable to the operation of Tenant's business in the Premises at Tenant's sole cost and expense.

      Article X.    <u>Assignment/Subleasing</u>. Tenant shall not assign, sublet, underlet, mortgage, pledge or encumber (collectively referred to as "transfer") this lease without Landlord's prior written consent.

      Article XI.    <u>Compliance with Law and Insurance Policies</u>. Tenant, at its sole expense, shall use reasonable best efforts to comply in all material respects with all laws, orders and regulations of Federal, State, County and City Authorities. Tenant shall not do or Permit to be done anything upon the Premises which will invalidate, or be in conflict with, fire insurance policies covering the Building and fixtures and property therein and shall not do, or permit to be done, anything upon the Premises which might subject Landlord to any liability or responsibility for injury to any person or to property; and Tenant, at its sole expense, shall use reasonable best efforts to comply in all material respects with all rules, orders, regulations or requirements of the Board of Fire Underwriters, or any other similar body, and shall not do or permit anything to be done or kept on the Premises, except as permitted by the Fire Department, Board of Fire Underwriters, Fire Insurance Rating organization, or other governmental entities. Except for those materials necessary for the cleaning and maintenance of Tenant's business, which shall be properly stored to minimize the risk of fire and explosion, there shall not be brought or kept in or on the Premises any inflammable, combustible or explosive fluid, material, chemical or substance. If the insurance premiums for the Building increase because of anything Tenant does or permits to be done on the Premises, Tenant shall pay the full amount of such increase.

Article XII.  Tenant's Risk. Except as modified by statute, all merchandise, furniture, fixtures and property which may be on or about the Premises shall be at the sole risk and hazard of Tenant, and if the whole or any part of the Premises is destroyed or damaged by fire, water or by the leaking or bursting of water pipes, or in any other manner, no part of such loss or damage will be charged to Landlord unless caused by the Landlord's conduct or negligence, or that of its employees, invitees, contractors or independent agents of the Landlord.

Article XIII.  Indemnification. The Tenant will save Landlord harmless, and will exonerate and indemnify Landlord from and against any and all claims, liabilities or penalties on account of or based upon any injury to person, or loss of or damage to property sustained in or occurring or emanating from the Building and/or the Premises on account of or based upon the act, omission, fault, negligence or misconduct of any person except Landlord, its employees, invitees, agents and independent contractors and, in respect to the foregoing, from and against all costs, expenses (including reasonable attorneys' fees), and liabilities incurred in or in connection with any such claim, or any action or proceedings; and in case any action or proceeding is brought against Landlord by reason of any such claim, Tenant upon notice from Landlord shall at Tenant's expense resist or defend such action or proceeding and employ counsel reasonably satisfactory to Landlord. The Landlord will save Tenant harmless, and will exonerate and indemnify Tenant from and against any and all claims, liabilities or penalties on account of or based upon any injury to person, or loss of or damage to property sustained in or occurring or emanating from the Building and/or the Premises on account of or based upon the negligence or misconduct of the Landlord, its employees, invitees, agents and independent contractors and, in respect to the foregoing, from and against all costs, expenses (including reasonable attorneys' fees), and liabilities incurred in or in connection with any such claim, or any action or proceedings; and in case any action or proceeding is brought against Tenant by reason of any such claim, Landlord upon notice from Tenant shall at Landlord's expense resist or defend such action or proceeding and employ counsel reasonably satisfactory to Tenant.

Article XIV.  Landlord's Access to Premises. Landlord shall have the right without charge to it and without reduction in rent, at reasonable times and upon 5 days advance notice and in such manner as not unreasonably to interfere with Tenant's business, to enter to view the Premises for any purpose. In case of an emergency on the Premises or in the Building, Landlord or its representative may enter the Premises (forcibly, if necessary) at any time to take such measures as may be needed to cope with such emergency. Without limiting the generality of the foregoing, during the six months next preceding the Expiration Date, Landlord may show the Premises to persons wishing to lease or purchase same. During the two months next preceding the Expiration Date, Landlord may affix to any suitable part of the Premises a notice for letting or selling the Premises or property of which the Premises are a part and keep the same so affixed without hindrance.

Article XV.  Materialmen's, Mechanic's Lien. Tenant shall not do or suffer anything to be done whereby the land and building may be encumbered by any

materialmen's or mechanic's lien and shall, whenever and as often as any such lien is filed purporting to be for labor or material furnished to the Tenant, discharge the same of record or bond the same within 30 days after the date of filing.

Article XVI.    Subordination. This Lease is and shall be subject and subordinate to all mortgages which may now or hereafter affect the Building and to all renewals, modifications, consolidations, replacements, and extensions of such mortgages. In confirmation of such subordination, Tenant shall, within 15 days of demand, execute promptly any certificate that the Landlord may reasonably request, including but not limited to, Subordination, Non-Disturbance and Attornment Agreements, Tenant Estoppel Certificates and Assignments of Rents and Leases. If Landlord requires such subordination from the Tenant, Landlord shall cause the mortgagee to execute a non-disturbance agreement in favor of the Tenant in form and substance reasonably satisfactory to the Tenant.  From time to time on request, the Tenant will deliver to Landlord a statement in writing certifying that this Lease is unmodified and in full force and effect (or that the same is in full force and effect as modified and stating the modifications) and the dates to which the rent and other charges have been paid and stating whether or not Landlord is in default and if so, specifying each such default.

Article XVII.    Eminent Domain and Demolition. If the Premises or any part thereof or the whole or any part of the Building are taken for any street or other public use, by action of the city or other authorities, such that the Premises and/or the Building have been rendered unsuitable for Tenant's continued use and occupancy and it is not economically reasonable to relocate or rearrange the Tenant's operations within the Building and/or the Premises to allow for the Tenant's continued use and occupancy without any material adverse effect in such operation, and the Landlord or the Tenant are entitled to or actually receive any direct or consequential damages by reason of anything lawfully done in pursuance of any public authority, then this Lease shall terminate at the election of Landlord or Tenant; provided however, that if the Tenant, in its reasonable judgment, determines that the Premises allow for the continued use and occupancy without any material adverse affect on Tenant's operation, then the Landlord shall not have the right to terminate this Lease pursuant to this paragraph. Subject to the preceding sentence, Landlord may elect so to terminate this Lease even if the entire interest of the Landlord is divested by such a taking. If, as a result of a taking or damage to or destruction of the Premises, the Premises or any part thereof are rendered unfit for use and occupation, but this Lease has not been terminated pursuant to the provisions of this Article, the rent shall be abated proportionately according to the nature and extent of the injury sustained by the Premises until the Premises or, in the case of a taking, what may remain thereof, shall have been put in proper condition. Any election to terminate shall be made by Landlord or Tenant not later than thirty (30) days after Landlord or Tenant receives notice of such taking or action or the occurrence of such damage, as the case may be. The Landlord reserves and excepts from this Lease all rights to damages resulting from the taking for public use of the Premises or any portion thereof, or right appurtenant thereto, or privilege or easement in, through, or over the same, and by way of confirmation of the foregoing the Tenant hereby grants all rights to such damages previously accrued or accruing during the Term to the Landlord, to have and to hold for

the Landlord forever. Provided, however, Tenant shall be entitled to that portion of the damages allocated for the taking of leasehold improvements installed by Tenant.

Article XVIII. Fire and Other Damage; Subrogation.

A. Abatement of Rent. If the Premises shall be damaged by fire or casualty, rent payable by Tenant shall abate proportionately for the period in which, by reason of such damage, there is substantial interference with Tenant's use of the Premises, having regard to the extent to which Tenant may be required to discontinue Tenant's use of all or a portion of the Premises, but such abatement or reduction shall end if and when Landlord shall have substantially restored the Premises (excluding any alterations, additions or improvements made by Tenant) to the condition in which they were prior to such damage. In no event shall Landlord have any liability for damages to Tenant for inconvenience, annoyance, or interruption of business arising from such fire, casualty or eminent domain. Landlord covenants that he will diligently proceed to repair and restore the Premises in the event of a fire or casualty.

B. Rights of Termination. If the Premises are substantially damaged by fire or casualty (the term unsubstantially damaged shall have the meaning damage of such a character that the Premises or the Building have been rendered unsuitable for Tenant's continued use and occupancy and the same cannot, in ordinary course, reasonably be expected to be repaired within 120 days from the time that the Premises are rendered unsuitable for Tenant's use), then Landlord and Tenant shall each have the right to terminate this Lease (even if Landlord's entire interest in the Premises may have been divested) by giving notice to the other of its election so to do within 30 days after the occurrence of such casualty or the effective date of such taking, whereupon this Lease shall terminate 30 days after the date of such notice (except that Tenant shall have no further obligation to pay rent hereunder upon the date of such notice) with the same force and effect as if such date were the date originally established as the expiration date hereof; provided, however, that if the Tenant, in its reasonable judgment, determines that the Premises are not rendered unsuitable for the Tenant's use and occupancy, then the Landlord shall not have the right to terminate this Lease. In the event that the Premises are substantially damaged within the last 12 calendar months of the Term, then Tenant shall have the right to terminate this Lease by giving Landlord notice of its desire to do so within 30 days after such damage, and on the giving of such notice, this Lease shall terminate with the same force and effect as if such day were the day originally established as the expiration date hereof. In the event either party terminates this Lease in accordance with the provisions of this paragraph B, all insurance proceeds necessary to restore the Building to its condition prior to the fire, casualty or taking shall be the property of the Landlord, and if after the restoration of the Building to the condition it was in on the Commencement Date, there are available insurance proceeds attributable to Tenant improvements, then the proportionate share of such proceeds shall be the property of the Tenant.

C. <u>Restoration</u>. If this Lease shall not be terminated pursuant to the terms of this Lease, Landlord shall thereafter use due diligence to restore the Premises (excluding any alterations, additions or improvements made by Tenant) to proper condition for Tenant's use and occupation. If, for any reason, such restoration shall not be substantially completed within two months after the expiration of the 120 day period referred to in Section B of this Article, Tenant shall have the right to terminate this Lease by giving notice to Landlord thereof within 30 days after the expiration of such period (as so extended). Upon the giving of such notice, this Lease shall cease and come to an end without further liability or obligation on the part of either party unless, within such 30 day period, Landlord substantially completes such restoration. Such right of termination shall be Tenant's sole and exclusive remedy at law or in equity for Landlord's failure so to complete such restoration.

D. <u>Subrogation</u>. Landlord and Tenant hereby release each other from any and all liability or responsibility to the other or anyone claiming through or under them by way of subrogation or otherwise for any loss or damage to property caused by fire or any of the extended coverage or supplementary contract casualties, even if such fire or other casualty shall have been caused by the fault or negligence of the other party, or anyone for whom such party may be responsible, provided, however, that this release shall be applicable and in force and effect only with respect to loss or damage occurring during such time as the releasor's policies contain a clause or endorsement to the effect that any such release shall not adversely effect said policies or prejudice the right of the releasor to recover thereunder. Landlord and Tenant each agree that it will request its insurance carriers to include in its policies such a clause or endorsement. If extra cost shall be charged, each party will advise the other of the amount of the extra cost, and the other party, at its election, may pay the same, but shall not be obligated to do so.

Article XIX. <u>Tenant's Default</u>. If Tenant neglects or fails to perform or observe any of Tenant's obligations and covenants (except for the payment of rent, utilities charges, taxes, insurance or any other sum due Landlord) for a period of 45 days after written notice to it from Landlord, or, if such default shall reasonably require longer than 30 days to cure, shall not within said 45 day period commence and diligently proceed to cure such default, or if Tenant fails to pay rent, utilities charges, taxes, insurance or any other sum of money due Landlord for 15 days after written notice to it from Landlord that such amount is due, or if the estate hereby created is taken by execution or by other process of law and not redeemed by Tenant within 15 days, or if proceedings for corporate reorganization or arrangement under the Bankruptcy Laws of the United States, or any laws amendatory thereof or supplemental thereto, are filed by or against Tenant and a decree entered for such reorganization or arrangement, or if any assignment shall be made of Tenant's property for the benefit of creditors, or if any proceedings are instituted by or against Tenant under any Bankruptcy or Insolvency Law, or if a receiver for Tenant or other similar officer shall be appointed (and if any of said proceedings which are instituted against Tenant or the said appointment of any receiver or other similar officer shall not be contested and dismissed within 30 days after the institution or appointment thereof) Landlord may, immediately or any time thereafter (notwithstanding any license or waiver of any former breach or waiver of the benefit, or consent in a

former instance) and without demand or notice, in person or by agent or attorney, enter the Premises or any part thereof and repossess the same as of its former estate, or terminate by written notice to Tenant and in either event expel Tenant and those claiming through or under it and remove their effects without being deemed guilty of any manner of trespass and without prejudice to any remedy which otherwise might be used for arrears of rent or breach of covenant, and upon entry or notice as aforesaid, this lease shall terminate. (Tenant hereby waiving any rights of redemption under M.G.L.A. c.186, s.11).

Article XX. <u>Landlord's Default</u>. Landlord shall not be deemed to be in default unless such default remains uncured for more than 30 days following written notice from Tenant specifying the nature of such default, or such longer period as may be reasonably required to correct such default, so long as Landlord is diligently proceeding to cure such default, but in no event longer than 60 days. Landlord's liability for maintenance and repair shall always be limited to the cost of making such repair or accomplishing such maintenance or repair. In no event shall Landlord be liable for consequential or any indirect damages. If there is a default by Landlord under this Lease that would make it impossible for Tenant to use the Premises for its intended use, and such default cannot be cured within the applicable grace period, if any, then the Tenant shall have the right to terminate this Lease upon such a default.

Article XXI. <u>Landlord's Remedies</u>. If this lease is terminated as provided herein, Tenant shall forthwith pay to Landlord all sums which were due prior to the date of such termination. Tenant agrees (i) to indemnify and save Landlord harmless from and against all reasonable expenses together with interest at the rate of 10% per annum from the date of demand for payment thereof which Landlord may incur in collecting such amount or in obtaining possession of, or in defending any action arising as a result of or in connection with a default, including, without limitation, reasonable legal expenses, reasonable attorneys' fees, and the cost of putting the Premises in good order; (ii) that Landlord may relet the Premises or any part or parts thereof, either in the name of Landlord or otherwise for a term or terms which may, at Landlord's option, be less than or exceed the period which would otherwise have constituted the balance of the Term and may grant concessions or free rent for a reasonable time. The failure of Landlord to re-let the Premises or any part thereof shall not release or affect Tenant's liability for damage. Any suit brought to collect the amount of deficiency for any month shall not prejudice the right of Landlord to collect the deficiency for any subsequent month by a similar proceeding. Landlord may make such alterations, repairs, replacements and decorations on the Premises which in Landlord's sole judgment are advisable or necessary for the purpose of reletting the Premises, and the making of such alterations or decorations shall not release Tenant from any liability. In the event the Premises are relet by Landlord, Tenant shall be entitled to a credit in the net amount of rent received by Landlord, after deduction of all expenses incurred in connection with Tenant's default, reletting the Premises and in collecting the rent. Tenant further agrees that, if on the Expiration Date or other termination date, Tenant fails to remove any of its property from the Premises within 15 days of termination, Landlord is authorized, in its sole option, and in Tenant's name and on its behalf, either (i) to cause such property to be removed and placed in

storage for the account and at the expense of Tenant; or (ii) to sell such property at public or private sale with or without notice, and to apply the proceeds, after the payment of all expenses of removal, storage and sale, to the indebtedness of Tenant to Landlord, the surplus, if any, to be paid to Tenant.

Article XXII.   Landlord's Right to Perform Tenant's Covenants. Tenant agrees that, if it fails to make any payment or perform any other act as required in this lease, Landlord, in its sole discretion, may make any payment or perform any other act on the part of the Tenant in such manner and to such extent as Landlord may reasonably deem desirable including paying necessary and incidental costs and reasonable attorneys' fees. The making of any such payment or the performing of any other act by the Landlord shall not waive, or release the Tenant from its obligations. All amounts so paid by Landlord shall be payable to Landlord on demand, with interest thereon at a rate of 12% per annum, and Tenant covenants to pay such amount promptly.

Article XXIII.   Renewal Option.  Tenant shall have the right, at its election, to extend the Term for an additional period of five (5) years commencing upon the expiration of the original Term, provided that Landlord shall receive written notice from tenant of the exercise of its election at least one hundred-eighty (180) days prior to the expiration of the original Term and provided further that Tenant shall not have been in material default in the performance or observance of any of the terms and agreements in this Lease contained on the part of tenant to be performed and observed at any time during the Lease term.  In the event Tenant seeks to exercise this Renewal Option, the Base Rent for the five year renewal option term shall be $39,600 per month and $475,200 annually.

Article XXIV.   Quiet Enjoyment. Upon Tenant's observing and performing all of the terms, covenants and conditions in this Lease, Tenant shall peaceably and quietly have and hold, the Premises, without hindrance or molestation by any person or persons lawfully claiming by, through or under Landlord, subject to the terms of this Lease.

Article XXV.   Notices. All notices shall be given by certified mail, return receipt requested, and shall be addressed to the Landlord at the address stated in Article I, or to such other place designated by written notice to the Tenant; and to the Tenant at its address as set forth in this Lease, or to the Tenants home address or business address.

Article XXVI.   Counterparts and Headnotes. This Lease is executed in duplicate, both copies of which are identical, and either one of which is to be deemed to be complete in itself and may be introduced in evidence or used for any purpose without the production of the other copy. The head notes throughout this Lease and the coversheet are for convenience or reference only, and shall in no way be held or deemed to define, limit, explain, describe, modify or add to the interpretation, construction or meaning of any provision of this Lease.

Article XXVII.   Recording & Governing Law. Tenant agrees not to record this Lease, but each party hereto agrees, on request of the other, to execute a Notice of Lease

in recordable form and complying with applicable Massachusetts laws, and reasonably satisfactory to attorneys for Landlord and Tenant. In no event shall such document set forth the rental or other charges payable by Tenant under this Lease; and any such document shall expressly state that it is executed pursuant to the terms and conditions contained in this Lease, and is not intended to vary the terms and conditions of this Lease.

Article XXVIII <u>Sign</u>. Tenant shall be responsible at its sole cost and expense to install signage on the exterior of the Premises. All signage shall be compliant with any applicable municipal rules and regulation and subject to the Landlord's written approval. Tenant shall obtain all sign permits and approvals at Tenant's sole cost and expense.

Article XXIX. <u>Environmental Concerns</u>. To the best of Landlord's knowledge, the property is not contaminated with hazardous materials requiring Landlord's remedial actions.

Article XXX. <u>Agency</u>. Tenant and Landlord represent that they have not dealt with any real estate broker in connection with this transaction.

Article XXXI. <u>Dispute Resolution</u>. In the event of any dispute arising out of or relating to this Lease or the breach thereof, the parties shall use their best efforts to settle the dispute by direct negotiations between individuals with full settlement authority. If the dispute in not settled promptly through negotiation, the parties shall submit the dispute to mediation under the then-applicable Mediation Rules of the American Arbitration Association. The parties to the dispute shall share equally the mediator's fees and administrative fee but shall otherwise bear their own expenses. Either of the parties to this Lease may, notwithstanding the other provisions of this Lease, request at any time a temporary restraining order, preliminary injunction or other interim relief from any court of competent jurisdiction without thereby waiving its other rights under this Section. If either party files an action in court or proceeds with litigation in violation of this agreement, that party shall indemnify the other party for its costs and attorneys' fees incurred as a result of such violation.


IN WITNESS WHEREOF, the Landlord and Tenant have hereunto set their hands and common seals on the date first set forth above.


LANDLORD:

347 Middlesex Road Realty Trust


_____
Luciana Oliveira, Trustee

TENANT:

FGC EPC, LLC


_____

Erin P. Carroll, Manager

# EXHIBIT A

# PLAN OF PREMISES

# EXHIBIT B

## COMMENCEMENT CERTIFICATE

This COMMENCEMENT CERTIFICATE is entered into effective this _____ day of _____, 2022 (the "Effective Date"), by and between 347 Middlesex Road Realty Trust ("Landlord"), and FGC EPC, LLC ("Tenant").

WHEREAS, Landlord and Tenant under that certain commerical lease dated as of _____, (the "Lease") pursuant to which Landlord has leased certain premises more particularly described therein to Tenant; and

WHEREAS, the Premises have been delivered to the tenant and the Rent Commencement Date is now known and Landlord and Tenant wish to confirm the dates by executing this COMMENCEMENT CERTIFICATE as provided for in the Lease.

NOW, THEREFORE, Landlord and Tenant hereby agree as follows:

1. The Date of Delivery of premises is _____, 20____.

2. The Rent Commencement Date is _____, 20____.

3. The Expiration Date of the Original Term is _____, 20___.

LANDLORD:                          TENANT:

347 Middlesex Road Realty Trust    FGC EPC, LLC

_____    _____
Luciana Oliveira, Trustee          Erin P. Carroll, Manager

16

## EXHIBIT B
(Proposed Consulting Agreement)

## FGC EPC, LLC

## <u>CONSULTING AGREEMENT</u>

The undersigned consultant ("Consultant") in consideration for and as a condition of Consultant's engagement as a consultant of FGC EPC, LLC, a Massachusetts limited liability company ("Company"), does hereby agree with Company as hereinafter set forth as of the date (the "Effective Date") set forth on the signature page to this Consulting Agreement (this "Agreement").

**1.** **<u>Engagement as Consultant; Term; Services</u>**. Company agrees to retain the services of Consultant as an independent contractor, subject to Section 3 below, for the period from the Effective Date to and including Friday, April 28, 2023 (the term of such engagement is the "Term"). The services to be provided by Consultant are personal to Consultant and may not be assigned by Consultant without the written consent of Company acting in its sole discretion. The Consultant shall devote not less than 40 hours per month to providing services to the Company. Notwithstanding the foregoing time commitment, the Consultant shall be permitted three weeks of unpaid leave in order to undergo two medical procedures and related recuperation. The Consultant's services shall include, but not be limited to: advising the Company on all aspects of its business operations, including without limitation purchasing, marketing, sales, human resources and manufacturing. In addition, the Consultant shall introduce the owners and managers of the Company to all significant customers and suppliers of businesses previously owned or operated by the Consultant. The Consultant shall also arrange at least two in-person visits by the owners and managers of the Company to suppliers outside of the United States and the Consultant shall accompany the owners and managers on such visits. Such visits shall be at the reasonable expense of the Company.

**2.** **<u>Compensation</u>**.

(a) The Company shall pay to the Consultant consulting fees of $5,000 per month beginning with the calendar month in which the Company's purchase of the assets of Top Line Granite Design Inc. closes in accordance with the Asset Purchase Agreement dated September 20, 2022 between the Company and Top Line Granite Design Inc. (the "Closing"). All consulting fees shall be payable in arrears monthly. Payment for any partial month shall be prorated. If the Closing has not occurred by January 15, 2023 this Agreement shall automatically terminate with the parties having no financial or other obligation to each other.

(b) The Company shall reimburse the Consultant for all reasonable and necessary documented out of pocket expenses incurred or paid by the Consultant in connection with, or related to, the performance of his services under this Agreement with the prior written approval of the Company. The Consultant shall submit to the Company itemized monthly statements, in a form satisfactory to the Company, of such expenses incurred in the previous month. The Company shall pay to the Consultant amounts shown on each such statement within 30 days after receipt thereof.

(c)     The Consultant shall not be entitled to any benefits, coverages or privileges, including, without limitation, social security, unemployment, medical or pension payments, made available to employees of the Company.

**3.     Termination.**  The Company may, without prejudice to any right or remedy it may have due to any failure of the Consultant to perform his obligations under this Agreement, terminate the Term upon 30 days' prior written notice to the Consultant.  In the event of such termination, the Consultant shall be entitled to (a) payment hereunder and for expenses paid or incurred prior to the effective date of termination and (b) continued payments of the compensaton described in Section 2(a) above at the times described in such Section 2(a).  Such payments shall constitute full settlement of any and all claims of the Consultant of every description against the Company.  Notwithstanding the foregoing, the Company may terminate the Term effective immediately upon receipt of written notice, if the Consultant breaches or threatens to breach any provision of Sections 4, 5, 7 or 8.

**4.     Cooperation and Communications.**  The Consultant shall use his best efforts in the performance of his obligations under this Agreement.  The Company shall provide such access to its information and property as may be reasonably required in order to permit the Consultant to perform his obligations hereunder.  The Consultant shall cooperate with the Company's personnel, shall not interfere with the conduct of the Company's business and shall observe all rules, regulations and security requirements of the Company concerning the safety of persons and property.  The Consultant shall support the business of the Company and shall not disparage the Company in all of his communications with third parties, whether written or oral and in any format including without limitation on social media.

**5.     Confidential Information.**

(a)     Consultant acknowledges that, except to the extent otherwise provided below in this Section 5(a) or in Section 5(b) hereof, all Confidential Information disclosed to or acquired by Consultant is a valuable, special, and unique asset of Company and Consultant will hold such Confidential Information in trust for Company's sole benefit.  Except as otherwise provided below in this Section 5, Consultant shall not, at any time (including, without limitation, after the Term), use for Consultant or others, or disclose or communicate to any person for any reason, any Confidential Information without the prior written consent of Company.  Notwithstanding anything in this Section 5(a) to the contrary, it is understood that, except to the extent otherwise expressly prohibited by Company, (A) Consultant may use Confidential Information in performing Consultant's duties and responsibilities to Company but only to the extent required or necessary for the performance of such duties and responsibilities in the ordinary course and within the scope of Consultant's association with Company as an employee, consultant, officer or director, and (B) Consultant may disclose any Confidential Information pursuant to a request or order of any court or governmental agency, *provided, however,* that Consultant promptly notify Company of any such request or order and provide reasonable cooperation (at Company's expense) in the efforts, if any, of Company to contest or limit the scope of such request or order.

(c)     Consultant's obligations under Section 5(a) hereof as to Confidential Information shall not apply to any Confidential Information which (i) is or becomes publicly known (as demonstrated by written evidence provided by Consultant) under circumstances involving no breach by Consultant of this Agreement or (ii) was or is approved for release by the Board of Directors of Company or the President of Company acting in such capacity.

**6.     Absence of Conflicting Agreements.**  Consultant represents that Consultant is not bound by any agreement or any other existing or previous business relationship which conflicts with or prevents the full performance of Consultant's consulting services to Company.

**7.     Covenant Not to Compete.**  Consultant agrees that the services to be rendered by Consultant to Company are special and unique.  During the period commencing on the Effective Date and ending on April 28, 2023, Consultant shall not, as an owner, part-owner, partner, director, officer, trustee, employee, agent, consultant, joint venturer, stockholder, representative, sole proprietor, independent contractor or in any other capacity directly or indirectly engage in any business that is competitive with the business of the Company if the competing business has a primary place of business within a radius of 100 miles from 347 Middlesex Road, Tyngsboro, Massachusetts.  If Company chooses to terminate this Agreement without cause in accordance with the 30 day notification in Par. 3 above, then the non-compete provision contained herein shall be deemed null and void concurrently with such termination.

**8.     Nonsolicitation.**  During the period commencing on the Effective Date and ending on April 28, 2023, Consultant shall not, as an owner, part-owner, partner, director, officer, trustee, employee, agent, consultant, joint venturer, stockholder, sole representative, sole proprietor or independent contractor, or in any other capacity directly or indirectly (a) solicit, divert or take away any of the customers or business of Company or (b) solicit or discuss with any employee of Company, or with anyone who was an employee of Company within the six (6) month period prior thereto, the employment or other retention of such person by any other company, business organization or other entity. If Company chooses to terminate this Agreement without cause in accordance with the 30 day notification in Par. 3 above, then the non-solicitation provision contained herein shall be deemed null and void concurrently with such termination.

**9.     No Obligation of Employment.**  Consultant understands that Consultant's obligations under this Agreement are independent of any relationship relating to Consultant's engagement as a consultant to Company and do not create or give rise to any obligation on the part of Company to continue Consultant's engagement.  Consultant acknowledges and agrees that Consultant's engagement by Company is on an "at-will" basis, and that no other arrangement with Company, including without limitation bonus arrangements, stock option or other incentive arrangements, shall be construed to impose any minimum or fixed term of engagement.

**10.     Unique Nature of Agreement; Specific Enforcement; Severability.**

(a)     Consultant agrees and acknowledges that the rights and obligations set forth in this Agreement are of a unique and special nature and that Company is, therefore, without an adequate legal remedy in the event of Consultant's violation of any of the covenants set forth in this Agreement. Consultant agrees, therefore, that, in addition to all other rights and remedies, at law or in equity or otherwise, that may be available to Company, each of the covenants made by Consultant under this Agreement shall be enforceable by injunction, specific performance or other equitable relief, without any

requirement that Company have to post a bond or that Company have to prove any damages. Consultant hereby agrees, in connection with any action or proceeding to enforce any provisions of this Agreement, to waive any claim or defense that Company has an adequate remedy at law. Consultant recognizes and agrees that the enforcement of this Agreement is necessary to ensure the preservation, protection and continuity of the confidential business information, trade secrets and goodwill of Company.

(b)     If one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to scope, activity or subject matter so as to be unenforceable at law, such provision(s) shall be construed and reformed by the appropriate judicial body by limiting and reducing it (or them), so as to be enforceable to the maximum extent compatible with the applicable law as it shall then appear. Any invalid, illegal or unenforceable provisions of this Agreement shall, to the extent they cannot be reformed pursuant to the preceding sentence, be severed, and after any such severance, all other provisions hereof shall remain in full force and effect.

**11.     Independent Counsel**. Consultant acknowledges that this Agreement has been prepared on behalf of Company by counsel to Company and that such counsel does not represent Consultant and is not acting on Consultant's behalf. Consultant has been provided with an opportunity to consult with Consultant's own counsel with respect to this Agreement.

**12.     Miscellaneous.**

12.1.     Notices. Any notice required or permitted to be given hereunder shall be in writing and shall be deemed to be properly given on the date sent, if sent by email with confirmed receipt, or the date of postmark when sent by registered or certified mail, return receipt requested, addressed to the address set forth on the signature page or such other address as any party may give the other notice of pursuant to this Section 12.

12.2.     Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts, without regard to conflicts of laws principles thereof. Any action to enforce, arising out of, or relating in any way to, any of the provisions of this Agreement shall be brought and prosecuted in the state courts of the Commonwealth of Massachusetts or the United States District Court for the District of Massachusetts and the parties consent to the jurisdiction of said courts and to service of process by registered mail, return receipt requested, or by any other manner provided by law.

12.3.     Waivers; Amendments. No waiver of any right hereunder by the Company or Consultant shall operate as a waiver of any other right, or of the same right with respect to any subsequent occasion for its exercise, or of any right to damages. No waiver by the Company or Consultant of any breach of this Agreement shall be held to constitute a waiver of any other breach or a continuation of the same breach. All remedies provided by this Agreement are in addition to all other remedies provided by law, in equity or otherwise. This Agreement may not be amended except in a writing signed by both the Company and Consultant.

12.4.    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.5.    Prior Understandings.  This Agreement represents the complete agreement of the Company and Consultant with respect to the transactions contemplated hereby and supersedes all prior and contemporaneous agreements and understandings.

12.6.    Headings.  Headings in this Agreement are included for reference only and shall have no effect upon the construction or interpretation of any part of this Agreement.

12.7.    Survival.  Consultant's obligations under this Agreement shall survive the termination of Consultant's relationship with the Company.

12.8.    Assignment.  This Agreement shall be binding upon and inure to the benefit of the Consultant, the Company and their respective heirs, successors and permitted assigns.  This Agreement may be assigned by the Company to any affiliate of the Company and to any successor or assign of all or a substantial portion of the Company's business.  Consultant may not assign or transfer any or all of Consultant's rights or obligations under this Agreement by operation of law or otherwise.

12.9.    Third Party Beneficiaries.  The provisions of this Agreement shall be for the exclusive benefit of the parties to this Agreement, and their respective successors and assigns, and no third party is an intended beneficiary of, or shall be entitled to rely on, the provisions of this Agreement.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Consulting Agreement as of this ___ day of November, 2022.

COMPANY                                CONSULTANT

FGC EPC, LLC


By: _____        _____
     Erin P. Carroll, Manager          Edmilson Ramos

Address for notices:                   Address for notices:

24 Rodman Lane                         _____
North Kingstown, RI 02852              _____
Email: david@pegasus-holdings.com      Email: _____