UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>TOP LINE GRANITE DESIGN INC.[1]<br><br>Debtor. | Case No. 22-40216 (EDK)<br><br>Chapter 11 |

## SECOND AMENDED CHAPTER 11 PLAN FOR SMALL BUSINESS DEBTOR UNDER SUBCHAPTER V (LIQUIDATING PLAN)[2]

Top Line Granite Design Inc., the debtor and debtor-in-possession in the above captioned bankruptcy proceeding (the "**Debtor**") and a small business debtor under Subchapter V, hereby proposes the following Chapter 11 plan pursuant to section 1189 of the Bankruptcy Code, which reflects and incorporates comments of the Subchapter V Trustee and the major creditors having appeared before the court in this case.

## ARTICLE I: CASE BACKGROUND

On March 25, 2022 (the "**Petition Date**") the Debtor commenced this proceeding by filing a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code, as a small business Subchapter V debtor. On March 28, 2022, the Bankruptcy Court appointed Steven Weiss as the Subchapter V trustee (the "**Subchapter V Trustee**"). Pursuant to section 1190(1) of the Bankruptcy Code, following is a brief history of the Debtor's business operation, and attached to the Plan are certain other background information and Exhibits in support of the Plan, including (i) a liquidation analysis attached as *__Exhibit A__*, and (ii) a distribution statement with respect to the proposed payments from the Asset Sale proceeds is attached as *__Exhibit B__*. The proposed Plan is a "pot" plan which does not rely on any future income or revenue from operations.

### 1.1 Description and History of the Debtor's Business

The Debtor is a Massachusetts corporation, organized in October 2004, doing business in Tyngsboro, MA. The Debtor, one of the largest stone fabricators in New England, sells and fabricates marble, granite, onyx, soapstone, quartzite, quartz, and porcelain. The Debtor also designs and installs countertops for the New England area using state of the art equipment.

As of the Petition Date, the Debtor had approximately 10 employees, including the Debtor's owner, Edmilson Ramos ("**Mr. Ramos**") plus its sales manager and bookkeeper who is

---

[1] A/k/a Design Top Line Granite, and aka Top Line Granite Design. The Debtor's name was changed from Brazil Stones Inc. in November 2005.

[2] Pursuant to Bankruptcy Rule 3016(d), this Plan conforms with Official Form 425A (Plan of Reorganization for Small Business Under Chapter 11) and includes all Articles.

paid as a subcontractor and receives a Form 1099 from the Debtor. The Debtor also used and relied on subcontractors for various positions, including its installer and polisher, template technician, CNC operator, programmer, forklift and robot operator, production and project manager / assistant, accounting and inventory personnel, and/ or sales representative. Such workers are generally paid for subcontractor services through US Construction (as discussed below in Section 1.1(iii)).

Before the bankruptcy filing, compensation to Mr. Ramos included salary (approximately $100,000 or less) plus other distributions or payments made by the Debtor directly to Mr. Ramos' creditors. Post-petition, Mr. Ramos' compensation package was approximately $6,000.00 per week, which may include payments made directly to Mr. Ramos' mortgagee, Jeanne D'Arc Credit Union.

### (i)  *347 Middlesex Road Realty Trust*

Mr. Ramos is the grantor under the Declaration of Trust Establishing The 347 Middlesex Road Realty Trust dated July 28, 2014, amended and restated as of August 12, 2019 (the "**Trust**"). Mr. Ramos was the initial trustee; Luciana Oliveira was appointed as trustee in July 2019. Mr. Ramos is the primary beneficiary of the Trust. As discussed below, the Trust is the owner of the Real Estate leased by the Debtor in Tyngsboro, MA.

As discussed below, the Trust has two mortgage loans, approximately $4,000,000.00, with Avidia Bank, and Bay Colony / SBA. The Debtor is a guarantor for such mortgage loans. *See guaranty Claims discussed in Section 1.5(G)*. Also, as discussed in Section 1.5 below, the Trust guaranteed the Avidia Equipment Loan, and the Avidia Inventory Loan of the Debtor (total of approximately $2,500,000.00).

### (ii)  *347 Middlesex Road Property*

The Trust purchased the land and building thereon located at 347 Middlesex Road, Tyngsboro, MA (the "**Real Estate**") pursuant to a certain quitclaim deed dated July 30, 2015. Mr. Ramos used the Real Estate for the construction of the existing facility at 347 Middlesex Road starting in 2015 through 2017.

The facility at 347 Middlesex Road is approximately 39,000 square feet of gross building area (with approximately 11 acres of land) according to a certain Appraisal Report by DAS Daly Appraisal Services, as of April 7, 2022 (ordered by or prepared for Avidia Bank). The Debtor moved to the new facility in 2017, and, as of the Petition Date, occupied the Real Estate pursuant to a Commercial Property Lease, effective as of January 1, 2019 (as may be amended) between the Debtor and the Trust. Under such lease and/or the mortgage loan documents, the Debtor paid the taxes for the Real Estate. The lease payments from the Debtor to the Trust ($28,000.00 monthly as of the Petition Date) are generally used to pay the Mortgage Claims.

According to a certain rental analysis letter, dated as of August 25, 2022, by Moore Commercial Real Estate, the estimated market rent for the facility is $17 PSF NNN, totaling $54,541.00 per month.

Pursuant to the April 2022 appraisal report referred to above, the estimated market value for the Real Estate is approximately $6,700,000.00.[3] As of the Petition Date, the recorded liens and encumbrances are primarily with respect to (i) the two mortgage loans of approximately $4,000,000.00, (ii) the Avidia's Equipment Loan, and (iii) the Avidia Inventory Loan.[4]

In the event the Ramos Stipulation is approved, all Claims related to the Trust and/or against the Real Estate will be subject to the terms of the Plan.

### (iii)    *US Construction and Maintenance LLC*

US Construction and Maintenance LLC ("**US Construction**") was formed in May 2015. Mr. Ramos is the majority owner (97%) of US Construction, with three other individuals owning 1% each.

Pre-petition and post-petition, US Construction provided cleaning and maintenance services for the Debtor's projects. The Debtor also used the services of various subcontractors including individual labor subcontractors through US Construction. The Form 1099 reflects payments from the Debtor to US Construction of approximately $2,561,680 in 2020, and approximately $4,116,253 in 2021.

Prior to the Petition Date, the Debtor owed approximately $250,000.00 to US Construction, as reflected in Schedule F, for certain pre-petition amounts owed to employees and subcontractors. In light of the Wage Order, the Debtor paid a portion of this amount post-petition. The 250,000.00 pre-petition claim owed to US Construction has been reduced to approximately $117,000.00.

In the past, US Construction paid the Debtor for use of rental space in the amount of $9,500.00 per month. Such payment was last made in August 2020.

### 1.2    **Events Leading to Bankruptcy Filing**

The events that led to the filing of the bankruptcy filing include (i) the Covid-19 pandemic, and (ii) certain actions of the Cash Advance Lenders as described below:

### (i)    *Covid-19 Pandemic*

While the Debtor's revenue remained stable during the Covid -19 pandemic, that was the result of contracts and projects the Debtor was able to line up before Covid-19. The Covid-19 Pandemic has led to project and material delays, as well as an increase in operating and business expenses. Despite all efforts, the Debtor was not able to fully eliminate all of the lingering effects of this Pandemic pre-petition.

---

[3] A separate market analysis in March 2022 by Bill Kafkas Real Estate suggests an estimated value of approximately $8,000,000.00 for the Real Estate.

[4] This does not include the following filings after 2019: (i) the ROC Funding Lien, (ii) a notice of betterment assessment, and (ii) the Caggiano Lien.

In the past, to help with the need for more working capital, Mr. Ramos has taken personal loans to infuse in the business, including certain payday loans. Even such payday loans became harder to obtain during the Covid-19 pandemic.

(ii)    *Cash Advance Lenders*

In 2021 and 2022, the Debtor entered into several short-term loans, which for the most part seem similar to factoring contracts, with various Cash Advance Lenders.

Most, if not all, of the agreements of the Cash Advance Lenders (i) provide for a grant of security interest on substantially all assets of the Debtor, and (ii) require daily ACH payments from the Debtor's bank account and/or credit card. The total for such payments to the Cash Advance Lenders was approximately $30,000.00 daily before the bankruptcy filing. Such daily payments, while covering other operating and business expenses, became unsustainable for the Debtor. The Debtor reserves all rights with respect to the Cash Advance Lenders, including with respect to the predatory nature of the transactions, the true nature of the underlying agreements as loans which are subject to statutory and regulatory provisions, including but not limited to the Massachusetts usury statute (G.L. c. 271, § 49).

(iii)    *Merchant Capital*

As discussed in the Cash Collateral Motion, pre-petition, Alpha Recovery Partners on behalf of Merchant Capital (i) intentionally sent false and misleading letters to the Debtor's customers incorrectly claiming that the Debtor defaulted on certain merchant agreement, (ii) incorrectly claimed that the Debtor owed money to Merchant Capital, and (iii) improperly requested that the customers send future payments owed to the Debtor directly to Merchant Capital.

On February 7, 2022, the Debtor, through counsel, sent both Merchant Capital and Alpha Recovery Partners a pre-litigation demand letter which included a demand for relief pursuant to Massachusetts General Laws Chapter 93A (the Massachusetts Consumer Protection statute) and a notice to cease and desist all efforts.

Thereafter, Alpha Recovery Partners and Merchant Capital issued statements acknowledging the wrongdoing. However, damage had already resulted from the improper collection communications from Alpha Recovery Partners on behalf of Merchant Capital. As a direct and proximate result of the false and misleading letters from Alpha Recovery Partners on behalf of Merchant Capital, the Debtor suffer monetary and reputational damages including lost of customers and work in progress. Despite the Debtor's considerable efforts to mitigate the damages caused by these communications, these actions resulted in significant economic harm to the Debtor. As discussed below, the Debtor's estate reserves the right to pursue a complaint against Merchant Capital / Alpha Recovery Partners with respect to such damages.

1.3    **Affiliated Entities**

The other businesses affiliated with or operated by Mr. Ramos that were operating or not dissolved before the Petition Date include the following:

(i)     The 347 Middlesex Road Realty Trust:  As discussed above, this Trust is the owner of the Real Estate leased by the Debtor in Tyngsboro, MA. Mr. Ramos is the Trust grantor, and was the initial trustee. Mr. Ramos is the primary beneficiary of the Trust.  This entity is listed as a creditor in the Debtor's Schedule F (claim amount paid post-petition).

(ii)     US Construction and Maintenance LLC:  According to the Massachusetts Secretary of State summary, this entity was formed in 2015, and Mr. Ramos is one of the two listed managers. As discussed above, Mr. Ramos is the majority owner.  This entity provides cleaning and maintenance services.  Also, the Debtor used the services of various subcontractors through US Construction.  This entity is listed as a creditor in the Debtor's Schedule F (claim amount partly paid post-petition).

(iii)     Top Paving Inc.: This entity was formed in February 2022. According to the Massachusetts Secretary of State summary, Kamyla L. Gomez (an employee or subcontractor of the Debtor) is listed as the owner.  This entity was formed to provide paving services that the Debtor does not offer.  Since its formation through November 2022, this entity's net operating income has been negative.

(iv)     US Cabinets Inc.: This entity was formed in November 2021. According to the Massachusetts Secretary of State summary, Luciana Oliveira (an employee or subcontractor of the Debtor) is listed as the owner.  This entity was formed to provide cabinet installation services. Since its formation, this entity has had no operating income.

(v)     Design Tile and Flooring Inc.:  This entity was formed in February 2022. According to the Massachusetts Secretary of State summary, Kamyla L. Gomez (an employee or subcontractor of the Debtor) is listed as the owner.  This entity was formed to provide tile and flooring installation services that the Debtor does not offer.  Since its formation through November 2022, this entity's net operating income has been negative.

(vi)     Global Stone and Maintenance Inc.:  This entity was formed in October 2017. According to the Massachusetts Secretary of State summary, Luciana Oliveira (an employee or subcontractor of the Debtor) is listed as the owner.  This entity was formed to provide services related to cleaning, stone wall, installation of granite and cabinets.  This entity is listed as a creditor in the Debtor's Schedule F.

1.4     **Pre-petition Assets**

The Debtor's pre-petition assets and estimated value (book value for the most part) are listed in its Balance Sheet (2021) filed with the Bankruptcy Court on March 28, 2022 [Doc. No. 7], and Schedule B filed on April 11, 2022 [Doc. No. 44].  Such assets are also reflected in the Liquidation Analysis attached as ***Exhibit A***.

The Debtor listed in Schedule B a certain receivable of approximately $2,000,000 due from the Trust.  Such accounting entry reflects certain amounts paid by the Debtor over the years (mostly 2015 to 2017) for or on behalf of the Trust.  Such payments appear to include construction related costs, and loan payments. Any claim related to this accounting entry will be released as part of the Ramos Stipulation. To the extent the Ramos Stipulation is not approved,

the parties reserve all rights with respect to any amount owed to the Debtor, the Trust (including any setoff with respect to reduced rent paid by the Debtor over the years), and Mr. Ramos.  The Debtor and/or the Subchapter V Trustee can bring or pursue any such claim on behalf of the Debtor's bankruptcy estate.

### 1.5 Pre-Petition Debts/ Liabilities

Pursuant to the Order Setting (A) Status Conference; (B) Claims Bar Date; (C) Deadline for Election Under 11 U.S.C. § 1111(b); and (D) Other Deadlines [Doc. No. 23], June 3, 2022 was the general bar date for creditors to file their claims (the deadline for governmental authorities was September 21, 2022 under section 502(b)(9) of the Bankruptcy Code).  The description of the Claims provided below is based on the Debtor's Schedules and the proofs of claim filed by the bar date.  The ultimate amount due to the various holders of Claims will be determined upon completion of the claims objection process.

### A. Senior / Secured Claims

The Debtor's senior creditors with pre-petition secured claims, for purposes of this Plan, are as follows (the "**Senior Claims**"):

*(i)* *Enterprise Bank Loan:* According to the proof of claim filed by Enterprise Bank and Trust Company ("**Enterprise Bank**"), the pre-petition Claim amount is $22,729.71 (original loan amount $50,000.00).  The loan documents, dated as of 12/13/16, include a Promissory Note, a Commercial Security Agreement, and a UCC-1 financing statement filed on March 16, 2007 (with continuation filed on 2/7/2022) with respect to substantially all assets of the Debtor.  The maturity date under the promissory note is "on demand".  The loan accrues interest at 1.5 % above the Wall Street Journal Prime Rate with an initial rate of 5% per annum.  Pre-petition, the monthly payment amount was $900.00.

*(ii)* *Avidia Bank Revolving Line of Credit / Inventory Loan- 2019:*  According to the proof of claim filed by Avidia Bank, the pre-petition Claim amount is $1,489,414.30 (original loan amount $1,500,000.00, increased from $1,000,000.00) (the "**Avidia Inventory Loan**").  As of the March 23, 2023 payoff statement from Avidia Bank, the stated total is $1,558,471 (including accrued interest, late charges, and foreclosure fees).  The loan documents, dated as of 8/28/19, include a Revolving Demand Note, a loan and security agreement, and a UCC-1 financing statement filed on August 28, 2019 with respect to substantially all assets of the Debtor.[5]  The maturity date under the promissory note is "on demand".  The minimum interest rate is 7.25% per year.  Pre-petition, the monthly payment amount was $8,200.00. This loan is guaranteed by US Construction, Mr. Ramos, and the Trust (secured by a mortgage on its Real Estate dated 8/28/19).

*(iii)* *Avidia Bank Equipment Loan- 2019 (*SBA (7A) loan): According to the proof of claim filed by Avidia Bank, the pre-petition Claim amount is $1,086,862.44 (original loan

---

[5] The UCC-1 financing statement filed by Avidia Bank for this inventory loan was not found in a preliminary unofficial search presumably because of the extra character after the Debtor's name.  The Debtor reserves all rights to the extent an official UCC search using Debtor's name as required by Article 9 does not locate the financing statement.

amount $1,339,000.00) (the **Avidia Equipment Loan**"). As of the March 23, 2023 payoff statement from Avidia Bank, the stated total is $1,164,034 (including accrued interest, late charges, and foreclosure fees). The loan documents, dated as of 8/28/19, include a Note, a Security Agreement, and a UCC-1 financing statement filed on August 28, 2019 with respect to substantially all assets of the Debtor. According to the commitment letter agreement (dated 8/23/19), the loan term is for 10 years. The initial interest rate is 7.50% per year. Pre-petition, the monthly payment amount was $14,320.00. This loan is guaranteed by US Construction, Mr. Ramos, and the Trust (secured by a mortgage on its Real Estate dated 8/28/19).

*(iv)* *FCB Equipment Loan:* This loan relates to the purchase and finance of a certain equipment (Northwood NW-127 Raptor CNC Waterjet Cutter (serial number 21257). The initial financing was from ENGS Commercial Finance Co. Upon information and belief, First Citizens Bank & Trust Company ("**FCB**") is the successor in interest of ENGS Commercial Finance. According to the amended proof of claim filed by FCB, the pre-petition Claim amount is $306,790.93 (original sale price $379,950.00) (the "**FCB Equipment Loan**"). The parties agree that, for purposes of this Plan, the collateral value is approximately $150,000.00.[6] The loan documents include a Commercial Finance Agreement (dated as of 10/7/20) (as may be amended on November 3, 2020), and a UCC-1 financing statement filed on October 8, 2020 with respect to the equipment. Under the finance agreement, the transaction is for a 5-year term with monthly installment payments of $7,213.33 (totaling approximately $433,000.00). Therefore, the effective interest rate is about 5.2%. This debt is guaranteed by Mr. Ramos.

### B. SBA EIDL Loan

The Debtor received an Economic Injury Disaster Loan (EIDL) from the SBA pre-petition. According to the proof of claim filed by the SBA, the pre-petition Claim amount is $514,897.26 (original loan amount $500,000.00) (the "**SBA Loan**").[7] The loan documents include an amended loan authorization and agreement with effective date of 8/2/21 (original date 1/6/21), 1st Modification of Note, Amended Security Agreement, and a UCC-1 financing statement filed on January 20, 2021 with respect to substantially all assets of the Debtor. The interest rate is 3.75% per annum, with monthly payments of $2,484.00. The first monthly payment was due in July 2022.[8] Under the loan documents, the SBA Loan would mature in 30 years. This loan is guaranteed by Mr. Ramos.

The SBA's Lien is undersecured or wholly unsecured due to the insufficient value of collateral securing the Senior Claims and the SBA Loan, depending on (i) the total Claim amount for the senior Liens, including post-petition interest, reasonable fees, costs or other charges to the extent applicable or permitted under Section 506(b) of the Bankruptcy Code, and (ii) the market

---

[6] The fair market value used by FCB is between $126,874.36 to $149,263.95. The liquidation value used by FCB is between $78,363.57 to $104,487.76.

[7] According to Avidia Bank, the Debtor also received a Paycheck Protection Program (PPP) loan from the SBA pre-petition. Upon information and belief, a loan forgiveness was approved for this PPP loan.

[8] The loan documents provide that monthly payments are to begin 18 months from the date of the original note. Upon information and belief, the original note is dated 1/6/21 in which case the initial payment would be due on 7/6/22.

value of the Debtor's business assets.  Therefore, any unsecured portion of the SBA Claim will be treated as a General Unsecured Claim.

### C.    Other Secured Loans/ Automobiles

As reflected in Schedule F, as of the Petition Date, the Debtor had several automobile loans.  Pursuant to filed proofs of claim, the financing entities are Toyota Motor Credit Corporation (Toyota Lease Trust), and Ally Bank.  The loan documents are retail installment sale contracts (4 to 6 years).  Mr. Ramos is a guarantor or co-signer for some of the automobile loans.

As part of the Initial Sale, the financing contracts for approximately four (4) financed vehicles were assumed and assigned as set forth in the Initial Sale Order. In connection with the Asset Sale, the Debtor will not seek to assume and assign any leased or financed motor vehicles to the Proposed Buyer.

### D.    Cash Advance Lenders

Several Cash Advance Lenders filed UCC-1 financing statements against assets of the Debtor with scheduled Claims totaling approximately $1,300,000.00. The Debtor listed the Claims of the Cash Advance Lenders as disputed on its Schedule D.  Some of the Cash Advance Lenders received the guarantees of Mr. Ramos and US Construction.

The Debtor maintains that the underlying agreements for the Cash Advance Lenders are not true factoring agreements, but are loans.  Such loan transactions may be subject to the Massachusetts usury statute (M.G.L. c. 271 § 49) which requires the filing of certain notice with the Attorney General's office if the lender is charging usurious interest rate.  The creditors in question did not.

In any event, the Liens of the Cash Advance Lenders are wholly unsecured due to the insufficient value of collateral securing the Senior Claims, the SBA Loan, and the claim of the Cash Advance Lenders depending on (i) the total Claim amount for senior Liens, including any post-petition interest, reasonable fees, costs or other charges, to the extent applicable or permitted under Section 506(b) of the Bankruptcy Code, and (ii) the market value of the Debtor's business assets.  Also, the holders of the pre-petition Senior Claims and the SBA Claim did not subordinate their Liens with respect to the Cash Advance Lenders.  Any Allowed Claim of the Cash Advance Lenders will be treated as a General Unsecured Claim.

The Debtor reserves all rights with respect to potential actions against the Cash Advance Lenders related to Litigation Matters and Avoidance Actions.  Therefore, any payment to be made under the Plan to such creditors may be subject to setoff, including pursuant to sections 553 and 502(d) of the Bankruptcy Code.

### E.    Priority Claims/ Tax Claims

Schedule E has few employee related claims.  As discussed below, such employee related claims were paid post-petition pursuant to the Wage Order.

Schedule E also has a claim for the DOR (notice of levy) for sales tax and corporate excise tax) for approximately $100,000.00. On April 5, 2022, the DOR filed a proof of claim in the amount of $106,797.52.

The Internal Revenue Service filed an amended claim (Claim 8-2) on June 10, 2022 in the amount of $3,519.88 including a priority claim of $459.76.

### F. General Unsecured Claims

The total for filed and scheduled General Unsecured Claims against the Debtor is approximately $2,200,000.00, not including (i) scheduled insider claims of Mr. Ramos in the amount of approximately $4,780,000 (the "**Insider Claims**"), (ii) any unscheduled insider claim, (iii) filed Claims of Cash Advance Lenders (approximately $1,300,000.00), (iv) potential deficiency amount from Avidia Bank if no counteroffer (approximately $1,200,000.00), (v) potential other deficiency amounts from FCB (approximately $157,000.00), the SBA Loan ($500,000.00), and other scheduled secured creditors, and (iv) any additional Claims related to the Trust and against the Real Estate to the extent the Ramos Stipulation is approved.

The amount stated above for the General Unsecured Claims do not include the Mortgage Claims to be treated under Class 10.

According to Schedule F, the Insider Claims for Mr. Ramos include amounts from home refinancing ($1,500,000.00), and personal / payday loans used for the business ($3,279,657.00). Post-petition, Mr. Ramos granted a mortgage on his personal residence for approximately $620,000 with respect to other payday loans owed to Kitchen Concepts (or its owner John Testa) which Mr. Ramos maintains was used for in the Debtor's business.

The Debtor reserves the right to amend Schedules F, including to mark certain unsecured claims as disputed so that the claim holders will be required to file proofs of claim and supporting documents in the event of any Remaining Fund for distribution to General Unsecured Creditors under the Plan. Unless already addressed in the potential Ramos Stipulation, such schedule amendment may relate to Claims of the following parties; (i) M. Ramos' Insider Claims, (ii) Global Stone and Maintenance Inc., (iii) US Construction and Maintenance, and (iv) Mendonca & Partners, CPA LLC. In such event, the Debtor will establish a separate amended schedules bar date for affected creditors.

### G. Guaranty Claims; Mortgages

The pre-petition Senior Claims do not include the following loans of Avidia Bank, and Bay Colony Development Corp. ("**Bay Colony**") to the Trust totaling approximately $4,000,000, for which the Debtor is a guarantor:

*(i)*     *Bay Colony Mortgage Loan:* This is a SBA (CDC 504) loan. According to the proof of claim filed by the SBA, the prepetition Claim amount is $2,024,508.85 (claim #35) (original loan amount $2,123,000.00) (the "**Bay Colony/ SBA Mortgage**"). The loan

documents, dated 8/28/19, include a Note, and a Mortgage by the Trust to Bay Colony.[9]  As of the March 23, 2023 payoff statement from Avidia Bank, the stated total is $1,906,763. The maturity date for the loan is October 1, 2044.  The interest rate on the note is 2.25% per annum.  Pre-petition, the monthly payment amount was $14,937.60.  The primary obligor for this loan is the Trust, and the loan is guaranteed by the Debtor, US Construction, and Mr. Ramos.

*(ii)    Avidia Mortgage Loan:*  According to the Debtor's Schedules F, the pre-petition Claim amount is approximately $2,030,570.05 (original loan amount $2,064,142.00) (the "**Avidia Mortgage**").  As of the March 23, 2023 payoff statement from Avidia Bank, the stated total is $2,047,457 (including accrued interest, late charges, other interest charges, and foreclosure fees). The loan documents, dated 8/28/19, include a Five Year Adjustable Term Note, and a Commercial Mortgage, Security Agreement and Assignment of Leases and Rents by the Trust to Avidia Bank.  The amortization term of the loan is 25 years (through August 28, 2044).  The minimum interest rate is 5.875% per annum.  Pre-petition, the monthly payment amount was $13,250.79. The primary obligor for this loan is the Trust, and the loan is guaranteed by the Debtor, US Construction, and Mr. Ramos.

The Mortgage Claims will be paid from the Real Estate Sale proceeds or the mortgages may be assumed by the Proposed Buyer.

## 1.6    Post-petition Administrative Expense Claims

According to the February 2023 monthly operating report, the total Administrative Expense Claims was $382,122.00 (to be reduced by accrued post-petition payments not made to the Senior Claims, and potentially disputed post-petition claim of Mendonca & Partners, LLC).[10]  The Debtor estimates that the accrued and unpaid Administrative Expense Claims may be approximately $200,000.00 (without Professional Fee Claims), including sales tax and other amounts that may be owed to the Massachusetts Department of Revenue (the "**DOR**").  On January 26, 2023, the DOR filed a Claim for Administrative Expense in the amount of $22,520.18.

The Debtor estimates that the Professional Fee Claims will be approximately $455,000.00 plus expenses (through confirmation of the Plan), including (i) approximately $375,000.00 for Professional Fee Claim of the Debtor's bankruptcy counsel, and (ii) $80,000.00 for fees and expenses related to the Subchapter V Trustee.  Professional Fee Claims will be paid from the Carve-Out, with the balance of the Professional Fee Claims to be paid from the Plan Funding.

## 1.7    Other Post-Petition Matters

Soon after the Petition Date, on April 1, 2022, the Bankruptcy Court issued the Notice of Chapter 11 Bankruptcy Case [Doc. No. 22] and a Scheduling Order [Doc. No. 23] scheduling the

---

[9] An Assignment of Mortgage dated August 28, 2019 was signed by Bay Colony to the SBA.

[10] Mendonca & Partners, LLC has not been retained as a professional by the Debtor in the bankruptcy case.

Section 341 meeting of creditors for May 4, 2022, and establishing certain deadlines, including a plan filing date of June 23, 2022.

Post-Petition, the Debtor filed several motions and other pleadings in connection with administration of the bankruptcy estate, including the following:

(i)     Application to employ Riemer & Braunstein LLP, as the Debtor's bankruptcy counsel [Doc. No. 13]. The application was approved by the Bankruptcy Court on an interim and final basis [Doc. No. 30 and No. 70].

(ii)     Motion for authority to pay pre-petition employee wages, amounts due to subcontractors, and other employment related obligations [Doc No. 35]. This motion was granted and denied in part [Doc. No. 67] (the "**Wage Order**").

(iii)     Motion for entry of an Order (i) prohibiting utilities from discontinuing, altering, or refusing service, and (ii) deeming utilities adequately assured of future performance [Doc. No. 36]. The Bankruptcy Court granted this utility motion on April 29, 2022 [Doc. No. 68].

(iv)     Motion for authority to continue using certain existing bank accounts with Avidia Bank and business form [Doc. No. 55]. Both Avidia Bank and the US Trustee's office filed objections to the bank account motion [Doc. No. 64 and Doc. No. 65]. The bank account motion was granted in part and denied in part on April 29, 2022 [Doc. No. 69]. The Debtor ultimately opened its DIP bank accounts with Chase Bank and closed the pre-petition bank accounts with Avidia Bank.

(v)     On May 4, 2022, the Debtor filed the Section 1188(c) Status Conference Report with the Bankruptcy Court [Doc No. 72]; the telephonic status conference was held on May 18, 2022.

(vi)     On July 28, 2022, the Debtor filed a motion [Doc. No. 146] for an order against Brickstone Group LLC, a Cash Advance Lender ("**Brickstone**") for its willful violation of the automatic stay for placing a hold on the Debtor's bankruptcy accounts for collection of a pre-petition claim despite having actual notice of the Debtor's bankruptcy filing. On August 3, 2022, the Court entered an Order [Doc. No. 153] granting the stay violation in part and continued the hearing on the stay violation motion. After multiple hearings, to which Brickstone failed to appear, the Court entered an Order on February 2, 2023 [Doc. No. 255] awarding damages as sanctions for the stay violation in favor of the Debtor and against Brickstone in the total amount of $21,625.90.

In connection with the filing of this Plan, the Debtor will be filing a separate Motion for Order (i) Approving Form and Content of Plan Filing Notice; (ii) Fixing the Voting and Objection Deadlines; and (iii) Scheduling the Plan Confirmation Hearing (the "**Plan Procedure Motion**").

The Debtor reserves the right to file (i) a motion to employ special litigation counsel in connection with Litigation Matters related to Merchant Capital / Alpha Recovery Partners (discussed above), and (ii) a motion to employ an accountant.

## A.    Use of Cash Collateral

On March 30, 2022, the Debtor filed a motion for authority to use cash collateral [Doc. No. 16] (the "**Cash Collateral Motion**").  In connection with the Cash Collateral Motion, the Debtor proposed (i) as adequate protection, that certain secured creditors be granted certain post-petition replacement liens and security interests in property of the Debtor's estate to the extent such Lienholders held validly perfected liens and security interests as of the Petition Date, and (ii) as further adequate protection, to the extent funds are available, monthly payments to certain senior claim holders (or adequate protection payments).

The grant of post-petition Liens in property of the Debtor's estate is to the extent the lienholders held validly perfected liens and security interests as of the Petition Date.  The post-petition Liens shall only secure the amount of any diminution in the value of the lienholders' prepetition collateral constituting cash collateral resulting from the Debtor's use thereof in the operation of the Debtor's business in the post-petition period.  The post-petition Liens shall have the same priority, validity, and enforceability as the lienholders' liens on their pre-petition collateral.  The post-petition Liens shall not attach to Avoidance Action.  The post-petition Lien pursuant to the cash collateral order(s) shall not be affected by the DIP Financing order(s), except that the post-petition Liens shall be subject to the Lien of the DIP Lender.

The Bankruptcy Court entered a Third Order Authorizing Final Use of Cash Collateral on September 30, 2022 [Doc. No. 190] (with further extensions).  The continued hearing on the Debtor's motion for further use of cash collateral is scheduled for April 4, 2023. The Debtor believes that the sale closing or confirmation of the Plan will render moot the request or relief under the Cash Collateral Motion, including any objection.

## B.    DIP Financing

On May 16, 2022, the Debtor filed a motion for order (i) authorizing the Debtor to obtain postpetition financing, (ii) granting superpriority claim, security interest, and priming first priority lien to the DIP Lender [Doc. No. 76] (the "**DIP Financing Motion**").  Pursuant to the DIP Financing Motion, the Debtor sought approval of a post-petition financing from Legalist, Inc., as investment adviser and DIP lender (the "**DIP Lender**") on an interim basis in an amount up to $400,000.00 and on a final basis in the aggregate committed amount of up to $1,000,000.00 ("**DIP Financing**").  Attached to the DIP Financing Motion is the Debtor-in-Possession Term Loan Credit Agreement, dated as of May 13, 2022 (the "**DIP Credit Agreement**") between the Debtor and the DIP Lender.

Pursuant to the DIP Financing Motion, the Debtor sought authority to grant to the DIP Lender a super-priority lien pursuant to sections 364(c) (2) and (3), and (d)(1) of the Bankruptcy Code.  The DIP collateral in connection with the DIP Financing Motion includes all assets and properties of the Debtor as set forth in the DIP Financing Agreement, excluding all Avoidance Actions.  The DIP collateral shall include any other litigation proceeds; *provided that* such proceeds may be used for distributions or payments to creditors under a chapter 11 plan of the Debtor with the consent of the DIP Lender, if applicable.

On May 19, 2022, the Bankruptcy Court entered the initial interim DIP Financing order authorizing the Debtor to obtain post-petition financing in the amount of $400,000.00 [Doc. No. 87]. On June 21, 2022, the US Trustee's office filed a limited objection and reservation of rights [Doc. No. 104]. On July 22, 2022, the Bankruptcy Court entered a second interim DIP Financing order authorizing the debtor to obtain post-petition financing in an additional amount of $235,000.00 [Doc. No. 138].[11] On January 23, 2023, the Court entered an order that the previous interim orders regarding the DIP Financing Motion are deemed final and that the balance of the DIP Financing motion is denied [Doc. No. 251].

Pursuant to the Sale Order, the Debtor will be authorized to pay the DIP Lender from the sale proceeds after the closing date.

### C. Avidia Bank Comfort Motion; Stay Extension

With respect to the Real Estate, on June 24, 2022, Avidia Bank filed a motion for comfort order that its action to foreclose on non-debtor property does not violate the automatic stay [Doc. No. 107]. The Debtor filed an objection to the comfort order motion on July 6, 2022 [Doc. No. 115]. The Bankruptcy Court granted Avidia Bank's comfort order motion on July 20, 2022 [Doc. No. 133]

The Debtor also filed, on July 14, 2022, a motion for extension of the automatic stay pursuant to section 105 of the Bankruptcy Code with respect to certain non-debtor guarantors and foreclosure of the Debtor's principal place of business [Doc. No. 126]. The hearing on the stay extension motion has been continued several times before the Debtor withdrew it in January 2023 without prejudice. Avidia Bank has thereafter scheduled a foreclosure auction of the Real Estate last continued to May 9, 2023 (and possibly continued further to on or after June 1, 2023).

### D. Sale of the Debtor's Assets

#### 1. *Initial Sale*

On September 8, 2022, the Debtor filed a motion to sell its assets free and clear of Liens under section 363(f) of the Bankruptcy Code, subject to counteroffers [Doc. No. 176] and supplemented on October 3, 2022 [Doc. No. 194] (the "**Initial Sale Motion**"). On October 4, 2022, the Bankruptcy Court entered an Order Approving Sale and Bidding Procedures and Breakup Fee in Connection with Proposed Sale of Assets of the Debtor [Doc. No. 196]. Ultimately, the Debtor did not receive any other bids by the counteroffer or bid deadline, and an auction was not held. On November 10, 2022, after hearing, the Bankruptcy Court entered the Initial Sale Order approving the going concern sale of the Debtor's business assets to the Initial Buyer as the successful bidder.

Pursuant to the Initial APA, the purchased assets included all right, title, and interests of the Debtor in and to all its assets, as set forth in Section 1.1 of the Initial APA, including (i) all trade and other accounts receivable, (ii) all inventories, (iii) all equipment and machinery, and

---

[11] In February 2023, the Debtor returned the DIP Financing balance to the DIP Lender in the amount of $207,787.79.

(iv) customer and prospect lists and other intangibles. Pursuant to the Initial APA, the Debtor also sought to assume and assign to the Initial Buyer certain unexpired pre-petition agreements and/or unexpired leases as set forth in the Initial APA (and amended in the Initial Sale Order).

In connection with the Initial Sale, the Trust entered into a Commercial Lease with the Initial Buyer, and to facilitate the sale, with a base rent in the amount of $36,000.00 per month. Mr. Ramos also entered into a consulting agreement with the Initial Buyer for approximately six months.

The initial closing was first scheduled to take place by November 14, 2022. Despite multiple extensions, the Initial Buyer defaulted and did not consummate the purchase of the Debtor's business assets. On March 23, 2023, the Debtor sent a termination notice to the Initial Buyer, including with respect to the bankruptcy estate's retention of the $50,000.00 deposit under the Initial APA. The $50,000.00 deposit is forfeited and will be used to cover additional Professional Fee Claims related to the closing delays and breach of the Initial APA by the Initial Buyer, including the new Asset Sale.

### 2. *New Sale*

The Debtor received an offer from the Proposed Buyer for the purchase of the Debtor's business assets (for $2,500,000.00) and the Real Estate (the assumption of the Avidia Mortgage and the Bay Colony/ SBA Mortgage, totaling approximately $3,891,000.00). Upon information and belief, the Proposed Buyer intends to operate the business.

The Debtor will file a separate motion for the sale of the business assets and the Real Estate as a package, free and clear of all Liens, claims, encumbrances, and other interests, pursuant to sections 363(f), 1123(a)(5)(D), and/or 1141(c) of the Bankruptcy Code (the "**Sale Motion**").

The sale shall be subject to the approval of a stipulation by and among the Debtor, the Subchapter V Trustee, Mr. Ramos, and Avidia Bank. Avidia Bank reserves its right to credit bid with respect to the sale of the Debtor's business assets and the Real Estate.

### E. Investigation Motion; Motion to Convert/ Dismiss

On August 5, 2022, the United States Trustee's office filed a motion for the entry of an order (i) directing the Subchapter V Trustee to conduct an investigation and file a report, and (ii) directing the Debtor to cooperate with the investigation [Doc. No. 156] (the "**Investigation Motion**"). The Debtor filed a response to the Investigation Motion on September 15, 2022 [Doc. No. 172]. On September 29, 2022, the Bankruptcy Court entered a Proceeding Memorandum and Order [Doc. No. 185] granting the Investigation Motion inasmuch as, pursuant to 11 U.S.C. §1183(b)(2), the Subchapter V Trustee is directed to perform the duties under sections 1106(a)(3) and (4) of the Bankruptcy Code.

The Subchapter V Trustee filed the investigation report on November 4, 2022 [Doc. No. 203]. According to such investigation report, its purpose is to identify and quantify, as much as possible, the potential claims for recovery for the Debtor's creditors. A copy of the investigation report can be obtained from the case docket.

On January 13, 2023, the US Trustee's Office filed a motion to convert, or in the alternative, to dismiss the case [Doc. No. 240]. A continued hearing is scheduled on this motion for April 4, 2023.

**F.      Prior Chapter 11 Plan**

On June 24, 2022, the Debtor filed its Chapter 11 Plan of Reorganization for Small Business Debtor Under Subchapter V, dated June 23, 2022 [Doc. No. 106]. On July 1, 2022, the Debtor filed a First Amended Chapter 11 Plan of Reorganization for Small Business Debtor Under Subchapter V [Doc. No. 113]. On August 19, 2022, the Court entered an order cancelling the September 1, 2022 confirmation hearing related to this prior plan of reorganization and suspending related deadlines subject to further court order [Doc. No. 168].

1.8      **Litigation Matters**

The Debtor reserves all rights with respect to (i) any complaint against Merchant Capital / Alpha Recovery Partners and any other Cash Advance Lenders for damages caused to the Debtor's business pre-petition, (ii) any post-petition violation of the automatic stay and/or unauthorized transfers or payments by the Debtor, and (iii) any potential challenge of the Claims of the Cash Advance Lenders based on violation of the Massachusetts usury law ("**Litigation Matters**"). Proceeds from pre-petition related Litigation Matters, if any, may constitute collateral of the DIP Lender.

1.9      **Avoidance and Recovery Actions**

Attached to the Debtor's SOFA (Question #3) is a list of certain payments or transfers made by the Debtor within 90 days before filing of the bankruptcy petition. Such payments include:

(i) the withdrawals by or payments to the various Cash Advance Lenders;

(ii) ordinary course payment of invoices to vendors and suppliers;

(iii) payments to senior secured creditors;

(iv) payments to Bridge Tree for loans that are part of Mr. Ramos' scheduled Insider Claim;

(v) compensation related payments made on behalf of Mr. Ramos to his creditors or for loans Mr. Ramos maintains was used in the business, including Jeanne D'Arc Credit Union;

(vi) payments to Kitchen Concepts for payday loans Mr. Ramos maintains has been used in the business;

(vii) payments to US Construction for services rendered and/or for subcontractors; and

(viii) payments to other unsecured creditors.

A list of selected payments or transfers to Cash Advance Lenders, Bridge Tree, and to Kitchen Concepts, totaling approximately $2,300,000.00, made by the Debtor within 90 days of the bankruptcy filing is attached as ***Exhibit C***.

Attached to the Debtor's SOFA (Question #4) is a list of certain payments or transfers made by the Debtor within 1 year before filing of the bankruptcy petition that benefited insider(s). Such payments include (i) certain lease related payments, (ii) payments to Bridge Tree as referred to above, (iii) compensation related payments to or on behalf of Mr. Ramos as referred to above, (iv) Kitchen Concepts payments as referred to above, (v) payments to US Constructions as referred to above, and (vi) payments for other third-party loans Mr. Ramos maintains has been used in the business.

Pursuant to section 546(a) of the Bankruptcy Code, the general two-year statute of limitation deadline for filing such actions will be March 25, 2024. The Debtor reserves all rights with respect to any Avoidance Actions, including preference payments referred to above. The Subchapter V Trustee shall be authorized to bring, pursue or litigate any Avoidance Action on behalf of the Debtor's bankruptcy estate.

## ARTICLE II: SUMMARY

2.1 **Plan Payments.** The Plan proposes to pay Allowed Claims of creditors of the Debtor as set forth in Article VII of the Plan.

2.2 **Claims and Interests**. The Plan provides for the following Claims and Interests:

(i)      Administrative Expense Claims (including Professional Fee Claims)
(ii)     Priority Tax Claims
(iii)    Other Priority Claims, if any (Class 1)
(iv)     DIP Financing (Class 2)
(v)      Enterprise Line of Credit (Class 3)
(vi)     Avidia Equipment Loan (Class 4)
(vii)    Avidia Inventory Loan (Class 5)
(viii)   FCB Equipment Loan (Class 6)
(ix)     SBA Loan (Class 7)
(x)      Other Secured Loans (Class 8)
(xi)     Cash Advance Lenders (Class 9)
(xii)    Mortgage Claims (Class 10)
(xiii)   General Unsecured Claims (Class 11)
(xiv)    Interests (Class 12)

Administrative Expense Claims and Priority Tax Claims are not classified and will be paid as provided under Article III of the Plan.

Holders of Claims and Interests in Class 1 to Class 12 will receive distributions or will be treated as provided in Article IV of the Plan.

2.3 **Disclosure**. All Claim and Interest holders should refer to Articles 3 through 6 of this Plan for information regarding the precise treatment of their Claims and Interests. **Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.**).

## ARTICLE III: CLAIMS AND INTERESTS

3.1 **Non-Classified and Classified Claims and Interests**. Allowed Claims and Interests shall be treated as follows under this Plan:

| Claim/ Class | Impairment | Treatment | Entitled to Vote? |
|---|---|---|---|
| Administrative Expense Claims *(not including. Professional Fee Claims)* | N/A | To be paid from the Plan Funding, to the extent sufficient. | N/A |
| Professional Fee Claims | N/A | To be paid from the Carve-Out; _provided that_ any balance may be paid from the Plan Funding. | N/A |
| Priority Tax Claims | N/A | To be paid from the Plan Funding, to the extent sufficient, or pursuant to such agreement between the parties. | N/A |
| **Class 1-** Other Priority Claims (if any) | Impaired | To be paid from the Plan Funding, to the extent sufficient, or pursuant to such agreement between the parties. | Yes |
| **Class 2-** DIP Financing | Unimpaired | To be paid in full from the proceeds of the Asset Sale. | No |
| **Class 3-** Enterprise Line of Credit | Unimpaired | To be paid in full from proceeds of the Asset Sale. | No |
| **Class 4-** Avidia Equipment Loan | Impaired | To be partially paid from the remaining amount of the Net Asset Sale Proceeds. Any deficiency amount to receive the same treatment provided for Class 11 under the Plan, unless paid from the Real Estate Sale proceeds. | Yes |

| | | | |
|---|---|---|---|
| **Class 5-** Avidia Inventory Loan | Impaired | To be partially paid from the remaining amount of the Net Asset Sale Proceeds. Any deficiency amount to receive the same treatment provided for Class 11 under the Plan, unless paid from the Real Estate Sale proceeds. | Yes |
| **Class 6-** FCB Equipment Loan | Impaired | To be paid $150,000.00 from proceeds of the Asset Sale (subject to section 506(c) surcharge or agreed upon carve-out amount). Any deficiency amount to receive the same treatment provided for Class 11 under the Plan. | Yes |
| **Class 7-** SBA Loan | Impaired | To be reclassified as a General Unsecured Claim and will receive the same treatment provided for Class 11 under the Plan. | Yes |
| **Class 8-** Other Secured Loans | Impaired | Collateral to be returned to the secured creditor(s). | Yes |
| **Class 9-** Cash Advance Lenders | Impaired | To be classified as General Unsecured Claims and will receive the same treatment provided for Class 11 under the Plan. | Yes |
| **Class 10-** Mortgage Claims | Unimpaired | Mortgages to be assumed by the Proposed Buyer or to be paid in full from the Real Estate Sale proceeds, subject to the terms of the Intercreditor Agreement. | No |
| **Class 11** - General Unsecured Claims | Impaired | Pro rata share in cash distribution from the Remaining Fund, if any. | Yes |
| **Class 12** – Interests | Impaired | No distribution on account of such equity interest in the Debtor. | No (deemed to reject) |

3.2 **No Admission**. The description of the Claims and estimation of the recoveries set forth above should not constitute an admission that the Claims are Allowed. The Plan recovery is a projection and the Debtor reserves all of its rights, claims and defenses with respect to any and all Claims.

3.3 **Post-Petition Interest; Fine and Penalties**. Allowed Claims shall not include any interest accrued subsequent to the Petition Date unless specifically provided otherwise under the Plan.  As set forth in Section 5.3, Allowed Claims do not include any fines and penalties.

## ARTICLE IV: TREATMENT OF NON-CLASSIFIED CLAIMS

As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims against the Debtor are not classified for the purpose of voting on, or receiving distributions under, the Plan.  Such non-classified Claims shall be treated as follows pursuant to sections 1129(a)(9)(A) and (C) and 1191(e) of the Bankruptcy Code.

4.1 **Administrative Expense Claims**. The holders of Allowed Administrative Expenses Claims shall be paid from the Plan Funding, to the extent of sufficient funding, or pursuant to such agreement between the parties; *provided that* Professional Fee Claims will be paid from the Carve-Out with any balance to be paid from the Plan Funding.  Notwithstanding the foregoing, a holder of an Administrative Expense Claim may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

Within thirty (30) days after the Effective Date, each holder of Administrative Expense Claims (including Professional Fee Claims) shall file a request for payment of administrative expense Claim or final fee application for Professional Fee Claim, if not filed already.  Any objection to such filed request or fee application may be filed by the objection deadline to be provided in the Confirmation Order.

All other post-Effective Date Claims and invoices may be paid from the Plan Funding in such amounts approved by the Bankruptcy Court.

4.2 **Priority Tax Claims**.  Each holder of an Allowed Priority Tax Claim against the Debtor, if any, shall be paid from the Plan Funding, to the extent of sufficient funding, or pursuant to such agreement between the parties.  The Allowed Priority Tax Claim shall include only post-Effective Date interest thereon at the non-default rate determined under applicable non-bankruptcy law as required by 11 U.S.C. § 511(b).  Notwithstanding the foregoing, a holder of a Priority Tax Claim may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

4.3 **Statutory Fees**. Not applicable in Subchapter V cases.

4.4 **Prospective Quarterly Fees**. Not applicable in Subchapter V cases.

## ARTICLE V:  TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

5.1 **Treatment of Claims and Interests**. The categories of Claims and Interests listed below classify such Claims and Interests for all purposes, including voting, confirmation, and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  Claims against the Debtor (except as set forth in Article IV) are classified as follows:

**Class 1 – Other Priority Claims** (if any)

(a)    <u>Treatment</u>. In full and complete satisfaction, settlement, release and discharge of the Class 1 Claims, if any, each holder of the Allowed Class 1 Claim will receive payment from the Plan Funding (after payment in full of Administrative Expense Claims and Priority Tax Claims) to the extent of sufficient funding, or pursuant to such agreement between the parties. Notwithstanding the foregoing, a holder of an Allowed Class 1 Claim may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

(b)    <u>Impairment and Voting</u>: Class 1 is impaired under the Plan. Each holder of an Allowed Claim in Class 1 shall be entitled to vote to accept or reject this Plan.

## Class 2 - DIP Financing

(a)    <u>Treatment</u>. In full and complete satisfaction, settlement, release and discharge of the Class 2 Claim, the DIP Lender shall receive payment in full from proceeds of the Asset Sale. Notwithstanding the foregoing, the DIP Lender may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

b)    <u>Lien Retention</u>. The DIP Lender shall retain the Lien securing the Class 2 Claim on the proceeds of the Asset Sale, until payment of the Allowed Class 2 Claim as provided herein.

(c)    <u>Impairment and Voting</u>. Class 2 is unimpaired under the Plan. The DIP Lender shall be presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan with respect to Class 2 Claim.

## Class 3 - Enterprise Line of Credit

(a)    <u>Treatment</u>. In full and complete satisfaction, settlement, release and discharge of the Class 3 Claim, Enterprise Bank shall receive payment in full from proceeds of the Asset Sale. Notwithstanding the foregoing, Enterprise Bank may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

(b)    <u>Lien Retention</u>. Enterprise Bank shall retain the Lien securing the Class 3 Claim on the proceeds of the Asset Sale, until payment of the Allowed Class 3 Claim as provided herein.

(c)    <u>Impairment and Voting</u>. Class 3 is unimpaired under the Plan. Enterprise Bank shall be presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan with respect to Class 3 Claim.

## Class 4 - Avidia Equipment Loan

(a)     <u>Treatment</u>. In full and complete satisfaction, settlement, release and discharge of the Class 4 Claim, Avidia Bank shall receive partial payment for this loan from the Net Asset Sale Proceeds, on the Effective Date, as set forth in Exhibit B.  Any deficiency amount will receive the same treatment provided for Class 11 under the Plan, unless paid from the Real Estate Sale proceeds.  Notwithstanding the foregoing, Avidia Bank may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

(b)     <u>Lien Retention</u>.  Avidia Bank shall retain the Lien securing the Class 4 Claim on the proceeds of the Asset Sale, until payment of the Allowed Class 4 Claim as provided herein.

(c)     <u>Impairment and Voting</u>.  Class 4 is impaired under the Plan.  Avidia Bank shall be entitled to vote to accept or reject the Plan with respect to the Class 5 Claim.

## Class 5 - Avidia Inventory Loan

(a)     <u>Treatment</u>.  In full and complete satisfaction, settlement, release and discharge of the Class 5 Claim, Avidia Bank shall receive partial payment for this loan from the remaining amount of the Net Asset Sale Proceeds, on the Effective Date, as set forth in Exhibit B.  Any deficiency amount will receive the same treatment provided for Class 11 under the Plan, unless paid from the Real Estate Sale proceeds.  Notwithstanding the foregoing, Avidia Bank may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

(b)     <u>Lien Retention</u>.  Avidia Bank shall retain the Lien securing the Class 5 Claim on the proceeds of the Asset Sale until payment of the Allowed Class 5 Claim as provided herein.

(c)     <u>Impairment and Voting</u>.  Class 5 is impaired under the Plan.  Avidia Bank shall be entitled to vote to accept or reject the Plan with respect to the Class 5 Claim.

## Class 6 - FCB Equipment Loan

(a)     <u>Treatment</u>.  In full and complete satisfaction, settlement, release and discharge of the Class 6 Claim, FCB shall receive payment of $150,000.00 from proceeds of the Asset Sale (subject to section 506(c) surcharge or carve-out agreed upon between the Debtor and FCB).  Any balance of the Class 6 Claim shall be re-classified as a General Unsecured Claim to be paid as a Class 11 General Unsecured Claim.  Notwithstanding the foregoing, FCB may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

(b)     <u>Lien Retention</u>.  FCB shall retain the Lien securing the Class 6 Claim on the proceeds of the Asset Sale until payment of the Allowed Class 6 Claim as provided herein.

(c)    Impairment and Voting.  Class 6 is impaired under the Plan.  FCB shall be entitled to vote to accept or reject the Plan with respect to the Class 6 Claim.

## Class 7 - SBA Loan

(a)    Treatment. In full and complete satisfaction, settlement, release and discharge of the Class 7 Claim, the SBA Loan shall be re-classified as a General Unsecured Claim to be paid as a Class 11 General Unsecured Claim.  Notwithstanding the foregoing, the SBA may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

(b)    Lien Retention. Pursuant to section 1141(c) of the Bankruptcy Code, the UCC-1 financing statement shall be terminated and any existing Lien shall be released with respect to the SBA Loan.

(c)    Impairment and Voting.  Class 7 is impaired under the Plan.  The SBA shall be entitled to vote to accept or reject the Plan with respect to the Class 7 Claim.

## Class 8 - Other Secured Loans

(a)    Treatment. In full and complete satisfaction, settlement, release and discharge of the Class 8 Claims, each holder of the Allowed Class 8 Claim shall receive relief from the automatic stay and may repossess its collateral.  Any deficiency amount shall be treated as a General Unsecured Claim receiving the same treatment provided for Class 11 under the Plan.  Notwithstanding the foregoing, the holders of Class 8 Claim may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

(b)    Impairment and Voting.  Class 8 is impaired under the Plan.  Holders of Class 8 Claim shall be entitled to vote to accept or reject the Plan with respect to the Class 8 Claim.

## Class 9 - Cash Advance Lenders

(a)    Treatment. In full and complete satisfaction, settlement, release and discharge of the Class 9 Claims, each loan shall be classified as a General Unsecured Claim to be paid as a General Unsecured Claim.  Notwithstanding the foregoing, the holders of Class 9 Claim may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

(b)    Lien Retention.  Pursuant to section 1141(c) of the Bankruptcy Code, on the Effective Date, the UCC-1 financing statements shall be terminated and any existing Lien shall be released with respect to the Claims of the Cash Advance Lenders.

(c)     Impairment and Voting.  Class 9 is impaired under the Plan.  Holders of Class 9 Claim shall be entitled to vote to accept or reject the Plan with respect to the Class 9 Claim.

**Class 10 – Mortgage Claims**

(a)     Treatment. In full and complete satisfaction, settlement, release and discharge of the Class 10 Claims, the Mortgage Claims will be assumed by the Proposed Buyer or will be paid in full from the Real Estate Sale proceeds, subject to the terms of the Intercreditor Agreement.  Notwithstanding the foregoing, the holders of Class 10 Claims may receive such other less favorable treatment as may be agreed upon by such holders and the Debtor.

(b)     Lien Retention.  Holders of the Mortgage Claims shall retain the Liens securing the Class 10 Claims on the Real Estate or related sale proceeds until payment of the Allowed Class 10 Claims as provided herein. Pursuant to section 1141(c) of the Bankruptcy Code, on the Effective Date, all other Liens, mortgages, and encumbrances (recorded or otherwise) related to the Real Estate shall be terminated and shall be released.

(c)     Impairment and Voting.  Class 10 is unimpaired under the Plan.  Holders of Class 10 Claim shall be presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan with respect to Class 10 Claims.

**Class 11 – General Unsecured Claims.**

(a)     Treatment.  In full and complete satisfaction, settlement, release and discharge of the Class 11 Claims, each holder of the Allowed Class 11 Claim shall receive a *pro rata* share in cash distribution from the Remaining Fund, if any, from the Plan Funding (after payment in full of Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims (if any)), as discussed further in Section 6.1. Notwithstanding the foregoing, the holder of an Allowed Class 11 Claim may receive such other less favorable treatment as may be agreed upon by such holder and the Debtor.

(b)     Impairment and Voting.  Class 11 is impaired under the Plan.  Each holder of a Class 11 Claim shall be entitled to vote to accept or reject the Plan.

**Class 12 – Interests.**

(a)     Treatment. The holders of Class 12 Interests will receive nothing on account of such Interest in the Debtor.  On the Effective Date, all Interests shall be cancelled, extinguished, and discharged.

(b)     Impairment and Voting:  Class 12 is impaired under the Plan.  The holder of Class 12 Interests shall be deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

5.2     **Payment to Taxing Authorities**.  Any payment made to taxing authorities under Article IV and Article V shall be applied first to the principal owed on trust fund taxes of the Debtor until paid in full, and thereafter interest owed on such trust fund taxes until paid in full.

5.3     **Allowed Claims**.  "Allowed" shall mean any Claim against the Debtor (a) for which (i) a proof of claim was timely and properly filed or, if no proof of claim was filed, the Claim is listed by the Debtor in the Schedules as liquidated in amount and not disputed or contingent (and for which no contrary proof of claim has been filed), and (ii) no objection to the allowance of the Claim (including without limitation an objection based on rights of set off or recoupment, or under sections 502(d), 510 or 549 of the Bankruptcy Code) or request to estimate the Claim has been interposed on or before the Claims Objection Deadline, or if any timely objection or request for estimation has been interposed, such Claim has been determined by a final order to be allowed in favor of the respective Claim holder (in which case the Allowed Claim shall equal the allowed amount as determined by such final order); (b) that is allowed pursuant to the terms of an agreement by and between the holder of such Claim and the Debtor; or (c) that is allowed by final order or under the terms of the Plan.

With respect to Administrative Expense Claim, "Allowed" shall mean any Administrative Expense Claim, or any portion thereof, with respect to which both (i) a timely and proper request for payment has been made to the extent required by the Plan, the Confirmation Order, or by any other order of the Bankruptcy Court, and (ii) such Administrative Expense Claim is allowed by the Bankruptcy Court.

Allowed Claims shall not include Disputed Claims or Disallowed Claims.  All non-compensatory penalties, fines, punitive damages, exemplary damages, multiple damages, or any other claims or obligations that do not compensate for actual losses incurred shall be deemed subordinated to General Unsecured Claims or disallowed under sections 105(a) and 726(a)(4) of the Bankruptcy Code or otherwise.

5.4     **Impairment of Claims or Interests**.  A class of Claims or Interests is deemed unimpaired under section 1124 of the Bankruptcy Code to the extent (i) the Plan leaves the legal, equitable, and contractual rights of such  Claim or Interest unaltered, or (ii) notwithstanding  any contractual provisions in the loan documents or applicable law entitles a creditor to demand or receive accelerated payment of its Claim due to the occurrence of a default, if applicable, the Plan has cured any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, and the other requirements of section 1124(2) are met.

# ARTICLE VI:  DISTRIBUTIONS

6.1     **Plan Distributions**.

Except as otherwise provided in the Plan, all distributions to creditors in Class 11 will be made as set forth below:

(i)     In the event of a consensual Plan confirmed pursuant to section 1191(a) of the Bankruptcy Code, the Subchapter V Trustee will make the distributions under the Plan to holders of allowed Claims in Class 11, and the service of the Subchapter V Trustee will terminate when the Plan is substantially consummated pursuant to the terms of section 1183(c).

(ii)    In the event of a nonconsensual Plan confirmed pursuant to section 1191(b) of the Bankruptcy Code, the Subchapter V Trustee, in his discretion,[12] will make the distributions under the Plan to holders of allowed Claims in Class 11 pursuant to the terms of section 1194(b).

(iii)   To the extent applicable, professional fees incurred after the Confirmation Date by the Subchapter V Trustee may be paid from the Plan Funding as set forth in Section 4.1.

The proposed Plan distribution breakdown from the Asset Sale proceeds is attached as ***Exhibit B***.

The Plan distributions to be made from the Plan Funding, if any, will be as follows: first, for expense of administering the Debtor's estate post Confirmation Date (to the extent of such additional expenses are not already included in the estimate for Administrative Expense Claims); second, to Administrative Expense Claims, including Professional Fee Claim; third, to Priority Tax Claims; fourth, to Other Priority Claims, if any; and fifth, to General Unsecured Claims.

Plan distributions shall be mailed by first class mail, postage prepaid, to the address of such holder as provided in the Schedules or filed proof of claim, if any, unless the Debtor or the Subchapter V Trustee has been notified in writing of a change of address.  The Debtor and the Subchapter V Trustee shall have no obligation to locate such holders whose distributions or notices are properly mailed but nevertheless returned.

6.2     **Objections to Claims; Investigation**.  Any objection to Claims shall be prosecuted by the Debtor or Subchapter V Trustee.  Except as otherwise provided by order of the Bankruptcy Court, such objection to a Claim may be filed until the later of: (a) the date that such Claim becomes due and payable in accordance with its terms, and (b) the Claims Objection Deadline.  The Subchapter V Trustee's rights are reserved with respect to his investigation pursuant to the Investigation Motion and related report.

6.3     **Distribution on a Disputed Claim.**  No distribution will be made on account of a Disputed Claim unless such claim is an Allowed Claim.  If applicable, a reserve may be maintained for such Disputed Claims.

---

[12] Section 1194(b) provides that the trustee shall make payments to creditors under the plan unless the plan or the confirmation order provides otherwise.

6.4    **Settlement of Disputed Claims.** The Debtor shall have the power and authority to settle and compromise a Disputed Claim with court approval and compliance with Bankruptcy Rule 9019.

6.5    **Uncashed Distributions**. Checks issued by the Debtor or the Subchapter V Trustee as distributions pursuant to the Plan shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof and thereafter shall be treated under the Plan as an unclaimed distribution.  The holder of the Allowed Claim to whom such check originally was issued shall make any requests for re-issuance of any check to the Debtor or the Subchapter V Trustee, as applicable.  Any requests for re-issuance of such a voided check shall be made on or before forty-five (45) days after the expiration of the ninety (90) day period following the date of issuance of such check.  After such date, all funds held on account of any such voided check shall, in the discretion of the Debtor, be used to satisfy the costs of administering and fully consummating the Plan or become available cash for distribution in accordance with the Plan, and the holder of any such Claim shall not be entitled to any other or further distribution under the Plan on account of such Claim and shall be deemed to have waived its Claim and any right to a distribution thereon.

## ARTICLE VII: EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

7.1    **Executory Contracts and Unexpired Leases**. According to Schedule G, as of the Petition Date, the Debtor was a party to several executory contracts and/or unexpired leases.

7.2    **Assumed Executory Contracts and Unexpired Leases.** None, unless provided otherwise under the Sale Order.

7.3    **Rejected Executory Contracts and Unexpired Leases.** The Debtor hereby rejects all its executory contracts and unexpired leases, if any, that are not assumed and assigned under the Sale Order.  The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejection pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code.

All Allowed General Unsecured Claims arising from the rejection of executory contracts or unexpired leases (if any) shall be treated as Claims in Class 11 under the Plan.  Any such pre-petition Claim must be filed with the Bankruptcy Court within thirty (30) days after the Effective Date or as provided under the Confirmation Order.  The Debtor shall have sixty (60) days to object to or seek estimation of any proof of Claim filed hereunder or such additional time as may be ordered by the Bankruptcy Court and may do so on any ground, including without limitation, that the contract or lease in question is not properly regarded as executory or unexpired.

## ARTICLE VIII: MEANS FOR IMPLEMENTATION OF THE PLAN

8.1    **Plan Implementation**. This Plan will be funded with:

(i)    Proceeds from the Asset Sale

(ii)     Proceeds from the Real Estate Sale, as applicable.

(iii)    The Plan Funding, which includes (i) available cash as of the Effective Date, if any (ii) proceeds from Litigation Matters, and Avoidance Actions, if any, (iii) any Net Real Estate Proceeds, and (iv) any proceeds of any other remaining assets, claims, and recovery actions of the Debtor and the bankruptcy estate.

Since the Debtor will not be operating post-Effective Date, the requirements of section 1190(2) (for the Plan to provide for the submission of future earnings of the Debtor as is necessary for the execution of the Plan) is not applicable.

8.2    **Ramos Stipulation and Sale Motion**. The Debtor is also planning to file a motion to approve the Ramos Stipulation to transfer the Real Estate to the Debtor's bankruptcy estate, and new Sale Motion regarding the Debtor's business assets and the Real Estate.  The Ramos Stipulation, if approved, shall be deemed incorporated into the Plan.

8.3    **Disposable Income; Fair and Equitable Analysis**.

The Debtor's projected disposable income (as defined in section 1191(d) of the Bankruptcy Code) is not applicable and will not be used to make payment distributions under the Plan.

In  the event the impaired classes, Class 1 (Other Priority Claims), Class 4 (Avidia Equipment Loan), Class 5 (Avidia Inventory Loan), Class 6 (FCB Equipment Loan), Class 7 (SBA Loan), Class 8 (Other Secured Loans), Class 9 (Cash Advance Lenders), Class 11 (General unsecured Claims), and Class 12 (Interests), do not vote to accept the Plan, and the requirements of section 1129(a)(8) and (10) of the Bankruptcy Code are not satisfied, the Bankruptcy Court may still confirm the Plan as part of a non-consensual/ cramdown process under section 1191(b) of the Bankruptcy Code as long as the Plan does not discriminate unfairly, and is fair and equitable, with respect to each impaired class of Claims and Interests that has not accepted the Plan.

Under section 1191(c) of the Bankruptcy Code, the condition that a plan be fair and equitable is different for secured creditors and unsecured claims:

(i)     For a Secured Claim with allowed claim, the provisions under section 1129(b)(2)(A) of the Bankruptcy Code require: (i) lien retention, and payments totally at least the allowed amount of such claim of at least the value of the creditor's interest in the collateral; (ii) in the event of a sale, the creditor's lien to attach to sale proceeds subject to section 363(k), **or** (ii) the realization of the indubitable equivalent of the creditor's claim.

(ii)    As a general matter and with respect to unsecured creditors, the fair and equitable requirements include (i) all of the projected disposable income of a debtor to be applied to make payments under the plan, **or** (ii) the value of the property to be distributed under the plan not to be less than the projected disposable income of the debtor.  Also, the debtor should be able to

make all payments under the plan, or there is reasonable likelihood that the debtor will be able to make all payments under the plan (provided the plan provides appropriate remedies to protect the holders of claims or interests in the event that the plan payments are not made).

Based on the above-mentioned requirements of section 1191(c), the Plan does not discriminate unfairly, and is fair and equitable, with respect to all impaired classes.

(i)      Under the Plan, each holder of Secured Claim will retain its Lien or security interest and will receive payment totaling at least the allowed amount of its Claim. Whether a claim is secured or unsecured is determined in accordance with section 506(a) of the Bankruptcy Code, which provides that a secured creditor's claim is a "secured claim to the extent of the value of such creditor's interest in the estate's interest in such property… and is an unsecured claim to the extent that the value of such creditor's interest… is less than the amount of such allowed claim."

(ii)     Based on the value of the Debtor's business assets, the SBA Loan and claims of the Cash Advance Lenders shall be deemed wholly unsecured, to the extent they had valid security interests.  Therefore, such claims will be re-classified as General Unsecured Claims under the Plan.  Also, any deficiency for secured creditors that are under-secured shall be treated as a General Unsecured Claim under the Plan.

(iii)    The value of the property to be distributed under the Plan includes the Asset Sale proceeds and all the Debtor's remaining assets.  As required under section 1191(c)(3) of the Bankruptcy Code, the Debtor expects that it will be able to make the proposed payments under the Plan.

8.4      **Execution of Necessary Documents.** Confirmation of the Plan shall constitute authorization for the Debtor, its agents, representatives, partners, affiliates, and successors or assigns to effectuate the Plan and enter into all documents, instruments and agreements reasonably necessary to effectuate the terms of the Plan.

8.5      **Amendment of Documents.** As of the Effective Date, all pre-Confirmation Date documents and agreements (whether written or oral) between the Debtor and any party, including, without limitation, any instruments, contracts, notes, mortgages, deeds of trust, assignments, bills of sale, leases, property settlement agreements and purchase and sale agreements, shall be deemed to be amended as necessary to effectuate and conform to the terms of the Plan.  To the extent that there is any inconsistency between the Plan and any such documents and agreements, the terms of the Plan shall control.

8.6      **Vesting of Property; Free and Clear.** Except as otherwise provided in the Plan, as of the Effective Date, all assets of the bankruptcy estate shall vest in the Debtor, and such property shall be free and clear of all claims and interests of creditors or any other interested parties pursuant to sections 1141(b) and (c) of the Bankruptcy Code.

8.7      **Preservation of Causes of Action.** The Debtor will exclusively retain and may enforce, and the Debtor expressly reserves and preserves for these purposes, in accordance with section 1123(a)(5)(A) of the Bankruptcy Code, any Claims, demands, rights and causes of action

that the Debtor or it estate may hold against any Person. No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims by virtue of or in connection with the confirmation, consummation of effectiveness of the Plan. Potential causes of action for potential recoveries that would benefit the bankruptcy estate are discussed in Sections 1.8 and 1.9.

8.8    **Transfer Taxes**. The sale or transfer of the Real Estate under, pursuant to, in connection with and in furtherance of the Plan and the Confirmation Order, together with the transfer and delivery of any and all instruments of transfer, including, without limitation, the deed from the Trust to the Proposed Buyer, in connection therewith shall not be taxed under any Transfer Taxes pursuant to section 1146(a) of the Bankruptcy Code.

8.9    **Recording Documents**. Pursuant to sections 105, 1141(c), 1142(b) and 1146(a) of the Bankruptcy Code, each and every federal, state and local governmental agency or department, shall be directed to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Plan, and any and all notices of satisfaction or assignment of any Lien, Claim and other encumbrances not expressly preserved by the Plan.

## ARTICLE IX: DISCHARGE OF CLAIMS; RELEASE

9.1    **Discharge.** If the Debtor's Plan is confirmed under section 1191(a) of the Bankruptcy Code, on the Effective Date of the Plan, the Debtor will be discharged from any debts that arose before confirmation of this Plan, pursuant to section 1141(d)(1)(A). If the Debtor's Plan is confirmed under section 1191(b) of the Bankruptcy Code, on the Effective Date of the Plan, the Debtor will be discharged from any debts that arose before confirmation of the Plan, subject to completion of all payments proposed under the Plan, pursuant to section 1141(d)(1)(A), as provided under sections 1181(c) and 1192 of the Bankruptcy Code.

9.2    **Injunction Relating to the Plan.** Upon entry of discharge pursuant to Section 9.1 of the Plan, all Persons are hereby permanently enjoined from commencing, continuing or enforcing in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively or otherwise (i) against the Debtor or its assets, or (ii) related to, on account of, or respecting any Claims, debts, rights, obligations, causes of action or liabilities discharged pursuant to the Plan.

9.3    **Releases.** Upon entry of discharge pursuant to Section 9.1 of the Plan, in consideration for, among other things, the obligations of the Debtor under the Plan and other contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, (a) each holder of a Claim that votes in favor of the Plan and (b) to the fullest extent permissible under applicable law, each Person that has held, holds or may hold a Claim or at any time was a creditor of the Debtor and that does not vote on the Plan or votes against the Plan, in each case will be deemed to forever release, waive and discharge all Claims, obligations, suits, judgments, damages, demands, rights, causes of action and liabilities (other than the right to enforce the Debtor's obligations under the Plan and the contracts, instruments, releases, agreements and documents delivered under the Plan), whether liquidated or

unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Bankruptcy Case or the Plan that such entity has, had or may have against the Debtor, the Debtor's estate and its assets.

      9.4    **Exculpation.** Except as otherwise set forth in the Plan, neither the Debtor, nor any of its respective present or former members, officers, directors, employees, general or limited partners, advisors, attorneys, agents, successors or assigns, including the Subchapter V Trustee, shall have or incur any liability to any holder to a Claim, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successor or assigns, for any act or omission in connection with, relating to, or arising out of, the administration of the Chapter 11 bankruptcy proceeding, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan occurring prior to the Effective Date. Nothing in this Section 9.4 of the Plan shall relieve any of the foregoing parties from carrying out their responsibilities, if any, under the Plan and such exculpation shall not apply to any liability for acts or omissions involving gross negligence or willful misconduct.

      9.5    **Cancellation of Existing Indebtedness and Liens.** Upon entry of an order of discharge pursuant to Section 9.1 of the Plan: to the extent applicable, (a) all credit agreements, promissory notes, mortgages, security agreements, invoices, contracts, agreements and any other documents or instruments evidencing Claims against the Debtor, together with any and all Liens securing same, shall be canceled, discharged, and released without further act or action by any Person under any applicable agreement, law, regulation, order or rule, (b) the obligations of the Debtor thereunder shall be deemed cancelled, discharged, and released, and (c) all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens or other security interests, including any rights to any collateral thereunder, will revert to the Debtor to the extent of applicable law and subject to this Plan.

## ARTICLE X: GENERAL AND OTHER PROVISIONS

      10.1    **Plan Confirmation Hearing; Objection Deadline**. The Bankruptcy Court will schedule a hearing on confirmation of the Plan and to consider whether the Plan satisfies the various requirements of the Bankruptcy Code. Any objection to the Plan shall be filed by the objection deadline to be indicated in a separate notice or Order of the Bankruptcy Court.

      10.2    **Voting on the Plan.** All creditors with Allowed Claims and Interests entitled to vote on the Plan, Class 1 (Other Priority Claims), Class 4 (Avidia Equipment Loan), Class 5 (Avidia Inventory Loan), Class 6 (FCB Equipment Loan), Class 7 (SBA Loan), Class 8 (Other Secured Loans), Class 9 (Cash Advance Lenders), Class 11 (General unsecured Claims), and Class 12 (Interests), may cast their votes for or against the Plan by completing, dating, signing and causing the ballot, form of which to be attached to the Plan Procedure Motion, to be returned to the Debtor's counsel by the voting deadline to be indicated in a separate plan filing notice (form of which is attached as an exhibit to the Plan Procedure Motion) or Order of the Bankruptcy Court.

10.3    **Plan Acceptance / Rejection Standard**. Pursuant to section 1126 of the Bankruptcy Code, an impaired class of Claims shall have accepted the Plan if (a) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan, and (b) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan (in both instances, acceptance or rejection by the creditor to be in good faith).  If necessary and applicable for confirmation of the Plan, the Debtor reserves the right to request that the Bankruptcy Court address whether the Plan may be deemed accepted or rejected by any impaired Class that does not vote.[13]

10.4    **Consensual / Nonconsensual Confirmation.**  Pursuant to section 1191(a) of the Bankruptcy Code, the Bankruptcy Court shall confirm the Plan if all applicable requirements of section 1129(a) are met.  Under section 1191(b) of the Bankruptcy Code, if all of the applicable requirements of section 1129(a) are met other than 1129(a)(8) (each class of claims or interests to accept the plan if impaired) and 1129(a)(10) (if a plan has impaired class of claims, at least one class of claims to accept the plan), the Bankruptcy Court  may still confirm the Plan if the Plan does not discriminate unfairly, and is fair and equitable (*See Sections 8.2 and 8.3 above*).

There are eight impaired classes of Claims and Interests under the Plan: Class 1 (Other Priority Claims), Class 4 (Avidia Equipment Loan), Class 5 (Avidia Inventory Loan), Class 6 (FCB Equipment Loan), Class 7 (SBA Loan), Class 8 (Other Secured Loans), Class 9 (Cash Advance Lenders), Class 11 (General unsecured Claims), and Class 12 (Interests).  In the event holders of Claims in any such classes of Claims vote to accept the Plan by the requisite majority provided in section 1126(c) of the Bankruptcy Code, section 1129(a)(10) will be satisfied.  Section 1129(a)(8) will be satisfied if all eight impaired classes of Claims and Interests vote to accept the Plan.  If the requirements of both sections 1129(a)(8) and (a)(10) are met, the Debtor will seek confirmation of the Plan pursuant to section 1191(a) of the Bankruptcy Code.

---

[13] Courts have adopted the view that although actual acceptance of a plan by at least one class of impaired claims is necessary for a bankruptcy court's confirmation of a plan under section 1129(a)(10), not every creditor is obligated to vote on a plan.  See, 11 U.S.C. § 1126(a) (a creditor "may" accept or reject a plan).  See, In re Ruti-Sweetwater, Inc., 836 F.2d 1263, 1266 (10th Cir. 1988) (holding that creditor's inaction constituted an acceptance of the plan; a plan is not only presumed confirmable, but is confirmable under § 1129(a) or 1129(b) where only one class of impaired claims has accepted the plan and the other elements of § 1129(a) or §1129(b) are met); In re Cypresswood Land Partners, I, 409 B.R. 396, 430 (Bankr. S.D. Texas 2009) (adopted the view in In re Ruti-Sweetwater and acknowledged the disagreement between courts as to whether a creditor's failure to vote or to object to a plan constitutes acceptance of the plan).  But see, In re M. Long Arabians, 103 B.R. 211, 215-216 (BAP 9th Cir. 1989) (holding that the holder of a claim must affirmatively accept the plan).  Courts in the First Circuit have cited to In re Ruti-Sweetwater but the First Circuit has not addressed this issue.  See, In re Boston Hotel Venture, LLC, 460 B.R. 38, 51 (Bankr. D. Mass. 2011), *vacated on other grounds*, 2012 WL 4513869 (BAP 1st Cir. November 14, 2011) (impaired class that did not vote was deemed to have accepted the plan); In re Fili, 257 B.R. 370, 373 (BAP 1st Cir. 2001) (citing to In re Ruti-Sweetwater in the context of res judicata effect, stating that chapter 11 plan's discharge provisions bound non-voting, non-objecting creditor with notice).

Otherwise, the Debtor will seek confirmation of the Plan pursuant to section 1191(b) of the Bankruptcy Code.

10.5 **Best Interest Test and Liquidation Alternative**

Section 1129(a)(7)(A)(ii) of the Bankruptcy Code requires that each holder of a claim or an interest in an impaired class of claims must either accept the Plan or receive or retain at least the amount or value it would receive if the Debtor's assets were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. The Debtor believes that this requirement is satisfied under the Plan. Pursuant to sections 1129(a)(7) and 1190(1)(B) of the Bankruptcy Code, a Liquidation Analysis is attached as ___**Exhibit A**___. Creditors will receive under the Plan more than the amount they would have received if the Debtor's assets were liquidated.

In addition, if the case is converted to Chapter 7 a trustee would be appointed which would result in additional administrative costs as the Chapter 7 trustee would need to hire new professionals to analyze and liquidate the Debtor's assets. The conversion would result in the establishment of a new bar date and would require the new trustee to re-analyze the claims filed against the Debtor.

10.6 **Plan Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that the Plan be feasible (that is, that there be a reasonable prospect that the Debtor will be able to perform its obligations under the Plan without further financial reorganization). As set forth in Section 8.1, the sources of payments under the Plan will be the proceeds of the Asset Sale, and the Plan Funding. The Debtor expects there will be sufficient amount to cover the distributions or payments contemplated under the proposed Plan. Pursuant to section 1190(1)(C) of the Bankruptcy Code, ___**Exhibit B**___ attached hereto is the Debtor's proposed Plan distributions from the Asset Sale proceeds.

10.7 **Tax Consequences.** The Debtor has not requested a ruling from the Internal Revenue Service with respect to these matters and no opinion of counsel has been sought or obtained by the Debtor with respect thereto. There can be no assurance that the Internal Revenue Service or any state or local taxing authorities will not challenge any or all of the tax consequences of the Plan, or that such a challenge, if asserted, would not be sustained. FOR THE FOREGOING REASONS, CREDITORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES (FOREIGN, FEDERAL, STATE AND LOCAL) TO THEM OF THE PLAN. THE DEBTOR IS NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CREDITOR OR EQUITY HOLDER, NOR IS THE DEBTOR RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.

10.8 **Reservation of Rights**. The Debtor reserves the right to, among other things, (i) contest the right of the holder of any Claim to vote on the Plan, or designate the vote of the holder of any Claim (ii) contest the right of the holder of any Claim to receive distributions under the Plan, (iii) contest the validity of a creditor's Lien or security interest, and (iv) seek to

subordinate any Claim for inequitable conduct or otherwise. Except as otherwise provided, no assets shall be deemed abandoned and no defense, set-off, counterclaim or right of recoupment of the Debtor shall be deemed waived, released or compromised.

10.9 **Amendment or Modification of the Plan**. The Debtor shall be permitted to amend, supplement, or modify the Plan at any time, so long as such amendment, supplement, or modification satisfies the restrictions and requirements in section 1193 of the Bankruptcy Code.

10.10 **Substantial Consummation; Case Closure.** If the Plan is confirmed pursuant to section 1191(a), the role of the Subchapter V Trustee will be terminated, pursuant to section 1183(c)(1), after the filing of a notice of substantial consummation of the Plan. Upon substantial consummation of the Plan, the Debtor shall (i) file the notice required under section 1183(c)(2) (ii) file a motion for the case to be closed and for final decree pursuant to MLBR 3022-1, and (iii), if required, file a motion or request for entry of discharge under section 1192 of the Bankruptcy Code.

10.11 **Risks Associated With Plan Distributions**. Distributions under the Plan does not rely on the Debtor's revenue going forward. However, the Debtor or the Subchapter V Trustee, as applicable, may not be able to make the projected distributions under the Plan, particularly to Class 11 (General Unsecured Creditors) in the event (i) there is an increase in Administrative Expense Claims due to further litigation or otherwise, (ii) any filing of substantial Priority Tax Claims or Other Priority Claims, (iii) if the sale of the Real Estate and the business assets to the Proposed Buyer are not consummated, and (iv) if Litigation Matters, and/or Avoidance Actions are pursued but the bankruptcy estate does not recover sufficient proceeds from such proceedings.

10.12 **Conditions Precedent to the Effective Date**. The following conditions must be fully satisfied for the Plan to become effective:

(a) The Confirmation Order shall have been entered by the Bankruptcy Court.

(b) The Sale Order shall have been entered by the Bankruptcy Court.

(c) The Order approving the Ramos Stipulation shall have been entered by the Bankruptcy Court.

(d) The Asset Sale shall have closed.

(e) The Real Estate Sale shall have closed

10.13 **Effect of Non-occurrence of Effective Date.** If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against the Debtor, or (b) prejudice in any

manner the rights of the Debtor, or constitute an admission, acknowledgement, offer or undertaking by the Debtor.

10.14 **Severability.** If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

10.15 **Binding Effect.** The rights and obligations of any Person named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such Person.

10.16 **Captions.** The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of the Plan.

10.17 **Controlling Effect.** Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Massachusetts, without giving effect to the principles of conflicts of law of such jurisdiction.

10.18 **Corporate Governance.** The Debtor's organizational documents do not provide for issuance of non-voting equity securities or any preferred class of equity securities, as referred to under section 1123(a)(6) of the Bankruptcy Code, to the extent applicable.

10.19 **Retention of Jurisdiction**. Notwithstanding entry of the Confirmation Order, the occurrence of the Effective Date, consummation of the Plan, the Bankruptcy Case having been closed, or a final decree having been entered, the Bankruptcy Court shall have and retain jurisdiction of matters arising in or related to the Bankruptcy Case and the Plan, to the fullest extent permitted by law, including under, and for the purposes of, sections 105(a), 1127, 1142, 1144, 1146, and 1193 of the Bankruptcy Code, as applicable.

## ARTICLE XI: DEFINITIONS

11.1 **Definitions and Rules of Construction.** The definitions and rules of construction contained in sections 101 and 102 of the Bankruptcy Code shall apply when the terms defined or construed in the Bankruptcy Code are used in the Plan but not defined. For purposes of the Plan, the following terms shall have the meanings specified herein:

"Administrative Expense Claim" shall mean any cost or expense of administration of the Bankruptcy Case arising on or before the Effective Date allowable under section 503(b) or 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary post-petition expense of preserving the Debtor's estate or operating the business, all Professional Fee Claims, all to the extent not properly paid previously by the Debtor in the ordinary course or pursuant to Bankruptcy Court order.

"Allowed" shall have the meaning set forth in Section 5.3 of the Plan.

"<u>Asset Sale</u>" shall mean the sale of the Debtor's business assets to the Proposed Buyer or another successful bidder pursuant to the Sale Order.

"<u>Avidia Equipment Loan</u>" shall have the meaning set forth in Section 1.5(A) of the Plan.

"<u>Avidia Inventory Loan</u>" shall have the meaning set forth in Section 1.5(A) of the Plan.

"<u>Avoidance Actions</u>" shall mean any avoidance claims or powers held by the Debtor or any trustee for the Debtor, including those avoidance powers set forth in sections 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, or to the proceeds of any related claims, or actions commenced pursuant to such powers.

"<u>Bankruptcy Case</u>" shall mean the Debtor's Chapter 11 bankruptcy case pending in the Bankruptcy Court, Case No. 22-40216 (EDK).

"<u>Bankruptcy Code</u>" shall mean Title 11 of the United States Code, 11 U.S.C. §§101 et seq., as amended from time to time.

"<u>Bankruptcy Court</u>" shall mean the United States Bankruptcy Court for the District of Massachusetts in which the Bankruptcy Case is pending.

"<u>Bankruptcy Rules</u>" shall mean the Federal Rules of Bankruptcy Procedure as promulgated under 28 U.S.C. § 2075, and any local rules of the Bankruptcy Court.

"<u>Bay Colony</u>" shall have the meaning set forth in Section 1.5(G) of the Plan.

"<u>Brickstone</u>" shall have the meaning set forth in Section 1.7 of the Plan.

"<u>Bridge Tree</u>" shall mean the following entities that, according to Mr. Ramos, have given various short term loans used in the business and part of the scheduled Insider Claims: (i) Bridge Tree Investment Holdings, and (ii) Bridge Capital LLC.

"<u>Business Loans</u>" shall mean the Avidia Equipment Loan and the Avidia Inventory Loan.

"<u>Caggiano Lien</u>" shall mean any lien of Angela Caggiano and/or Tyngsboro Gardens, LLC based on writ of attachment against the Real Estate for approximately $220,000.00 that may be related to pending state court litigation against Mr. Ramos and/or the Trust.

"<u>Carve-Out</u>" shall be (i) the plan funding in the amount of $225,000.00 as agreed among the Debtor's bankruptcy counsel, the Subchapter V Trustee, and Avidia Bank, and (ii) any additional section 506(c) surcharge or carve-out amount in relation to FCB.

"<u>Cash Advance Lenders</u>" shall mean certain creditors with cash advance agreements, such as (i) merchant cash advance agreements, (ii) agreement for purchase and sale of future receipts, (iii) future receivables sale and purchase agreements, and (iv) revenue purchase agreement, and as further identified in the Cash Collateral Motion.

"<u>Cash Collateral Motion</u>" shall have the meaning set forth in Section 1.7(A) of the Plan.

"Claim" shall mean a claim against a Person or its property as defined in section 101(5) of the Bankruptcy Code, including, without limitation, (a) any right to payment, whether or not such right is reduced to judgment, and whether or not such right is liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy for breach of performance, if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, or is fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

"Claims Objection Deadline" means the later of (i) sixty days after the Effective Date, and (ii) such greater period of limitation for the filing of an objection to any Claim as may be fixed or established by the Bankruptcy Court or by agreement between the Debtor and the Claim holder.

"Confirmation Date" shall mean the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket in this Bankruptcy Case.

"Confirmation Order" shall mean the order of the Bankruptcy Court confirming the Plan pursuant to the provisions of the Bankruptcy Code, and any supplementary orders of the Bankruptcy Court issued in furtherance of the Plan.

"Debtor" shall have the meaning set forth in the preamble to the Plan, and shall include the confirmed Debtor after the Effective Date of the Plan, as applicable.

"DIP Credit Agreement" shall have the meaning set forth in Section 1.7(B) of the Plan.

"DIP Financing" shall have the meaning set forth in Section 1.7(B) of the Plan.

"DIP Financing Motion" shall have the meaning set forth in Section 1.7(B) of the Plan.

"DIP Lender" shall have the meaning set forth in Section 1.7(B) of the Plan.

"Disallowed Claim" shall mean (a) any Claim that has been disallowed or expunged by a final order; (b) any Claim that has been listed by the Debtor in the Schedules in the amount of "$0" or as unliquidated in amount, disputed, contingent, or unknown and for which a bar date has been established but no proof of claim has been timely filed; or (c) unless otherwise specified herein or by order of the Bankruptcy Court, any interest, fees and other charges, fines, penalties, multiple or punitive damages.

"Disputed Claim" shall mean: (i) all or the portion of any Claim against the Debtor that is neither an Allowed Claim nor Disallowed Claim, including any Claim as to which the Debtor interposed an objection or request for estimation on or before the Claims Objection Deadline, which objection or request for estimation has not been withdrawn or determined by a final order; (ii) a Claim as to which the holder of such Claim is a defendant in a pending Avoidance Action, or has failed to pay or turn over property as required by section 502(d) of the Bankruptcy Code; (iii) a Claim that is otherwise treated as a "Disputed Claim" pursuant to the Plan, including (a) the claims for creditors subject to Schedule F amendment as set forth in Section 1.5(F), (b) the ROC Funding Lien, and (c) the Caggiano Lien, or (iv) Claims scheduled as disputed, contingent, or unliquidated, including Claims of the Cash Advance Lenders.

"<u>DOR</u>" shall have the meaning set forth in Section 1.6 of the Plan.

"<u>Effective Date</u>" shall mean the date upon which all of the conditions precedent to the Effective Date of the Plan, as set forth in Section 10.12, shall have been satisfied or waived (to the extent subject to waiver).

"<u>Enterprise Bank</u>" shall have the meaning set forth in Section 1.5(A) of the Plan.

"<u>FCB</u>" shall have the meaning set forth in Section 1.5(A) of the Plan.

"<u>FCB Equipment Loan</u>" shall have the meaning set forth in Section 1.5(A) of the Plan.

"<u>General Unsecured Claim</u>" shall mean a Claim against the Debtor, including any trade vendor claim, that is not an Administrative Expense Claim, a Priority Tax Claim, or a Claim under Classes 1-8. General Unsecured Claims shall include (i) Non-Priority Tax Claims, if any, (ii) any deficiency Claim amount, (iii) the wholly unsecured Claims of the Cash Advance Lenders, (vi) the Insider Claims, (vii) any Paycheck Protection Program (PPP) loan to the extent not already forgiven, and (viii) Claims of creditors of the Trust, including (a) Claims based on the ROC Funding Lien, and the Caggiano Lien to the extent Allowed.

"<u>Initial APA</u>" shall mean the Asset Purchase Agreement, dated as of September 20, 2022 (as may be amended), with the Initial Buyer, and approved by the Initial Sale Order.

"<u>Initial Buyer</u>" shall mean FGC EPC, LLC pursuant to the Initial Sale Order.

"<u>Initial Sale Motion</u>" shall have the meaning set forth in Section 1.7(D)(1) of the Plan.

"<u>Initial Sale Order</u>" shall mean the Order (I) Approving and Authorizing Sale of the Debtor's Assets Free and Clear of Any and All Liens, Claims, Encumbrances, and Other Interests, and (III) Granting Related Relief, dated November 10, 2022 [Doc. No. 215] with respect to the Initial Buyer.

"<u>Insider Claims</u>" shall have the meaning set forth in Section 1.5(F) of the Plan.

"<u>Intercreditor Agreement</u>" shall mean the Third Party Lender Agreement, dated as of August 28, 2019, between Avidia Bank and Bay Colony.

"<u>Interests</u>" means any equity or membership interest in the Debtor, whether in the form of common or preferred stock, stock options, warrants, partnership interests, membership interests, any other right to purchase or otherwise receive any ownership interest in the Debtor, or other interest or related right to payment or compensation based upon such interest, existing on or before the Effective Date.

"<u>Kitchen Concepts</u>" shall mean Kitchen Concepts, a New Hampshire corporation, or its owner John Testa that Mr. Ramos maintains has provided payday loans used in the business.

"<u>Lien</u>" shall have the meaning set forth in section 101(37) of the Bankruptcy Code and shall include all writs of attachment, and lis pendens; except that (a) a lien that has been avoided in

accordance with sections 544, 545, 546, 547, 548, 549 or 553 of the Bankruptcy Code shall not constitute a Lien, and (b) no lien shall be valid unless approved by a final order or by agreement of the Debtor.

"Litigation Matters" shall have the meaning set forth in Section 1.8 of the Plan.

"Mortgage Claims" shall mean the guaranty Claims for the Avidia Mortgage, and the Bay Colony/ SBA Mortgage.

"Mr. Ramos" shall have the meaning set forth in Section 1.1 of the Plan.

"Net Asset Sale Proceeds" shall mean the $2,500,000.00 purchase price from the Asset Sale minus the Carve-Out, payment to Claim holders in Class 2, and Class 6.

"Net Real Estate Proceeds" shall mean, unless the Mortgage Claims are assumed by the Proposed Buyer as the successful bid, the sale proceeds for the Real Estate minus (i) payment in full for the Mortgage Claims, (ii) payment of the balance for the Business Loans in an amount agreed by Avidia Bank, the Debtor's counsel, and the Subchapter V Trustee, and (iii) payment of any other junior liens that are Allowed or are not avoided by the Debtor or the Subchapter V Trustee.

"Non-Priority Tax Claims" means any Claim of a governmental unit not entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

"Other Priority Claims" means an allowed Claim entitle to priority under section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim or Priority Tax Claim.

"Other Secured Loans" means the financing or retail installment sale contracts for certain financed vehicles.

"Person" shall mean any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated association or organization, governmental agency or political subdivision.

"Petition Date" shall have the meaning set forth in the case background section of the Plan.

"Plan" shall mean the *Second Amended Chapter 11 Plan For Small Business Debtor Under Subchapter V*, including, without limitation, any Exhibits and any plan supplement documents, as the same may be altered, amended or modified from time to time.

"Plan Funding" shall mean any (i) available cash as of the Effective Date, if any, (ii) proceeds from Litigation Matters, and Avoidance Actions, if any, (iii) any Net Real Estate Proceeds, and (iv) any proceeds of any other remaining assets, claims, and recovery actions of the Debtor and the bankruptcy estate.

"Plan Procedure Motion" shall have the meaning set forth in Section 1.7 of the Plan.

"Priority Tax Claims" shall mean any Claim of a governmental unit entitled to priority under section 507(a)(8) of the Bankruptcy Code, including the accrued and unpaid real estate tax obligations for the Real Estate.

"Professional Fee Claims" shall mean the fees and expenses of professionals (employed pursuant to sections 327 and 1183 (a) of the Bankruptcy Code) under sections 328, 329, 330, 331, 503, 507(a) or 1191(e) of the Bankruptcy Code approved by an Order of the Bankruptcy Court.

"Proposed Buyer" shall mean Michael Argiros, a third party with no relation to the Debtor or the Debtor's principal.

"Ramos Stipulation" shall mean a potential stipulation entered among Mr. Ramos, and/or the Trust, the Subchapter V Trustee, and the Debtor, which may include, among other things, waiver of claims against Mr. Ramos by the bankruptcy estate and the Subchapter V Trustee, and the inclusion of the Real Estate as property of the bankruptcy estate, subject to approval of the Bankruptcy Court.

"Real Estate" shall have the meaning set forth in Section 1.1 of the Plan.

"Real Estate Sale" shall mean the sale of the Real Estate to the Proposed Buyer or another successful bidder pursuant to the Sale Order.

"Remaining Fund" shall mean the Plan Funding after payment in full to holders of Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims.

"ROC Funding Lien" shall mean the mortgage recorded against the Real Estate by ROC Funding Group LLC, a Cash Advance Lender, for $260,000.00 which the Debtor believes is not be a valid mortgage.

 "Sale Motion" shall have the meaning set forth in Section 1.7(D)(2) of the Plan.

"Sale Order" shall mean an order entered by the Bankruptcy Court, in connection with the Debtor's Plan, approving the Sale Motion and sale of the Real Estate and the Debtor's business assets to the successful bidder(s), free and clear of all Liens, Claims, encumbrances, and other interests pursuant to sections 363(f), 1123(a)(5)(D), and/or 1141(c) of the Bankruptcy Code.

"SBA" shall mean U.S. Small Business Administration.

"SBA Loan" shall have the meaning set forth in Section 1.5(B) of the Plan.

"Schedules" shall mean the bankruptcy schedules of assets and liabilities filed by the Debtor on April 11, 2022 [Doc. No. 44] under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists and statements may be supplemented or amended from time to time.

"Secured Claim" shall mean any Claim that is secured by a Lien on property to the extent of the value of such property, as determined in accordance with section 506(a) of the Bankruptcy Code,

or, in the event that such Claim is a claim of setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

"Senior Claims" shall have the meaning set forth in Section 1.5(A) of the Plan.

 "SOFA" shall mean the amended Statement of Financial Affairs filed by the Debtor on April 15, 2022 [Doc. No. 51] under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such statements may be further supplemented or amended from time to time.

"Subchapter V Trustee" shall have the meaning set forth in the case background section of the Plan.

"Transfer Taxes" shall mean any and all real estate transfer, deed stamp, excise, sales, use, mortgage recording, or similar taxes, if and as applicable, that, absent the operation of section 1146 of the Bankruptcy Code, may be incurred or arise in connection with the transactions contemplated by the Plan and recording of the deed, and as further described in the Sale Motion and any sale agreement.

"Trust" shall have the meaning set forth in Section 1.1 of the Plan.

"US Construction" shall have the meaning set forth in Section 1.1 of the Plan.

"Wage Order" shall have the meaning set forth in Section 1.7 of the Plan.

Respectfully submitted,

TOP LINE GRANITE DESIGN INC.,

Debtor and Debtor in Possession

By: _____
Name: Edmilson Ramos
Title: President

TOP LINE GRANITE DESIGN INC.

By its bankruptcy counsel

RIEMER & BRAUNSTEIN LLP

_/s/ Alan L. Braunstein_
Alan L. Braunstein (BBO #546042)
100 Cambridge Street
Boston, Massachusetts 02114
Tel: (617) 523-9000
Fax: (617) 880-3456
abraunstein@riemerlaw.com

DATED: April 2, 2023

## <u>EXHIBITS</u> *

Exhibit A: Liquidation Analysis
Exhibit B: Proposed distributions from Sale Proceeds
Exhibit C: Selected list of payments and transfers within 90 days


* The Debtor reserves the right to modify or amend any of the Exhibits or to add new Exhibits to the Plan as supplement by filing a notice to that effect.


3557272.8

# EXHIBIT A

EXHIBIT A
**Liquidation Analysis**

Top Line Granite Design Inc. - Second Amended Chapter 11 Plan of Liquidation

| | Asset | Pre-petition / Scheduled value | Value available if liquidation- Chapter 7 * | Market Value available under Chapter 11 plan | NOTES: |
|---|---|---|---|---|---|
| 1 | Cash balance | $100.00 | $0.00 | $0.00 | This does not include the $50,000.00 deposit from the initial buyer retained by the estate. |
| 3 | Sale proceeds | n/a | $2,500,000.00 | $2,500,000.00 | |
| 4 | Accounts receivable | Asset sold pursuant to sale order | n/a | n/a | |
| 5 | Inventory/ raw materials | Asset sold pursuant to sale order | n/a | n/a | |
| 6 | General office furniture and fixtures | Asset sold pursuant to sale order | n/a | n/a | |
| 7 | Owned vehicles | Asset sold pursuant to sale order | n/a | n/a | |
| 8 | Machinery and equipment | Asset sold pursuant to sale order | n/a | n/a | |
| 9 | Office equipment | Asset sold pursuant to sale order | n/a | n/a | |
| 10 | Leasehold improvements | Asset sold pursuant to sale order | n/a | n/a | |
| 11 | Due from Realty Trust ($2,067,000.00) | unknown | Unknown; may be subject to setoff and collection issues | Unknown but value to be determined if ultimate sale price for real estate is higher than offer | |
| 12 | Due from US Construction - use of space ($26,000.00) | unknown | Unknown; may be subject to collection issues **$2,500,000.00** | Unknown [and may be waive if Ramos Stipulation is approved] **$2,500,000.00** | |
| 13 | Litigation Matters/ Recovery Actions | n/a | Unknown; may be subject to collection issues | Unknown; may be subject to collection issues | |

* This analysis does not include any liquidation cost or any deduction for Chapter 7 trustee's fees and expenses.

# EXHIBIT B

**PROPOSED Plan Distributions - With Asset Sale Proceeds**

Top Line Granite Design Inc. -Second Amended Chapter 11 Plan of Liquidation

<u>**Sources/ Receipts**</u>

| | | | |
|---|---|---|---|
| | Cash balane | $0.00 | This does not include the $50,000.00 deposit from the initial buyer retained by the estate. |
| | Asset Sale proceeds | $2,500,000.00 | |
| | Real Estate Sale proceeds | Unknown - subject to potential counterbid increase | |
| | TOTAL | $2,500,000.00 | |

<u>**Uses/ Payments**</u>      <u>Estimated Amount</u>

| | | | |
|---|---|---|---|
| 1 | Plan funding for Professional Fee Claims | $225,000.00 | Plan funding agreed with Avidia Bank |
| 2 | Legalist/ Post-petition DIP lender (Class 2) | $595,109.56 | Estimate as of 3/29/23; may be subject to dispute of undrawn line fee ($17,079.83) |
| 3 | Enterprise Bank - line of credit (Class 3) | $24,000.00 | Scheduled claim amount $23,936 |
| 4 | ENGS equipment loan/ First Citizens (money purchase financing) (Class 6) | $150,000.00 | Agreed payment $150,000 (subject to Section 506 (c) surcharge/ agreed carve-out). Scheduled claim amount $317,386.52 |
| | *Balance* | $994,109.56<br>$1,505,890.44 | |
| 5 | Avidia Bank - equipment loan (Class 4) | $647,532.89 | 43% of balance. Total $1,164,034 as of payoff 3/23/23 (including accrued interest, late charges, and foreclosure fees); POC filed for $1,086,438.41 |
| 6 | Avidia Bank- inventory loan (Class 5) | $858,357.55 | 57% of balance. Total $1,558,471 as of payoff 3/23/23 (including accrued interest, late charges, and foreclosure fees); POC filed for $1,489,414.30 |
| 7 | SBA EIDL Loan (Class 7) | $0.00 | See Class 11 |
| 8 | Cash Money Lenders (Class 9) | $0.00 | See Class 11 |
| 9 | Mortgage Claims (Class 10) | Claims to be assumed by Proposed Buyer or to be paid from Real Esate Sale proceeds | |

**OTHER PROPOSED AMOUNTS PURSUANT TO PLAN:**      <u>Estimated Amount</u>

| | | |
|---|---|---|
| Balance of professional fees - before confirmation | Unknown | To be paid from proceeds of recovery actions, if any |
| Professional fees after confirmation | Unknown | To be paid from proceeds of recovery actions, if any |

| | | |
|---|---|---|
| Other Administrative Expense Claims | Approx $200,000.00 | To be paid from proceeds of recovery actions, if any, or pursuant to agreement between the parties. |
| Priority Tax Claims | Approx $102,000.00 (not incl. fees and interests) | To be paid from proceeds of recovery actions, if any, or pursuant to agreement between the parties. |
| Other Priority Claims (if any) (Class 1) | $0.00 | |
| General Unsecured Claims (Class 10) | $10,190,873.17 | Approximate; to be paid from proceeds of recovery actions, if any |
| *General unsecured claims before deficiency, cash money lenders, SBA EIDL loan, and insider claims(approx.)* | *$2,239,141.00* | Amount does not include any claim of creditors of the Trust or related to the Real Estate |
| *Potential deficiency claims and cash money lenders, and SBA EIDL loan (approx.)* | *$3,172,075.17* | The expected deficiency claim for the Avidia Bank business loans ($1,216,614.56) may be reduced if the successful bid for the Real Estate is more than the offer. |
| *Scheduled insider claims* | *$4,779,657.00* | |

# EXHIBIT C

EXHIBIT C

**Selected Potential Avoidance Actions - payments within 90 days**

Top Line Granite Design Inc. - Second Amended Chapter 11 Plan of Liquidation

| Name | Type | Date | Num | Credit | |
|------|------|------|-----|--------|---|
| AJ Equity Group. | Check | 01/21/2022 | EFT | 2,490.90 | Acc #2674 |
| AJ Equity Group. | Check | 01/24/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 01/25/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 01/26/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 01/27/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 01/28/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 01/31/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/01/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/02/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/03/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/04/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/07/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/08/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/09/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/10/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/11/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/14/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/15/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/16/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/17/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/18/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/23/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/24/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/28/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 03/01/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 03/04/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 03/04/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 03/04/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 03/14/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/15/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/16/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/16/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/17/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/17/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/18/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/18/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/21/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/21/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/22/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/22/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/24/2022 | EFT | 2,590.90 | Acc#1847 |
| | | | | **106,126.90** | |
| | | | | | |
| Blade Funding | Check | 02/07/2022 | EFT | 3,021.00 | Acc #2674 |
| Blade Funding | Check | 02/08/2022 | EFT | 3,021.00 | Acc #2674 |
| Blade Funding | Check | 02/09/2022 | EFT | 3,021.00 | Acc #2674 |

| | | | | | |
|---|---|---|---|---|---|
| Blade Funding | Check | 02/10/2022 | EFT | 3,021.00 | Acc #2674 |
| Blade Funding | Check | 02/11/2022 | EFT | 3,021.00 | Acc #2674 |
| Blade Funding | Check | 02/14/2022 | EFT | 3,021.00 | Acc #2674 |
| Blade Funding | Check | 02/15/2022 | EFT | 3,021.00 | Acc #2674 |
| Blade Funding | Check | 02/16/2022 | EFT | 3,021.00 | Acc #2674 |
| Blade Funding | Check | 02/17/2022 | EFT | 3,021.00 | Acc #2674 |
| Blade Funding | Check | 02/18/2022 | EFT | 3,021.00 | Acc #2674 |
| Blade Funding | Check | 02/23/2022 | EFT | 3,021.00 | Acc #2674 |
| Blade Funding | Check | 02/24/2022 | EFT | 3,021.00 | Acc #2674 |
| Blade Funding | Check | 02/28/2022 | EFT | 3,021.00 | Acc #2674 |
| Blade Funding | Check | 03/01/2022 | EFT | 3,021.00 | Acc #2674 |
| Blade Funding | Check | 03/01/2022 | EFT | 3,021.00 | Acc #2674 |
| Blade Funding | Check | 03/02/2022 | EFT | 3,021.00 | Acc #2674 |
| Blade Funding | Check | 03/03/2022 | EFT | 3,021.00 | Acc #2674 |
| Blade Funding | Check | 03/04/2022 | EFT | 3,021.00 | Acc #2674 |
| Blade Funding | Check | 03/08/2022 | EFT | 3,021.00 | Acc #2674 |
| Blade Funding | Check | 03/15/2022 | EFT | 3,021.00 | Acc #2674 |
| Blade Funding | Check | 03/18/2022 | EFT | 3,021.00 | Acc #2674 |
| | | | | **63,441.00** | |
| | | | | | |
| Brickstone Group | Check | 02/16/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 02/17/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 02/18/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 02/22/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 02/22/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 02/23/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 02/24/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 02/25/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 02/28/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/02/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/07/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/08/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/09/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/10/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/11/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/14/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/15/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/16/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/17/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/18/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/21/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/23/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/24/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/25/2022 | EFT | 2,313.83 | Acc #8092 |
| | | | | **55,531.92** | |
| | | | | | |
| Bridge Tree (100K). | Check | 02/16/2022 | Wire | 103,000.00 | Acc #8092 |
| Bridge Tree (2,7M) | Check | 12/30/2021 | EFT | 5,000.00 | Acc #2674 |
| Bridge Tree (2,7M) | Check | 01/05/2022 | EFT | 5,000.00 | Acc #2674 |
| Bridge Tree (2,7M) | Check | 01/13/2022 | EFT | 6,500.00 | Acc #2674 |
| Bridge Tree (2,7M) | Check | 01/20/2022 | EFT | 6,500.00 | Acc #2674 |
| Bridge Tree (2,7M) | Check | 01/27/2022 | EFT | 6,500.00 | Acc #2674 |
| Bridge Tree (2,7M) | Check | 02/03/2022 | EFT | 6,500.00 | Acc #2674 |
| Bridge Tree (2,7M) | Check | 02/10/2022 | EFT | 6,500.00 | Acc #2674 |
| Bridge Tree (2,7M) | Check | 02/17/2022 | EFT | 6,500.00 | Acc #2674 |
| Bridge Tree (2,7M) | Check | 02/24/2022 | EFT | 6,500.00 | Acc #2674 |

| | | | | | |
|---|---|---|---|---|---|
| Bridge Tree (2,7M) | Check | 03/02/2022 | EFT | 6,500.00 | Acc #2674 |
| Bridge Tree (2,7M) | Check | 03/10/2022 | EFT | 6,500.00 | Acc #2674 |
| Bridge tree (200M) | Check | 01/19/2022 | EFT | 4,450.00 | Acc #2674 |
| Bridge tree (200M) | Check | 01/21/2022 | EFT | 4,450.00 | Acc #2674 |
| Bridge tree (200M) | Check | 01/26/2022 | EFT | 4,450.00 | Acc #2674 |
| Bridge tree (200M) | Check | 01/28/2022 | EFT | 4,450.00 | Acc #2674 |
| Bridge tree (200M) | Check | 02/02/2022 | EFT | 4,450.00 | Acc #2674 |
| Bridge tree (200M) | Check | 02/04/2022 | EFT | 4,450.00 | Acc #2674 |
| Bridge tree (200M) | Check | 02/09/2022 | EFT | 4,450.00 | Acc #2674 |
| Bridge tree (200M) | Check | 02/11/2022 | EFT | 4,450.00 | Acc #2674 |
| Bridge tree (200M) | Check | 02/16/2022 | EFT | 4,450.00 | Acc #2674 |
| Bridge tree (200M) | Check | 02/18/2022 | EFT | 4,450.00 | Acc #2674 |
| Bridge tree (200M) | Check | 02/23/2022 | EFT | 4,450.00 | Acc #2674 |
| Bridge tree (200M) | Check | 03/02/2022 | EFT | 4,450.00 | Acc #2674 |
| Bridge tree (200M) | Check | 03/04/2022 | EFT | 4,450.00 | Acc #2674 |
| Bridge Tree (230K) | Check | 02/23/2022 | EFT | 5,000.00 | Acc #8092 |
| Bridge Tree (230K) | Check | 03/08/2022 | EFT | 5,000.00 | Acc #8092 |
| Bridge Tree (640M) | Check | 12/27/2021 | EFT | 2,950.00 | Acc #2674 |
| Bridge Tree (640M) | Check | 01/03/2022 | EFT | 2,950.00 | Acc #2674 |
| Bridge Tree (640M) | Check | 01/10/2022 | EFT | 2,950.00 | Acc #2674 |
| Bridge Tree (640M) | Check | 01/18/2022 | EFT | 2,950.00 | Acc #2674 |
| Bridge Tree (640M) | Check | 01/24/2022 | EFT | 2,950.00 | Acc #2674 |
| Bridge Tree (640M) | Check | 01/31/2022 | EFT | 2,950.00 | Acc #2674 |
| Bridge Tree (640M) | Check | 02/07/2022 | EFT | 2,950.00 | Acc #2674 |
| Bridge Tree (640M) | Check | 02/14/2022 | EFT | 2,950.00 | Acc #2674 |
| Bridge Tree (640M) | Check | 02/22/2022 | EFT | 2,950.00 | Acc #2674 |
| Bridge Tree (640M) | Check | 02/28/2022 | EFT | 2,950.00 | Acc #2674 |
| Bridge Tree (640M) | Check | 03/07/2022 | EFT | 2,950.00 | Acc #2674 |
| Bridge Tree (640M) | Check | 03/14/2022 | EFT | 2,950.00 | Acc #2674 |
| | | | | **274,750.00** | |
| | | | | | |
| Delta Bridge Funding | Check | 12/27/2021 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 12/28/2021 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 12/29/2021 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 12/30/2021 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 12/31/2021 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 01/03/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 01/04/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 01/05/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 01/06/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 01/07/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 01/10/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 01/11/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 01/12/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 01/13/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 01/14/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 01/17/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 01/19/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 01/20/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 01/21/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 01/24/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 01/25/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 01/26/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 01/27/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 01/28/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 01/31/2022 | EFT | 1,863.00 | Acc #8092 |

| | | | | | |
|---|---|---|---|---|---|
| Delta Bridge Funding | Check | 02/01/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 02/02/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 02/03/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 02/04/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 02/07/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 02/08/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 02/09/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 02/10/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 02/11/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 02/14/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 02/15/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 02/16/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 02/17/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 02/18/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 02/22/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 02/23/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 02/24/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 02/25/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 02/28/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 03/02/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 03/07/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 03/08/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 03/17/2022 | EFT | 1,863.00 | Acc #8092 |
| Delta Bridge Funding | Check | 03/25/2022 | EFT | | Acc #8092 |
| | | | | **89,424.00** | |
| | | | | | |
| Diverse Capital/Onpoint 1 | Check | 12/27/2021 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 12/28/2021 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 12/29/2021 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 12/30/2021 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 12/31/2021 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 01/03/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 01/04/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 01/05/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 01/06/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 01/07/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 01/10/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 01/11/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 01/12/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 01/13/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 01/14/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 01/18/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 01/18/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 01/19/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 01/20/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 01/21/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 01/24/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 01/25/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 01/26/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 01/27/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 01/28/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 01/31/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 02/01/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 02/02/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 02/03/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 02/04/2022 | EFT | 3,156.00 | Acc #2674 |

| | | | | | |
|---|---|---|---|---|---|
| Diverse Capital/Onpoint 1 | Check | 02/04/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 02/07/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 02/07/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 02/08/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 02/09/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 02/10/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 02/11/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 02/14/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 02/15/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 02/16/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 02/17/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 02/18/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 02/22/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 02/22/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 02/23/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 02/24/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 02/28/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 03/01/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 03/02/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 03/03/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 03/03/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 03/04/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 03/07/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 03/08/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 03/09/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 03/10/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 03/11/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 03/14/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 03/15/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 1 | Check | 03/16/2022 | EFT | 3,156.00 | Acc #2674 |
| Diverse Capital/Onpoint 2 | Check | 03/18/2022 | EFT | 5,437.00 | Acc #2674 |
| Diverse Capital/Onpoint 2 | Check | 03/24/2022 | EFT | 2,000.00 | Acc#1847 |
| | | | | **196,797.00** | |
| | | | | | |
| | | | | | |
| Kitchen Concepts - 542M | Check | 01/20/2022 | 7861 | 3,000.00 | Acc #2674 |
| Kitchen Concepts - 542M | Check | 01/21/2022 | 7862 | 5,000.00 | Acc #2674 |
| Kitchen Concepts - 542M | Check | 01/25/2022 | 7876 | 5,000.00 | Acc #2674 |
| Kitchen Concepts - 542M | Check | 01/26/2022 | 7877 | 5,000.00 | Acc #2674 |
| Kitchen Concepts - 542M | Check | 01/27/2022 | 7878 | 5,000.00 | Acc #2674 |
| Kitchen Concepts - 542M | Check | 01/28/2022 | 7879 | 5,000.00 | Acc #2674 |
| Kitchen Concepts - 542M | Check | 02/01/2022 | 7928 | 5,000.00 | Acc #2674 |
| Kitchen Concepts - 542M | Check | 02/02/2022 | 7929 | 5,000.00 | Acc #2674 |
| Kitchen Concepts - 542M | Check | 02/03/2022 | 7930 | 5,000.00 | Acc #2674 |
| Kitchen Concepts - 542M | Check | 02/04/2022 | 7931 | 5,000.00 | Acc #2674 |
| Kitchen Concepts - 542M | Check | 02/09/2022 | 7977 | 5,000.00 | Acc #2674 |
| Kitchen Concepts - 542M | Check | 02/10/2022 | 7978 | 5,000.00 | Acc #2674 |
| Kitchen Concepts - 542M | Check | 02/15/2022 | 8019 | 5,000.00 | Acc #2674 |
| Kitchen Concepts - 542M | Check | 02/16/2022 | 8020 | 5,000.00 | Acc #2674 |
| Kitchen Concepts - Agreem | Check | 01/11/2022 | 7826 | 5,000.00 | Acc #2674 |
| Kitchen Concepts - Agreem | Check | 01/12/2022 | 7827 | 5,000.00 | Acc #2674 |
| Kitchen Concepts - Agreem | Check | 01/13/2022 | 7828 | 5,000.00 | Acc #2674 |
| Kitchen Concepts - Agreem | Check | 01/18/2022 | 7858 | 5,000.00 | Acc #2674 |
| Kitchen Concepts - Agreem | Check | 01/19/2022 | 7859 | 5,000.00 | Acc #2674 |
| Kitchen Concepts - Agreem | Check | 01/20/2022 | 7860 | 2,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/24/2022 | Wire | 51,000.00 | Acc #8092 |

| | | | | | |
|---|---|---|---|---|---|
| Kitchen Concepts - Loan | Check | 02/02/2022 | Wire | 43,500.00 | Acc #8092 |
| Kitchen Concepts - Loan | Check | 02/12/2022 | Wire | 11,500.00 | Acc #8092 |
| Kitchen Concepts - Loan | Check | 02/17/2022 | Wire | 32,000.00 | Acc #8092 |
| Kitchen Concepts - Loan | Check | 02/17/2022 | Wire | 60,000.00 | Acc #8092 |
| Kitchen Concepts - Loan | Check | 12/29/2021 | 7758 | 18,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 12/29/2021 | 7759 | 14,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/03/2022 | 7795 | 9,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/03/2022 | 7807 | 13,500.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/03/2022 | 7814 | 25,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/04/2022 | 7796 | 9,500.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/04/2022 | 7808 | 14,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/04/2022 | 7815 | 25,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/05/2022 | 7809 | 15,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/06/2022 | 7810 | 4,100.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/06/2022 | 7816 | 25,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/07/2022 | 7817 | 23,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/10/2022 | 7798 | 10,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/10/2022 | 7799 | 10,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/10/2022 | 7800 | 10,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/10/2022 | 7801 | 10,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/10/2022 | 7803 | 10,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/10/2022 | 7804 | 10,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/10/2022 | 7805 | 15,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/10/2022 | 7820 | 13,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/10/2022 | 7821 | 13,200.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/10/2022 | 7822 | 19,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/10/2022 | 7823 | 19,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/10/2022 | 7824 | 23,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/18/2022 | 7867 | 15,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/18/2022 | 7868 | 14,500.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/20/2022 | Wire | 60,500.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/25/2022 | 7908 | 7,500.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/26/2022 | 7913 | 7,600.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/27/2022 | 7914 | 17,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/27/2022 | 7915 | 17,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/27/2022 | 7916 | 16,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 01/31/2022 | 7927 | 826.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 02/01/2022 | 7940 | 16,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 02/01/2022 | 7941 | 16,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 02/01/2022 | 7942 | 18,500.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 02/03/2022 | 7945 | 20,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 02/03/2022 | 7946 | 20,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 02/03/2022 | 7947 | 21,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 02/03/2022 | 7948 | 21,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 02/04/2022 | Wire | 33,500.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 02/09/2022 | 7989 | 10,000.00 | Acc #2674 |
| Kitchen Concepts - Loan | Check | 02/10/2022 | Wire | 41,200.00 | Acc #2674 |
| | | | | **1,023,426.00** | |
| | | | | | |
| Mercure Funding/Secure Ca | Check | 12/27/2021 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca | Check | 12/28/2021 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca | Check | 12/29/2021 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca | Check | 12/30/2021 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca | Check | 12/31/2021 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca | Check | 01/03/2022 | EFT | 1,780.00 | Acc #2674 |

| | | | | | |
|---|---|---|---|---|---|
| Mercure Funding/Secure Ca Check | | 01/04/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 01/05/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 01/05/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 01/07/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 01/10/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 01/11/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 01/12/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 01/13/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 01/14/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 01/18/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 01/19/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 01/20/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 01/21/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 01/24/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 01/25/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 01/26/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 01/27/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 01/28/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 01/31/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 02/01/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 02/02/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 02/03/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 02/04/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 02/07/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 02/08/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 02/09/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 02/10/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 02/11/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 02/14/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 02/15/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 02/16/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 02/17/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 02/18/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 02/23/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 02/24/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 02/25/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 02/28/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 03/01/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 03/02/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 03/02/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 03/03/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 03/04/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 03/07/2022 | EFT | 1,780.00 | Acc #2674 |
| Mercure Funding/Secure Ca Check | | 03/15/2022 | EFT | 1,780.00 | Acc #2674 |
| | | | | **89,000.00** | |
| | | | | | |
| MR Advance. | Check | 12/28/2021 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 12/29/2021 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 12/30/2021 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 12/31/2021 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 01/03/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 01/04/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 01/05/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 01/06/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 01/07/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 01/10/2022 | EFT | 1,873.75 | Acc #8092 |

| | | | | | |
|---|---|---|---|---|---|
| MR Advance. | Check | 01/11/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 01/12/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 01/13/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 01/14/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 01/14/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 01/19/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 01/20/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 01/20/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 01/21/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 01/24/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 01/25/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 01/26/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 01/27/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 01/28/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 01/31/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 02/01/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 02/02/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 02/03/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 02/04/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 02/07/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 02/08/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 02/09/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 02/10/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 02/11/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 02/14/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 02/15/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 02/16/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 02/17/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 02/18/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 02/18/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 02/22/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 02/23/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 02/25/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 02/28/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 03/02/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 03/03/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 03/04/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 03/07/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 03/08/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 03/08/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 03/08/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 03/09/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 03/10/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 03/10/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 03/11/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 03/14/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 03/15/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 03/16/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 03/17/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 03/18/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 03/21/2022 | EFT | 1,873.75 | Acc #8092 |
| MR Advance. | Check | 03/22/2022 | EFT | 1,873.75 | Acc #8092 |
| | | | | **116,172.50** | |
| | | | | | |
| Speedy Funding | Check | 02/16/2022 | EFT | 4,051.00 | Acc #8092 |

| | | | | | |
|---|---|---|---|---|---|
| Speedy Funding | Check | 02/17/2022 | EFT | 4,051.00 | Acc #8092 |
| Speedy Funding | Check | 02/18/2022 | EFT | 4,051.00 | Acc #8092 |
| Speedy Funding | Check | 02/22/2022 | EFT | 4,051.00 | Acc #8092 |
| Speedy Funding | Check | 02/22/2022 | EFT | 4,051.00 | Acc #8092 |
| Speedy Funding | Check | 02/23/2022 | EFT | 4,051.00 | Acc #8092 |
| Speedy Funding | Check | 02/24/2022 | EFT | 4,051.00 | Acc #8092 |
| Speedy Funding | Check | 02/25/2022 | EFT | 4,051.00 | Acc #8092 |
| Speedy Funding | Check | 02/28/2022 | EFT | 4,051.00 | Acc #8092 |
| Speedy Funding | Check | 03/01/2022 | EFT | 4,051.00 | Acc #8092 |
| Speedy Funding | Check | 03/02/2022 | EFT | 4,051.00 | Acc #8092 |
| Speedy Funding | Check | 03/03/2022 | EFT | 4,051.00 | Acc #8092 |
| Speedy Funding | Check | 03/07/2022 | EFT | 4,051.00 | Acc #8092 |
| Speedy Funding | Check | 03/08/2022 | EFT | 4,051.00 | Acc #8092 |
| Speedy Funding | Check | 03/09/2022 | EFT | 4,051.00 | Acc #8092 |
| Speedy Funding | Check | 03/14/2022 | EFT | 4,051.00 | Acc #8092 |
| Speedy Funding | Check | 03/15/2022 | EFT | 4,051.00 | Acc #8092 |
| Speedy Funding | Check | 03/16/2022 | EFT | 4,051.00 | Acc #8092 |
| Speedy Funding | Check | 03/18/2022 | EFT | 4,051.00 | Acc #8092 |
| Speedy Funding | Check | 03/21/2022 | EFT | 4,051.00 | Acc #8092 |
| Speedy Funding | Check | 03/24/2022 | EFT | 4,051.00 | Acc #8092 |
| Speedy Funding | Check | 03/25/2022 | EFT | | Acc #8092 |
| | | | | **85,071.00** | |
| | | | | | |
| TVT Capital // Capital UT LL | Check | 12/27/2021 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 12/28/2021 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 12/29/2021 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 12/30/2021 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 12/31/2021 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 01/03/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 01/04/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 01/05/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 01/06/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 01/07/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 01/10/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 01/11/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 01/12/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 01/13/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 01/14/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 01/18/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 01/19/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 01/20/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 01/21/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 01/24/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 01/25/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 01/26/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 01/27/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 01/28/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 01/31/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 02/01/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 02/02/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 02/03/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 02/04/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 02/07/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 02/08/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 02/10/2022 | EFT | 2,397.50 | Acc #2674 |

| | | | | | |
|---|---|---|---|---|---|
| TVT Capital // Capital UT LL | Check | 02/11/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 02/14/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 02/14/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 02/15/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 02/16/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 02/17/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 02/18/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 02/22/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 02/23/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 02/24/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 02/25/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 02/28/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 03/02/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 03/03/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 03/04/2022 | EFT | 2,397.50 | Acc #2674 |
| TVT Capital // Capital UT LL | Check | 03/10/2022 | EFT | 2,397.50 | Acc #2674 |
| | | | | **115,080.00** | |
| | | | | | |
| Ultra Funding | Check | 01/24/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 01/25/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 01/26/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 01/27/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 01/28/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 01/31/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 02/01/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 02/02/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 02/03/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 02/04/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 02/07/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 02/08/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 02/09/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 02/10/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 02/11/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 02/14/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 02/15/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 02/16/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 02/17/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 02/18/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 02/23/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 02/24/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 02/28/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 03/01/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 03/02/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 03/03/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 03/03/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 03/04/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 03/04/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 03/07/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 03/09/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 03/11/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 03/15/2022 | EFT | 3,747.50 | Acc #2674 |
| Ultra Funding | Check | 03/18/2022 | EFT | 3,747.50 | Acc #2674 |
| | | | | **127,415.00** | |

2,342,235.32

Unauthorized Post-Petition Payments:

ROC Funding                          3/26/22 to 4/20/22                    23,601.42