| | |
|---|---|
| In re: | ) |
| | ) |
| TOP LINE GRANITE DESIGN, INC. | ) |
| | ) Chapter 11 |
| Debtor | ) Case No. 22-40216 (EDK) |
| | ) |

## NOTICE OF COUNTER OFFER

NOW comes FGC – EPC, LLC (hereinafter "FGC") by and through its counsel, and

hereby notifies this Court, Debtor's counsel, and interested parties, that it submits the attached

Counteroffer/Overbid Asset Purchase Agreement ("APA") pursuant to the Debtor's Notice of

Sale. The terms of the attached APA contain all the terms of the counteroffer. In the event of any

further overbids, FGC hereby reserves its right to amend its offer to include additional or more

favorable terms to the Estate and Buyer.

Respectfully Submitted,
John M. McAuliffe & Associates, P.C.,

/s/ John M. McAuliffe, Esq.
John M. McAuliffe, Esq. (BBO# 555109)
John M. McAuliffe & Associates, P.C.
P.O. Box 66045
2000 Commonwealth Ave, Suite 100
Newton, MA 02466
(617) 558-6889
john@jm-law.net

Dated:   April 18, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2023, I filed this document through the Court's ECF system which will send an electronic copy to the registered participants as identified on the Notice of Electronic Filing.

*/s/ John M. McAuliffe*
John M. McAuliffe

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is entered into as of April 12, 2023, by and between **FGC-EPC, LLC,** a Massachusetts limited liability company, or its nominee ("**FGC** or the "**Buyer**"), and **TOP LINE GRANITE DESIGN INC.**, a Massachusetts corporation and debtor in possession (the "**Seller**" or "**Top Line**") (Buyer and Seller or Top Line are sometimes referred to herein individually as a "**Party**", and collectively as the "**Parties**").

## RECITALS

**WHEREAS,** Seller is engaged in the business of design, manufacture, and installation of countertops and other related products and services (the "**Business**").

**WHEREAS,** certain Real Estate (as defined below) where the Business operates is owned by The 347 Middlesex Road realty Trust dated July 28, 2014, amended and restated as of August 12, 2019 (the "**Trust**").

**WHEREAS,** Seller is currently a debtor in possession in Case No. 22-40216, captioned *In re Top line Granite Design Inc.* (the "**Bankruptcy Case**"), pending in the United States Bankruptcy Court for the District of Massachusetts (the "**Bankruptcy Court**").

**WHEREAS,** Seller intends to file a motion in the Bankruptcy Case seeking approval of a certain stipulation among the Seller, Steven Weiss as the Subchapter V Trustee, the Trust, and/or the Debtor's principal, among others, for the Real Estate to be deemed property of the Top Line bankruptcy estate (the "**Ramos Stipulation**").

**WHEREAS,** Seller desires to sell the Real Estate and the Business assets to Buyer, and Buyer desires to purchase the Purchased Assets from Seller, subject to the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the recitals and of the mutual covenants, conditions and agreements set forth herein and for other good and valuable consideration, the receipt, adequacy, and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

## ARTICLE I.
## PURCHASE AND SALE OF ASSETS

**1.1.** **Purchased Assets.** On the terms and subject to Bankruptcy Court approval and the other terms and conditions set forth in this Agreement, at the Closing (defined in Section 2.1), Buyer shall purchase from Seller, and Seller shall sell, transfer, convey, assign and deliver to Buyer, free and clear of any and all liens, claims, interests, encumbrances and other Liabilities (defined in Section 1.3) pursuant to section 363 of title 11 of the United States Code, in effect on the date of this Agreement, and as the same may hereafter be modified, altered or amended from time to time (the "**Bankruptcy Code**") all right, title and interest of Seller in and to all or substantially all assets of the Seller including the following assets (collectively, the "**Purchased Assets**"):

(a)     The real estate located at 347 Middlesex Road, Tyngsboro, MA (the "**Real Estate**"), and more particularly described on <u>Exhibit A</u> attached hereto (the "**Land**"), including all buildings, improvements, and permanent fixtures situated on and under the Land, if any (the "**Improvements**").

(b)     All the interest of Seller and/or the Trust, if any, in any rights, profits, privilege and easements appurtenant to the Land and/or the Improvements, including all development rights, and any easements, right of way or other appurtenances used in connection with the beneficial use and enjoyment of the Land.

(c)     and all interest of Seller and/or the Trust, if any, in any rights, profits, privileges and easements appurtenant to the land and/or the improvements

(d)     All trade and other accounts receivable and related notes that are payable to the Seller from customers.

(e)     All inventories of raw materials, wherever located and whether at the premises of the Real Estate, in transit or stored off-site, work in process, finished goods, supplies, packaging materials, spare parts and similar items, other than prepaid inventories of customers for incomplete projects, if any.

(f)     All computers, machinery, equipment, tools and tooling, furniture, supplies, leasehold improvements that do not constitute assets of any landlord.

(g)     The motor vehicles owned by the Debtor not subject to financing, and other tangible personal property, wherever located and in any condition.

(h)     Any intellectual property (including patents, trademark, copyright, computer software, the name "Top Line Granite Design") relating to the foregoing assets, including, without, limitation, the right to sue for past, present, or future infringement or misappropriation thereof.

(i)     All permits, licenses, registrations, certificates, orders, approvals, franchises, variances, and similar rights issued by or obtained from any governmental entity, if any (including those issued or required under environmental laws and those relating to the occupancy or use of leased real property).

(j)     All books, records, accounts, ledgers, files, documents, correspondence, lists (including customer and prospect lists), manufacturing and procedural manuals, sales and promotional materials, all employee files and related records, including the records of any company that contracted with Top Line to provide skilled and unskilled Labor, studies, reports and other printed or written materials related to the Purchased Assets.

(k)     Any claim, right or remedy related to the foregoing assets and proceeds of insurance policies recoverable in connection with the Purchased Assets.

**1.2.** **Excluded Assets.** The Purchased Assets shall not include the assets of the Seller listed below (the "**Excluded Assets**"):

(a) Cash and cash equivalents or similar type instruments, certificates of deposit and other marketable securities on hand as of the **Closing**, wherever located, including, without limitation, in bank accounts and other similar accounts, unless these cash and cash equivalents were sums advanced by a 3rd party pursuant to an Interim Management Agreement and also are deposits on customer jobs/contracts to be completed by the Buyer

(b) Seller's rights under or pursuant to this Agreement.

(c) All corporate governance books and records of Seller, including, without limitation, articles of incorporation, by-laws, minute books, and board resolutions.

(d) All audit records, tax returns and related work papers of Seller.

(e) All income tax refunds or other tax refunds.

(f) All insurance policies and, except to the extent included in the Purchased Assets, all proceeds recovered under such insurance policies.

(g) All claims or causes of action (including pursuant to Chapter 5 of the Bankruptcy Code, as applicable).

(h) All other claims and causes of action which the Seller or the bankruptcy estate may have against any third party or creditors.

(i) Seller's unexpired leases or executory contracts, if any.

(j) Any note or loan receivable from third parties, creditors, or affiliates of the Seller.

**1.3.** **Excluded Liabilities.** Without limitation of any other provision of this Agreement, the Buyer shall not assume or become responsible for any Liabilities of the Seller. The term "**Liabilities**" shall mean any liability, commitment, pledge, hypothecation, right of others, claim (as defined in section 101(5) of the Bankruptcy Code), defense, interest, debt, payable, judgment, decree, order, security interest of any kind, lien (as defined in section 101(37) of the Bankruptcy Code), interest (as used in section 363(f) of the Bankruptcy Code), encumbrance, successor liability, set-off rights, recoupment rights, lease, sublease, license, occupancy agreement, adverse claim or interest, easement, covenant, encroachment, burden, title defect, title retention agreement, voting trust agreement, equity, option, right of first refusal, charge or other restrictions, limitations or obligations, either accrued, absolute, contingent, or otherwise, matured or unmatured, known or unknown of every kind and nature whatsoever.

### 1.4     **Purchase Price; Deposit.**

(a)     The purchase price for the Purchased Assets is as follows: (i) Two Million Five Hundred Fifty Thousand and 00/100 Dollars ($2,550,000.00) cash for the Business assets, (ii) the assumption of the Avidia Bank mortgage and the Bay Colony/ SBA mortgage (the "**Existing Secured Debt**"), totaling approximately Three Million Eight Hundred Ninety One Thousand and 00/100 Dollars ($3,954,220.00)[1] for the Real Estate, (iii) up to $50,000.00 for administrative expense claims of the Debtor,which shall include a credit for any amounts paid in the following sub paragraph (iv), (iv) To the extent not paid at Closing, p to $31,000 in funds related to the Tyngsboro Board of Health Order to connect to Town sewer before June 6, 2023 and, (v) a payment in an amount sufficient to pay-off and remove the 3rd and 4th Liens presently recorded against the Real Estate and held by Avidia Bank and the SBA. The sum paid shall be the lesser of the outstanding balances owed on these two Notes pursuant to a payoff statement provided by each lender or $1.1 Million.

Thus, the Buyer's Counter-Offer consists of a cash payment of $3.7 Million (allocated as above or as otherwise agreed between the Debtor and the secured parties) and the assumption obligations in the approximate amount of $4.0 Million Dollars and $31,000 in administrative costs for a total of ~ $7.75 Million Dollars (the "**Purchase Price**").

To the extent not within the scope or not otherwise addressed in the Sale Order, any agreement memorializing the Buyer's assumption of the Existing Secured Debt shall be in a form acceptable to both Buyer and secured lenders and shall be executed and delivered at the Closing being a condition precedent to Buyer's obligation to perform under this Agreement.

(b)     Upon execution of this Agreement, Buyer shall make a cash deposit of $100,000.00 (the "**Deposit**"). The Deposit should be paid by wire transfer or check to Top Line's client trust account at Riemer and Braunstein LLP and to be applied to the Purchase Price, subject to the terms and conditions of this Agreement.

(c)     At the Closing, subject to the terms and conditions set forth in this Agreement, the Buyer shall pay the Purchase Price minus the Deposit. Such closing payment shall be payable by the Buyer at the Closing in cash or by wire transfer of immediately available funds to an account identified by Seller to Buyer at least two (2) business days prior to the Closing.

(d)     In order to allow approval of the assumption of the first and second Mortgages and Notes, the Buyer shall submit the necessary and required financial information to both Avidia Bank and the SBA/Baystate, forthwith.

### 1.5.     **Allocation of Purchase Price.** For tax and revenue purposes, the Purchase Price shall be allocated among the Purchased Assets by Buyer; *provided that* any such allocation of purchase price will not affect the allocations in the Ramos Stipulation. The Parties agree (i) to report the transactions contemplated hereby in accordance with such allocation in computing their taxable income and otherwise in preparing and filing their tax returns for federal, state and local income tax purposes; and (ii) that, in the event any audit, proceeding, suit, action or investigation

---

[1] This payoff amount is as of March 21, 2023 and may not include interest and fees for the Bay Colony/ SBA mortgage. The total amount may be more as of the sale closing date.

is brought against the other Party by or before any governmental authority, each Party will at all times maintain and defend the reporting positions agreed on in this Agreement, and use its respective reasonable business efforts to obtain a settlement or resolution consistent with such position in any such proceeding.

### 1.6 Bankruptcy Court Orders.

(a) Sale Procedures Order. The Seller shall file with the Bankruptcy Court a motion to enter the sale and bidding procedure order in form and substance satisfactory to the Buyer (the "Sale Procedures Order"), providing for approval of the transactions contemplated herein, which Sales Procedures Order, among other matters, shall include (but not be limited to) the following provisions:

(i) Existence of Counteroffer- a statement that there is an existing counteroffer to the Stalking Horse Bid and that FGC has entered into an Interim Management Agreement with Top Line that provides for recovery of any administrative advances by FGC to the business operations are, in the event that FGC is not the successful bidder, recoverable from excess proceeds generated from over-bids greater than FGC.

(ii) a provision that the Seller's obligation referred to in subclause (i) above (x) shall be deemed an allowed administrative expense claim against Seller's estate pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code, secured by a perfected lien pursuant to section 364(d) of the bankruptcy Code on all of the Seller's assets and any proceeds therefrom (the "Secured Administrative Claim");

(iii) a provision that notwithstanding Rules 6004(h) of the Bankruptcy Rules, the Sale Procedures Order shall become effective immediately upon entry;

(iv) a factual finding by the Bankruptcy Court that all necessary third parties had received proper and timely notice; and

(v) a provision that the deadline for counteroffers is at least one business day in advance of the hearing in the Bankruptcy Court with respect to the Sale Order (as defined in Section 1.6(b)).

(b) Sale Order. The Seller shall move the Bankruptcy Court to enter an order in form and substance satisfactory to the Buyer, approving the execution of this Agreement and related agreements between the Buyer and the Seller, approving the transactions contemplated herein, and the transfer of the Purchased Assets from the Seller to the Buyer free and clear of any Liabilities (the "Sale Order"), which Sale Order, among other matters, shall include (but not be limited to) the following provisions:

(i) a factual finding of good faith within the meaning of section 363(m) of the Bankruptcy Code;

(ii) a provision that the sale of Purchased Assets is free and clear of all Liabilities, claims and causes of action by all creditors and equity owners of the Debtor's Estate;

(iii) a provision that notwithstanding Rule 6004(h), the Sale Order shall become effective immediately upon entry;

(iv) a provision that all parties are barred from asserting claims against the Buyer for any acts or omissions related to the Purchased Assets before the Closing, including any claims related to the initial bid submitted by FGC and previously approved by the Court, and are otherwise barred from asserting any successor liability claims against the Buyer;

(v) a provision that the Buyer is entitled to the Secured Administrative Claim; and

(vii) such other factual findings as the Parties may mutually and reasonably agree.

(viii) a provision that releases this Buyer, if the successful bidder, from any and all claims of the this Bankruptcy Estate and during the course of this Ch. 11 proceeding, particularly those claims, if any, that may be asserted by the Debtor or any Trustee on behalf of the Chapter 11 Estate or, in the event of a conversion of this case to a case under Chapter 7, post-sale, this release shall be binding on any Chapter 7 Trustee as well.

### 1.7. **Contracts.**

(a)     In connection with the sale, Seller shall, pursuant to sections 363 or 365 of the Bankruptcy Code, assume and then sell, assign, transfer and convey to Buyer, and the Buyer shall accept from Seller, all of Seller's right, title and interest in and to certain unexpired equipment and vehicle leases, and/or executory contracts, in the Buyer's discretion, as set forth on ***Schedule 1.7*** (the "**Assigned Contracts**"); *provided, however, that*, to the extent an Assigned Contract is not an executory contract within the meaning of section 365 of the Bankruptcy Code, the Seller's interest in such Assigned Contract is nevertheless transferable to the Purchaser as an asset of the Seller pursuant to section 363 of the Bankruptcy Code. ***Schedule 1.7*** may be amended to remove or add such leases or contracts from time to time with the consent of the Buyer and at the request of the Buyer, the Seller may withdraw any notice of assumption and assignment of such leases or contracts that may be filed with the Bankruptcy Court at any time prior to entry of the Sale Order.

(b)     The Buyer shall be responsible for any cure costs associated with the assumption and assignment of the Assigned Contracts, provided that prior to the hearing on the Sale Motion, the Seller will use its best efforts to continue to make any payments under the present contractual obligations. The Buyer shall otherwise be responsible for not more than 60 days of "cure payments". Seller has set forth a description of the nature and amount of such cure payments expected to be required as of the Closing on ***Schedule 1.7.***

Any related claims and /or termination fees, if applicable, shall for all purposes be deemed a Liability of the Seller.

### 1.8. **Business Employees.** On and after the Closing Date, it is the intent of this Buyer to continue the operation of the Top Line enterprise and to offer the present employees (approximately 55 individuals overall, including skilled laborers, sales persons and administrative staff) a position at the business provided they meet the qualifications for continued employment.

Otherwise, those employees of Seller in the Business not qualified shall be terminated. The Buyer may (but shall have no affirmative obligation to) offer at-will employment to all or certain current hourly and salaried employees of the Seller or other workers/ independent contractors utilized in the Business prior to the Closing (collectively, the "**Business Employees**"). Notwithstanding any of the foregoing, neither the Buyer nor any of the Buyer's affiliates is assuming any Liability with respect to (i) any employment, deferred compensation, or similar contract with any Business Employee, (ii) any severance obligation to any Business Employee, or any other employee of the Seller, or (iii) any employee benefit plan.

## ARTICLE II.
## THE CLOSING

**2.1.** **Place and Date.** Subject to Article V hereof, the closing of the transactions contemplated hereby (the "**Closing**") shall take place at such location as may be mutually agreed by the Parties on (i) the second (2nd) business day after entry of the Sale Order, or (ii) such other date as the Parties hereto may mutually agree upon which shall not be later than May 30, 2023 (the "**Closing Date**").

**2.2.** **Closing Deliveries by Seller.** At the Closing, subject to the terms and conditions set forth in this Agreement, Seller shall deliver, or cause to be delivered, to Buyer (i) a bill of sale conveying to Buyer all of the Purchased Assets, and an assumption and assignment transferring to the Buyer the Assigned Contracts (if any), (ii) all other requested documents reasonably required to implement the transactions contemplated in this Agreement.

**2.3.** **Closing Deliveries by Buyer.** At the Closing, subject to the terms and conditions set forth in this Agreement, Buyer shall deliver, or cause to be delivered, to Seller the Purchase Price (minus the Deposit).

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES

**3.1.** **Representations and Warranties of Seller.** Seller hereby makes the following representations and warranties to Buyer, each of which (a) is relied upon by Buyer in executing this Agreement, and (b) shall be true and correct as of the date hereof and as of the Closing Date as though such representation and warranty is made as of the Closing Date.

**Organization.** Seller is a corporation validly existing and in good standing under the laws of the Commonwealth of Massachusetts as set forth in the good standing certificate, dated as of September 9, 2022. Seller has all requisite corporate power and authority to carry on its business as now being conducted and to own, lease and operate its properties and assets as now owned, leased or operated, and to perform all its obligations under the agreements and instruments to which it is a party or by which it is bound.

**Authorization.** Subject to Bankruptcy Court approval, Seller has full corporate power and authority to execute and deliver this Agreement, to perform fully its obligations hereunder, and to consummate the transactions contemplated hereby. The execution and delivery by Seller of this Agreement, and the consummation of the transactions contemplated hereby, have been duly authorized by all requisite corporate action of Seller,

7

and Seller has duly executed and delivered this Agreement. Subject to Bankruptcy Court approval, this Agreement is, and the other documents and instruments required hereby will be, when executed and delivered by Seller, legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms.

**No Violation or Conflicts; Consents.** Subject to Bankruptcy Court approval, the execution, delivery and performance of this Agreement by Seller, and the consummation of the transactions contemplated hereby, do not and will not conflict with or result in a violation of or a default under (with or without the giving of notice or the lapse of time or both) (i) any provisions of the Articles of Organization or Bylaws of Seller; or (ii) any law applicable to Seller or any of the properties or assets of Seller (including, but not limited to, the Purchased Assets).

**Litigation and Claims.** Except for the Bankruptcy Case and claims, actions, lawsuits or proceedings disclosed in or related to the Bankruptcy Case, there is no action, claim, demand, suit, judicial, administrative or governmental proceeding pending against or relating to Seller, the Purchased Assets or the transactions contemplated by this Agreement.

**Compliance with Laws.** Seller has not received any notice alleging its noncompliance with any applicable law.

**Purchased Assets.** Subject to Bankruptcy Court approval, Seller has good and marketable title to all the Purchased Assets and at the Closing will transfer the Purchased Assets to Buyer pursuant to section 363 of the Bankruptcy Code free and clear of any and all Liabilities.

**Real Estate.** The Real Estate is to be conveyed by a quitclaim deed running to the Buyer or to a nominee designated by the Buyer by written notice to the Seller at least three (3) business days before the deed is to be delivered as herein provided (the "**Deed**"), and said Deed shall convey a marketable and insurable title thereto, free from all liens, claims and encumbrances in accordance with 11 U.S.C. § 363, except for standard title exclusions acceptable to Buyer.

**3.2.** **Representations and Warranties of Buyer.** Buyer hereby makes the following representations and warranties to Seller, each of which (a) is relied upon by Seller in executing this Agreement, and (b) shall be true and correct as of the date hereof and as of the Closing Date as though such representation and warranty is made as of the Closing Date.

**Organization.** Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts. Buyer has all requisite corporate power and authority to carry on its business as now being conducted and to own, lease and operate its properties and assets as now owned, leased or operated, and to perform all its obligations under the agreements and instruments to which it is a party or by which it is bound.

**Authorization.** Buyer has full corporate power and authority to execute and deliver this Agreement, to perform fully its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Buyer of this Agreement, and the consummation of the transactions contemplated hereby, have been duly authorized by all requisite corporate action of Buyer, and Buyer has duly executed and delivered this Agreement. This Agreement is, and the other documents and instruments required hereby will be, when executed and delivered by Buyer, legal, valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms.

**No Violation or Conflicts; Consents.** The execution, delivery and performance of this Agreement by Buyer, and the consummation of the transactions contemplated hereby, do not and will not conflict with or result in a violation of or under (with or without the giving of notice or the lapse of time, or both) (i) any provision of the Certificate of Organization of Buyer; or (ii) any law applicable to Buyer. No governmental approval or other consent is required to be obtained or made by Buyer in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

**Litigation and Claims.** There is no action, claim, demand, suit, judicial, administrative or governmental proceeding pending against or relating to Buyer, the Purchased Assets or the transactions contemplated by this Agreement.

**Brokers and Finders.** All negotiations relating to this Agreement and the transactions contemplated hereby have been carried on without the participation of any party acting on behalf of Buyer in such manner as to give rise to any claim against Seller for any brokerage or finder's commission, fee or similar compensation.

## ARTICLE IV.
## CERTAIN MATTERS PENDING THE CLOSING

**4.1.** **Bankruptcy Court.** The Buyer and the Seller acknowledge that the Seller is debtor and debtor-in-possession in the Bankruptcy Case, and that the matters contemplated by this Agreement are subject to the rulings, decisions and approvals of the courts having jurisdiction over the Seller with respect to the Bankruptcy Case.

**4.2.** **Notice of Change.** Seller shall promptly notify Buyer in writing in the event of (i) any material development with respect to the Purchased Assets or (ii) any breach of or inaccuracy in any of the covenants, representations and warranties of Seller set forth herein.

**4.3.** **Carry on Business in Regular Course.** Prior to the Closing Date, Seller shall (a) carry on the Business, and use the Purchased Assets, in the ordinary course consistent with prudent business practice, including the payment of lease obligations that will be assumed by the Buyer; (b) maintain and repair the Purchased Assets in accordance with prudent business practice and in good working order, and use its best efforts to obtain adequate fire and casualty and general liability insurance for the Purchased Assets; (c) not dispose of any Purchased Assets or enter into any contract, agreement or commitment with respect thereto (other than in the ordinary course of

9

business) without the prior written consent of Buyer, (d) not amend, modify, terminate or license any Intellectual Property (such as patents, trademarks, copyrights), if any, without the prior written consent of Buyer, and € comply with all applicable laws and with all governmental approvals. The Buyer, FGC, and Seller acknowledge that they have, in conjunction with this Agreement, executed an "Interim Management Agreement" ("IMA") that provides for the operation and management of the Seller's business by FGC pending completion of this Sale Process.

### 4.4. Sale Hearing; Bidding Procedures.

(a)     Buyer acknowledges that in connection with the sale of the Purchased Assets, Seller shall have advertised to the public, in a commercially reasonable manner as required by the Bankruptcy Code and local rules of the Bankruptcy Court and as shall be directed by the Bankruptcy Court in the Sale Procedures Order, that the Purchased Assets are for sale and will be sold to the highest or best bidder at a hearing to be conducted in the Bankruptcy Case (the "Sale Hearing").

(b)     The bidding procedures shall be substantially in the form attached hereto as **Exhibit 1**.

(c)     A counterbid may be for the Real Estate and the Business assets as a package or separately.

4.5     **Closing Prorations.** To the extent applicable, the following shall be apportioned with respect to the Purchased Assets as of 12:01 a.m. on the day of Closing, as if Buyer were vested with title to such Real Estate during the entire day upon which Closing occurs:

(i) real estate taxes and assessments for the current fiscal year levied against the Real Estate;

(ii) post-petition water and/or sewer charges (if any) for the current year levied against the Real Estate (to be prorated on a calendar year basis); and

(iii) post-petition gas, electricity and other utility charges and municipal garbage and removal charges (if any) for which the Seller is liable. Such charges, if any, to be apportioned at Closing on the basis of the most recent meter reading occurring prior to Closing.

### ARTICLE V.
### CONDITIONS PRECEDENT TO THE OBLIGATIONS OF BUYER

The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment (or waiver by Buyer in writing), on or prior to the Closing Date, of the following conditions:

**5.1.     Representations; Performance.** The representations and warranties of Seller contained in this Agreement shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date. Seller shall have duly performed and complied with all

10

agreements required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

**5.2. No Material Adverse Effect.** No event, occurrence, fact, condition, change, development or effect shall have occurred, exist or come to exist since the date hereof that, individually or in the aggregate, has constituted or resulted in, or could reasonably be expected to constitute or result in, a material adverse effect on the Purchased Assets.

**5.3. Documents.** Seller shall have made available to Buyer and supplied to Buyer upon request the originals or true and correct copies of all documents or other information which Buyer may reasonably request in connection with the transactions contemplated by this Agreement.

**5.5 Deliveries at Closing.** Satisfaction of the closing deliverables in Section 2.2 by Seller and in Section 2.3 by Buyer.

**5.6. Bankruptcy Court.** The Sale Procedures Order shall have been entered and shall be in full force and effect on the Closing Date. The Sale Order shall have been entered and shall be in full force and effect on the Closing Date.

**5.7 Consulting Agreement.** At the election of the Buyer the parties may enter into a consulting agreement with the Seller's principal, Edmilson Ramos, for at least one year based on terms acceptable to both the Buyer and Mr. Ramos.

## ARTICLE VI.
## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF SELLER

The obligation of Seller to consummate the transactions contemplated hereby shall be subject to the fulfillment (or waiver by Seller), on or prior to the Closing Date, of the following conditions:

**6.1. Representations; Performance.** The representations and warranties of Buyer contained in this Agreement shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date. Buyer shall have duly performed and complied with all agreements required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

**6.2. Deliveries at Closing.** Buyer shall have delivered or cause to be delivered to Seller the Purchase Price minus the Deposit.

**6.3. Bankruptcy Court.** The Sale Procedures Order and the Sale Order shall have been entered approving the transactions contemplated herein. The order approving the Ramos Stipulation shall have been entered and the real property shall be sold as part of this Sale process.

## ARTICLE VII.
## ACTIONS BY SELLER AND BUYER AFTER THE CLOSING

**7.1.** **Further Assurances.** Both before and after the Closing Date, each Party will cooperate in good faith with the other and will take all appropriate action and execute any documents, instruments or conveyances of any kind which may be reasonably necessary or advisable to carry out any of the transactions contemplated hereunder.

**7.2.** **Liability for Taxes.** Seller shall be responsible for payment of all transfer, conveyance, deed stamp excise, sales and other similar taxes and fees arising out of or in connection with or attributable to the transactions effected pursuant to this Agreement (the "**Transfer Taxes**"); *provided that* the Seller's chapter 11 plan in the Bankruptcy Case (the "**Plan**") will provide that the sale facilitates the implementation of the Plan so as to invoke the provisions of section 1146 of the Bankruptcy Code governing the imposition of such Transfer Taxes.

**7.3.** **Access to Certain Books and Records; Confidentiality** Each of Buyer and Seller agrees that, after the Closing Date, it will cooperate with and make available to the other Party, during normal business hours, all books, records and other materials of Seller relating to the Purchased Assets and the Business (in the case of Seller) (collectively, the "**Information**") for any reasonable business purpose. Except with respect to Information that is generally available to the public, the Party requesting such Information shall (a) hold all such Information in the strictest confidence, except as required by applicable law, (b) shall disseminate such Information only to its officers, directors, employees, representatives and agents who have been advised of the confidential nature of such Information, (c) shall return promptly, upon request of the other Party, all copies of the Information received by it, and (d) shall take all steps necessary to cause its officers, directors, employees, representatives and agents who have received any such Information to comply with the terms and conditions of this Section 7.3. The Parties understand a copy of this Agreement will be attached to the sale motion to be filed by the Seller.

## ARTICLE VIII.
## TERMINATION

**8.1.** **Termination.** This Agreement may be terminated at any time prior to the Closing Date:

(a)     by the written agreement of Buyer and Seller;

(b)     by Buyer, upon written notice to Seller, if (i) the representations and warranties of Seller shall not have been true and correct in all material respects as of the date hereof, or (ii) Seller breaches any of its covenants or agreements contained in this Agreement (and such breach, if curable, is not cured within fifteen (15) days after written notice thereof is provided to Seller);

(c)     by Seller, upon written notice to Buyer, if (i) the representations and warranties of Buyer shall not have been true and correct in all material respects as of the date hereof; (ii) Buyer breaches any of its covenants or agreements contained in this Agreement (and such breach, if curable, is not cured within fifteen (15) days after written notice thereof is provided to Buyer); or (iii) in the event of an Alternative Transaction;

(d)     by the Buyer, if for any reason the Closing has not occurred on or before the date that is 14 business days after the date of the Sale Order; *provided, however*, that Buyer may not so terminate this Agreement if the Buyer's material breach of this Agreement or a material failure to perform or satisfy the conditions set forth in Article VI hereof under its control has caused, or resulted in, the failure of the Closing to occur by such date; or

## 8.2.     Effect of Termination.

(a)     In the event this Agreement is terminated pursuant to the provisions of Section 8.1, this Agreement shall be null and void, be of no force or effect, and be without prejudice or liability to either Party hereto or any of its directors, officers, employees, agents, consultants, representatives, advisors, stockholders or affiliates, except for any liability resulting from such Party's breach of this Agreement and as set forth below.

(b)     In the event this Agreement is terminated pursuant to Sections 8.1(a), 8.1(b), 8.1(c)(iii), 8.1(d), or 8.1(e), Seller shall refund the Deposit to Buyer within three business days following such termination.  In the event this Agreement is terminated pursuant to Sections 8.1(c)(i) or 8.1(c)(ii), Seller shall be entitled to keep the Deposit.

**ARTICLE IX.**
**MISCELLANEOUS**

**9.1.     Expenses.**  Except as may otherwise be provided herein, Seller, on the one hand, and Buyer, on the other hand, shall bear their respective expenses, costs and fees (including attorneys, auditors, and financing commitment fees) in connection with the transactions contemplated hereby, including the preparation, execution and delivery of this Agreement and compliance herewith.

**9.2.     Severability.**  If any provision of this Agreement, including any phrase, sentence, clause, Section, or subsection is inoperative or unenforceable for any reason, such circumstances shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions herein contained invalid, inoperative, or unenforceable to any extent whatsoever.

**9.3.     Survival.**  All covenants and agreements of the Parties hereto to be performed after the Closing shall survive the Closing.  The representations and warranties of the Parties set forth in Article III hereof shall not survive the Closing.

**9.4.     Notices.**  All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if (a) delivered personally, (b) sent by next-day or overnight mail or delivery, or (c) sent by facsimile or other electronic means (so long as written notice of such transmission is sent within two (2) business days thereafter by another delivery method hereunder).

<u>If to Buyer: FGC-EPC</u> LLC

24 Rodman Lane
North Kingstown, RI 02852
Attention: Erin P. Carroll

*with a copy to:*

John McAuliffe
McAuliffe & Assoc.
2000 Commonwealth Ave.
Newton, MA 02466
617 558 6889 x21
john@jm-law.net

<u>If to Seller:</u>

Top Line Granite Design, Inc.
347 Middlesex Road
Tyngsboro, MA 01886
Attention: Edmilson Ramos
Email:
Fax:

*with a copy to:*

Riemer & Braunstein LLP
100 Cambridge Street
Boston, MA 02114
Attention:  Alan L. Braunstein
Email: abraunstein@riemerlaw.com
Fax:

or, in each case, at such other address as may be specified in writing to the other Parties hereto.

All such notices, requests, demands, waivers and other communications shall be deemed to have been received (x) if by personal delivery on the day after such delivery, (y) if by next-day or overnight mail or delivery, on the day delivered, (z) if by facsimile or other electronic means, on the next day following the day on which such transmission was sent, provided that a copy is also sent as set forth above.

**9.5.** **Headings.** The headings contained in this Agreement are for purposes of convenience only and shall not affect the meaning or interpretation of this Agreement.

**9.6.** **Remedies.** The Parties hereto recognize that in the event either Party fails to fulfill or perform any of its covenants or agreements set forth in, or contemplated by, this Agreement, monetary damages alone will not be adequate. Each Party shall therefore be entitled, in addition to any other remedies that may be available, to seek injunctive relief, specific performance or any other form of relief to remedy a breach or threatened breach of this Agreement and to enforce the terms of this Agreement. Any default by the Buyer shall limit all damages to the amount of the deposit.

**9.7.** **Entire Agreement.** This Agreement constitutes the entire agreement, and supersedes all prior agreements and understandings, both written and oral, between the Parties with respect to the transactions contemplated in this Agreement.

**9.8.** **Counterparts.** This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same instrument.

**9.9.** **Governing Law; Jurisdiction.** This Agreement shall be governed in all respects, including as to validity, interpretation and effect, by the internal laws of the Commonwealth of Massachusetts, without giving effect to the conflict of laws rules thereof. The Parties hereby waive any right to jury trial and agree that all disputes under this Agreement shall be resolved by and subject to the exclusive jurisdiction of the Bankruptcy Court.

**9.10.** **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, successors and permitted assigns including, but not limited to, any Chapter 11 or Chapter 7 trustee that may hereafter be appointed in Seller's Bankruptcy Case.

**9.11.** **Assignment.** Neither Party hereto may assign or delegate any or all of its rights or obligations under this Agreement without the other Party's prior written consent; provided, however, Buyer may without Seller's consent assign its rights to an affiliated nominee upon written notice to the Seller within five (5) business days prior to the Closing.

**9.12.** **No Third Party Beneficiaries.** Nothing in this Agreement shall confer any rights upon any party other than the Parties hereto and their respective successors and permitted assigns.

**9.13.** **Amendment; Waivers, Etc.** No amendment, modification or discharge of this Agreement, and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the Party against whom enforcement of the amendment, modification, discharge or waiver is sought. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Party granting such waiver in any other respect or at any other time.

**9.14.** **Nonassignable Rights.** To the extent that Buyer shall have determined (which determination shall be in the sole reasonable discretion of the Buyer) to close under this Agreement prior to receipt of any consent, approval or waiver necessary, under applicable bankruptcy or other

law or otherwise, to transfer to the Buyer the rights and benefits of the Seller pursuant to any of the Purchased Assets, then the Parties will cooperate and use their respective commercially reasonable efforts to (A) obtain as promptly as practicable all consents, approvals and waivers required by any third party or governmental authority to transfer to the Buyer such Purchased Assets in a manner that will avoid any default, conflict or termination of rights thereunder and (B) cooperate in any lawful and commercially reasonable arrangement designed to provide the benefits of such Purchased Asset to the Buyer in a manner that would as nearly as practicable reflect the purpose and intention of this Agreement.

[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be duly executed as of the date first above written.

SELLER:

**Top Line Granite Design Inc.**

By: _____

Name: ___EDmilson Ramos___

Title: ___Owner___


BUYER:

**FGC-EPC, LLC**

By: _____

Name: Erin P. Carroll

Title: Manager