# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>TOP LINE GRANITE DESIGN INC.,[1]<br><br><br><br>Debtor. | Chapter 11<br>Case No. 22-40216 (EDK) |

### APPLICATION OF RIEMER & BRAUNSTEIN LLP FOR COMPENSATION AND FOR REIMBURSEMENT OF EXPENSES AS COUNSEL TO THE DEBTOR FOR PERIOD FROM MARCH 25, 2022 (PETITION DATE) THROUGH JUNE 29, 2023 AND FOR INTERIM PAYMENT FROM CARVE-OUT AND RETAINER

The law firm of Riemer & Braunstein LLP (the "**Firm**"), as counsel to Top Line Granite Design Inc. (the "**Debtor**"), pursuant to 11 U.S.C. §§ 327 and 330, hereby applies to this Court for an entry of an order allowing compensation award for legal services rendered and expenses incurred on behalf of the Debtor's bankruptcy estate (the "**Estate**") from the Petition Date (March 25, 2022) to June 29, 2023 (the "**Application Period**"). During the Application Period, the requested total for legal services is $580,430.50 (the "**Fee Amount**"), not including amounts designated as No Charge Time, and the total incurred expenses is $17,433.20 (the "**Expenses**", together with the Fee Amount, the "**Total Fee Amount**").[2]

The Firm seeks allowance of the Total Fee Amount, and seeks that the Court authorize payment of such amount to be paid from (i) the Retainer ($12,423.40), (ii) the pro-rata portion of the $225,000.00 carve-out amount allocated for professional fees from the sale of the Debtor's assets, (iii) the pro-rata portion of the $150,000.00 total deposit amount forfeited by the Proposed Buyer (defined below) after failing to close on the purchase of the Debtor's business assets, as

---

[1] A/k/a Design Top Line Granite, and aka Top Line Granite Design. The Debtor's name was changed from Brazil Stones Inc. in November 2005.

[2] Without the No Charge Time discount, the total amount for legal services would have been $961,437.00 (without including the Sanction (Brickstone) category).

may be allocated for professional fees, and (iv) remaining amount to be paid from proceeds of recovery actions by the Chapter 7 Trustee (the "**Trustee**") and other assets liquidated and to be liquidated by the Trustee.  In support of this application (the "**Application**") the Firm respectfully states as follow:

## I.  <u>BACKGROUND</u>

1.      On March 25, 2022 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11, Subchapter V of the United States Bankruptcy Code.  Pursuant to sections 1107(a) and 1108 of the United States Bankruptcy Code, the Debtor operated or managed its property as a debtor in possession before appointment of the operating trustee and ultimate conversion of the Chapter 11 case to Chapter 7.

2.      On March 28, 2022, Steven Weiss was appointed as Subchapter V Trustee (the "**Subchapter V Trustee**").

3.      The Debtor is a Massachusetts corporation, formed in October 2004, that was doing business in Tyngsboro, MA with Edmilson Ramos ("**Mr. Ramos**") as the owner.  The Debtor sold and fabricated marble, granite, onyx, soapstone, quartzite, quartz, and porcelain. The Debtor also designed and installed countertops for the New England area.

4.      As of the Petition Date, the Debtor occupied the facility located at 347 Middlesex Road, Tyngsboro, MA (the "**Real Estate**") pursuant to a Commercial Property Lease, effective as of January 1, 2019 (as may be amended) between the Debtor and the 347 Middlesex Road Realty Trust (the "**Trust**") for which Mr. Ramos was the beneficiary.

5.      On March 29, 2022, the Debtor filed an application to employ the Firm as bankruptcy counsel [Doc. No. 13], as supplemented on April 6, 2022 [Doc. No. 31] (the

"**Employment Application**").[3] Pursuant to Local Rule 2016-1(a)(1)(E), a copy of the Order dated May 2, 2022, allowing the Employment Application is attached hereto as **Exhibit A-1**.

6.      As set forth in the Employment Application, subject to the Court's approval, the Debtor has agreed to compensate the Firm for its services at its usual hourly rates in effect at the time that services are rendered.  The Debtor has also agreed to reimburse the Firm in full for its cash disbursements and for such expenses as the Firm customarily bills to its clients.  Pursuant to Local Rule 2016-1(a)(1)(D), a copy of the engagement letter between the Firm and the Debtor dated March 14, 2022 is attached hereto as **Exhibit A-2.**

7.      Pursuant to Bankruptcy Rule 2016(b), the Firm filed a disclosure of compensation on April 6, 2022 [Doc. No. 32], pursuant to which the Firm disclosed that it is holding $12,423.40 as a retainer for legal services and expenses in connection with this bankruptcy proceeding (the "**Retainer**").  The Firm received such Retainer pre-petition.

8.      As discussed below, the Debtor filed its Chapter 11 plan of reorganization, and later plans of liquidation based on a proposed sale of the Debtor's assets.  Such sale transactions, despite going through several machinations, were not ultimately consummated and plan confirmation was ultimately not feasible, though the court approved buyer, FGC EPC, LLC ("**Proposed Buyer**" or "**FGC**") forfeited $150,000 in deposits.

9.      As discussed below, on April 28, 2023, in connection with a pending Motion to Convert/ Dismiss (defined below) filed by the U.S. Trustee's office, the Court removed the debtor in possession pursuant to 11 U.S.C. § 1185(a), and the Subchapter V Trustee was

---

[3] The Employment Application affidavit was later supplemented on April 4, 2023 [Doc. No. 289].

appointed as an operating trustee pursuant to sections 1183(b)(5), 704(a)(8), and 1106(a)(1), (2), (6) of the Bankruptcy Code.

10. On June 29, 2023, after the Proposed Buyer failed to close the sale by the final extension period, the Court converted the case to Chapter 7, with the Subchapter V Trustee appointed as the Trustee in the Chapter 7 case.

## II. SUMMARY CHART

11. Pursuant to Local Rule 2016-1 (a)(2), and as reflected in the statements of services attached as **Exhibit B**, below is a chart of the total number of hours expended by each attorney and paralegal, his or her respective adjudicated hourly rate during the Application Period, and the calculation of the time incurred multiplied by the applicable hourly rate *less* the "No Charge Time" entries (the "**Net Lodestar Calculation**").

| Attorney | Specialty | Rate | Hours (after NCT) | Fee (after NCT) |
|---|---|---|---|---|
| Alan Braunstein (ALB) | Bankruptcy | 795.00 | 33.00 | $26,235.00 |
| Alan Braunstein (ALB) (Rate Change January 1, 2023) | Bankruptcy | 845.00 | 104.10 | $87,964.50 |
| Macken Toussaint (MXT) | Bankruptcy | 465.00 | 797.80 | $370,977.00 |
| Macken Toussaint (MXT) (Rate Change January 1, 2023) | Bankruptcy | 550.00 | 142.90 | $78,595.00 |
| | | | | |

| PARALEGAL | | | | |
|---|---|---|---|---|
| Dennis Haley (DMH) | Paralegal | 225.00 | 1.70 | $382.50 |
| Nicole Dailey (NMD) | Paralegal | 225.00 | 54.70 | $12,307.50 |
| Nicole Dailey (NMD) (Rate Change January 1, 2023) | Paralegal | 245.00 | 16.20 | $3,969.00 |
| | | | | |
| **TOTAL HRS AND NET LODESTAR FEES** | | | **1,150.40** | **$580,430.50** |

12. A detailed computer-generated description of the specific time entries of legal services is attached hereto collectively as **Exhibit B** (invoice for March 25, 2022 to October 31, 2022, and invoice for November 1, 2022 to June 29, 2023).

13. Pursuant to Local Rule 2016-1 (a)(2), the hourly billing rate of each person and the fee charged for the work described in each entry are both described herein. **Exhibit B** has (i) the date the work was performed, (ii) the name of the person performing the work, (iii) brief description of the nature of the work, and (iv) the time expended on the particular service.

14. A brief biographical sketch of each attorney performing services through June 29, 2023 is attached hereto as **Exhibit C**.

### III. NARRATIVE SUMMARY OF SERVICES

15. The Debtor proceeded with the filing of the Chapter 11, Subchapter V case in order to invoke the protections afforded by the Bankruptcy Code and to continue its operations that had been stymied by (i) the continued impact of the Covid-19 Pandemic which brought construction to a virtual halt, and (ii) certain unfair practices of the Debtor's lenders and creditors, including direct cash withdrawals by hard money lenders from the Debtor's accounts

that became unsustainable. After efforts made to reach agreements with the Debtor's primary lender were unsuccessful the prospects of generating post-Covid work were seemingly attainable. The Debtor determined that potential means to economically reorganize and preserve value to creditors was to avail itself of Subchapter V.

16. The allowance of the Firm's Application for the legal services incurred during the Application Period is appropriate as the Firm has expended considerable time and resources to preserve the Debtor's business and to optimize value to the Estate.

17. Pursuant to Local Rules 2016-1(a)(1) and (d), the services rendered by the Firm during the Application Period have been divided into the following fifteen (15) categories:

| **Category** | **Title of Category** | **Requested Fees** |
|---|---|---|
| A | Subchapter V | $3,583.50 |
| B | Avidia Foreclosure/Stay Extension | $36,128.00 |
| C | Sale/Asset Disposition | $161,853.50 |
| D | Business Operations | $62,174.50 |
| E | Case Administration | $81,129.50 |
| F | Claim Administration and Objections | $16,130.50 |
| G | Financing | $49,805.50 |
| H | Litigation | $11,059.50 |
| I | Meeting of Creditors | $5,109.00 |
| J | Chapter 11 Plan | $112,310.50 |
| K | Sanctions (Brickstone) | $4,954.50 |

| | | |
|---|---|---|
| L | Subchapter V Trustee Investigation | $27,562.50 |
| M | Employment Applications and Objections | $0.00 |
| N | Fee Application | $8,629.50 |
| O | Recovery Actions | $0.00 |
| | **TOTAL** | **$580,430.50** |

18. Based on the above chart and as reflected in the statements of services attached as **Exhibit B**, there is a substantial voluntary reduction in the fees requested for payment including entries designated as "No Charge Time," which refers to time actually incurred in the case, that was reasonable and necessary, but the Firm has voluntarily not billed for payment to the Estate, including, among services, telephonic conferences with the Debtor and various professionals in the case, U.S. Trustee meetings or Court hearings where more than one of the Firm's attorneys attended, as well as internal strategy conferences.

A. **Subchapter V**

19. After the Petition Date, the Firm engaged in several communications with counsel for the United States Trustee ("**U.S. Trustee**"), and the Subchapter V Trustee regarding the Debtor's eligibility to file as a Subchapter V debtor. Pursuant to sections 1182(1) and 101(51D) of the Bankruptcy Code the debt limit for Subchapter V eligibility is based on non-contingent liquidated debts. After filing of the Chapter 11 petition, the Firm prepared and filed a separate SBRA Eligibility Statement (Supplement to Voluntary Petition) [Doc. No. 15] to address concerns raised by the U.S. Trustee's office. Such eligibility statement has a breakdown of the

Debtor's debt structure showing the deduction of certain insider claims and contingent obligations from the total estimated liabilities. This category also includes communications with the Debtor and others, and review of due diligence documents regarding the Debtor's debt structures and debt limit analysis.

20. As noted on Exhibit D-1, the Firm incurred and requests payment for a net Lodestar Calculation of $3,583.50 in connection with the Subchapter V matter.

**B. Avidia Foreclosure/Stay Extension**

21. As of the Petition Date, the Debtor had two business loans with Avidia Bank. The first one is a revolving line of credit (Inventory Loan- 2019) in the amount of approximately $1,489,414.30. The second one is an equipment loan (2019 SBA (7A) loan) in the amount of $1,086,862.44. Both loans are guaranteed by the Trust.

22. Such pre-petition obligations of the Debtor with respect to Avidia Bank do not include certain mortgage loans of Avidia Bank to the Trust, for which the Debtor is a guarantor. According to the Debtor's Schedules F, the pre-petition guaranty claim for Avidia Bank is approximately $2,030,570.05. The mortgage loan documents, dated 8/28/19, include a Five Year Adjustable Term Note, and a Commercial Mortgage, Security Agreement and Assignment of Leases and Rents by the Trust to Avidia Bank, with guaranties by the Debtor, US Construction and Maintenance LLC ("**US Construction**"), and Mr. Ramos.

23. With respect to the Real Estate, on June 24, 2022, Avidia Bank filed a motion for comfort order that its action to foreclose on non-debtor property does not violate the automatic stay [Doc. No. 107] (the "**Comfort Order Motion**"). The Debtor, thereafter, filed on July14, 2022 a motion for extension of the automatic stay pursuant to section 105 of the Bankruptcy

Code with respect to certain non-debtor guarantors and foreclosure of the Debtor's principal place of business [Doc. No. 126] (the "**Stay Extension Motion**").

24.     The services rendered in this category related to the Firm's efforts to preserve agreements with Avidia regarding the proposed sale and means and gained traction when Avidia and the Proposed Buyer and lender to the Proposed Buyer commenced negotiations regarding a sale of Avidia's note or the Real Estate.  Negotiations became more problematic after alleged defaults under the pre-petition mortgage loan documents and foreclosure proceedings that Avidia commenced with the Massachusetts state court.  Counsel for the Debtor engaged in numerous communications with Avidia Bank's attorney regarding these matters in an effort to preserve the sale of the Debtor's assets, but the Proposed Buyer and Avidia could not reach accord with two junior lienholders as to the Proposed Buyer's sale of the Real Estate.

25.     The Firm conducted legal research and reviewed materials about the Bankruptcy Court's authority to deny Avidia Bank's Comfort Order Motion and to find that Sections 105 and 362 of the Bankruptcy Code would protect the Debtor against the foreclosure of the Real Estate to the extent necessary for the continued operation of the Debtor and its reorganization efforts. The Firm filed an objection to the Comfort Order Motion filed by Avidia Bank, and the Firm also prepared and filed the Stay Extension Motion in an abundance of caution.

26.     The Firm reviewed pleadings and due diligence documents related to the state court foreclosure proceeding(s) filed by Avidia Bank, the Comfort Order Motion, and the Stay Extension Motion.  The Firm also attend Bankruptcy Court hearing(s) for the Comfort Order Motion, and the Stay Extension Motion.

27.     In addition, after the initial hearing on the Stay Extension Motion, the Court established deadline for Avidia Bank and the Debtor to file joint statement of facts or individual affidavits for the continued hearing.  The services rendered in this category also include follow up communications between the Firm and Avidia Bank's attorney regarding preparation of such documents.  Moreover, the parties spent time exploring options to potentially resolve the disputes and prevent the foreclosure from occurring for the benefit of the Debtor's business and the Estate.

28.     As noted on Exhibit D-2, the Firm incurred and requests payment for a net Lodestar Calculation of $36,128.00 in connection with the Avidia Foreclosure / Stay Extension matter.

**C.     Sale/Asset Disposition**

29.     While the Debtor implemented measures to conserve working capital and received approval of some DIP financing for continued operations, after considering all options, the Debtor concluded that its reorganization prospects were remote and that a going concern sale would generate greater recovery.

30.     The Debtor decided to pursue a 363 sale process for the business and accepted a stalking horse bid of a proposed buyer, subject to higher and better offers. On September 8, 2022, the Debtor filed a motion to sell its assets to the Proposed Buyer free and clear of all liens, claims, and encumbrances under section 363(f) of the Bankruptcy Code, subject to counteroffers [Doc. No. 176] and supplemented on October 3, 2022 [Doc. No. 194] (the "**Initial Sale Motion**").

31. On October 4, 2022, the Bankruptcy Court entered an Order Approving Sale and Bidding Procedures and Breakup Fee in Connection with Proposed Sale of Assets of the Debtor [Doc. No. 196] (the "**Initial Sale Procedures Order**"). Ultimately, after entry of the Initial Sale Procedures Order, the Debtor did not receive any other bids by the counteroffer or bid deadline, and an auction was not held.

32. On November 10, 2022, after hearing, the Bankruptcy Court entered an Order approving the Initial Sale Motion and the going concern sale of the Debtor's assets to the Proposed Buyer, as the successful bidder [Doc. No. 215] (the "**Initial Sale Order**"). Pursuant to the asset purchase agreement with the Proposed Buyer (the "**FGC APA**"), the purchased assets included all right, title, and interests of the Debtor in and to all its assets, as set forth in Section 1.1 of the asset purchase agreement, including (i) all trade and other accounts receivable, (ii) all inventories, (iii) all equipment and machinery, and (iv) customer and prospect lists and other intangibles. Under the FGC APA, the Debtor also agreed to assume and assign to the Proposed Buyer certain unexpired pre-petition agreements and/or unexpired leases.

33. Despite multiple extensions, the Proposed Buyer, the successful bidder under the Initial Sale Order defaulted and did not consummate the purchase of the Debtor's business assets. On March 23, 2023, the Debtor sent a termination notice to the Proposed Buyer, including with respect to the Estate's retention of the $50,000.00 deposit under the FGC APA.

34. Thereafter, the Debtor, the Subchapter V Trustee, the Trust, and Mr. Ramos negotiated a proposed sale of the Real Estate with the going concern sale of the Debtor's business after both Avidia and the Proposed Buyer concluded it was the only means in which the Proposed Buyer could obtain its financing needs. However, negotiations stalled prompting the

Debtor on April 5, 2023 to file a Motion for an Order (A) Authorizing and Approving Sale and Bidding Procedures and Break Up Fee in Connection with Proposed Sale of the Debtor's Assets; (B) Scheduling a Hearing to Consider Approval of the Sale; (C) Prescribing the Manner of Notice for Such Hearing; (D) Authorizing and Approving Asset Purchase Agreement with Charles River Realty Group LLC or Another Bidder Approving a Higher or Better Offer; (E) Authorizing Such Sale Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; and (F) Granting Other Related Relief [Doc. No. 294], as supplemented on April 18, 2023 [Doc. No. 338] (the "**Second Sale Motion**").

36. The Second Sale Motion was pursuant to an asset purchase agreement with Charles River Realty Group LLC ("**Charles River**") which included the Real Estate (the "**Charles River APA**"). On April 21, 2023, the Court entered an Order approving sale and bidding procedures, with breakup fee, pursuant to the Charles River APA [Doc. No. 346] (the "**Second Sale Procedures Order**").

36. FGC filed a notice of counteroffer on April 18, 2023 [Doc. No. 336] before entry of the Second Sale Procedures Order. In connection with this counteroffer, FGC provided a $100,000.00 deposit as the Firm had required in the Second Sale Motion.

37. Several parties files objections to the Second Sale Motion, including (i) the U.S. Small Business Administration (the "**SBA**") [Doc. No. 300 and 381], (ii) the U.S. Trustee's office [Doc. No. 304 and 395], (iii) Avidia Bank [Doc. No. 392], and (iv) Angela Cagianno, a creditor of the Trust and/ or Mr. Ramos with lien on the Real Estate [Doc. No. 314 and 388].

38. In connection with the Second Sale Motion, the Debtor, Mr. Ramos and certain related entities, and Avidia Bank together with the assent of the Subchapter V Trustee entered

into a global stipulation (the "**Ramos Stipulation**"), filed with the Court on April 14, 2023 [Doc. No. 311]. Pursuant to the Ramos Stipulation, the Real Estate would be transferred to the Debtor's Estate subject to (i) approval of both the Second Sale Motion and the Ramos Stipulation, and (ii) the sale under the Second Sale Motion having closed. On April 14, 2023, the Debtor, Mr. Ramos, and Avidia Bank filed a Motion to Approve Global Stipulation [Doc. No. 312] [(the "**Stipulation Motion**").

39. The SBA objected to approval of the Stipulation Motion [Doc. No. 381]. The U.S. Trustee also objected to the Stipulation Motion [Doc. No. 394]; the SBA ultimately did not proceed on its objection as Avidia Bank agreed to, and did, purchase the SBA Loan.

40. As an alternative and because of raised issues and objections related to the sale of the Real Estate, the Subchapter V Trustee, as operating trustee and with the requested assistance of the Firm, negotiated and filed a motion for entry of Order confirming and modifying the Initial Sale Order [Doc. No. 373] (the "**Confirmatory Sale Motion**"). The Court granted the Confirmatory Sale Motion after hearing on May 25, 2025, and entered the confirmatory and amended sale order on May 26, 2023 [Doc. No. 414] (the "**Confirmatory Sale Order**").

41. After conversion of the case to Chapter 7, on June 30, 2023, the Trustee filed a second motion for order confirming and modifying sale of property of the estate [Doc. No. 437]. Ultimately, no going concern sale was consummated by the Proposed Buyer, and the second deposit was forfeited on or about July 11, 2023. Avidia Bank foreclosed on the Real Estate in June 2023.

42. On July 20, 2023, the Trustee filed a motion for order authorizing auction sale of property free and clear of liens and encumbrances [Doc. No. 451]. The Trustee's auction of the business assets is scheduled for September 7, 2023.

43. This category includes the Firm's efforts with soliciting stalking horse bids, communications with the Debtor, proposed buyers, and others related to the Initial Sale Motion, the FGC APA, the Second Sale Motion, and the Charles River APA (which led to the increased offer of FGC and increased deposit), in addition to the Stipulation Motion, and Confirmatory Sale Order that became necessary. The Firm also facilitated meetings and conference calls with the Debtor, the Subchapter V Trustee, Avidia Bank, and other parties in interest to address questions and sale strategies, including with respect to solicitation of counteroffers. The Firm addressed with the Debtor the sale process, excluded assets, and assumption and assignment of certain contracts and unexpired leases, as was applicable for the Initial Sale Motion and the FGC APA. The Firm also negotiated the resolutions with secured creditors, including Avidia Bank and First Citizens.

44. The Firm also attended to inquiries and communications with the U.S. Trustee's office, the Subchapter V Trustee and secured creditors regarding the asset sale, certain open issues, and sale objections. The Firm responded to various inquiries of the U.S. Trustee's office and the Subchapter V Trustee and document requests.

45. The Firm prepared form sale documents, including the form asset purchase agreements to facilitate stalking horse bids. Thereafter, the Firm established an online data room to streamline the due diligence process for potential buyers, and downloaded multiple due diligence documents. After the Debtor received stalking horse bids, the Firm reviewed and

attended to the preparation of the asset purchase agreements and related exhibits, including the FGC APA, and the Charles River APA. The Firm reviewed due diligence documents for the preparation of the asset purchase agreements. Thereafter, the Firm also prepared the sale pleadings for filing, including the Initial Sale Motion, the Second Sale Motion, bidding procedures, sale notice, and proposed orders. During the Application Period, the Firm attended hearing for sale related matters, including bidding procedures, the Initial Sale Motion, the Second Sale Motion, and the Stipulation Motion.

46. Moreover, the Firm worked with and discussed with the Subchapter V Trustee and Avidia Bank a proposed distribution analysis from the sale proceeds.

47. As noted on Exhibit D-3, the Firm incurred and requests payment for a net Lodestar Calculation of $161,853.50 in connection with the Sale / Asset Disposition matter.

**D.     Business Operations**

48. Soon after the Petition Date, on March 30, 2022, the Debtor filed a motion for authority to use cash collateral [Doc. No. 16] (the "**Cash Collateral Motion**"). In connection with the Cash Collateral Motion, the Debtor proposed (i) as adequate protection, that certain secured creditors (the "**Lienholders**") be granted certain post-petition replacement liens and security interests in property of the Debtor's Estate to the extent such Lienholders held validly perfected liens and security interests as of the Petition Date, and (ii) as further adequate protection, to the extent funds were available, monthly payments to certain senior claim holders (or adequate protection payments).

49. The Bankruptcy Court entered a Third Order Authorizing Final Use of Cash Collateral on September 30, 2022 [Doc. No. 190] with hearing continued through January 19,

2023 [Doc. No. 247], through March 9, 2023 [Doc. No. 247], through April 4, 2023 [Doc. No. 272], through May 25, 2023 [Doc. No. 292], through June 29, 2023 [Doc. No. 412]. Because of the case conversion to Chapter 7 on June 29, 2029, use of cash collateral became moot and the Cash Collateral Motion was withdrawn in open court [Doc. No. 433].

50. The services rendered in this category include work done in connection with the filing and preparation and filing of the Cash Collateral Motion and exhibits and attending hearings thereon.

51. The Firm also prepared and filed (i) a motion for authority to pay pre-petition employee wages, amounts due to subcontractors, and other employment related obligations [Doc No. 35], (ii) a motion for entry of an order prohibiting utilities from discontinuing, altering, or refusing service, and deeming utilities adequately assured of future performance, and (iii) a motion for authority to continue using certain existing bank accounts with Avidia Bank and business forms [Doc. No. 55]. The Debtor reviewed documents and attended to communications with the Debtor and others in connection with such filings.

52. The Firm assisted the Debtor with the opening of new DIP accounts, and addressed the follow up inquiries from the U.S. Trustee's office regarding such accounts. The Debtor ultimately opened its DIP bank accounts with Chase Bank and closed the pre-petition bank accounts with Avidia Bank.

53. In connection with the Second Sale Motion and to facilitate needed funding and support for the Debtor to continue with operations pending sale closing, the Debtor and FGC, with the assent of the Subchapter V Trustee, entered into a certain Interim Management Agreement, which the parties filed with the Court on April 17, 2023 [Doc. No. 324], together

with an expedited motion for approval [Doc. No. 325], and supplement filed on April 26, 2023 [Doc. No. 355]. The U.S. Trustee objected to the approval of the interim management agreement on April 25, 2023 [Doc. No. 354]. The Debtor filed a response to the U.S. Trustee's objection on April 26, 2023 [Doc. No. 356]. As a result of the removal of the debtor-in-possession and appointment of the operating trustee on April 28, 2023, the motion for approval of the interim management agreement was withdrawn in open court [Doc. No. 369].

54. As noted on Exhibit D-4, the Firm incurred and requests payment for a net Lodestar Calculation of $62,174.50 in connection with the Business Operations matter.

**E.**     <u>**Case Administration**</u>

55.     The services rendered in this category of services were of a general nature including certain case administration matters that required the Firm's attention particularly at the commencement of the case, including preparation and filing of first day pleadings, and other required filings.

56.     This category includes numerous communications with the Debtor as to the Debtor's fiduciary obligations and financial reporting requirements, creditor relationships, and assessment with the Debtor of its operations.

57.     The Firm has also responded to e-mails and phone calls from creditors inquiring of and pertaining to initial review and assessment of their claims in the case.  The Firm responded to requests from creditors for information about the case, and general inquiries from the U.S. Trustee's office and the Subchapter V Trustee, including initially with respect to reorganization efforts, and operating issues.

58.     On April 11, 2022, the Debtor filed the bankruptcy schedules of assets and liabilities [Doc. No. 44] (the "**Schedules**").  The Debtor also filed on April 15, 2022 its amended Statement of Financial Affairs [Doc. No. 51] (the "**SOFA**").  This category includes review of due diligence documents regarding preparation and filing of the Schedules and the SOFA, drafting of notes to the Schedules to ensure as accurate information as possible, and conformity with the Debtor's books and records.  The Debtor had numerous transfers pre-petition responsive to the SOFA questions and the Firm reviewed various drafts of Excel spreadsheet exhibits attached to the SOFA and had series of conversations with the Subchapter V Trustee regarding the viability of numerous alleged avoidance actions.

18

59. The Firm also engaged in numerous communications and telephonic meetings with the Debtor's principal and staff regarding the Schedules and SOFA. The Firm worked with the Debtor to ensure focus on the significance of complete and authoritative disclosure as possible.

60. On January 13, 2023, the United States Trustee's office filed a Motion to Convert Case to Case Under Chapter 7, or, in the Alternative, to Dismiss Case [Doc. No. 240] (the "**Motion to Convert/ Dismiss**"). The Debtor filed an objection to the Motion to Convert/ Dismiss on March 2, 2023 [Doc. No. 262].

61. In late April 2023, the Firm became aware of certain funding by an FGC related party to the Debtor, reflected in the draft March 2023 reconciliation statement, that was not previously authorized by the Court. The Firm promptly brought this to the attention of the Subchapter V Trustee and made such disclosure to the Court at the hearing on April 28, 2023.

62. In connection with the Motion to Convert/Dismiss, on April 28, 2023, the Court entered a Proceeding Memorandum and Order removing the debtor in possession pursuant to 11 U.S.C. § 1185(a) [Doc. No. 368]. Pursuant to section 1183(b)(5) of the Bankruptcy Code, the Subchapter V Trustee was authorized to perform the duties specified in section 704(a)(8) and paragraphs (1), (2), and (6) of section 1106(a) of the Bankruptcy Code, including operating the business.

63. On June 29, 2023, the Court ultimately entered an Order granting the Motion to Convert/ Dismiss, and converted the case to Chapter 7 [Doc. No. 434], with the Subchapter V Trustee appointed as the Trustee in the Chapter 7 case.

64. This category also includes general hearing preparation, filing of motions and time for attending multiple hearings. The Firm reviewed documents and attended to emails with the Debtor, the U.S. Trustee's office, the Subchapter V Trustee, and secured creditors whenever requested.

65. As noted on Exhibit D-5, the Firm incurred and requests payment for net Lodestar Calculation of $81,129.50 in connection with the Case Administration matter.

**F.** **Claim Administration and Objections**

66. The services rendered in this category include review of documents related to the Debtor's prepetition obligations and creditors' claims. The Firm also engaged in communications with creditors and/or creditors' attorneys regarding payment issues and treatment of claims under a Chapter 11 plan or from sale proceeds. The Firm also attended to some legal research related to creditors' claims and potential objections, such as issues concerning equipment lease versus secured loan, and treatment of undisputed scheduled claims. The Firm also started with the initial review and preparation of the claims analysis.

67. As noted on Exhibit D-6, the Firm incurred and requests payment for a net Lodestar Calculation of $16,130.50 in connection with the Claim Administration and Objections matter.

**G.** **Financing**

68. Due to pre-petition collection actions of certain cash money lenders and the bankruptcy filing, it became difficult for the Debtor to collect from commercial customers the generally required down payment or deposit before starting a new project. In order to maintain the viability of the business during the Chapter 11 proceeding, the Debtor needed additional working capital to purchase supplies and materials in order to start on new projects and to keep the ongoing relationships with its customers. Post-petition, the Debtor needed the option to finance the beginning of its new projects in order to preserve these contracts.

69. On May 16, 2022, the Debtor filed a motion for an order (i) authorizing the Debtor to obtain post-petition financing, (ii) granting a superpriority claim, security interest, and priming first priority lien to the DIP Lender [Doc. No. 76] (the "**DIP Financing Motion**"). Pursuant to the DIP Financing Motion, the Debtor sought approval of a post-petition financing from Legalist, Inc., as investment adviser and DIP lender (the "**DIP Lender**") on an interim basis in an amount up to $400,000.00 and on a final basis in the aggregate committed amount of up to $1,000,000.00 ("**DIP Financing**").

70. On May 19, 2022, the Court entered the initial interim DIP Financing order authorizing the Debtor to obtain post-petition financing in the amount of $400,000.00 [Doc. No. 87]. On June 21, 2022, the U.S. Trustee's office filed a limited objection and reservation of rights [Doc. No. 104]. On July 22, 2022, the Bankruptcy Court entered a second interim DIP Financing order authorizing the debtor to obtain post-petition financing in an additional amount of $235,000.00 [Doc. No. 138]. On January 23, 2023, the Court entered an Order deeming the previous interim orders as final and denying the balance of the DIP Financing Motion.

71.     This category includes numerous communications with potential DIP financing lenders and agents, review of numerous due diligence documents, and delivery of information to potential lenders.  The Firm had several meetings, email communications, and conference calls with the Debtor to address questions regarding searches for potential lenders, due diligence document requests, and terms of proposed financing.  The Firm addressed with the Debtor the financing process, and related strategies, and assisted the Debtor with the review of the proposed budget for the DIP Financing.

72.     The Firm prepared and worked with the ultimate DIP Lender on the term sheet and later on the financing agreement, together with related exhibits, to facilitate the new funding. Thereafter, the Firm also prepared the financing pleadings for filing with the Bankruptcy Court, including the DIP Financing Motion, and related notice and proposed order(s).  The Firm also conducted legal research and reviewed materials related to super-priority lien and adequate protection under the DIP Financing Motion.  The Firm also worked on supplements to the DIP Financing Motion, and discussed with the Debtor objections to the DIP Financing Motion.

73.     The Firm also attended to inquiries and communications with the U.S. Trustee's office, the Subchapter V Trustee and secured creditors regarding the proposed post-petition financing, and addressed objections to the DIP Financing Motion.  The Firm attended hearings for the approval of the DIP Financing, and attended to multiple inquiries regarding payoff statements and repayment of the DIP Financing amount.  The Firm also apprised the DIP Lender of the sale status and monitored efforts by the DIP Lender to seek stay relief as its DIP Loan was eventually purchased by Avidia Bank.

74. As noted on Exhibit D-7, the Firm incurred and requests payment a net Lodestar Calculation of $49,805.50 in connection with the Financing matter.

**H.** **Litigation**

75. Pre-petition, the Debtor regrettably, had entered into several short-term loans which, for the most part, are similar to factoring contracts pursuant to which the Debtor received upfront cash in exchange for the sale of certain accounts receivable. The required daily payments to such cash money lenders had become unsustainable for the Debtor's business, and had nearly depleted the Debtor's accounts.

76. Pre-petition, the cash money lenders sent improper collection communications to the Debtor's customers which caused and continued to cause what became irreparable damage to the Debtor's business (including monetary and reputational damages).[4]

77. After the Petition Date, some of the cash money lenders continued with the communications to the Debtor's customers, such as unauthorized transfers, directing customers to send payments to the cash money lender and other actions violating the automatic stay. The Firm upon learning of such stay violations contacted the cash money lenders regarding violation of the automatic stay, prepared and sent demand letters to cease and desist. The Firm also reviewed documents and the agreements between the Debtor and cash money lenders many not having provided the requisite notices to the secretary of state and were determined by the Firm to be liable for recovery under section 548 of the Bankruptcy Code.

---

[4] During the Chapter 11 proceeding, the Debtor reserved all rights with respect to the cash money lenders, including with respect to the predatory nature of the transactions, the true nature of the cash advance agreements as loans which are subject to statutory and regulatory provisions, including but not limited to the Massachusetts usury statute (G.L. c. 271, § 49).

78.     Notably, the Firm had comprehensive discussions with the Subchapter V Trustee highlighting the substantial recoveries that would need to be pursued.

79.     As noted on Exhibit D-8, the Firm incurred and requests payment for a net Lodestar Calculation of $11,059.50 in connection with the Litigation matter.

## I.     Meeting of Creditors

80.     The Firm engaged in communications with the U.S. Trustee's office, and was responsive to each and every request for information including proof of insurance, tax returns and other requested documents.  Throughout the tenure of the case, the Firm has been promptly responsive to each and every request of the U.S. Trustee's counsel and the Subchapter V Trustee, including regarding background information about the Debtor and its operation, first day pleadings, alleged improper transactions, and notably the significant avoidable recoveries.

81.     The Firm attended the section 341 meeting with the principal of the Debtor (telephonically).  Thereafter, the Firm provided the U.S. Trustee's office with additional information from the Debtor.  The Firm also engaged in communications with the Debtor regarding preparation for the meetings with the U.S. Trustee's office, and explanations as to the process and requests for documents.

82.     As noted on Exhibit D-9, the Firm incurred and requests payment for a net Lodestar Calculation of $5,109.00 in connection with the Meeting of Creditors matter.

**J.      Chapter 11 Plan**

83.      On May 4, 2022, the Debtor filed the Section 1188(c) Status Conference Report with the Bankruptcy Court [Doc No. 72] (the "**Status Report**"); the telephonic status conference was held on May 18, 2022.

84.      On June 24, 2022 the Debtor filed a Chapter 11 Plan of Reorganization for Small Business Debtor Under Subchapter V [Doc. No. 106], with the First Amended Chapter 11 Plan of Reorganization For Small Business Debtor Under Subchapter V filed on July 1, 2022 [Doc. No. 113] (the "**Initial Plan**").

85.      On April 2, 2023, the Debtor filed a Second Amended Chapter 11 Plan For Small Business Debtor Under Subchapter V [Doc. No. 279] (the "**Second Plan**").  On April 3, 2023, the Debtor also filed a Motion for Order (I) Approving Form and Content of Plan Filing Notice; (II) Fixing the Voting and Objection Deadlines; and (III) Scheduling the Plan Confirmation Hearing [Doc. No. 285] (the "**Plan Filing Motion**").

86.      After hearing on April 13, 2023 on the Plan Filing Motion, the Court ordered the Debtor to file an amended plan on or before April 18, 2023.  The Debtor filed a Third Amended Chapter 11 Plan for Small Business Debtor Under Subchapter V (Liquidating Plan) on April 14, 2023 [Doc. No. 309] (the "**Third Plan**").  Thereafter, on April 18, 2023, the Court scheduled the confirmation hearing on the Third Plan for May 25, 2023 [Doc. No. 329].

87.      The Third Plan (as was the Second Plan) incorporate the approved going concern sale of the Debtor's assets and efforts to bring that sale to closure, made problematic when FGC and its lender required the purchase of the Real Estate before advancing funds to close on the purchase of the business assets.

88.     The services rendered in this category include preparation of the Status Report, preparation of the Chapter 11 plans, plan amendments, several plan exhibits, the Plan Filing Motion and related pleadings, and review of various due diligence documents with respect to preparation of the proposed plans.  The services also include numerous communications with the Debtor regarding background information, the chapter 11 plan process, and issues related to confirmable Chapter 11 plans.  The Firm also worked with the Debtor for the preparation of the budgets and projections that were necessary for the Initial Plan at the time and a determination of disposable income for the Initial Plan.

89.     The Firm engaged in communications with the U.S. Trustee's office, and the Subchapter V Trustee regarding the proposed Chapter 11 plans, and related concerns, such as financial feasibility.  The Firm was also responsive to inquiries from creditors regarding treatment of claims under the Debtor's proposed plans.

90.     In addition, the Firm attended to legal research and review of documents regarding plan confirmation issues, including third party release in relation to potential insider plan contribution for the Initial Plan.

91.     The essence of delays associated with the Second Plan and the Third Plan becoming feasible was the impediments to the sale between FGC and its own lender and exchanges it had necessitated which had been acceptable to Avidia Bank but became impeded through no fault of the Debtor and the Firm.  In fact, the Firm and the Subchapter V Trustee, whose interests were aligned, provided ample means to facilitate a sale but such strong recommendations of the Firm and the Subchapter V Trustee were ignored.

92.     As noted on Exhibit D-10, the Firm incurred and requests payment for a net Lodestar Calculation of $112,310.50 in connection with the Chapter 11 Plan matters.

**K.     Sanctions - Brickstone**

93.     Brickstone Group LLC ("**Brickstone**") is one of the pre-petition cash money lenders. On July 26, 2022, the Debtor's two DIP accounts with Chase Bank were placed on hold by Brickstone for collection of a purported pre-petition claim.

94.     On July 28, 2022, the Debtor filed a Motion for an Order Against Brickstone Group LLC for Willful Violation of the Automatic Stay by Placing Post-petition Lien on DIP Account [Doc. No. 146] (the "**Brickstone Stay Violation Motion**").  The Debtor maintained that Brickstone's actions to place a hold on all of the Debtor's bankruptcy accounts for collection of a pre-petition claim was a stay violation, as (1) Brickstone having actual written notice of the Debtor's bankruptcy filing, and (2) Brickstone had not had a filed proof of claim in the case at the time.  On August 8, 2022, the Brickstone Stay Violation Motion was granted in part as set forth therein [Doc. No. 153]

95.     After the initial hearing on the Brickstone Stay Violation Motion, as requested by the Court, on September 15, 2022, the Debtor's counsel filed an affidavit regarding damages caused by Brickstone's violation of the automatic stay by liening the Debtor's DIP account [Doc. No. 173].

96.     On January 19, 2023, the Court granted the Brickstone Stay Violation Motion, and further ordered the Subchapter V Trustee to file an affidavit in support of his request on or before February 2, 2023 [Doc. No. 249].

97.    Pursuant to the February 2, 2023 Affidavit [Doc. No. 254], the Subchapter V Trustee requested legal expenses in the amount of $2,185.00 related to the Brickstone Stay Violation Motion (for period July 27, 2022 to September 15 2022).

98.    On February 2, 2022, the Court entered an Order awarding damages as sanctions for the stay violation in favor of the Debtor against Brickstone in the total amount of $21,625.90, which included legal fees to the Firm and Subchapter V Trustee [Doc. No. 255] (the "**Sanction Award Amount**").

99.    The services rendered in this category relate to the Brickstone Stay Violation Motion not included in the Sanction Award Amount.

100.    As noted on Exhibit D-11, in addition to the Sanction Award Amount, the Firm incurred and requests payment Lodestar Calculation of $4,954.50 in connection with the Sanctions- Brickstone matters.

**L.    Subchapter V Trustee Investigation**

101.    On August 5, 2022, the U.S. Trustee's office filed a motion for entry of an order (i) directing the Subchapter V Trustee to conduct an investigation and file a report, and (ii) directing the Debtor to cooperate with the investigation [Doc. No. 156] (the "**Investigation Motion**").  The Debtor filed a response to the Investigation Motion on September 15, 2022. [Doc. No. 172].  The Court granted the Investigation Motion on September 29, 2022 [ Doc. No. 185].

102.    The Subchapter V Trustee filed the report on November 4, 2022 [Doc. No. 203] (the "**Investigation Report**").  As stated in the Investigation Report, the Subchapter V Trustee commenced review of many documents, including but not limited to the following: the Debtor's

schedules and statement of financial affairs; pre- and post-petition accounts of the Debtor; pre- and post-petition accounts of US Construction, invoices from US Construction to the Debtor; documentation concerning various "hard money" lenders; loan documents and Debtor records concerning transactions with John Testa and Kitchen Concepts, Inc.; documents regarding Top Paving, Inc.; documents regarding amounts owed by 347 Middlesex Road Realty Trust to the Debtor; and various other documents.

103.     This category includes various communications with the Debtor about concerns raised in the Investigation Motion, explanations for the allegations in the Investigation Motion, and document requests from the Subchapter V Trustee.  The Firm has been responsive to the requests of the Subchapter V Trustee and the U.S. Trustee's office regarding the Investigation Motion.

104.     The Firm established an online data room to streamline the document requests and the responsive documents from the Debtor, with access to the Subchapter V Trustee and the U.S. Trustee's counsel, to facilitate the investigation.  The Firm downloaded numerous documents from the Debtor to the data room.

105.     As noted on Exhibit D-12, the Firm incurred and requests payment for a net Lodestar Calculation of $27,562.50 in connection with the Subchapter V Trustee Investigation matter.

**M.     Employment Applications and Objections**

106.     On March 29, 2022, the Debtor filed the Employment Application which was approved by the Court.  This category includes communications with the Debtor and review of documents related to the Employment Application.

107.     During the Application Period, there is no fees and expenses in this Employment Applications and Objections category after No Charge Time in the amount of $1,906.50.

**N.     Fee Application**

108.     The requirements for preparation and submission to the Court of any application for compensation is mandated by the Bankruptcy Court and the local rules.  The Firm would be remiss in not carefully preparing such application in accordance with all relevant standards.  The time incurred in reviewing and categorizing all time entries, calculating the amount of time incurred by each attorney and paralegal within each category of services, qualifying the Lodestar Calculation, preparing exhibits, and drafting narrative of services in categories merit consideration for compensation.

109.     As noted on Exhibit D-13, the Firm incurred and requests payment for a net Lodestar Calculation of $8,629.50 in connection with the Fee Application matter.

**O.** **Recovery Actions**

110.　The Firm reviewed documents and engaged in extensive communications with the Subchapter V Trustee regarding potential recovery actions, including with respect to pre-petition payments the Firm deemed as avoidable.  Those actions were an integral part of the Chapter 11 plans filed. The information was conveyed to and discussed with the Subchapter V Trustee who requested the Firm review demand letters and information regarding certain entities for conducting Section 2004 Examinations.

111.　During the Application Period, there is no fees and expenses in this Recovery Actions category after No Charge Time in the amount of $1,423.50.

## IV.　EXPENSE REIMBURSEMENT

112.　Below is a summary of all unpaid expenses and disbursements which were incurred by or on behalf of the Firm during the Application Period.

| | |
|---|---|
| Photocopies Internal | $11,388.20 |
| Travel Expenses | $68.00 |
| Automobile (Mileage) | $245.74 |
| Parking – Other | $30.00 |
| Federal Express, etc. | $44.86 |
| Postage | $1,990.12 |
| Clerical Overtime | (Not Charged- $3,115.58) |
| Pacer Service Center | $552.00 |
| LexisNexis | $322.84 |
| UCC Search Service | $93.75 |
| Conference Call | $217.88 |
| Courier | $33.80 |
| Legal Advertisement | $508.01 |
| Filing Fees | $1,926.00 |
| Certificate of Good Standing | $12.00 |
| **TOTAL** | **$17,433.20** |

## V.　STATEMENT SEEKING COMPENSATION

113. Pursuant to 11 U.S.C. § 330, the Firm is entitled to "reasonable compensation for actual, necessary services" and "reimbursement for actual, necessary expenses." 11 U.S.C. § 330.

114. No agreement or understanding exists between the Firm and any other person for the sharing of compensation which may be received pursuant to this application except among the partners of the Firm.

115. The compensation requested by the Law Firm is reasonable compensation for the actual and necessary legal services rendered by the Firm, based upon the time, nature, extent and value of the services rendered in this case. The Firm further submits that the cost of services rendered for and on behalf of the Debtor's Estate in this case is comparable to the cost of similar services in legal matters other than those under the Bankruptcy Code.

116. The Firm respectfully submits that the fees and expense reimbursement sought herein are reasonable and were necessary given the nature, extent and value of the services rendered, the quality and skill which the situation required, the costs of comparable services in other cases under Chapter 11, and that the time has been fairly and properly expended. In addition, the Firm has agreed to considerable concessions, including the fee discounts and No Charge Time discussed herein.

117. The Firm expended and requests payment for services provided to the Debtor and the Estate through June 29, 2023 (the date the case was converted to Chapter 7), at a net Lodestar Calculation of $580,430.50. As noted, time designated in the statement of services (Exhibit B) as "no-charge time" was for services performed and time recorded, but not billed to the Estate or considered a voluntary discount.

118. Based on the hourly charges of the Firm set forth above, after taken into account the No Charge Time and discount, the Firm requests that the Court (i) approve allowance of the Fee Amount and the Expenses, and (ii) authorize payment of the Total Fee Amount.

119. A copy of the Application will be sent to the Debtor, and all parties receiving electronic filing notice in this case, including the Trustee. Notice of any hearing or objection deadline on the Application and amounts requested will be served on all creditors and other parties in interest as provided under Bankruptcy Rule 2002 (with copy of the Application to be made available upon request).

WHEREFORE, the Firm respectfully requests that this Court enter an Order as follows: (i) allowing the Fee Amount and the Expenses, (ii) authorizing payment of the Total Fee Amount as set forth herein, including payment from the Retainer, sale proceeds carve-out, and forfeited deposits, if warranted; and the balance to be paid from additional sales and recoveries of the Estate, (iii) reserving the Firm's right to seek the balance of fees incurred after June 29, 2023, including for preparation of the fee application, and (iv) granting such other and additional relief as the Court deems just and proper.

Respectfully submitted this 7th day of September, 2023.

<div style="margin-left:50%">

ALAN L. BRAUNSTEIN AND THE FIRM
OF RIEMER & BRAUNSTEIN LLP,


*/s/ Alan L. Braunstein*
Alan L. Braunstein (BBO #546042)
Macken Toussaint (BBO #645076)
Riemer & Braunstein LLP
100 Cambridge Street, 22nd Floor
Boston, MA  02114
Tel: (617) 523-9000
Fax: (617) 880-3456
abraunstein@riemerlaw.com
mtoussaint@riemerlaw.com

</div>

**EXHIBIT A-1**

# EXHIBIT A-2

**EXHIBIT B**

# **EXHIBIT C**

3707485.9