B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br><br>Steven Weiss, Chapter 7 Trustee | DEFENDANTS<br><br>AJ Equity Group, LLC |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Mark J. Esposito, Esquire<br>Shatz Schwartz and Fentin, P.C.<br>1441 Main Street, Suite 1100<br>Springfield, MA 01103    Phone (413) 737-1131 | **ATTORNEYS** (If Known) |
| **PARTY** (Check One Box Only)<br>□ Debtor      □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor    □ Other<br>☒ Trustee | **PARTY** (Check One Box Only)<br>□ Debtor      □ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor<br>□ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

This is an adversary proceeding seeking to recover preferential transfers made by the Debtor, Top Line Granite Design, Inc. ("Top Line"), to AJ Equity Group, LLC ("AJEG") pursuant to 11 U.S.C. §§ 547, 550. Further, the interest rate charged on the loan AJEG made to Top Line exceeded the amount allowed by Massachusetts law, and making loans at rates in violation of Massachusetts law constitutes a violation of General Laws Chapter 93A, § 2. Accordingly, the Trustee requests entry of judgment for the damages arising from such violations, plus multiple damages and attorney's fees incurred in connection with this matter.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

| FRBP 7001(1) – Recovery of Money/Property | FRBP 7001(6) – Dischargeability (continued) |
|---|---|
| □ 11-Recovery of money/property - §542 turnover of property | □ 61-Dischargeability - §523(a)(5), domestic support |
| ☒ 12-Recovery of money/property - §547 preference | □ 68-Dischargeability - §523(a)(6), willful and malicious injury |
| □ 13-Recovery of money/property - §548 fraudulent transfer | □ 63-Dischargeability - §523(a)(8), student loan |
| □ 14-Recovery of money/property - other | □ 64-Dischargeability - §523(a)(15), divorce or separation obligation |
| | (other than domestic support) |
| **FRBP 7001(2) – Validity, Priority or Extent of Lien** | □ 65-Dischargeability - other |
| □ 21-Validity, priority or extent of lien or other interest in property | |
| | **FRBP 7001(7) – Injunctive Relief** |
| **FRBP 7001(3) – Approval of Sale of Property** | □ 71-Injunctive relief – imposition of stay |
| □ 31-Approval of sale of property of estate and of a co-owner - §363(h) | □ 72-Injunctive relief – other |
| | |
| **FRBP 7001(4) – Objection/Revocation of Discharge** | **FRBP 7001(8) Subordination of Claim or Interest** |
| □ 41-Objection / revocation of discharge - §727(c),(d),(e) | □ 81-Subordination of claim or interest |
| | |
| **FRBP 7001(5) – Revocation of Confirmation** | **FRBP 7001(9) Declaratory Judgment** |
| □ 51-Revocation of confirmation | □ 91-Declaratory judgment |
| | |
| **FRBP 7001(6) – Dischargeability** | **FRBP 7001(10) Determination of Removed Action** |
| □ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims | □ 01-Determination of removed claim or cause |
| □ 62-Dischargeability - §523(a)(2), false pretenses, false representation, | |
| actual fraud | **Other** |
| □ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny | □ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.* |
| **(continued next column)** | ☒ 02-Other (e.g. other actions that would have been brought in state court |
| | if unrelated to bankruptcy case) |

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand $ 106,126.90 |
| Other Relief Sought | |

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Top Line Granite Design, Inc. | BANKRUPTCY CASE NO.<br>22-40216 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central Division | DIVISION OFFICE<br>Worcester | NAME OF JUDGE<br>Elizabeth D. Katz |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>12/19/23 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>STEVEN WEISS | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

|  |  |  |
|---|---|---|
| In re | ) | |
| | ) | Chapter 7 |
| TOP LINE GRANITE DESIGN, INC., | ) | Case No. 22-40216-EDK |
| Debtor | ) | |
| | ) | |
| STEVEN WEISS, Chapter 7 Trustee, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. 23-_____ |
| | ) | |
| AJ EQUITY GROUP, LLC, | ) | |
| Defendant | ) | |
| | ) | |

## COMPLAINT

### Introduction

1.      This is an adversary proceeding brought by Steven Weiss, Chapter 7 Trustee (the "Trustee") seeking to recover preferential transfers made by the Debtor, Top Line Granite Design, Inc. ("Top Line"), to AJ Equity Group, LLC ("AJEG") pursuant to 11 U.S.C. §§ 547, 550. Further, the interest rate charged on the loan AJEG made to Top Line exceeded the amount allowed by Massachusetts law, and making loans at rates in violation of Massachusetts law constitutes a violation of General Laws Chapter 93A, § 2. Accordingly, the Trustee requests entry of judgment for the damages arising from such violations, plus multiple damages and attorney's fees incurred in connection with this matter.

### Parties

2.      The Trustee is an individual practicing law with Shatz, Schwartz and Fentin, P.C., with a business address of 1441 Main Street, Suite 1100, Springfield, Massachusetts, 01103.

3.     The Defendant, AJEG, is a limited liability company organized under the laws of the State of New York with a business address of 1648 61st Street, Brooklyn, New York, 11204.

### Jurisdiction and Venue

4.     This Court has jurisdiction over the core proceeding set forth in Count I pursuant to 28 U.S.C. § 157(b)(2)(F).

5.     This Court has jurisdiction over the non-core proceeding set forth in Count II pursuant to 28 U.S.C. § 1334(b).

6.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408-1409.

7.     AJEG filed a claim against the bankruptcy estate of Top Line. [Claim No. 2]

8.     In filing a claim against the bankruptcy estate, AJEG submitted itself to the jurisdiction of this Court. *Langenkamp v. Culp*, 498 U.S. 42, 44 (1990), *citing Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58-59 & n.14 (1989).

### Facts

9.     Top Line borrowed money from several so-called merchant cash advance lenders ("MCAs") such as AJEG to fund its ongoing operations.

10.     At all times relevant herein, Top Line was insolvent.

11.     On January 18, 2022, Top Line and AJEG entered into a so-called Standard Merchant Cash Advance Agreement (the "Agreement"). A true copy of the Agreement is attached hereto as Exhibit A.

12.     While the Agreement purports to be one by which AJEG purchased a portion of Top Line's accounts receivable, in purpose and effect it in fact constituted a loan from AJEG to Top Line. AJEG's proof of claim reflects that its claim against Top Line is unsecured. [Claim No.2]

13.     Under the Agreement, Top Line was to receive from AJEG Ninety-Four Thousand, Nine Hundred Fifty Dollars ($94,950) (the "Loan Amount"), and pay to AJEG One Hundred Forty-Two Thousand, Five Hundred Dollars ($142,500) (the "Repayment Amount"), in the form of daily payments each business day in the amount of Two Thousand, Five Hundred Ninety and 90/100 Dollars ($2590.90) (the "Daily Payments").

14.     While under the Agreement the "Purchase Price" to be paid to Top Line is listed as One Hundred Thousand Dollars ($100,000), the actual amount to be remitted to Top Line was reduced to the Loan Amount when net of fees imposed by AJEG.

15.     The Repayment Amount equaled the sum of fifty-five (55) Daily Payments.

16.     As set forth on Top Line's amended statement of financial affairs [Doc 51], during the ninety (90) days before and including the Petition Date of March 25, 2022 (the "Preference Period"), Top Line transferred a total of One Hundred Six Thousand, One Hundred Twenty-Six and 90/100 Dollars ($106,126.90) to AJEG in the form of forty-one (41) Daily Payments.[1] A summary of such payments is attached hereto as Exhibit B.[2]

17.     Thus, during the Preference Period, Top Line made transfers of an interest of Top Line's Property to or for the benefit of AJEG of One Hundred Six Thousand, One Hundred Ninety Dollars ($106,190.90) (the "Transfers").

18.     On June 12, 2023, the Trustee served on AJEG a letter demanding repayment of the Transfers into Top Line's bankruptcy estate (the "Demand Letter"). A true copy of that letter is attached hereto as Exhibit C. AJEG has not responded to the Demand Letter.

---

[1] For reasons unknown to the Trustee, the first payment made from Top Line to AJEG was actually for Two Thousand, Four Hundred Ninety and 90/100 Dollars ($2,490.90), One Hundred Dollars ($100) less than the Daily Payment amount set forth in the Agreement. For simplicity's sake, this payment is referred to herein as a Daily Payment.
[2] Top Line paid to AJEG three (3) Daily Payments on March 4, 2022. Top Line paid to AJEG two (2) Daily Payments on each of March 16, March 17, March 18, March 21, and March 22, 2022.

## COUNT I – AVOIDANCE OF PREFERENTIAL TRANSFERS

19. The facts set forth above are incorporated as if fully set forth herein.

20. The Transfers were made to AJEG, a creditor of Top Line.

21. The Transfers were made on account of antecedent debt owed by Top Line to AJEG.

22. At the time of the Transfers, Top Line was insolvent.

23. The Transfers were made within the Preference Period.

24. If not voided, the Transfers will enable AJEG to receive more than it would in a distribution under Chapter 7 if such transfer had not been made.

25. The Trustee therefore states that the Transfers constitute preferential transfers which may be voided pursuant to 11 U.S.C. § 547(b).

## COUNT II -- VIOLATION OF G.L. c. 93A

26. The facts set forth above are incorporated as if fully set forth herein.

27. Under the Massachusetts usury statute, no person may charge an interest rate exceeding twenty percent (20%) unless the lender provides prior written notice to the Attorney General of the Commonwealth of Massachusetts (the "Attorney General") of his, her, or its intent to make a loan in excess of such rate. G.L. c. 271, § 49 (the "Usury Statute").

28. For purposes of the Usury Statute, interest includes commissions and other charges assessed by the lender.

29. By its own terms, violation of the Usury Statute constitutes a criminal offense.

30. Effectively, the Agreement was a disguised loan charging fifty percent (50%) interest over an expected repayment period of approximately three months, roughly equivalent to annualized interest of two hundred percent (200%).

31.     Upon information and belief, at no time did AJEG notify the Attorney General of its intent to make a loan with an interest rate exceeding twenty percent (20%).

32.     Willfully extending a usurious loan *per se* constitutes an unfair business practice within the meaning of G.L. c. 93A, § 2.

33.     Top Line was damaged by being forced to repay a usurious loan.

34.     The Demand Letter constituted a written demand for relief within the meaning of G.L. c. 93A, § 9(3), although such demand was not required pursuant to G.L. c. 93A, § 11.

35.     AJEG is liable to Top Line's bankruptcy estate for treble damages and attorney's fees and costs.

WHEREFORE, the Trustee respectfully requests that this Honorable Court:

1.     On Count I, enter an order determining that the Transfers from Top Line to AJEG constitute preferential transfers pursuant to 11 U.S.C. § 547(b), and enter judgment against AJEG in the amount of One Hundred Six Thousand, One Hundred Twenty-Six and 90/100 Dollars ($106,126.90) plus interest and costs.

2.     On Count II, enter an order determining that AJEG's enforcement of the terms of a usurious loan constituted an unfair business practice pursuant to G.L. c. 93A, § 2, enter judgment against AJEG in the amount of One Hundred Six Thousand, One Hundred Twenty-Six and 90/100 Dollars ($106,126.90) plus interest, treble the award of damages, and award to the bankruptcy estate the Trustee's attorney's fees and costs pursuant to G.L. c. 93A, § 11.

Respectfully submitted,
For the Plaintiff,
STEVEN WEISS, TRUSTEE,
By his attorneys,

Steven Weiss, BBO # 545619
Mark J. Esposito, BBO # 672638
Shatz, Schwartz and Fentin, P.C.
1441 Main Street, Suite 1100
Springfield, MA 01103
(413) 737-1131
(413) 736-0375 (f)
sweiss@ssfpc.com
mesposito@ssfpc.com

Dated: December 18, 2023

22\0137\Avoidance Claims\Complaint - AJ Equity





## AJ EQUITY GROUP LLC
1648 61st Street, Brooklyn, NY 11204
(212) 645-1835

# STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Agreement dated 01/18/2022 by and between AJ EQUITY GROUP LLC ("AJ") and each merchant listed below ("Merchant").

Merchant's Legal Name: **TOP LINE GRANITE DESIGN INC / US CONSTRUCTION AND MAINTENANCE LLC.**
D/B/A/: **Same,**        Fed ID #: ▓▓▓▓
Type of Entity:
**V** Corporation **V** Limited Liability Company __ Limited Partnership __ Limited Liability Partnership __ Sole Proprietor
Business Address: **347 Middlesex Rd.**        City: **Tyngsborough,**        State: **MA**        Zip: **01879**
Contact Address: **290 Massapoag Rd.**        City: **Tyngsborough,**        State: **MA**        Zip: **01879**
E-mail Address: _____        Phone Number: _____

| | |
|---|---|
| **Purchase Price**<br>*This is the amount being paid to Merchant(s) for the Receivables Purchased Amount (defined below).* | $100,000 |
| **Receivables Purchased Amount**<br>*This is the amount of Receivables (defined in Section 1 below) being sold.* | $142,500 |
| **Specified Percentage**<br>*This is the percentage of Receivables (defined below) to be delivered until the Receivables Purchased Amount is paid in full.* | 10% |
| **Net Funds Provided**<br>*This is the net amount being paid to or on behalf of Merchant(s) after deduction of applicable fees listed in Section 2 below.* | $94,950 |
| **Net Amount to Be Received Directly by Merchant(s)**<br>*This is the net amount being received directly by Merchant(s) after deduction of applicable fees listed in Section 2 below and the payment of any part of the Purchase Price elsewhere pursuant to an Addendum to this Agreement.* | $94,950 |
| **Initial Estimated Payment**<br>*This is only applicable if an Addendum for Estimated Payments is being signed. This is the initial amount of periodic payments collected from Merchant(s) as an approximation of no more than the Specified Percentage of the Receivables and is subject to reconciliation as set forth in Section 4 below.* | $2,590.90<br><br>Per day |

## TERMS AND CONDITIONS

**1. Sale of Future Receipts.** Merchant(s) hereby sell, assign, and transfer to AJ (making AJ the absolute owner) in consideration of the funds provided ("Purchase Price") specified above, all of each Merchant's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card, electronic transfer,

I have read and agree to the terms and conditions set forth above:

_____

Name: **EDMILSON RAMOS** Title: **OWNER** Date: **01/18/2022**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

or other form of monetary payment in the ordinary course of each merchant's business), for the payment of each Merchant's sale of goods or services until the amount specified above (the "Receivables Purchased Amount") has been delivered by Merchant(s) to AJ. Each Merchant hereby acknowledges that until the Receivables Purchased Amount has been received in full by AJ, each Merchant's Receivables, up to the balance of the Receivables Purchased Amount, are the property of AJ and not the property of any Merchant. Each Merchant agrees that it is a fiduciary for AJ and that each Merchant will hold Receivables in trust for AJ in its capacity as a fiduciary for AJ.

The Receivables Purchased Amount shall be paid to AJ by each Merchant irrevocably authorizing only one depositing account acceptable to AJ (the "Account") to remit the percentage specified above (the "Specified Percentage") of each Merchant's settlement amounts due from each transaction, until such time as AJ receives payment in full of the Receivables Purchased Amount. Each Merchant hereby authorizes AJ to ACH debit the specified remittances from the Account on a daily basis as of the next business day after the date of this Agreement and will provide AJ with all required access codes and monthly bank statements. Each Merchant understands that it will be held responsible for any fees resulting from a rejected ACH attempt or an Event of Default (see Section 2). AJ is not responsible for any overdrafts or rejected transactions that may result from AJ's ACH debiting the Specified Percentage amounts under the terms of this Agreement.

**2. Additional Fees.** In addition to the Receivables Purchased Amount, each Merchant will be held responsible to AJ for the following fees, where applicable:

A. **5%** - to cover underwriting and the ACH debit program, as well as related expenses. This will be deducted from payment of the Purchase Price.

B. Wire Fee - Merchant(s) shall receive funding electronically to the Account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH. This will be deducted from payment of the Purchase Price.

C. Blocked Account/Default - $2,500.00 - If AJ considers an Event of Default to have taken place under Section 34.

D. UCC Fee - $195.00 – to cover AJ filing a UCC-1 financing statement to secure its interest in the Receivables Purchased Amount. A $195.00 UCC termination fee will be charged if a UCC filing is terminated.

E. Court costs, arbitration fees, collection agency fees, attorney fees, expert fees, and any other expenses incurred in litigation, arbitration, or the enforcement of any of AJ's legal or contractual rights against each Merchant and/or each Guarantor, if required, as explained in other Sections of this Agreement.

**3. Cap on Collection of the Receivables Purchased Amount.** The amount that AJ will collect from Merchant(s) towards the Receivables Purchased Amount during any specific **day** will be capped at **$2,590.90** (the "Cap"). If the Specified Percentage of all Receivables for a specific **day** is less than the Cap, then in addition to the Specified Percentage of Receivables for that **day**, AJ will be permitted to collect any Receivables it did not previously collect due to the Cap such that the total amount collected during that **day** does not exceed the Cap. The Cap is not applicable to make up for a business day on which AJ is closed and does not ACH debit the Account, to subsequent attempts to collect a rejected or blocked ACH payment, or for the collection of any of the fees listed in Section 2 or if any Event of Default listed in Section 34 is considered by AJ to have taken place.

**4. Reconciliations.** Any Merchant may give written notice to AJ requesting that AJ conduct a reconciliation in order to ensure that the amount that AJ has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A reconciliation may also be requested by e-mail to joshua@ajequity.com and such notice will be deemed to have been received if and when AJ sends a reply e-mail (but not a read receipt). If such reconciliation determines that AJ collected more than it was entitled to, then AJ will credit to the Account all amounts to which AJ was not entitled within seven days thereafter. If such reconciliation determines that AJ collected less than it was entitled to, then AJ will debit from the Account all additional amounts to which AJ was entitled within seven days thereafter. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. AJ will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

**5. Prepayments.** Although there is no obligation to do so, any Merchant may prepay any amount towards the Receivables Purchased Amount. There will be no penalty for any prepayment made by any Merchant. Any Merchant may

I have read and agree to the terms and conditions set forth above:

Name: **EDMILSON RAMOS** Title: **OWNER** Date: **01/18/2022**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

elect to terminate this Agreement by prepaying AJ the amount of the balance of the Receivables Purchased Amount at that time.

**6. Merchant Deposit Agreement.** Merchant(s) shall appoint a bank acceptable to AJ, to obtain electronic fund transfer services and/or "ACH" payments. Merchant(s) shall provide AJ and/or its authorized agent with all of the information, authorizations, and passwords necessary to verify each Merchant's Receivables. Merchant(s) shall authorize AJ and/or its agent(s) to deduct the amounts owed to AJ for the Receivables as specified herein from settlement amounts which would otherwise be due to each Merchant and to pay such amounts to AJ by permitting AJ to withdraw the Specified Percentage by ACH debiting of the account. The authorization shall be irrevocable absent AJ's written consent.

**7. Term of Agreement.** The term of this Agreement is indefinite and shall continue until AJ receives the full Receivables Purchased Amount, or earlier if terminated pursuant to any provision of this Agreement. The provisions of Sections 4, 6, 7, 8, 10, 11, 13, 14, 15, 17, 18, 19, 22, 23, 28, 31, 32, 33, 34, 35, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, and 58 shall survive any termination of this Agreement.

**8. Ordinary Course of Business.** Each Merchant acknowledges that it is entering into this Agreement in the ordinary course of its business and that the payments to be made from each Merchant to AJ under this Agreement are being made in the ordinary course of each Merchant's business.

**9. Financial Condition.** Each Merchant and each Guarantor (Guarantor being defined as each signatory to the Guarantee of this Agreement) authorizes AJ and its agent(s) to investigate each Merchant's financial responsibility and history, and will provide to AJ any bank or financial statements, tax returns, and other documents and records, as AJ deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. AJ is authorized to update such information and financial profiles from time to time as it deems appropriate.

**10. Monitoring, Recording, and Electronic Communications.** AJ may choose to monitor and/or record telephone calls with any Merchant and its owners, employees, and agents. By signing this Agreement, each Merchant agrees that any call between AJ and any Merchant or its representatives may be monitored and/or recorded. Each Merchant and each Guarantor grants access for AJ to enter any Merchant's premises and to observe any Merchant's premises without any prior notice to any Merchant at any time after execution of this Agreement.

AJ may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Merchant(s), Owner(s) (Owner being defined as each person who signs this Agreement on behalf of a Merchant), and Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Merchant, each Owner, and each Guarantor gives AJ permission to call or send a text message to any telephone number given to AJ in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Merchant, each Owner, and each Guarantor also gives AJ permission to communicate such information to them by e-mail. Each Merchant, each Owner, and each Guarantor agree that AJ will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Merchant, each Owner, and each Guarantor acknowledge that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that AJ has no liability for any such charges.

**11. Accuracy of Information Furnished by Merchant and Investigation Thereof.** To the extent set forth herein, each of the parties is obligated upon his, her, or its execution of the Agreement to all terms of the Agreement. Each Merchant and each Owner signing this Agreement represent that he or she is authorized to sign this Agreement for each Merchant, legally binding said Merchant to its obligations under this Agreement and that the information provided herein and in all of AJ's documents, forms, and recorded interview(s) is true, accurate, and complete in all respects. AJ may produce a monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant(s) to AJ. An investigative report may be made in connection with the Agreement. Each Merchant and each Owner signing this Agreement authorize AJ, its agents and representatives, and any credit-reporting agency engaged by AJ, to (i) investigate any references given or any

I have read and agree to the terms and conditions set forth above:

Name: EDMILSON RAMOS Title: **OWNER** Date: **01/18/2022**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

other statements obtained from or about each Merchant or any of its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as any Merchant and/or Owners(s) continue to have any obligation to AJ under this Agreement or for AJ's ability to determine any Merchant's eligibility to enter into any future agreement with AJ. Any misrepresentation made by any Merchant or Owner in connection with this Agreement may constitute a separate claim for fraud or intentional misrepresentation.

*Authorization for soft pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to AJ under the Fair Credit Reporting Act, authorizing AJ to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes AJ to obtain such information solely to conduct a pre-qualification for credit.

*Authorization for hard pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to AJ under the Fair Credit Reporting Act, authorizing AJ to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes AJ to obtain such information in accordance with a merchant cash advance application.

**12. Transactional History.** Each Merchant authorizes its bank to provide AJ with its banking and/or credit card processing history.

**13. Indemnification.** Each Merchant and each Guarantor jointly and severally indemnify and hold harmless each Merchant's credit card and check processors (collectively, "Processor") and Processor's officers, directors, and shareholders against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by Processor resulting from (a) claims asserted by AJ for monies owed to AJ from any Merchant and (b) actions taken by any Processor in reliance upon information or instructions provided by AJ.

**14. No Liability.** In no event will AJ be liable for any claims asserted by any Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect, or consequential damages, each of which is waived by each Merchant and each Guarantor.

**15. Sale of Receivables.** Each Merchant and AJ agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from AJ to any Merchant. AJ is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in AJ not receiving the Receivables Purchased Amount. Each Merchant agrees that the Purchase Price in exchange for the Receivables pursuant to this Agreement equals the fair market value of such Receivables. AJ has purchased and shall own all the Receivables described in this Agreement up to the full Receivables Purchased Amount as the Receivables are created. Payments made to AJ in respect to the full amount of the Receivables shall be conditioned upon each Merchant's sale of products and services and the payment therefor by each Merchant's customers in the manner provided in this Agreement. Although certain jurisdictions require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, those disclosures do not change the fact that the transaction encompassed by this Agreement is not a loan and does not have an interest rate.

**16. Power of Attorney.** Each Merchant irrevocably appoints AJ as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to AJ, or, if AJ considers an Event of Default to have taken place under Section 34, to settle all obligations due to AJ from each Merchant, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (which is defined in Section 33); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign each Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to AJ; and (v) to file any claims or take any action or institute any proceeding which AJ may deem necessary for the collection of any of the unpaid Receivables Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Receivables Purchased Amount.

**17. Protections Against Default.** The following Protections 1 through 7 may be invoked by AJ, immediately and without notice to any Merchant in the event:

(a) Any Merchant takes any action to discourage the use of methods of payment ordinarily and customarily used by

I have read and agree to the terms and conditions set forth above:

Name: EDMILSON RAMOS Title: **OWNER** Date: **01/18/2022**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

its customers or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks and credit cards for the purchase of any Merchant's services and products;

(b) Any Merchant changes its arrangements with any Processor in any way that is adverse to AJ;

(c) Any Merchant changes any Processor through which the Receivables are settled to another electronic check and/or credit card processor or permits any event to occur that could cause diversion of any Merchant's check and/or credit card transactions to another such processor;

(d) Any Merchant interrupts the operation of its business (other than adverse weather, natural disasters, or acts of God) or transfers, moves, sells, disposes, or otherwise conveys its business or assets without (i) the express prior written consent of AJ and (ii) the written agreement of any purchaser or transferee to the assumption of all of any Merchant's obligations under this Agreement pursuant to documentation satisfactory to AJ; or

(e) Any Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for any Merchant's goods or services with any means other than checks and/or credit cards that are settled through Processor. These protections are in addition to any other remedies available to AJ at law, in equity, or otherwise available pursuant to this Agreement.

(f) AJ considers any Event of Default listed in Section 34 to have taken place.

Protection 1: The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately.

Protection 2. AJ may enforce the provisions of the Guarantee against Guarantor.

Protection 3. AJ may enforce its security interest in the Collateral identified in Section 33.

Protection 4. AJ may proceed to protect and enforce its rights and remedies by litigation or arbitration.

Protection 5. If requested by AJ, Merchant shall deliver to AJ an executed assignment of lease of each Merchant's premises in favor of AJ. Upon breach of any provision in this Section 17, AJ may exercise its rights under such assignment of lease.

Protection 6. AJ may debit any Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on any Merchant's bank account or otherwise, in an amount consistent with the terms of this Agreement.

Protection 7. AJ will have the right, without waiving any of its rights and remedies and without notice to any Merchant and/or Guarantor, to notify each Merchant's credit card and/or check processor of the sale of Receivables hereunder and to direct such credit card processor to make payment to AJ of all or any portion of the amounts received by such credit card processor on behalf of each Merchant. Each Merchant hereby grants to AJ an irrevocable power-of-attorney, which power-of-attorney will be coupled with an interest, and hereby appoints AJ and its representatives as each Merchant's attorney-in-fact to take any and all action necessary to direct such new or additional credit card and/or check processor to make payment to AJ as contemplated by this Section.

18. Protection of Information. Each Merchant and each person signing this Agreement on behalf of each Merchant and/or as Owner, in respect of himself or herself personally, authorizes AJ to disclose information concerning each Merchant, Owner and/or Guarantor's credit standing and business conduct to agents, affiliates, subsidiaries, and credit reporting bureaus. Each Merchant, Guarantor, and Owner hereby waives to the maximum extent permitted by law any claim for damages against AJ or any of its affiliates relating to any (i) investigation undertaken by or on behalf of AJ as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

19. Confidentiality. Each Merchant understands and agrees that the terms and conditions of the products and services offered by AJ, including this Agreement and any other AJ documents (collectively, "Confidential Information") are proprietary and confidential information of AJ. Accordingly, unless disclosure is required by law or court order, Merchant(s) shall not disclose Confidential Information of AJ to any person other than an attorney, accountant, financial advisor, or employee of any Merchant who needs to know such information for the purpose of advising any Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising any Merchant and first agrees in writing to be bound by the terms of this Section 19.

20. D/B/As. Each Merchant hereby acknowledges and agrees that AJ may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between AJ and each Merchant, including the filing of UCC-1 financing statements and other notices or filings.

I have read and agree to the terms and conditions set forth above:

Name: EDMILSON RAMOS Title: OWNER Date: 01/18/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

21. Financial Condition and Financial Information. Each Merchant represents, warrants, and covenants that its bank and financial statements, copies of which have been furnished to AJ, and future statements which will be furnished hereafter at the request of AJ, fairly represent the financial condition of each Merchant at such dates, and that since those dates there have been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of any Merchant. Each Merchant has a continuing affirmative obligation to advise AJ of any material adverse change in its financial condition, operation, or ownership.

22. Governmental Approvals. Each Merchant represents, warrants, and covenants that it is in compliance and shall comply with all laws and has valid permits, authorizations, and licenses to own, operate, and lease its properties and to conduct the business in which it is presently engaged.

23. Authorization. Each Merchant represents, warrants, and covenants that it and each person signing this Agreement on behalf of each Merchant has full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

24. Insurance. Each Merchant represents, warrants, and covenants that within ten days after written notice of a request by AJ, Merchant(s) will maintain business-interruption insurance naming AJ as loss payee and additional insured in amounts and against risks as are satisfactory to AJ and shall provide AJ proof of such insurance upon request.

25. Electronic Check Processing Agreement. Each Merchant represents, warrants, and covenants that it will not, without AJ's prior written consent, change its Processor, add terminals, change its financial institution or bank account, or take any other action that could have any adverse effect upon any Merchant's obligations under this Agreement.

26. Change of Name or Location. Each Merchant represents, warrants, and covenants that it will not conduct its business under any name other than as disclosed to AJ or change any place(s) of its business without prior written consent from AJ.

27. Estoppel Certificate. Each Merchant represents, warrants, and covenants that it will, at any time, and from time to time, upon at least two day's prior notice from AJ to that Merchant, execute, acknowledge, and deliver to AJ and/or to any other person or entity specified by AJ, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Receivables Purchased Amount or any portion thereof have been paid.

28. No Bankruptcy. Each Merchant represents, warrants, and covenants that as of the date of this Agreement, it does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against any Merchant. Each Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. Each Merchant further warrants that there will be no statutory presumption that it would have been insolvent on the date of this Agreement.

29. Unencumbered Receivables. Each Merchant represents, warrants, and covenants that it has good, complete, and marketable title to all Receivables, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with this Agreement or adverse to the interests of AJ, other than any for which AJ has actual or constructive knowledge as of the date of this Agreement.

30. Stacking. Each Merchant represents, warrants, and covenants that it will not enter into with any party other than AJ any arrangement, agreement, or commitment that relates to or involves the Receivables, whether in the form of a purchase of, a loan against, collateral against, or the sale or purchase of credits against Receivables without the prior written consent of AJ.

31. Business Purpose. Each Merchant represents, warrants, and covenants that it is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and each Merchant is entering into this

I have read and agree to the terms and conditions set forth above:

Name: EDMILSON RAMOS Title: OWNER Date: 01/18/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

Agreement for business purposes and not as a consumer for personal, family, or household purposes.

32. Default Under Other Contracts. Each Merchant represents, warrants, and covenants that its execution of and/or performance under this Agreement will not cause or create an event of default by any Merchant under any contract with another person or entity.

33. Security Interest. To secure each Merchant's performance obligations to AJ under this Agreement and any future agreement with AJ, each Merchant hereby grants to AJ a security interest in collateral (the "Collateral"), that is defined as collectively: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by any Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC. The parties acknowledge and agree that any security interest granted to AJ under any other agreement between any Merchant or Guarantor and AJ (the "Cross-Collateral") will secure the obligations hereunder and under this Agreement. Negative Pledge: Each Merchant agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Cross-Collateral, as applicable.

Each Merchant agrees to execute any documents or take any action in connection with this Agreement as AJ deems necessary to perfect or maintain AJ's first priority security interest in the Collateral and the Cross-Collateral, including the execution of any account control agreements. Each Merchant hereby authorizes AJ to file any financing statements deemed necessary by AJ to perfect or maintain AJ's security interest, which financing statements may contain notification that each Merchant has granted a negative pledge to AJ with respect to the Collateral and the Cross-Collateral, and that any subsequent lienor may be tortiously interfering with AJ's rights. Each Merchant shall be liable for and AJ may charge and collect all costs and expenses, including but not limited to attorney fees, which may be incurred by AJ in protecting, preserving, and enforcing AJ's security interest and rights. Each Merchant further acknowledges that AJ may use another legal name and/or D/B/A or an agent when designating the Secured Party when AJ files the above-referenced financing statement(s).

34. Events of Default. An "Event of Default" may be considered to have taken place if any of the following occur:

(1) Any Merchant violates any term or covenant in this Agreement;

(2) Any representation or warranty by any Merchant in any Agreement with AJ that has not been terminated proves to have been incorrect, false, or misleading in any material respect when made;

(3) Any Merchant fails to provide AJ with written notice of any material change in its financial condition, operation, or ownership within seven days thereafter (unless a different notice period is specifically provided for elsewhere in this Agreement;

(4) the sending of notice of termination by any Merchant or Guarantor;

(5) Any Merchant transports, moves, interrupts, suspends, dissolves, or terminates its business intentionally and not in the ordinary course without the prior written consent of AJ other than a bankruptcy filing;

(6) Any Merchant transfers or sells all or substantially all of its assets without the prior written consent of AJ;

(7) Any Merchant makes or sends notice of any intended bulk sale or transfer by any Merchant without the prior written consent of AJ;

(8) Any Merchant uses multiple depository accounts without the prior written consent of AJ;

(9) Any Merchant changes the Account without the prior written consent of AJ;

(10) AJ is not provided with updated login or password information for the Account within one business day after any such change is made by any Merchant;

(11) Any Merchant fails to send bank statements, merchant account statements, or bank login information for the Account within two business days after a written request for same is made by AJ;

(12) Any Merchant performs any act that reduces the value of any Collateral granted under this Agreement;

(13) Any Merchant fails to deposit its Receivables into the Account;

(14) Any Merchant causes any ACH debit to the Account by AJ to be blocked or stopped without providing any advance written notice to AJ, which notice may be given by e-mail to joshua@ajequity.com; or

(15) Any Merchant prevents AJ from collecting any part of the Receivables Purchased Amount;

(16) Any Merchant causes any ACH debit to the Account to be stopped or otherwise returned that would result in an ACH Return Code of R08, R10, or R29 and that Merchant does not within two business days thereafter provide AJ with

I have read and agree to the terms and conditions set forth above:

Name: EDMILSON RAMOS Title: OWNER Date: 01/18/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

written notice thereof explaining why that Merchant caused the ACH debit to be stopped or otherwise returned, which notice may be given by e-mail to joshua@ajequity.com; or

(17) Any Merchant defaults under any of the terms, covenants, and conditions of any other agreement with AJ.

**35. Remedies.** In case any Event of Default occurs and is not waived, AJ may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement, or other provision contained herein, or to enforce the discharge of each Merchant's obligations hereunder, or any other legal or equitable right or remedy. All rights, powers, and remedies of AJ in connection with this Agreement, including each Protection listed in Section 17, may be exercised at any time by AJ after the occurrence of an Event of Default, are cumulative and not exclusive, and will be in addition to any other rights, powers, or remedies provided by law or equity. In case any Event of Default occurs and is not waived, AJ may elect that Merchant(s) be required to pay to AJ 25% of the unpaid balance of the Receivables Purchased Amount as liquidated damages for any reasonable expenses incurred by AJ in connection with recovering the unpaid balance of the Receivables Purchased Amount ("Reasonable Expenses"), AJ will not be required to itemize of prove its Reasonable Expenses, and all Merchant(s) and all Guarantor(s) agree that the Reasonable Expenses bear a reasonable relationship to AJ's actual expenses incurred in connection with recovering the unpaid balance of the Receivables Purchased Amount. In addition to the foregoing, in case any Event of Default occurs and is not waived, AJ will be entitled to the issuance of an injunction, restraining order, or other equitable relief in AJ's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to AJ as a result of the Event of Default, and each Merchant will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without AJ being required to furnish a bond or other undertaking in connection with the application. To the extent applicable, Merchant(s) and Guarantor(s) waive the right to a notice and hearing under Connecticut General Statutes sections 52-278a to 52-278g, inclusive, and consent to the issuance of a writ for a prejudgment remedy without securing a court order.

**36. Required Notifications.** Each Merchant is required to give AJ written notice at least one day prior to any filing under Title 11 of the United States Code. Merchant(s) are required to give AJ at least seven days' written notice prior to the closing of any sale of all or substantially all of any Merchant's assets or stock.

**37. Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of AJ, which consent may be withheld in AJ's sole discretion. AJ may assign, transfer, or sell its rights under this Agreement, including, without limitation, its rights to receive the Receivables Purchased Amount, and its rights under Section 33 of this Agreement, the Guarantee, and any other agreement, instrument, or document executed in connection with the transactions contemplated by this Agreement (a "Related Agreement"), or delegate its duties hereunder or thereunder, either in whole or in part. From and after the effective date of any such assignment or transfer by AJ, whether or not any Merchant has actual notice thereof, this Agreement and each Related Agreement shall be deemed amended and modified (without the need for any further action on the part of any Merchant or AJ) such that the assignee shall be deemed a party to this Agreement and any such Related Agreement and, to the extent provided in the assignment document between AJ and such assignee (the "Assignment Agreement"), have the rights and obligations of AJ under this Agreement and Related Agreements with respect to the portion of the Receivables Purchased Amount set forth in such Assignment Agreement, including but not limited to rights in the Receivables, Collateral and Additional Collateral, the benefit of each Guarantor's guaranty regarding the full and prompt performance of every obligation that is a subject of the Guarantee, AJ's rights under Section 17 of this Agreement (Protections Against Default), and to receive damages from any Merchant following a breach of this Agreement by any Merchant. In connection with such assignment, AJ may disclose all information that AJ has relating to any Merchant or its business. Each Merchant agrees to acknowledge any such assignment in writing upon AJ's request.

**38. Notices.** All notices, requests, consents, demands, and other communications hereunder shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation to the respective parties to this Agreement at their addresses set forth in this Agreement and shall become effective only upon receipt. Written notice may also be given to any Merchant or Guarantor by e-mail to the E-mail Address listed on the first page of this Agreement. Each Merchant must set its spam or junk mail filter to accept e-mails sent by joshua@ajequity.com and its domain. This Section

I have read and agree to the terms and conditions set forth above:

Name: **EDMILSON RAMOS** Title: **OWNER** Date: **01/18/2022**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

is not applicable to service of process or notices in any legal proceedings.

**39. Choice of Law.** Each Merchant acknowledges and agrees that this Agreement was made in the State of New York, that the Purchase Price is being paid by AJ in the State of New York, that the Receivables Purchased Amount is being delivered to AJ in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by this Agreement. This Agreement and the relationship between AJ, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**40. Venue and Forum Selection.** Any litigation relating to this Agreement or involving AJ on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Kings, Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Agreement encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Agreement that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to AJ may be commenced and maintained in any other court of competent jurisdiction.

**41. Jury Waiver.** The parties agree to waive trial by jury in any dispute between them.

**42. Counterclaim Waiver.** In any litigation or arbitration commenced by AJ, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**43. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against AJ within one year of its accrual will be time barred.

**44. Costs.** Each Merchant and each Guarantor must pay all of AJ's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement and the enforcement thereof, including but not limited to collection agency fees, attorney fees, which may include a contingency fee of up to 40% of the amount claimed, expert witness fees, and costs of suit.

**45. Prejudgment and Postjudgment Interest.** If AJ becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then AJ will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**46. Legal Fees.** If AJ prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay AJ's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**47. Class Action Waiver.** AJ, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**48. Arbitration.** Any action or dispute relating to this Agreement or involving AJ on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at

I have read and agree to the terms and conditions set forth above:

Name: **EDMILSON RAMOS** Title: **OWNER** Date: **01/18/2022**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

www.arbitrationservicesinc.com, or by Mediation & Civil Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Merchant and each Guarantor consents to AJ making an application in arbitration, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in AJ's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to AJ as a result of the Event of Default. Each Merchant and each Guarantor irrevocably authorize and direct each of their respective financial institutions and account debtors to comply with any injunction, restraining order, or other equitable relief issued in AJ's favor in arbitration under the terms of this Agreement, will hold harmless and indemnify AJ and its employees, agents, attorneys, members, managers, officers, subsidiaries, affiliate entities, successors, and assigns from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) relating to the making or enforcement of any application for the issuance of an injunction, restraining order, or other equitable relief in AJ's favor to restrain each Merchant's accounts and/or receivables, and will hold harmless and indemnify all financial institutions and account debtors from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) relating to compliance with any injunction, restraining order, or other equitable relief issued in favor of AJ.

Each Merchant acknowledges and agrees that this Agreement is the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under this Agreement will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that this Agreement therefore evidences a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in this Agreement to the contrary, all matters of arbitration relating to this Agreement will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules or the laws of the jurisdiction in which the application is made. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of AJ.

**49. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of this Agreement or any other address(es) provided in writing to AJ by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by AJ demonstrating that AJ was provided with notice of a change in the Contact Address.

**50. Survival of Representation, etc.** All representations, warranties, and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated unless specified otherwise in this Agreement.

**51. Waiver.** No failure on the part of AJ to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**52. Independent Sales Organizations/Brokers.** Each Merchant and each Guarantor acknowledge that it may have been introduced to AJ by or received assistance in entering into this Agreement or its Guarantee from an independent sales organization or broker ("ISO"). Each Merchant and each Guarantor agree that any ISO is separate from and is not an agent or representative of AJ. Each Merchant and each Guarantor acknowledge that AJ is not bound by any promises or agreements made by any ISO that are not contained within this Agreement. Each Merchant and each Guarantor exculpate

I have read and agree to the terms and conditions set forth above:

Name: EDMILSON RAMOS Title: OWNER Date: 01/18/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

from liability and agree to hold harmless and indemnify AJ and its officers, directors, members, shareholders, employees, and agents from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by any Merchant or any Guarantor resulting from any act or omission by any ISO. Each Merchant and each Guarantor acknowledge that any fee that they paid to any ISO for its services is separate and apart from any payment under this Agreement. Each Merchant and each Guarantor acknowledge that AJ does not in any way require the use of an ISO and that any fees charged by any ISO are not required as a condition or incident to this Agreement.

**53. Modifications; Agreements.** No modification, amendment, waiver, or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

**54. Severability.** If any provision of this Agreement is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Agreement is deemed void, all other provisions will remain in effect.

**55. Headings.** Headings of the various articles and/or sections of this Agreement are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**56. Attorney Review.** Each Merchant acknowledges that it has had an opportunity to review this Agreement and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**57. Entire Agreement.** This Agreement, inclusive of all addenda, if any, executed simultaneously herewith constitutes the full understanding of the parties to the transaction herein and may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Agreement and any other document preceding it, this Agreement will govern. This Agreement does not affect any previous agreement between the parties unless such an agreement is specifically referenced herein. This Agreement will not be affected by any subsequent agreement between the parties unless this Agreement is specifically referenced therein. AJ will not be permitted to enforce any of its rights under this Agreement if so expressed by in writing by Gene Rosen's Law Firm.

**58. Counterparts; Fax and Electronic Signatures.** This Agreement may be executed electronically and in counterparts. Facsimile and electronic copies of this Agreement will have the full force and effect of an original.

### SIGNATURE(S) TO FOLLOW ON NEXT PAGE

I have read and agree to the terms and conditions set forth above:

Name: EDMILSON RAMOS Title: OWNER Date: 01/18/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

### EACH UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS AGREEMENT

**FOR THE MERCHANT/OWNER (#1)**

By: <u>EDMILSON RAMOS</u>
    (Print Name)

<u>OWNER</u>
(Print Title)

(Signature)

SS# ▓▓▓▓

Driver License Number ▓▓▓▓

**FOR THE MERCHANT/OWNER (#2)**

By: _____
    (Print Name)

_____
(Print Title)

_____
(Signature)

SS# _____

Driver License Number _____

Approved for AJ EQUITY GROUP LLC by: _____

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

## GUARANTEE

**G1. Personal Guarantee of Performance.** This is a personal guaranty of performance, dated **01/18/2022**, of the Standard Merchant Cash Advance Agreement, dated **01/18/2022** ("Agreement"), inclusive of all addenda, if any, executed simultaneously therewith, by and between AJ EQUITY GROUP LLC ("AJ") and **TOP LINE GRANITE DESIGN INC / US CONSTRUCTION AND MAINTENANCE LLC.** ("Merchant"). Each undersigned Guarantor hereby guarantees each Merchant's performance of all of the representations, warranties, and covenants made by each Merchant to AJ in the Agreement, inclusive of all addenda, if any, executed simultaneously herewith, as the Agreement may be renewed, amended, extended, or otherwise modified (the "Guaranteed Obligations"). Each Guarantor's obligations are due at the time of any breach by any Merchant of any representation, warranty, or covenant made by any Merchant in the Agreement.

**G2. Communications.** AJ may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Guarantor gives AJ permission to call or send a text message to any telephone number given to AJ in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Guarantor also gives AJ permission to communicate such information to them by e-mail. Each Guarantor agrees that AJ will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Guarantor acknowledges that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that AJ has no liability for any such charges.

**G3. Guarantor Waivers.** If AJ considers any Event of Default to have taken place under the Agreement, then AJ may enforce its rights under this Guarantee without first seeking to obtain payment from any Merchant, any other guarantor, or any Collateral, Additional Collateral, or Cross-Collateral AJ may hold pursuant to this Guarantee or any other agreement or guarantee. AJ does not have to notify any Guarantor of any of the following events and Guarantor(s) will not be released from its obligations under this Guarantee even if it is not notified of: (i) any Merchant's failure to pay timely any amount owed under the Agreement; (ii) any adverse change in any Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) AJ's acceptance of the Agreement with any Merchant; and (v) any renewal, extension, or other modification of the Agreement or any Merchant's other obligations to AJ. In addition, AJ may take any of the following actions without releasing any Guarantor from any obligations under this Guarantee: (i) renew, extend, or otherwise modify the Agreement or any Merchant's other obligations to AJ; (ii) if there is more than one Merchant, release a Merchant from its obligations to AJ such that at least one Merchant remains obligated to AJ; (iii) sell, release, impair, waive, or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under the Agreement. Until the Receivables Purchased Amount and each Merchant's other obligations to AJ under the Agreement and this Guarantee are paid in full, each Guarantor shall not seek reimbursement from any Merchant or any other guarantor for any amounts paid by it under the Agreement. Each Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against any Merchant, any other guarantor, or any collateral provided by any Merchant or any other guarantor, for any amounts paid by it or acts performed by it under this Guarantee: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**G4. Joint and Several Liability.** The obligations hereunder of the persons or entities constituting each Guarantor under this Guarantee are joint and several.

**G5. Injunctive Relief.** In case any Event of Default occurs and is not waived, AJ will be entitled to the issuance of an injunction, restraining order, or other equitable relief in AJ's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to AJ as a result of the Event of Default, and each Guarantor will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent

I have read and agree to the terms and conditions set forth above:

Name: **EDMILSON RAMOS** Title: **OWNER** Date: **01/18/2022**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

jurisdiction without any prior notice to any Merchant or Guarantor and without AJ being required to furnish a bond or other undertaking in connection with the application. To the extent applicable, Merchant(s) and Guarantor(s) waive the right to notice and a hearing under Connecticut General Statutes sections 52-278a to 52-278g, inclusive, and consent to the issuance of a writ for a prejudgment remedy without securing a court order.

**G6. Choice of Law.** Each Guarantor acknowledges and agrees that the Agreement and this Guarantee were made in the State of New York, that the Purchase Price is being paid by AJ in the State of New York, that the Receivables Purchased Amount is being delivered to AJ in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by the Agreement and this Guarantee. This Guarantee and the relationship between AJ, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**G7. Venue and Forum Selection.** Any litigation relating to this Agreement or this Guarantee or involving AJ on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Kings, Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Guarantee encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Guarantee that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to AJ may be commenced and maintained in any other court of competent jurisdiction.

**G8. Jury Waiver.** Each Guarantor agrees to waive trial by jury in any dispute with AJ.

**G9. Counterclaim Waiver.** In any litigation or arbitration commenced by AJ, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**G10. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against AJ within one year of its accrual will be time barred.

**G11. Costs.** Each Merchant and each Guarantor must pay all of AJ's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement or this Guarantee and the enforcement thereof, including but not limited to collection agency fees, expert witness fees, and costs of suit.

**G12. Prejudgment and Postjudgment Interest.** If AJ becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then AJ will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**G13. Legal Fees.** If AJ prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay AJ's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**G14. Class Action Waiver.** AJ, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**G15. Arbitration.** Any action or dispute relating to this Agreement or this Guarantee or involving AJ on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any

I have read and agree to the terms and conditions set forth above:

Name: **EDMILSON RAMOS** Title: **OWNER** Date: **01/18/2022**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Civil Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement or this Guarantee must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Guarantor consents to AJ making an application in arbitration, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in AJ's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to AJ as a result of the Event of Default. Each Guarantor irrevocably authorizes and directs each of its financial institutions and account debtors to comply with any injunction, restraining order, or other equitable relief issued in AJ's favor in arbitration under the terms of this Agreement, will hold harmless and indemnify AJ and its employees, agents, attorneys, members, managers, officers, subsidiaries, affiliate entities, successors, and assigns from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) relating to the making or enforcement of any application for the issuance of an injunction, restraining order, or other equitable relief in AJ's favor to restrain each Guarantor's accounts and/or receivables, and will hold harmless and indemnify all financial institutions and account debtors from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) relating to compliance with any injunction, restraining order, or other equitable relief issued in favor of AJ.

Each Guarantor acknowledges and agrees that the Agreement and this Guarantee are the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under the Agreement and this Guarantee will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that the Agreement and this Guarantee therefore evidence a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in the Agreement or this Guarantee to the contrary, all matters of arbitration relating to the Agreement or this Guarantee will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules or the laws of the jurisdiction in which the application is made. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of AJ.

**G16. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of the Agreement or any other address(es) provided in writing to AJ by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of the Agreement if it does not furnish a certified mail return receipt signed by AJ demonstrating that AJ was provided with notice of a change in the Contact Address.

I have read and agree to the terms and conditions set forth above:

Name: <u>EDMILSON RAMOS</u> Title: <u>OWNER</u> Date: <u>01/18/2022</u>

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**G17. Severability.** If any provision of this Guarantee is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Guarantee is deemed void, all other provisions will remain in effect.

**G18. Survival.** The provisions of Sections G2, G3, G4, G5, G6, G7, G8, G9, G10, G11, G12, G13, G14, G15, G16, G17, G18, G19, G20, G21, and G22 shall survive any termination of this Guarantee.

**G19. Headings.** Headings of the various articles and/or sections of this Guarantee are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**G20. Attorney Review.** Each Guarantor acknowledges that it has had an opportunity to review this Guarantee, the Agreement, and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**G21. Entire Agreement.** This Guarantee, inclusive of all addenda, if any, executed simultaneously herewith may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Guarantee and any other document preceding it, this Guarantee will govern. This Guarantee does not affect any previous agreement between the parties unless such an agreement is specifically referenced in the Agreement or herein. This Guarantee will not be affected by any subsequent agreement between the parties unless this Guarantee is specifically referenced therein.

**G22. Counterparts; Fax and Electronic Signatures.** This Guarantee may be executed electronically and in counterparts. Facsimile and electronic copies of this Guarantee will have the full force and effect of an original.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "STANDARD MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS GUARANTEE. CAPITALIZED TERMS NOT DEFINED IN THIS GUARANTEE SHALL HAVE THE MEANING SET FORTH IN THE STANDARD MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

### EACH UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS GUARANTEE

GUARANTOR (#1)

By: **EDMILSON RAMOS**
    (Print Name)

(Signature)

SS# ▓▓▓▓

Driver License Number ▓▓▓▓

GUARANTOR (#2)

By: _____
    (Print Name)

_____
(Signature)

SS# _____

Driver License Number _____

STANDARD MERCHANT CASH ADVANCE AGREEMENT

# BANK INFORMATION

Dear Merchant,

Thank you for accepting this offer from AJ EQUITY GROUP LLC. We look forward to being your funding partner.

You authorize AJ EQUITY GROUP LLC to collect the Receivables Purchased Amount under this Agreement by ACH debiting your bank account with the bank listed below.

AJ EQUITY GROUP LLC will require viewing access to your bank account each business day.

AJ EQUITY GROUP LLC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

* Be sure to indicate capital or lower case letters.

Name of bank: AVIDIA Banc

Name of account: top line Granik Design inc

Account number: _____  Routing number: _____

Bank portal website: WWW. AVidiaBank.com

Username: _____

Password: _____

Security Question/Answer 1: _____ NO

Security Question/Answer 2: _____ NO

Security Question/Answer 3: _____ NO

Any other information necessary to access your account: _____ NO

If you have any questions please feel free to contact us directly at (212) 645-1835.

I have read and agree to the terms and conditions set forth above:

Name: EDMIKSON RAMOS Title: OWNER Date: 01/18/2022

| | | | | | |
|---|---|---|---|---|---|
| AJ Equity Group. | Check | 01/21/2022 | EFT | 2,490.90 | Acc #2674 |
| AJ Equity Group. | Check | 01/24/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 01/25/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 01/26/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 01/27/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 01/28/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 01/31/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/01/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/02/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/03/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/04/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/07/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/08/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/09/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/10/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/11/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/14/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/15/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/16/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/17/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/18/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/23/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/24/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 02/28/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 03/01/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 03/04/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 03/04/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 03/04/2022 | EFT | 2,590.90 | Acc #2674 |
| AJ Equity Group. | Check | 03/14/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/15/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/16/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/16/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/17/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/17/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/18/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/18/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/21/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/21/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/22/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/22/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/24/2022 | EFT | 2,590.90 | Acc#1847 |
| | | | | **106,126.90** | |




EXHIBIT
C

## SHATZ, SCHWARTZ AND FENTIN
### COUNSELLORS AT LAW

June 12, 2023

<u>By UPS Overnight Mail</u>
AJ Equity Group, LLC
1648 61st Street
Brooklyn, NY 11204

Attn: Managing Member

Re: Top Line Granite Design, Inc.
    <u>Case No. 22-40216-EDK</u>

Dear Sir/Madam:

On March 25, 2022 (the "Petition Date") Top Line Granite Design, Inc. (the "Debtor") filed a petition for relief under subchapter V of Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Massachusetts. I was appointed as the subchapter V Trustee. On April 28, 2023 the Bankruptcy Court entered an order removing the debtor in possession, and expanding my authority, pursuant to Bankruptcy Code § 1183(b)(5). A copy of that order is enclosed with this letter.

As Trustee, it is my duty to investigate the Debtor's affairs, and to recover transfers that may constitute preferential or fraudulent transfers under the applicable provisions of the Bankruptcy Code and Massachusetts law.

My investigations to date indicate that on January 18, 2022 AJ Equity and the Debtor entered into a "Standard Merchant Cash Agreement" (the "Agreement"). Under the terms of the Agreement, your company purported to pay the Debtor $100,000 to acquire accounts receivables from the Debtor in the amount of $142,500.00. A copy of the Agreement is enclosed with this letter.

While the Agreement purports to constitute a purchase agreement, and not a loan, it is my contention that the transaction actually constitutes a disguised loan transaction; indeed, ¶ 39 of the Agreement provides your company with a security interest in the Debtor's accounts receivables and proceeds, albeit a lien that appears to be unperfected.

The Debtor's records indicate that your company received transfers totaling $106,126.90 in the 90 days before the Chapter 11 petition was filed. An itemized list of the payments is also enclosed herein. It is my view that these payments constitute preferential transfers withing the meaning of 11 U.S.C. § 547. The reasons for my belief that the transfers are avoidable are that they were made:

*Springfield Office:*
1441 Main Street, Suite 1100
Springfield, MA 01103

Tel: 413-737-1131

*Northampton Office:*
64 Gothic Street
Northampton, MA 01060

Tel: 413-584-1600

ssfpc.com

*Albany Office:*
6 Automation Lane
Albany, NY 12205

Tel: 800-737-4178

1. To or for the benefit of a creditor;
2. On account of an antecedent debt;
3. Within 90 days before the Petition Date;
4. While the Debtor was insolvent; and
5. If not voided, will enable your company to receive more than it would in liquidation under Chapter 7 of the Bankruptcy Code.

Additionally, to the extent that the Agreement is determined to be a loan, the effective interest rate may well be usurious under applicable law. In Massachusetts interest on a loan may not exceed twenty (20) percent, unless the lender has registered with the Massachusetts Attorney General. If your company has registered, please provide proof of such registration. I reserve the rights of the Debtor and the bankruptcy estate to seek to have the entire transaction voided and seek all available legal and equitable remedies in the event the transaction is determined to be a usurious loan.

Demand is hereby made for the payment of the sum of $106,126.90 payable to "Steven Weiss, Trustee" on or before July 10, 2023. If payment is not received by that date, it is my intention to file an adversary proceeding against your company in the United States Bankruptcy Court for the District of Massachusetts to recover the transfers and seek all available relief. Until this matter is resolved, I reserve all rights and remedies available to the bankruptcy estate.

This letter is an attempt to collect a debt and any information received will be used for that purpose.

Yours truly,

/s/ Steven Weiss

Steven Weiss

Cc: Andrew Lizotte, Esquire
Alan Braunstein, Esquire

22\0137\Avoidance Claims\5.AJEquity.1601



# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

*In re:*

TOP LINE GRANITE DESIGN INC.,
    Debtor

Ch. 11

22-40216-EDK

### Proceeding Memorandum and Order

**MATTER:**

#240 Motion of United States Trustee to Convert case to Chapter 7, or in the alternative, to Dismiss case

#257 Response filed by Subchapter V Trustee

#261 Statement in Support filed by Avidia Bank

#262 Objection filed by Debtor

#268 Brief of First Citizens Bank & Trust Company in Support of Motion to Convert

#271 Objection filed by First Citizens Bank & Trust Company

**Decision set forth more fully as follows:**

The request to convert or dismiss this case is continued to May 25, 2023 at 9:00 a.m. in Worcester, Courtroom 3.

However, the Debtor is removed as a debtor in possession pursuant to 11 U.S.C. 1185(a) for the reasons stated in open Court at the hearing held this date. Accordingly, 11 U.S.C. 1183(b)(5) applies.

Dated: 4/28/2023

By the Court,

Elizabeth D. Katz
United States Bankruptcy Judge



### AJ EQUITY GROUP LLC
1648 61st Street, Brooklyn, NY 11204
(212) 645-1835

# STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Agreement dated 01/18/2022 by and between AJ EQUITY GROUP LLC ("AJ") and each merchant listed below ("Merchant").

Merchant's Legal Name: **TOP LINE GRANITE DESIGN INC / US CONSTRUCTION AND MAINTENANCE LLC,**
D/B/A/: **Same,**        Fed ID #:
Type of Entity:
**V** Corporation **V** Limited Liability Company __ Limited Partnership __ Limited Liability Partnership __ Sole Proprietor
Business Address: **347 Middlesex Rd.**        City: **Tyngsborough,**        State: **MA**        Zip: **01879**
Contact Address: **290 Massapoag Rd.**        City: **Tyngsborough,**        State: **MA**        Zip: **01879**
E-mail Address: _____        Phone Number: _____

| | |
|---|---|
| **Purchase Price** <br> *This is the amount being paid to Merchant(s) for the Receivables Purchased Amount (defined below).* | **$100,000** |
| **Receivables Purchased Amount** <br> *This is the amount of Receivables (defined in Section 1 below) being sold.* | **$142,500** |
| **Specified Percentage** <br> *This is the percentage of Receivables (defined below) to be delivered until the Receivables Purchased Amount is paid in full.* | **10%** |
| **Net Funds Provided** <br> *This is the net amount being paid to or on behalf of Merchant(s) after deduction of applicable fees listed in Section 2 below.* | **$94,950** |
| **Net Amount to Be Received Directly by Merchant(s)** <br> *This is the net amount being received directly by Merchant(s) after deduction of applicable fees listed in Section 2 below and the payment of any part of the Purchase Price elsewhere pursuant to an Addendum to this Agreement.* | **$94,950** |
| **Initial Estimated Payment** <br> *This is only applicable if an Addendum for Estimated Payments is being signed. This is the initial amount of periodic payments collected from Merchant(s) as an approximation of no more than the Specified Percentage of the Receivables and is subject to reconciliation as set forth in Section 4 below.* | **$2,590.90** <br><br> Per day |

## TERMS AND CONDITIONS

**1. Sale of Future Receipts.** Merchant(s) hereby sell, assign, and transfer to AJ (making AJ the absolute owner) in consideration of the funds provided ("Purchase Price") specified above, all of each Merchant's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card, electronic transfer,

I have read and agree to the terms and conditions set forth above:

Name: **EDMILSON RAMOS** Title: **OWNER** Date: **01/18/2022**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

or other form of monetary payment in the ordinary course of each merchant's business), for the payment of each Merchant's sale of goods or services until the amount specified above (the "Receivables Purchased Amount") has been delivered by Merchant(s) to AJ. Each Merchant hereby acknowledges that until the Receivables Purchased Amount has been received in full by AJ, each Merchant's Receivables, up to the balance of the Receivables Purchased Amount, are the property of AJ and not the property of any Merchant. Each Merchant agrees that it is a fiduciary for AJ and that each Merchant will hold Receivables in trust for AJ in its capacity as a fiduciary for AJ.

The Receivables Purchased Amount shall be paid to AJ by each Merchant irrevocably authorizing only one depositing account acceptable to AJ (the "Account") to remit the percentage specified above (the "Specified Percentage") of each Merchant's settlement amounts due from each transaction, until such time as AJ receives payment in full of the Receivables Purchased Amount. Each Merchant hereby authorizes AJ to ACH debit the specified remittances from the Account on a daily basis as of the next business day after the date of this Agreement and will provide AJ with all required access codes and monthly bank statements. Each Merchant understands that it will be held responsible for any fees resulting from a rejected ACH attempt or an Event of Default (see Section 2). AJ is not responsible for any overdrafts or rejected transactions that may result from AJ's ACH debiting the Specified Percentage amounts under the terms of this Agreement.

**2. Additional Fees.** In addition to the Receivables Purchased Amount, each Merchant will be held responsible to AJ for the following fees, where applicable:

A. **5%** - to cover underwriting and the ACH debit program, as well as related expenses. This will be deducted from payment of the Purchase Price.

B. Wire Fee - Merchant(s) shall receive funding electronically to the Account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH. This will be deducted from payment of the Purchase Price.

C. Blocked Account/Default - $2,500.00 - If AJ considers an Event of Default to have taken place under Section 34.

D. UCC Fee - $195.00 – to cover AJ filing a UCC-1 financing statement to secure its interest in the Receivables Purchased Amount. A $195.00 UCC termination fee will be charged if a UCC filing is terminated.

E. Court costs, arbitration fees, collection agency fees, attorney fees, expert fees, and any other expenses incurred in litigation, arbitration, or the enforcement of any of AJ's legal or contractual rights against each Merchant and/or each Guarantor, if required, as explained in other Sections of this Agreement.

**3. Cap on Collection of the Receivables Purchased Amount.** The amount that AJ will collect from Merchant(s) towards the Receivables Purchased Amount during any specific **day** will be capped at **$2,590.90** (the "Cap"). If the Specified Percentage of all Receivables for a specific **day** is less than the Cap, then in addition to the Specified Percentage of Receivables for that **day**, AJ will be permitted to collect any Receivables it did not previously collect due to the Cap such that the total amount collected during that **day** does not exceed the Cap. The Cap is not applicable to make up for a business day on which AJ is closed and does not ACH debit the Account, to subsequent attempts to collect a rejected or blocked ACH payment, or for the collection of any of the fees listed in Section 2 or if any Event of Default listed in Section 34 is considered by AJ to have taken place.

**4. Reconciliations.** Any Merchant may give written notice to AJ requesting that AJ conduct a reconciliation in order to ensure that the amount that AJ has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A reconciliation may also be requested by e-mail to joshua@ajequity.com and such notice will be deemed to have been received if and when AJ sends a reply e-mail (but not a read receipt). If such reconciliation determines that AJ collected more than it was entitled to, then AJ will credit to the Account all amounts to which AJ was not entitled within seven days thereafter. If such reconciliation determines that AJ collected less than it was entitled to, then AJ will debit from the Account all additional amounts to which AJ was entitled within seven days thereafter. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. AJ will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

**5. Prepayments.** Although there is no obligation to do so, any Merchant may prepay any amount towards the Receivables Purchased Amount. There will be no penalty for any prepayment made by any Merchant. Any Merchant may

I have read and agree to the terms and conditions set forth above:

Name: **EDMILSON RAMOS** Title: **OWNER** Date: **01/18/2022**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

elect to terminate this Agreement by prepaying AJ the amount of the balance of the Receivables Purchased Amount at that time.

**6. Merchant Deposit Agreement.** Merchant(s) shall appoint a bank acceptable to AJ, to obtain electronic fund transfer services and/or "ACH" payments. Merchant(s) shall provide AJ and/or its authorized agent with all of the information, authorizations, and passwords necessary to verify each Merchant's Receivables. Merchant(s) shall authorize AJ and/or its agent(s) to deduct the amounts owed to AJ for the Receivables as specified herein from settlement amounts which would otherwise be due to each Merchant and to pay such amounts to AJ by permitting AJ to withdraw the Specified Percentage by ACH debiting the account. The authorization shall be irrevocable absent AJ's written consent.

**7. Term of Agreement.** The term of this Agreement is indefinite and shall continue until AJ receives the full Receivables Purchased Amount, or earlier if terminated pursuant to any provision of this Agreement. The provisions of Sections 4, 6, 7, 8, 10, 11, 13, 14, 15, 17, 18, 19, 22, 23, 28, 31, 32, 33, 34, 35, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, and 58 shall survive any termination of this Agreement.

**8. Ordinary Course of Business.** Each Merchant acknowledges that it is entering into this Agreement in the ordinary course of its business and that the payments to be made from each Merchant to AJ under this Agreement are being made in the ordinary course of each Merchant's business.

**9. Financial Condition.** Each Merchant and each Guarantor (Guarantor being defined as each signatory to the Guarantee of this Agreement) authorizes AJ and its agent(s) to investigate each Merchant's financial responsibility and history, and will provide to AJ any bank or financial statements, tax returns, and other documents and records, as AJ deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. AJ is authorized to update such information and financial profiles from time to time as it deems appropriate.

**10. Monitoring, Recording, and Electronic Communications.** AJ may choose to monitor and/or record telephone calls with any Merchant and its owners, employees, and agents. By signing this Agreement, each Merchant agrees that any call between AJ and any Merchant or its representatives may be monitored and/or recorded. Each Merchant and each Guarantor grants access for AJ to enter any Merchant's premises and to observe any Merchant's premises without any prior notice to any Merchant at any time after execution of this Agreement.

AJ may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Merchant(s), Owner(s) (Owner being defined as each person who signs this Agreement on behalf of a Merchant), and Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Merchant, each Owner, and each Guarantor gives AJ permission to call or send a text message to any telephone number given to AJ in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Merchant, each Owner, and each Guarantor also gives AJ permission to communicate such information to them by e-mail. Each Merchant, each Owner, and each Guarantor agree that AJ will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Merchant, each Owner, and each Guarantor acknowledge that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that AJ has no liability for any such charges.

**11. Accuracy of Information Furnished by Merchant and Investigation Thereof.** To the extent set forth herein, each of the parties is obligated upon his, her, or its execution of the Agreement to all terms of the Agreement. Each Merchant and each Owner signing this Agreement represent that he or she is authorized to sign this Agreement for each Merchant, legally binding said Merchant to its obligations under this Agreement and that the information provided herein and in all of AJ's documents, forms, and recorded interview(s) is true, accurate, and complete in all respects. AJ may produce a monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant(s) to AJ. An investigative report may be made in connection with the Agreement. Each Merchant and each Owner signing this Agreement authorize AJ, its agents and representatives, and any credit-reporting agency engaged by AJ, to (i) investigate any references given or any

I have read and agree to the terms and conditions set forth above:

Name: EDMILSON RAMOS Title: OWNER Date: 01/18/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

other statements obtained from or about each Merchant or any of its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as any Merchant and/or Owners(s) continue to have any obligation to AJ under this Agreement or for AJ's ability to determine any Merchant's eligibility to enter into any future agreement with AJ. Any misrepresentation made by any Merchant or Owner in connection with this Agreement may constitute a separate claim for fraud or intentional misrepresentation.

*Authorization for soft pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to AJ under the Fair Credit Reporting Act, authorizing AJ to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes AJ to obtain such information solely to conduct a pre-qualification for credit.

*Authorization for hard pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to AJ under the Fair Credit Reporting Act, authorizing AJ to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes AJ to obtain such information in accordance with a merchant cash advance application.

**12. Transactional History.** Each Merchant authorizes its bank to provide AJ with its banking and/or credit card processing history.

**13. Indemnification.** Each Merchant and each Guarantor jointly and severally indemnify and hold harmless each Merchant's credit card and check processors (collectively, "Processor") and Processor's officers, directors, and shareholders against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by Processor resulting from (a) claims asserted by AJ for monies owed to AJ from any Merchant and (b) actions taken by any Processor in reliance upon information or instructions provided by AJ.

**14. No Liability.** In no event will AJ be liable for any claims asserted by any Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect, or consequential damages, each of which is waived by each Merchant and each Guarantor.

**15. Sale of Receivables.** Each Merchant and AJ agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from AJ to any Merchant. AJ is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in AJ not receiving the Receivables Purchased Amount. Each Merchant agrees that the Purchase Price in exchange for the Receivables pursuant to this Agreement equals the fair market value of such Receivables. AJ has purchased and shall own all the Receivables described in this Agreement up to the full Receivables Purchased Amount as the Receivables are created. Payments made to AJ in respect to the full amount of the Receivables shall be conditioned upon each Merchant's sale of products and services and the payment therefor by each Merchant's customers in the manner provided in this Agreement. Although certain jurisdictions require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, those disclosures do not change the fact that the transaction encompassed by this Agreement is not a loan and does not have an interest rate.

**16. Power of Attorney.** Each Merchant irrevocably appoints AJ as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to AJ, or, if AJ considers an Event of Default to have taken place under Section 34, to settle all obligations due to AJ from each Merchant, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (which is defined in Section 33); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign each Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to AJ; and (v) to file any claims or take any action or institute any proceeding which AJ may deem necessary for the collection of any of the unpaid Receivables Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Receivables Purchased Amount.

**17. Protections Against Default.** The following Protections 1 through 7 may be invoked by AJ, immediately and without notice to any Merchant in the event:

(a) Any Merchant takes any action to discourage the use of methods of payment ordinarily and customarily used by

I have read and agree to the terms and conditions set forth above:

Name: **EDMILSON RAMOS** Title: **OWNER** Date: **01/18/2022**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

its customers or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks and credit cards for the purchase of any Merchant's services and products;

(b) Any Merchant changes its arrangements with any Processor in any way that is adverse to AJ;

(c) Any Merchant changes any Processor through which the Receivables are settled to another electronic check and/or credit card processor or permits any event to occur that could cause diversion of any Merchant's check and/or credit card transactions to another such processor;

(d) Any Merchant interrupts the operation of its business (other than adverse weather, natural disasters, or acts of God) or transfers, moves, sells, disposes, or otherwise conveys its business or assets without (i) the express prior written consent of AJ and (ii) the written agreement of any purchaser or transferee to the assumption of all of any Merchant's obligations under this Agreement pursuant to documentation satisfactory to AJ; or

(e) Any Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for any Merchant's goods or services with any means other than checks and/or credit cards that are settled through Processor. These protections are in addition to any other remedies available to AJ at law, in equity, or otherwise available pursuant to this Agreement.

(f) AJ considers any Event of Default listed in Section 34 to have taken place.

Protection 1: The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately.

Protection 2. AJ may enforce the provisions of the Guarantee against Guarantor.

Protection 3. AJ may enforce its security interest in the Collateral identified in Section 33.

Protection 4. AJ may proceed to protect and enforce its rights and remedies by litigation or arbitration.

Protection 5. If requested by AJ, Merchant shall deliver to AJ an executed assignment of lease of each Merchant's premises in favor of AJ. Upon breach of any provision in this Section 17, AJ may exercise its rights under such assignment of lease.

Protection 6. AJ may debit any Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on any Merchant's bank account or otherwise, in an amount consistent with the terms of this Agreement.

Protection 7. AJ will have the right, without waiving any of its rights and remedies and without notice to any Merchant and/or Guarantor, to notify each Merchant's credit card and/or check processor of the sale of Receivables hereunder and to direct such credit card processor to make payment to AJ of all or any portion of the amounts received by such credit card processor on behalf of each Merchant. Each Merchant hereby grants to AJ an irrevocable power-of-attorney, which power-of-attorney will be coupled with an interest, and hereby appoints AJ and its representatives as each Merchant's attorney-in-fact to take any and all action necessary to direct such new or additional credit card and/or check processor to make payment to AJ as contemplated by this Section.

**18. Protection of Information.** Each Merchant and each person signing this Agreement on behalf of each Merchant and/or as Owner, in respect of himself or herself personally, authorizes AJ to disclose information concerning each Merchant, Owner and/or Guarantor's credit standing and business conduct to agents, affiliates, subsidiaries, and credit reporting bureaus. Each Merchant, Guarantor, and Owner hereby waives to the maximum extent permitted by law any claim for damages against AJ or any of its affiliates relating to any (i) investigation undertaken by or on behalf of AJ as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**19. Confidentiality.** Each Merchant understands and agrees that the terms and conditions of the products and services offered by AJ, including this Agreement and any other AJ documents (collectively, "Confidential Information") are proprietary and confidential information of AJ. Accordingly, unless disclosure is required by law or court order, Merchant(s) shall not disclose Confidential Information of AJ to any person other than an attorney, accountant, financial advisor, or employee of any Merchant who needs to know such information for the purpose of advising any Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising any Merchant and first agrees in writing to be bound by the terms of this Section 19.

**20. D/B/As.** Each Merchant hereby acknowledges and agrees that AJ may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between AJ and each Merchant, including the filing of UCC-1 financing statements and other notices or filings.

I have read and agree to the terms and conditions set forth above:

Name: EDMILSON RAMOS Title: OWNER Date: 01/18/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**21. Financial Condition and Financial Information.** Each Merchant represents, warrants, and covenants that its bank and financial statements, copies of which have been furnished to AJ, and future statements which will be furnished hereafter at the request of AJ, fairly represent the financial condition of each Merchant at such dates, and that since those dates there have been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of any Merchant. Each Merchant has a continuing affirmative obligation to advise AJ of any material adverse change in its financial condition, operation, or ownership.

**22. Governmental Approvals.** Each Merchant represents, warrants, and covenants that it is in compliance and shall comply with all laws and has valid permits, authorizations, and licenses to own, operate, and lease its properties and to conduct the business in which it is presently engaged.

**23. Authorization.** Each Merchant represents, warrants, and covenants that it and each person signing this Agreement on behalf of each Merchant has full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**24. Insurance.** Each Merchant represents, warrants, and covenants that within ten days after written notice of a request by AJ, Merchant(s) will maintain business-interruption insurance naming AJ as loss payee and additional insured in amounts and against risks as are satisfactory to AJ and shall provide AJ proof of such insurance upon request.

**25. Electronic Check Processing Agreement.** Each Merchant represents, warrants, and covenants that it will not, without AJ's prior written consent, change its Processor, add terminals, change its financial institution or bank account, or take any other action that could have any adverse effect upon any Merchant's obligations under this Agreement.

**26. Change of Name or Location.** Each Merchant represents, warrants, and covenants that it will not conduct its business under any name other than as disclosed to AJ or change any place(s) of its business without prior written consent from AJ.

**27. Estoppel Certificate.** Each Merchant represents, warrants, and covenants that it will, at any time, and from time to time, upon at least two day's prior notice from AJ to that Merchant, execute, acknowledge, and deliver to AJ and/or to any other person or entity specified by AJ, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Receivables Purchased Amount or any portion thereof have been paid.

**28. No Bankruptcy.** Each Merchant represents, warrants, and covenants that as of the date of this Agreement, it does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against any Merchant. Each Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. Each Merchant further warrants that there will be no statutory presumption that it would have been insolvent on the date of this Agreement.

**29. Unencumbered Receivables.** Each Merchant represents, warrants, and covenants that it has good, complete, and marketable title to all Receivables, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with this Agreement or adverse to the interests of AJ, other than any for which AJ has actual or constructive knowledge as of the date of this Agreement.

**30. Stacking.** Each Merchant represents, warrants, and covenants that it will not enter into with any party other than AJ any arrangement, agreement, or commitment that relates to or involves the Receivables, whether in the form of a purchase of, a loan against, collateral against, or the sale or purchase of credits against Receivables without the prior written consent of AJ.

**31. Business Purpose.** Each Merchant represents, warrants, and covenants that it is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and each Merchant is entering into this

I have read and agree to the terms and conditions set forth above:

Name: **EDMILSON RAMOS** Title: **OWNER** Date: **01/18/2022**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

Agreement for business purposes and not as a consumer for personal, family, or household purposes.

**32. Default Under Other Contracts.** Each Merchant represents, warrants, and covenants that its execution of and/or performance under this Agreement will not cause or create an event of default by any Merchant under any contract with another person or entity.

**33. Security Interest.** To secure each Merchant's performance obligations to AJ under this Agreement and any future agreement with AJ, each Merchant hereby grants to AJ a security interest in collateral (the "Collateral"), that is defined as collectively: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by any Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC. The parties acknowledge and agree that any security interest granted to AJ under any other agreement between any Merchant or Guarantor and AJ (the "Cross-Collateral") will secure the obligations hereunder and under this Agreement. Negative Pledge: Each Merchant agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Cross-Collateral, as applicable.

Each Merchant agrees to execute any documents or take any action in connection with this Agreement as AJ deems necessary to perfect or maintain AJ's first priority security interest in the Collateral and the Cross-Collateral, including the execution of any account control agreements. Each Merchant hereby authorizes AJ to file any financing statements deemed necessary by AJ to perfect or maintain AJ's security interest, which financing statements may contain notification that each Merchant has granted a negative pledge to AJ with respect to the Collateral and the Cross-Collateral, and that any subsequent lienor may be tortiously interfering with AJ's rights. Each Merchant shall be liable for and AJ may charge and collect all costs and expenses, including but not limited to attorney fees, which may be incurred by AJ in protecting, preserving, and enforcing AJ's security interest and rights. Each Merchant further acknowledges that AJ may use another legal name and/or D/B/A or an agent when designating the Secured Party when AJ files the above-referenced financing statement(s).

**34. Events of Default.** An "Event of Default" may be considered to have taken place if any of the following occur:

(1) Any Merchant violates any term or covenant in this Agreement;

(2) Any representation or warranty by any Merchant in any Agreement with AJ that has not been terminated proves to have been incorrect, false, or misleading in any material respect when made;

(3) Any Merchant fails to provide AJ with written notice of any material change in its financial condition, operation, or ownership within seven days thereafter (unless a different notice period is specifically provided for elsewhere in this Agreement;

(4) the sending of notice of termination by any Merchant or Guarantor;

(5) Any Merchant transports, moves, interrupts, suspends, dissolves, or terminates its business intentionally and not in the ordinary course without the prior written consent of AJ other than a bankruptcy filing;

(6) Any Merchant transfers or sells all or substantially all of its assets without the prior written consent of AJ;

(7) Any Merchant makes or sends notice of any intended bulk sale or transfer by any Merchant without the prior written consent of AJ;

(8) Any Merchant uses multiple depository accounts without the prior written consent of AJ;

(9) Any Merchant changes the Account without the prior written consent of AJ;

(10) AJ is not provided with updated login or password information for the Account within one business day after any such change is made by any Merchant;

(11) Any Merchant fails to send bank statements, merchant account statements, or bank login information for the Account within two business days after a written request for same is made by AJ;

(12) Any Merchant performs any act that reduces the value of any Collateral granted under this Agreement;

(13) Any Merchant fails to deposit its Receivables into the Account;

(14) Any Merchant causes any ACH debit to the Account by AJ to be blocked or stopped without providing any advance written notice to AJ, which notice may be given by e-mail to joshua@ajequity.com; or

(15) Any Merchant prevents AJ from collecting any part of the Receivables Purchased Amount;

(16) Any Merchant causes any ACH debit to the Account to be stopped or otherwise returned that would result in an ACH Return Code of R08, R10, or R29 and that Merchant does not within two business days thereafter provide AJ with

**I have read and agree to the terms and conditions set forth above:**

Name: <u>EDMILSON RAMOS</u> Title: <u>OWNER</u> Date: <u>01/18/2022</u>

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

written notice thereof explaining why that Merchant caused the ACH debit to be stopped or otherwise returned, which notice may be given by e-mail to joshua@ajequity.com; or

(17) Any Merchant defaults under any of the terms, covenants, and conditions of any other agreement with AJ.

**35. Remedies.** In case any Event of Default occurs and is not waived, AJ may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement, or other provision contained herein, or to enforce the discharge of each Merchant's obligations hereunder, or any other legal or equitable right or remedy. All rights, powers, and remedies of AJ in connection with this Agreement, including each Protection listed in Section 17, may be exercised at any time by AJ after the occurrence of an Event of Default, are cumulative and not exclusive, and will be in addition to any other rights, powers, or remedies provided by law or equity. In case any Event of Default occurs and is not waived, AJ may elect that Merchant(s) be required to pay to AJ 25% of the unpaid balance of the Receivables Purchased Amount as liquidated damages for any reasonable expenses incurred by AJ in connection with recovering the unpaid balance of the Receivables Purchased Amount ("Reasonable Expenses"), AJ will not be required to itemize of prove its Reasonable Expenses, and all Merchant(s) and all Guarantor(s) agree that the Reasonable Expenses bear a reasonable relationship to AJ's actual expenses incurred in connection with recovering the unpaid balance of the Receivables Purchased Amount. In addition to the foregoing, in case any Event of Default occurs and is not waived, AJ will be entitled to the issuance of an injunction, restraining order, or other equitable relief in AJ's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to AJ as a result of the Event of Default, and each Merchant will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without AJ being required to furnish a bond or other undertaking in connection with the application. To the extent applicable, Merchant(s) and Guarantor(s) waive the right to a notice and hearing under Connecticut General Statutes sections 52-278a to 52-278g, inclusive, and consent to the issuance of a writ for a prejudgment remedy without securing a court order.

**36. Required Notifications.** Each Merchant is required to give AJ written notice at least one day prior to any filing under Title 11 of the United States Code. Merchant(s) are required to give AJ at least seven days' written notice prior to the closing of any sale of all or substantially all of any Merchant's assets or stock.

**37. Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of AJ, which consent may be withheld in AJ's sole discretion. AJ may assign, transfer, or sell its rights under this Agreement, including, without limitation, its rights to receive the Receivables Purchased Amount, and its rights under Section 33 of this Agreement, the Guarantee, and any other agreement, instrument, or document executed in connection with the transactions contemplated by this Agreement (a "Related Agreement"), or delegate its duties hereunder or thereunder, either in whole or in part. From and after the effective date of any such assignment or transfer by AJ, whether or not any Merchant has actual notice thereof, this Agreement and each Related Agreement shall be deemed amended and modified (without the need for any further action on the part of any Merchant or AJ) such that the assignee shall be deemed a party to this Agreement and any such Related Agreement and, to the extent provided in the assignment document between AJ and such assignee (the "Assignment Agreement"), have the rights and obligations of AJ under this Agreement and such Related Agreements with respect to the portion of the Receivables Purchased Amount set forth in such Assignment Agreement, including but not limited to rights in the Receivables, Collateral and Additional Collateral, the benefit of each Guarantor's guaranty regarding the full and prompt performance of every obligation that is a subject of the Guarantee, AJ's rights under Section 17 of this Agreement (Protections Against Default), and to receive damages from any Merchant following a breach of this Agreement by any Merchant. In connection with such assignment, AJ may disclose all information that AJ has relating to any Merchant or its business. Each Merchant agrees to acknowledge any such assignment in writing upon AJ's request.

**38. Notices.** All notices, requests, consents, demands, and other communications hereunder shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation to the respective parties to this Agreement at their addresses set forth in this Agreement and shall become effective only upon receipt. Written notice may also be given to any Merchant or Guarantor by e-mail to the E-mail Address listed on the first page of this Agreement. Each Merchant must set its spam or junk mail filter to accept e-mails sent by joshua@ajequity.com and its domain. This Section

I have read and agree to the terms and conditions set forth above:

Name: **EDMILSON RAMOS** Title: **OWNER** Date: **01/18/2022**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

is not applicable to service of process or notices in any legal proceedings.

**39. Choice of Law.** Each Merchant acknowledges and agrees that this Agreement was made in the State of New York, that the Purchase Price is being paid by AJ in the State of New York, that the Receivables Purchased Amount is being delivered to AJ in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by this Agreement. This Agreement and the relationship between AJ, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**40. Venue and Forum Selection.** Any litigation relating to this Agreement or involving AJ on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Kings, Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Agreement encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Agreement that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to AJ may be commenced and maintained in any other court of competent jurisdiction.

**41. Jury Waiver.** The parties agree to waive trial by jury in any dispute between them.

**42. Counterclaim Waiver.** In any litigation or arbitration commenced by AJ, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**43. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against AJ within one year of its accrual will be time barred.

**44. Costs.** Each Merchant and each Guarantor must pay all of AJ's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement and the enforcement thereof, including but not limited to collection agency fees, attorney fees, which may include a contingency fee of up to 40% of the amount claimed, expert witness fees, and costs of suit.

**45. Prejudgment and Postjudgment Interest.** If AJ becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then AJ will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**46. Legal Fees.** If AJ prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay AJ's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**47. Class Action Waiver.** AJ, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**48. Arbitration.** Any action or dispute relating to this Agreement or involving AJ on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at

I have read and agree to the terms and conditions set forth above:

Name: **EDMILSON RAMOS** Title: **OWNER** Date: **01/18/2022**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

www.arbitrationservicesinc.com, or by Mediation & Civil Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Merchant and each Guarantor consents to AJ making an application in arbitration, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in AJ's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to AJ as a result of the Event of Default. Each Merchant and each Guarantor irrevocably authorize and direct each of their respective financial institutions and account debtors to comply with any injunction, restraining order, or other equitable relief issued in AJ's favor in arbitration under the terms of this Agreement, will hold harmless and indemnify AJ and its employees, agents, attorneys, members, managers, officers, subsidiaries, affiliate entities, successors, and assigns from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) relating to the making or enforcement of any application for the issuance of an injunction, restraining order, or other equitable relief in AJ's favor to restrain each Merchant's accounts and/or receivables, and will hold harmless and indemnify all financial institutions and account debtors from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) relating to compliance with any injunction, restraining order, or other equitable relief issued in favor of AJ.

Each Merchant acknowledges and agrees that this Agreement is the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under this Agreement will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that this Agreement therefore evidences a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in this Agreement to the contrary, all matters of arbitration relating to this Agreement will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules or the laws of the jurisdiction in which the application is made. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of AJ.

**49. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of this Agreement or any other address(es) provided in writing to AJ by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by AJ demonstrating that AJ was provided with notice of a change in the Contact Address.

**50. Survival of Representation, etc.** All representations, warranties, and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated unless specified otherwise in this Agreement.

**51. Waiver.** No failure on the part of AJ to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**52. Independent Sales Organizations/Brokers.** Each Merchant and each Guarantor acknowledge that it may have been introduced to AJ by or received assistance in entering into this Agreement or its Guarantee from an independent sales organization or broker ("ISO"). Each Merchant and each Guarantor agree that any ISO is separate from and is not an agent or representative of AJ. Each Merchant and each Guarantor acknowledge that AJ is not bound by any promises or agreements made by any ISO that are not contained within this Agreement. Each Merchant and each Guarantor exculpate

I have read and agree to the terms and conditions set forth above:

Name: **EDMILSON RAMOS** Title: **OWNER** Date: **01/18/2022**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

from liability and agree to hold harmless and indemnify AJ and its officers, directors, members, shareholders, employees, and agents from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by any Merchant or any Guarantor resulting from any act or omission by any ISO. Each Merchant and each Guarantor acknowledge that any fee that they paid to any ISO for its services is separate and apart from any payment under this Agreement. Each Merchant and each Guarantor acknowledge that AJ does not in any way require the use of an ISO and that any fees charged by any ISO are not required as a condition or incident to this Agreement.

**53. Modifications; Agreements.** No modification, amendment, waiver, or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

**54. Severability.** If any provision of this Agreement is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Agreement is deemed void, all other provisions will remain in effect.

**55. Headings.** Headings of the various articles and/or sections of this Agreement are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**56. Attorney Review.** Each Merchant acknowledges that it has had an opportunity to review this Agreement and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**57. Entire Agreement.** This Agreement, inclusive of all addenda, if any, executed simultaneously herewith constitutes the full understanding of the parties to the transaction herein and may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Agreement and any other document preceding it, this Agreement will govern. This Agreement does not affect any previous agreement between the parties unless such an agreement is specifically referenced herein. This Agreement will not be affected by any subsequent agreement between the parties unless this Agreement is specifically referenced therein. AJ will not be permitted to enforce any of its rights under this Agreement if so expressed by in writing by Gene Rosen's Law Firm.

**58. Counterparts; Fax and Electronic Signatures.** This Agreement may be executed electronically and in counterparts. Facsimile and electronic copies of this Agreement will have the full force and effect of an original.

### SIGNATURE(S) TO FOLLOW ON NEXT PAGE

I have read and agree to the terms and conditions set forth above:

Name: <u>EDMILSON RAMOS</u> Title: <u>OWNER</u> Date: <u>01/18/2022</u>

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

### EACH UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS AGREEMENT

**FOR THE MERCHANT/OWNER (#1)**

By: <u>EDMILSON RAMOS</u>
   (Print Name)

**OWNER**
(Print Title)

_____
(Signature)

SS# ▮▮▮▮▮

Driver License Number ▮▮▮▮▮

**FOR THE MERCHANT/OWNER (#2)**

By: _____
   (Print Name)

_____
(Print Title)

_____
(Signature)

SS# _____

Driver License Number _____

Approved for AJ EQUITY GROUP LLC by: _____

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

## GUARANTEE

**G1. Personal Guarantee of Performance.** This is a personal guaranty of performance, dated **01/18/2022**, of the Standard Merchant Cash Advance Agreement, dated **01/18/2022** ("Agreement"), inclusive of all addenda, if any, executed simultaneously therewith, by and between AJ EQUITY GROUP LLC ("AJ") and **TOP LINE GRANITE DESIGN INC / US CONSTRUCTION AND MAINTENANCE LLC.** ("Merchant"). Each undersigned Guarantor hereby guarantees each Merchant's performance of all of the representations, warranties, and covenants made by each Merchant to AJ in the Agreement, inclusive of all addenda, if any, executed simultaneously herewith, as the Agreement may be renewed, amended, extended, or otherwise modified (the "Guaranteed Obligations"). Each Guarantor's obligations are due at the time of any breach by any Merchant of any representation, warranty, or covenant made by any Merchant in the Agreement.

**G2. Communications.** AJ may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Guarantor gives AJ permission to call or send a text message to any telephone number given to AJ in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Guarantor also gives AJ permission to communicate such information to them by e-mail. Each Guarantor agrees that AJ will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Guarantor acknowledges that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that AJ has no liability for any such charges.

**G3. Guarantor Waivers.** If AJ considers any Event of Default to have taken place under the Agreement, then AJ may enforce its rights under this Guarantee without first seeking to obtain payment from any Merchant, any other guarantor, or any Collateral, Additional Collateral, or Cross-Collateral AJ may hold pursuant to this Guarantee or any other agreement or guarantee. AJ does not have to notify any Guarantor of any of the following events and Guarantor(s) will not be released from its obligations under this Guarantee even if it is not notified of: (i) any Merchant's failure to pay timely any amount owed under the Agreement; (ii) any adverse change in any Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) AJ's acceptance of the Agreement with any Merchant; and (v) any renewal, extension, or other modification of the Agreement or any Merchant's other obligations to AJ. In addition, AJ may take any of the following actions without releasing any Guarantor from any obligations under this Guarantee: (i) renew, extend, or otherwise modify the Agreement or any Merchant's other obligations to AJ; (ii) if there is more than one Merchant, release a Merchant from its obligations to AJ such that at least one Merchant remains obligated to AJ; (iii) sell, release, impair, waive, or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under the Agreement. Until the Receivables Purchased Amount and each Merchant's other obligations to AJ under the Agreement and this Guarantee are paid in full, each Guarantor shall not seek reimbursement from any Merchant or any other guarantor for any amounts paid by it under the Agreement. Each Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against any Merchant, any other guarantor, or any collateral provided by any Merchant or any other guarantor, for any amounts paid by it or acts performed by it under this Guarantee: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**G4. Joint and Several Liability.** The obligations hereunder of the persons or entities constituting each Guarantor under this Guarantee are joint and several.

**G5. Injunctive Relief.** In case any Event of Default occurs and is not waived, AJ will be entitled to the issuance of an injunction, restraining order, or other equitable relief in AJ's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to AJ as a result of the Event of Default, and each Guarantor will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent

I have read and agree to the terms and conditions set forth above:

Name: **EDMILSON RAMOS** Title: **OWNER** Date: **01/18/2022**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

jurisdiction without any prior notice to any Merchant or Guarantor and without AJ being required to furnish a bond or other undertaking in connection with the application. To the extent applicable, Merchant(s) and Guarantor(s) waive the right to notice and a hearing under Connecticut General Statutes sections 52-278a to 52-278g, inclusive, and consent to the issuance of a writ for a prejudgment remedy without securing a court order.

**G6. Choice of Law.** Each Guarantor acknowledges and agrees that the Agreement and this Guarantee were made in the State of New York, that the Purchase Price is being paid by AJ in the State of New York, that the Receivables Purchased Amount is being delivered to AJ in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by the Agreement and this Guarantee. This Guarantee and the relationship between AJ, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**G7. Venue and Forum Selection.** Any litigation relating to this Agreement or this Guarantee or involving AJ on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Kings, Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Guarantee encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Guarantee that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to AJ may be commenced and maintained in any other court of competent jurisdiction.

**G8. Jury Waiver.** Each Guarantor agrees to waive trial by jury in any dispute with AJ.

**G9. Counterclaim Waiver.** In any litigation or arbitration commenced by AJ, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**G10. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against AJ within one year of its accrual will be time barred.

**G11. Costs.** Each Merchant and each Guarantor must pay all of AJ's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement or this Guarantee and the enforcement thereof, including but not limited to collection agency fees, expert witness fees, and costs of suit.

**G12. Prejudgment and Postjudgment Interest.** If AJ becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then AJ will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**G13. Legal Fees.** If AJ prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay AJ's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**G14. Class Action Waiver.** AJ, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**G15. Arbitration.** Any action or dispute relating to this Agreement or this Guarantee or involving AJ on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any

I have read and agree to the terms and conditions set forth above:

Name: **EDMILSON RAMOS** Title: **OWNER** Date: **01/18/2022**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Civil Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement or this Guarantee must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Guarantor consents to AJ making an application in arbitration, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in AJ's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to AJ as a result of the Event of Default. Each Guarantor irrevocably authorizes and directs each of its financial institutions and account debtors to comply with any injunction, restraining order, or other equitable relief issued in AJ's favor in arbitration under the terms of this Agreement, will hold harmless and indemnify AJ and its employees, agents, attorneys, members, managers, officers, subsidiaries, affiliate entities, successors, and assigns from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) relating to the making or enforcement of any application for the issuance of an injunction, restraining order, or other equitable relief in AJ's favor to restrain each Guarantor's accounts and/or receivables, and will hold harmless and indemnify all financial institutions and account debtors from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) relating to compliance with any injunction, restraining order, or other equitable relief issued in favor of AJ.

Each Guarantor acknowledges and agrees that the Agreement and this Guarantee are the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under the Agreement and this Guarantee will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that the Agreement and this Guarantee therefore evidence a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in the Agreement or this Guarantee to the contrary, all matters of arbitration relating to the Agreement or this Guarantee will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules or the laws of the jurisdiction in which the application is made. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of AJ.

**G16. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of the Agreement or any other address(es) provided in writing to AJ by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of the Agreement if it does not furnish a certified mail return receipt signed by AJ demonstrating that AJ was provided with notice of a change in the Contact Address.

**I have read and agree to the terms and conditions set forth above:**

Name: <u>EDMILSON RAMOS</u> Title: <u>OWNER</u> Date: <u>01/18/2022</u>

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**G17. Severability.** If any provision of this Guarantee is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Guarantee is deemed void, all other provisions will remain in effect.

**G18. Survival.** The provisions of Sections G2, G3, G4, G5, G6, G7, G8, G9, G10, G11, G12, G13, G14, G15, G16, G17, G18, G19, G20, G21, and G22 shall survive any termination of this Guarantee.

**G19. Headings.** Headings of the various articles and/or sections of this Guarantee are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**G20. Attorney Review.** Each Guarantor acknowledges that it has had an opportunity to review this Guarantee, the Agreement, and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**G21. Entire Agreement.** This Guarantee, inclusive of all addenda, if any, executed simultaneously herewith may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Guarantee and any other document preceding it, this Guarantee will govern. This Guarantee does not affect any previous agreement between the parties unless such an agreement is specifically referenced in the Agreement or herein. This Guarantee will not be affected by any subsequent agreement between the parties unless this Guarantee is specifically referenced therein.

**G22. Counterparts; Fax and Electronic Signatures.** This Guarantee may be executed electronically and in counterparts. Facsimile and electronic copies of this Guarantee will have the full force and effect of an original.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "STANDARD MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS GUARANTEE. CAPITALIZED TERMS NOT DEFINED IN THIS GUARANTEE SHALL HAVE THE MEANING SET FORTH IN THE STANDARD MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

### EACH UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS GUARANTEE

GUARANTOR (#1)

By: **EDMILSON RAMOS**
    (Print Name)

                                          (Signature)

SS# █████████

Driver License Number █████████

GUARANTOR (#2)

By: _____
          (Print Name)

                                    (Signature)

SS# _____

Driver License Number _____

STANDARD MERCHANT CASH ADVANCE AGREEMENT

# BANK INFORMATION

Dear Merchant,

Thank you for accepting this offer from AJ EQUITY GROUP LLC. We look forward to being your funding partner.

You authorize AJ EQUITY GROUP LLC to collect the Receivables Purchased Amount under this Agreement by ACH debiting your bank account with the bank listed below.

AJ EQUITY GROUP LLC will require viewing access to your bank account each business day.

AJ EQUITY GROUP LLC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

**\* Be sure to indicate capital or lower case letters.**

Name of bank: _AVIDIA Banc_

Name of account: _top line Granik Design inc_

Account number: _[redacted]_          Routing number: _[redacted]_

Bank portal website: _www.AVIDIABank.com_

Username: _[redacted]_

Password: _[redacted]_

Security Question/Answer 1: _____ NO

Security Question/Answer 2: _____ NO

Security Question/Answer 3: _____ NO

Any other information necessary to access your account: _____ NO

If you have any questions please feel free to contact us directly at (212) 645-1835.

I have read and agree to the terms and conditions set forth above:

Name: EDMIKSON RAMOS Title: OWNER Date: 01/18/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Addendum, dated **01/18/2022**, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated **01/18/2022**, between AJ EQUITY GROUP LLC ("AJ") and **TOP LINE GRANITE DESIGN INC / US CONSTRUCTION AND MAINTENANCE LLC,** ("Merchant"). This Addendum incorporates by reference the terms and conditions of the Agreement. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

Instead of debiting the **10%** Specified Percentage of Merchant's Receivables, AJ will instead debit **$2,590.90** ("Estimated Payment") from the Account every **day**. The Estimated Payment is intended to be an approximation of no more than the Specified Percentage.

Merchant may give written notice to AJ requesting that AJ adjust the Estimated Payment so that it is consistent with Merchant's most recent performance. Merchant may give written notice requesting a reconciliation by e-mail to joshua@ajequity.com and such notice will be deemed to have been received if and when AJ sends a reply e-mail (but not a read receipt). In order to effectuate this adjustment, Merchant must produce with its request the login and password for Merchant's Account and any and all bank statements, merchant statements, and other documents necessary to ascertain the amounts of the Specified Percentage. AJ will complete each such reconciliation within 2 business days after receipt of a written request for one accompanied by the information and documents required for it. If AJ determines that it collected more than it was entitled to, then AJ will credit to the Account all amounts to which it was not entitled and decrease the Estimated Payment accordingly. If AJ determines that it received less than it was entitled to under the Agreement, then AJ will immediately debit all additional amounts to which it is entitled from the Account and may increase the Estimated Payment accordingly. Nothing herein limits the amount of times that such an adjustment may be requested.

**FOR THE MERCHANT/OWNER (#1)**

By: **EDMILSON RAMOS – OWNER**
(Print Name and Title)

(Signature)

**FOR THE MERCHANT/OWNER (#2)**

By:_____

(Print Name and Title)

(Signature)

I have read and agree to the terms and conditions set forth above:

Name: **EDMILSON RAMOS** Title: **OWNER** Date: **01/18/2022**

| | | | | | |
|---|---|---|---|---|---|
| AJ Equity Group. | Check | 01/21/2022 | EFT | 2,490.90 | Ace #2674 |
| AJ Equity Group. | Check | 01/24/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 01/25/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 01/26/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 01/27/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 01/28/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 01/31/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 02/01/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 02/02/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 02/03/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 02/04/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 02/07/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 02/08/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 02/09/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 02/10/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 02/11/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 02/14/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 02/15/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 02/16/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 02/17/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 02/18/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 02/23/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 02/24/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 02/28/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 03/01/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 03/04/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 03/04/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 03/04/2022 | EFT | 2,590.90 | Ace #2674 |
| AJ Equity Group. | Check | 03/14/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/15/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/16/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/16/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/17/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/17/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/18/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/18/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/21/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/21/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/22/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/22/2022 | EFT | 2,590.90 | Acc#1847 |
| AJ Equity Group. | Check | 03/24/2022 | EFT | 2,590.90 | Acc#1847 |
| | | | | **106,126.90** | |

# COMPETITIVE CAPITAL SOLUTIONS LLC

## ACH Debit Authorization
### Check Draft Authorization Form

I Top Line Granite Design  authorize Vantiff LLC (dba COMPETITIVE CAPITAL SOLUTIONS LLC) to initiate funds from the checking account indicated below. I also authorize my depository financial institution to honor this transfer.

This authorization is valid for this transaction only. The transaction amount will be $ 3,469.50 .

I have read and agree to all of the terms and conditions on this page and any other contract or document that accompanies this agreement. I certify that I am the authorized account holder for this checking account. I understand this is a binding agreement and I will receive a copy of each check draft in my statement when the item has cleared.

I understand this is a legal binding agreement between Vantiff LLC (dba COMPETITIVE CAPITAL SOLUTIONS LLC) and, Top Line Granite Design .

I understand that all returned checks are subject to a $25.00 NSF Fee. This agreement will remain in effect until Vantiff LLC (dba COMPETITIVE CAPITAL SOLUTIONS LLC) receives my written notice of cancellation via mail, fax or email.

_____
Authorized Accountholder Signature (required)

01/19/2022
_____
Date (required)

_____
Authorized Bank Account Number

_____
Authorized Bank Account Routing Number

347 miDDlesex Rd , tyngsboro ma 01879
_____
Account Billing Address

DISREGARD
_____
Account Telephone Number

# COMPETITIVE CAPITAL SOLUTIONS LLC
## (516) 707-9131
### ACH Debit Authorization
### Check Draft Authorization Form

[TOP LINE GRANITE DESIGN INC.          COMPETITIVE CAPITAL SOLUTIONS
LLC) to initiate funds from the checking account indicated below. I also authorize my depository
financial institution to honor this transfer.

This authorization is valid for this transaction only. The transaction amount will be $ 3,987.65

I have read and agree to all of the terms and conditions on this page and any other contract or
document that accompanies this agreement. I certify that I am the authorized account holder for this
checking account. I understand this is a binding agreement and I will receive a copy of each check draft
in my statement when the item has cleared.

I understand this is a legal binding agreement between          (COMPETITIVE CAPITAL
SOLUTIONS LLC) and, TOP LINE GRANITE DESIGN INC.

I understand that all returned checks are subject to a $25.00 NSF Fee. This agreement will remain in
effect until Vantiff LLC (dba COMPETITIVE CAPITAL SOLUTIONS LLC) receives my written
notice of cancellation via mail, fax or email.

✖ _____
Authorized Accountholder Signature (required)

✖ 01/18/22
_____
Date (required)

✖ _____
Authorized Bank Account Number

✖ _____
Authorized Bank Account Routing Number

_____
Account Billing Address

N/A
_____
Account Telephone Number