B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br><br>Steven Weiss, Chapter 7 Trustee | DEFENDANTS<br><br>Brickstone Group, LLC |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Mark J. Esposito, Esquire<br>Shatz Schwartz and Fentin, P.C.<br>1441 Main Street, Suite 1100<br>Springfield, MA 01103    Phone (413) 737-1131 | ATTORNEYS (If Known) |
| PARTY (Check One Box Only)<br>□ Debtor    □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor    □ Other<br>☒ Trustee | PARTY (Check One Box Only)<br>□ Debtor    □ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor    □ Other<br>□ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

This is an adversary proceeding seeking to recover preferential transfers made by the Debtor, Top Line Granite Design, Inc. ("Top Line"), to Brickstone Group LLC ("Brickstone") pursuant to 11 U.S.C. §§ 547, 550. Further, the interest rate charged on the loan Brickstone made to Top Line exceeded the amount allowed by Massachusetts law, and making loans at rates in violation of Massachusetts law constitutes a violation of General Laws Chapter 93A, § 2. Accordingly, the Trustee requests entry of judgment for the damages arising from such violations, plus multiple damages and attorney's fees incurred in connection with this matter.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☐ 11-Recovery of money/property - §542 turnover of property
- ☒ 12-Recovery of money/property - §547 preference
- ☐ 13-Recovery of money/property - §548 fraudulent transfer
- ☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- ☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- ☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- ☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- ☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- ☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- ☐ 61-Dischargeability - §523(a)(5), domestic support
- ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
- ☐ 63-Dischargeability - §523(a)(8), student loan
- ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- ☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- ☐ 71-Injunctive relief – imposition of stay
- ☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- ☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- ☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- ☐ 01-Determination of removed claim or cause

**Other**
- ☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
- ☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand $ 55,531.92 |
| Other Relief Sought | |

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Top Line Granite Design, Inc. | BANKRUPTCY CASE NO.<br>22-40216 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central Division | DIVISION OFFICE<br>Worcester | NAME OF JUDGE<br>Elizabeth D. Katz |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>12/19/2023 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Steven Weiss, | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

|  |  |  |
|---|---|---|
| In re | ) | |
| | ) | Chapter 7 |
| TOP LINE GRANITE DESIGN, INC., | ) | Case No. 22-40216-EDK |
| Debtor | ) | |
| | ) | |
| STEVEN WEISS, Chapter 7 Trustee, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. 23-_____ |
| | ) | |
| BRICKSTONE GROUP LLC, | ) | |
| Defendant | ) | |
| | ) | |

## COMPLAINT

### Introduction

1.     This is an adversary proceeding brought by Steven Weiss, Chapter 7 Trustee (the "Trustee") seeking to recover preferential transfers made by the Debtor, Top Line Granite Design, Inc. ("Top Line"), to Brickstone Group LLC ("Brickstone") pursuant to 11 U.S.C. §§ 547, 550. Further, the interest rate charged on the loan Brickstone made to Top Line exceeded the amount allowed by Massachusetts law, and making loans at rates in violation of Massachusetts law constitutes a violation of General Laws Chapter 93A, § 2. Accordingly, the Trustee requests entry of judgment for the damages arising from such violations, plus multiple damages and attorney's fees incurred in connection with this matter.

### Parties

2.     The Trustee is an individual practicing law with Shatz, Schwartz and Fentin, P.C., with a business address of 1441 Main Street, Suite 1100, Springfield, Massachusetts, 01103.

3.     The Defendant, Brickstone, is a limited liability company organized under the laws of the State of Delaware with a business address of 1201 N. Orange Street, Suite 7140, Wilmington, DE 19801.

## Jurisdiction and Venue

4.     This Court has jurisdiction over the core proceeding set forth in Count I pursuant to 28 U.S.C. § 157(b)(2)(F).

5.     This Court has jurisdiction over the non-core proceeding set forth in Count II pursuant to 28 U.S.C. § 1334(b).

6.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408-1409.

7.     Brickstone filed a claim against the bankruptcy estate of Top Line. [Claim 41]

8.     In filing a claim against the bankruptcy estate, Brickstone submitted itself to the jurisdiction of this Court. *Langenkamp v. Culp*, 498 U.S. 42, 44 (1990), *citing Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58-59 & n.14 (1989).

## Facts

9.     Top Line borrowed money from several so-called merchant cash advance lenders ("MCAs") such as Brickstone to fund its ongoing operations.

10.     At all times relevant herein, Top Line was insolvent.

11.     On February 14, 2022, Top Line and Brickstone entered into a so-called Standard Merchant Cash Advance Agreement (the "Agreement"). A true copy of the Agreement is attached hereto as Exhibit A.

12.     While the Agreement purports to be one by which Brickstone purchased a portion of Top Line's accounts receivable, in purpose and effect it in fact constituted a loan from Brickstone to Top Line. Brickstone's proof of claim reflects that its claim against Top Line is

allegedly secured by Top Line's assets. [Claim 41]. However, the UCC-1 financing statement was not filed until March 31, 2022, more than 30 days after the Agreement was executed, and after the Debtor filed its Chapter 11 petition. Thus, Brickstone's alleged secured claim is unperfected and subject to avoidance.

13.     Under the Agreement, Top Line was to receive from Brickstone Sixty-Seven Thousand, Five Hundred Dollars ($67,500) (the "Loan Amount"), and pay to Brickstone One Hundred Eight Thousand, Seven Hundred and Fifty Dollars ($108,750) (the "Repayment Amount"), in the form of daily payments each business day in the amount of Two Thousand, Three Hundred Thirteen and 83/100 Dollars ($2,313.83) (the "Daily Payments").

14.     While under the Agreement the so-called "Purchase Price" to be paid to Top Line is listed as Seventy-Five Thousand Dollars ($75,000), the actual amount to be remitted to Top Line was reduced to the Loan Amount when net of fees imposed by Brickstone.

15.     The Repayment Amount equaled the sum of forty-seven (47) Daily Payments.

16.     As set forth on Top Line's amended statement of financial affairs [Doc 51], during the ninety (90) days before and including the Petition Date of March 25, 2022 (the "Preference Period"), Top Line transferred a total of Fifty-Five Thousand, Five Hundred Thirty-One and 92/100 Dollars ($55,531.92) to Brickstone in the form of twenty-four (24) Daily Payments. A summary of such payments is attached hereto as Exhibit B.[1]

17.     Thus, during the Preference Period, Top Line made transfers of an interest of Top Line's Property to or for the benefit of Brickstone of Fifty-Five Thousand, Five Hundred Thirty-One and 92/100 Dollars ($55,531.92) (the "Transfers").

---

[1] Top Line paid to Brickstone two (2) Daily Payments on February 22, 2022.

18.     On July 11, 2023, the Trustee served on Brickstone a letter demanding repayment of the Transfers into Top Line's bankruptcy estate (the "Demand Letter"). A true copy of that letter is attached hereto as Exhibit C. Brickstone has not responded to the Demand Letter.

## COUNT I – AVOIDANCE OF PREFERENTIAL TRANSFERS

19.     The facts set forth above are incorporated as if fully set forth herein.

20.     The Transfers were made to Brickstone, a creditor of Top Line.

21.     The Transfers were made on account of antecedent debt owed by Top Line to Brickstone.

22.     At the time of the Transfers, Top Line was insolvent.

23.     The Transfers were made within the Preference Period.

24.     If not voided, the Transfers will enable Brickstone to receive more than it would in a distribution under Chapter 7 if such transfer had not been made.

25.     The Trustee therefore states that the Transfers constitute preferential transfers which may be voided pursuant to 11 U.S.C. § 547(b).

## COUNT II – VIOLATION OF G.L. c. 93A

26.     The facts set forth above are incorporated as if fully set forth herein.

27.     Under the Massachusetts usury statute, no person may charge an interest rate exceeding twenty percent (20%) unless the lender provides prior written notice to the Attorney General of the Commonwealth of Massachusetts (the "Attorney General") of his, her, or its intent to make a loan in excess of such rate. G.L. c. 271, § 49 (the "Usury Statute").

28.     For purposes of the Usury Statute, interest includes commissions and other charges assessed by the lender.

29.     By its own terms, violation of the Usury Statute constitutes a criminal offense.

30.     Effectively, the Agreement was a disguised loan charging over sixty-one percent (61%) interest over an expected repayment period of less than three months, equivalent to annualized interest of over two hundred forty percent (240%).

31.     Upon information and belief, at no time did Brickstone notify the Attorney General of its intent to make a loan with an interest rate exceeding twenty percent (20%).

32.     Willfully extending a usurious loan *per se* constitutes an unfair business practice within the meaning of G.L. c. 93A, § 2.

33.     Top Line was damaged by being forced to repay a usurious loan.

34.     The Demand Letter constituted a written demand for relief within the meaning of G.L. c. 93A, § 9(3), although such demand was not required pursuant to G.L. c. 93A, § 11.

35.     Brickstone is liable to Top Line's bankruptcy estate for treble damages and attorney's fees and costs.

WHEREFORE, the Trustee respectfully requests that this Honorable Court:

1.     On Count I, enter an order determining that the Transfers from Top Line to Brickstone constitute preferential transfers pursuant to 11 U.S.C. § 547(b), and enter judgment against Brickstone in the amount of Fifty-Five Thousand, Five Hundred Thirty-One and 92/100 Dollars ($55,531.92) plus interest and costs.

2.     On Count II, enter an order determining that Brickstone's enforcement of the terms of a usurious loan constituted an unfair business practice pursuant to G.L. c. 93A, § 2, enter judgment against Brickstone in the amount of Fifty-Five Thousand, Five Hundred Thirty-One and 92/100 Dollars ($55,531.92) plus interest, treble the award of damages, and award to the bankruptcy estate the Trustee's attorney's fees and costs pursuant to G.L. c. 93A, § 11.

Respectfully submitted,
For the Plaintiff,
STEVEN WEISS, TRUSTEE,
By his attorneys,

Steven Weiss, BBO # 545619
Mark J. Esposito, BBO # 672638
Shatz, Schwartz and Fentin, P.C.
1441 Main Street, Suite 1100
Springfield, MA 01103
(413) 737-1131
(413) 736-0375 (f)
sweiss@ssfpc.com
mesposito@ssfpc.com

Dated: December 18, 2023

22\0137\Avoidance Claims\Complaint - Brickstone Group

EXHIBIT A ver. 5/20/21

## BRICKSTONE GROUP LLC
1201 N Orange Street STE 7140, Wilmington, DE 19801
(347) 620-1905

# STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Agreement dated <u>02/14/2022</u> by and between BRICKSTONE GROUP LLC ("BG") and each merchant listed below ("Merchant").

Merchant's Legal Name: TOP LINE GRANITE DESIGN INC.

| | |
|---|---|
| D/B/A: TOP LINE GRANITE DESIGN | Fed ID #: ▊▊▊▊ |

Type of Entity:
◉ Corporation ○ Limited Liability Company ○ Limited Partnership ○ Limited Liability Partnership ○ Sole Proprietor

| | | | |
|---|---|---|---|
| Business Address: 347 MIDDLESEX RD | City: TYNGSBORO | State: MA | Zip: 01879 |
| Contact Address: 290 MASSAPOAG RD | City: TYNGSBORO | State: MA | Zip: 01879 |
| E-mail Address: ramosedmilson@hotmail.com | Phone Number: 9783601199 | | |

| | |
|---|---|
| **Purchase Price** *This is the amount being paid to Merchant(s) for the Receivables Purchased Amount (defined below).* | $ 75,000.00 |
| **Receivables Purchased Amount** *This is the amount of Receivables (defined in Section 1 below) being sold.* | $ 108,750.00 |
| **Specified Percentage** *This is the percentage of Receivables (defined below) to be delivered until the Receivables Purchased Amount is paid in full.* | 25 % |
| **Net Funds Provided** *This is the net amount being paid to or on behalf of Merchant(s) after deduction of applicable fees listed in Section 2 below.* | $ 67,500.00 |
| **Initial Estimated Payment** *This is only applicable if an Addendum for Estimated Payments is being signed. This is the initial amount of periodic payments collected from Merchant(s) as an approximation of no more than the Specified Percentage of the Receivables and is subject to reconciliation as set forth in Section 4 below.* | $ 2,313.83 per day |

## TERMS AND CONDITIONS

**1. Sale of Future Receipts.** Merchant(s) hereby sell, assign, and transfer to BG (making BG the absolute owner) in consideration of the funds provided ("Purchase Price") specified above, all of each Merchant's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of each merchant's business), for the payment of each Merchant's sale of goods or services until the amount specified above (the "Receivables Purchased Amount") has been delivered by Merchant(s) to BG. Each Merchant hereby acknowledges that until the Receivables Purchased Amount has been received in full by BG, each Merchant's Receivables, up to the balance of the Receivables Purchased Amount, are the property of BG and not the property of any Merchant. Each Merchant agrees that it is a fiduciary for BG and that each Merchant will hold Receivables in trust for BG in its capacity as a fiduciary for BG.

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS          Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

The Receivables Purchased Amount shall be paid to BG by each Merchant irrevocably authorizing only one depositing account acceptable to BG (the "Account") to remit the percentage specified above (the "Specified Percentage") of each Merchant's settlement amounts due from each transaction, until such time as BG receives payment in full of the Receivables Purchased Amount. Each Merchant hereby authorizes BG to ACH debit the specified remittances from the Account on a daily basis as of the next business day after the date of this Agreement and will provide BG with all required access codes and monthly bank statements. Each Merchant understands that it will be held responsible for any fees resulting from a rejected ACH attempt or an Event of Default (see Section 2). BG is not responsible for any overdrafts or rejected transactions that may result from BG's ACH debiting the Specified Percentage amounts under the terms of this Agreement.

**2. Additional Fees.** In addition to the Receivables Purchased Amount, each Merchant will be held responsible to BG for the following fees, where applicable:

A. $ 7,500.00 - to cover underwriting and the ACH debit program, as well as related expenses. This will be deducted from payment of the Purchase Price.

B. Wire Fee - Merchant(s) shall receive funding electronically to the Account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH. This will be deducted from payment of the Purchase Price.

C. Blocked Account/Default - $2,500.00 - If BG considers an Event of Default to have taken place under Section 34.

D. UCC Fee - $195.00 – to cover BG filing a UCC-1 financing statement to secure its interest in the Receivables Purchased Amount. A $195.00 UCC termination fee will be charged if a UCC filing is terminated.

E. Court costs, arbitration fees, collection agency fees, attorney fees, expert fees, and any other expenses incurred in litigation, arbitration, or the enforcement of any of BG's legal or contractual rights against each Merchant and/or each Guarantor, if required, as explained in other Sections of this Agreement.

**3. Cap on Collection of the Receivables Purchased Amount.** The amount that BG will collect from Merchant(s) towards the Receivables Purchased Amount during any specific day will be capped at $ 2,313.83 (the "Cap"). If the Specified Percentage of all Receivables for a specific day is less than the Cap, then in addition to the Specified Percentage of Receivables for that day, BG will be permitted to collect any Receivables it did not previously collect due to the Cap such that the total amount collected during that day does not exceed the Cap. The Cap is not applicable to make up for a business day on which BG is closed and does not ACH debit the Account, to subsequent attempts to collect a rejected or blocked ACH payment, or for the collection of any of the fees listed in Section 2 or if any Event of Default listed in Section 34 is considered by BG to have taken place.

**4. Reconciliations.** Any Merchant may give written notice to BG requesting that BG conduct a reconciliation in order to ensure that the amount that BG has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A reconciliation may also be requested by e-mail to bruce@brickstonefund.com and such notice will be deemed to have been received if and when BG sends a reply e-mail (but not a read receipt). If such reconciliation determines that BG collected more than it was entitled to, then BG will credit to the Account all amounts to which BG was not entitled within seven days thereafter. If such reconciliation determines that BG collected less than it was entitled to, then BG will debit from the Account all additional amounts to which BG was entitled within seven days thereafter. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. BG will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

**5. Prepayments.** Although there is no obligation to do so, any Merchant may prepay any amount towards the Receivables Purchased Amount. There will be no penalty for any prepayment made by any Merchant. Any Merchant may elect to terminate this Agreement by prepaying BG the amount of the balance of the Receivables Purchased Amount at that time.

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS          Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**6. Merchant Deposit Agreement.** Merchant(s) shall appoint a bank acceptable to BG, to obtain electronic fund transfer services and/or "ACH" payments. Merchant(s) shall provide BG and/or its authorized agent with all of the information, authorizations, and passwords necessary to verify each Merchant's Receivables. Merchant(s) shall authorize BG and/or its agent(s) to deduct the amounts owed to BG for the Receivables as specified herein from settlement amounts which would otherwise be due to each Merchant and to pay such amounts to BG by permitting BG to withdraw the Specified Percentage by ACH debiting of the account. The authorization shall be irrevocable absent BG's written consent.

**7. Term of Agreement.** The term of this Agreement is indefinite and shall continue until BG receives the full Receivables Purchased Amount, or earlier if terminated pursuant to any provision of this Agreement. The provisions of Sections 4, 6, 7, 8, 10, 11, 13, 14, 15, 17, 18, 19, 22, 23, 28, 31, 32, 33, 34, 35, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, and 58 shall survive any termination of this Agreement.

**8. Ordinary Course of Business.** Each Merchant acknowledges that it is entering into this Agreement in the ordinary course of its business and that the payments to be made from each Merchant to BG under this Agreement are being made in the ordinary course of each Merchant's business.

**9. Financial Condition.** Each Merchant and each Guarantor (Guarantor being defined as each signatory to the Guarantee of this Agreement) authorizes BG and its agent(s) to investigate each Merchant's financial responsibility and history, and will provide to BG any bank or financial statements, tax returns, and other documents and records, as BG deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. BG is authorized to update such information and financial profiles from time to time as it deems appropriate.

**10. Monitoring, Recording, and Electronic Communications.** BG may choose to monitor and/or record telephone calls with any Merchant and its owners, employees, and agents. By signing this Agreement, each Merchant agrees that any call between BG and any Merchant or its representatives may be monitored and/or recorded. Each Merchant and each Guarantor grants access for BG to enter any Merchant's premises and to observe any Merchant's premises without any prior notice to any Merchant at any time after execution of this Agreement.

BG may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Merchant(s), Owner(s) (Owner being defined as each person who signs this Agreement on behalf of a Merchant), and Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Merchant, each Owner, and each Guarantor gives BG permission to call or send a text message to any telephone number given to BG in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Merchant, each Owner, and each Guarantor also gives BG permission to communicate such information to them by e-mail. Each Merchant, each Owner, and each Guarantor agree that BG will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Merchant, each Owner, and each Guarantor acknowledge that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that BG has no liability for any such charges.

**11. Accuracy of Information Furnished by Merchant and Investigation Thereof.** To the extent set forth herein, each of the parties is obligated upon his, her, or its execution of the Agreement to all terms of the Agreement. Each Merchant and each Owner signing this Agreement represent that he or she is authorized to sign this Agreement for each Merchant, legally binding said Merchant to its obligations under this Agreement and that the information provided herein and in all of BG's documents, forms, and recorded interview(s) is true, accurate, and complete in all respects. BG may produce a monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant(s) to BG. An investigative report may be made in connection with the Agreement. Each Merchant and each Owner signing this Agreement authorize BG, its agents and representatives, and any credit-reporting agency engaged by BG, to (i) investigate any references given or any other statements obtained from or about each Merchant or any of

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS   Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as any Merchant and/or Owners(s) continue to have any obligation to BG under this Agreement or for BG's ability to determine any Merchant's eligibility to enter into any future agreement with BG. Any misrepresentation made by any Merchant or Owner in connection with this Agreement may constitute a separate claim for fraud or intentional misrepresentation.

*Authorization for soft pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to BG under the Fair Credit Reporting Act, authorizing BG to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes BG to obtain such information solely to conduct a pre-qualification for credit.

*Authorization for hard pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to BG under the Fair Credit Reporting Act, authorizing BG to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes BG to obtain such information in accordance with a merchant cash advance application.

**12. Transactional History.** Each Merchant authorizes its bank to provide BG with its banking and/or credit card processing history.

**13. Indemnification.** Each Merchant and each Guarantor jointly and severally indemnify and hold harmless each Merchant's credit card and check processors (collectively, "Processor") and Processor's officers, directors, and shareholders against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by Processor resulting from (a) claims asserted by BG for monies owed to BG from any Merchant and (b) actions taken by any Processor in reliance upon information or instructions provided by BG.

**14. No Liability.** In no event will BG be liable for any claims asserted by any Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect, or consequential damages, each of which is waived by each Merchant and each Guarantor.

**15. Sale of Receivables.** Each Merchant and BG agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from BG to any Merchant. BG is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in BG not receiving the Receivables Purchased Amount. Each Merchant agrees that the Purchase Price in exchange for the Receivables pursuant to this Agreement equals the fair market value of such Receivables. BG has purchased and shall own all the Receivables described in this Agreement up to the full Receivables Purchased Amount as the Receivables are created. Payments made to BG in respect to the full amount of the Receivables shall be conditioned upon each Merchant's sale of products and services and the payment therefor by each Merchant's customers in the manner provided in this Agreement. Although certain jurisdictions require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, those disclosures do not change the fact that the transaction encompassed by this Agreement is not a loan and does not have an interest rate.

**16. Power of Attorney.** Each Merchant irrevocably appoints BG as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to BG, or, if BG considers an Event of Default to have taken place under Section 34, to settle all obligations due to BG from each Merchant, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (which is defined in Section 33); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign each Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to BG; and (v) to file any claims or take any action or institute any proceeding which BG may deem necessary for the collection of any of the unpaid Receivables Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Receivables Purchased Amount.

**17. Protections Against Default.** The following Protections 1 through 7 may be invoked by BG, immediately and without notice to any Merchant in the event:

(a) Any Merchant takes any action to discourage the use of methods of payment ordinarily and customarily used

**I have read and agree to the terms and conditions set forth above:**

Name and Title: EDMILSON RAMOS    Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

by its customers or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks and credit cards for the purchase of any Merchant's services and products;

(b) Any Merchant changes its arrangements with any Processor in any way that is adverse to BG;

(c) Any Merchant changes any Processor through which the Receivables are settled to another electronic check and/or credit card processor or permits any event to occur that could cause diversion of any Merchant's check and/or credit card transactions to another such processor;

(d) Any Merchant interrupts the operation of its business (other than adverse weather, natural disasters, or acts of God) or transfers, moves, sells, disposes, or otherwise conveys its business or assets without (i) the express prior written consent of BG and (ii) the written agreement of any purchaser or transferee to the assumption of all of any Merchant's obligations under this Agreement pursuant to documentation satisfactory to BG; or

(e) Any Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for any Merchant's goods or services with any means other than checks and/or credit cards that are settled through Processor. These protections are in addition to any other remedies available to BG at law, in equity, or otherwise available pursuant to this Agreement.

(f) BG considers any Event of Default listed in Section 34 to have taken place.

Protection 1: The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately.

Protection 2. BG may enforce the provisions of the Guarantee against Guarantor.

Protection 3. BG may enforce its security interest in the Collateral identified in Section 33.

Protection 4. BG may proceed to protect and enforce its rights and remedies by litigation or arbitration. Protection 5. If requested by BG, Merchant shall deliver to BG an executed assignment of lease of each Merchant's premises in favor of BG. Upon breach of any provision in this Section 17, BG may exercise its rights under such assignment of lease.

Protection 6. BG may debit any Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on any Merchant's bank account or otherwise, in an amount consistent with the terms of this Agreement.

Protection 7. BG will have the right, without waiving any of its rights and remedies and without notice to any Merchant and/or Guarantor, to notify each Merchant's credit card and/or check processor of the sale of Receivables hereunder and to direct such credit card processor to make payment to BG of all or any portion of the amounts received by such credit card processor on behalf of each Merchant. Each Merchant hereby grants to BG an irrevocable power-of-attorney, which power-of-attorney will be coupled with an interest, and hereby appoints BG and its representatives as each Merchant's attorney-in-fact to take any and all action necessary to direct such new or additional credit card and/or check processor to make payment to BG as contemplated by this Section.

**18. Protection of Information.** Each Merchant and each person signing this Agreement on behalf of each Merchant and/or as Owner, in respect of himself or herself personally, authorizes BG to disclose information concerning each Merchant, Owner and/or Guarantor's credit standing and business conduct to agents, affiliates, subsidiaries, and credit reporting bureaus. Each Merchant, Guarantor, and Owner hereby waives to the maximum extent permitted by law any claim for damages against BG or any of its affiliates relating to any (i) investigation undertaken by or on behalf of BG as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**19. Confidentiality.** Each Merchant understands and agrees that the terms and conditions of the products and services offered by BG, including this Agreement and any other BG documents (collectively, "Confidential Information") are proprietary and confidential information of BG. Accordingly, unless disclosure is required by law or court order, Merchant(s) shall not disclose Confidential Information of BG to any person other than an attorney, accountant, financial advisor, or employee of any Merchant who needs to know such information for the purpose of advising any Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising any Merchant and first agrees in writing to be bound by the terms of this Section 19.

**20. D/B/As.** Each Merchant hereby acknowledges and agrees that BG may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between BG and each Merchant, including the filing of UCC-1 financing statements and other notices or filings.

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS    Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**21. Financial Condition and Financial Information.** Each Merchant represents, warrants, and covenants that its bank and financial statements, copies of which have been furnished to BG, and future statements which will be furnished hereafter at the request of BG, fairly represent the financial condition of each Merchant at such dates, and that since those dates there have been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of any Merchant. Each Merchant has a continuing affirmative obligation to advise BG of any material adverse change in its financial condition, operation, or ownership.

**22. Governmental Approvals.** Each Merchant represents, warrants, and covenants that it is in compliance and shall comply with all laws and has valid permits, authorizations, and licenses to own, operate, and lease its properties and to conduct the business in which it is presently engaged.

**23. Authorization.** Each Merchant represents, warrants, and covenants that it and each person signing this Agreement on behalf of each Merchant has full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**24. Insurance.** Each Merchant represents, warrants, and covenants that it will maintain business-interruption insurance naming BG as loss payee and additional insured in amounts and against risks as are satisfactory to BG and shall provide BG proof of such insurance upon request.

**25. Electronic Check Processing Agreement.** Each Merchant represents, warrants, and covenants that it will not, without BG's prior written consent, change its Processor, add terminals, change its financial institution or bank account, or take any other action that could have any adverse effect upon any Merchant's obligations under this Agreement.

**26. Change of Name or Location.** Each Merchant represents, warrants, and covenants that it will not conduct its business under any name other than as disclosed to BG or change any place(s) of its business without prior written consent from BG.

**27. Estoppel Certificate.** Each Merchant represents, warrants, and covenants that it will, at any time, and from time to time, upon at least two day's prior notice from BG to that Merchant, execute, acknowledge, and deliver to BG and/or to any other person or entity specified by BG, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Receivables Purchased Amount or any portion thereof have been paid.

**28. No Bankruptcy.** Each Merchant represents, warrants, and covenants that as of the date of this Agreement, it does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against any Merchant. Each Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. Each Merchant further warrants that there will be no statutory presumption that it would have been insolvent on the date of this Agreement.

**29. Unencumbered Receivables.** Each Merchant represents, warrants, and covenants that it has good, complete, and marketable title to all Receivables, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with this Agreement or adverse to the interests of BG, other than any for which BG has actual or constructive knowledge as of the date of this Agreement.

**30. Stacking.** Each Merchant represents, warrants, and covenants that it will not enter into with any party other than BG any arrangement, agreement, or commitment that relates to or involves the Receivables, whether in the form of a purchase of, a loan against, collateral against, or the sale or purchase of credits against Receivables without the prior written consent of BG.

**I have read and agree to the terms and conditions set forth above:**

Name and Title: EDMILSON RAMOS   Date: 02/14/2022

Case 22-40216   Claim 41   Filed 07/29/22   Desc Attachment 2   Page 7 of 16

Page 7 of 19

# STANDARD MERCHANT CASH ADVANCE AGREEMENT

**31. Business Purpose.** Each Merchant represents, warrants, and covenants that it is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and each Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family, or household purposes.

**32. Default Under Other Contracts.** Each Merchant represents, warrants, and covenants that its execution of and/or performance under this Agreement will not cause or create an event of default by any Merchant under any contract with another person or entity.

**33. Security Interest.** To secure each Merchant's payment and performance obligations to BG under this Agreement and any future agreement with BG, each Merchant hereby grants to BG a security interest in collateral (the "Collateral"), that is defined as collectively: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by any Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC. The parties acknowledge and agree that any security interest granted to BG under any other agreement between any Merchant or Guarantor and BG (the "Cross-Collateral") will secure the obligations hereunder and under this Agreement. Negative Pledge: Each Merchant agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Cross-Collateral, as applicable.

Each Merchant agrees to execute any documents or take any action in connection with this Agreement as BG deems necessary to perfect or maintain BG's first priority security interest in the Collateral and the Cross-Collateral, including the execution of any account control agreements. Each Merchant hereby authorizes BG to file any financing statements deemed necessary by BG to perfect or maintain BG's security interest, which financing statements may contain notification that each Merchant has granted a negative pledge to BG with respect to the Collateral and the Cross-Collateral, and that any subsequent lienor may be tortiously interfering with BG's rights. Each Merchant shall be liable for and BG may charge and collect all costs and expenses, including but not limited to attorney fees, which may be incurred by BG in protecting, preserving, and enforcing BG's security interest and rights. Each Merchant further acknowledges that BG may use another legal name and/or D/B/A or an agent when designating the Secured Party when BG files the above-referenced financing statement(s).

**34. Events of Default.** An "Event of Default" may be considered to have taken place if any of the following occur:
(1) Any Merchant violates any term or covenant in this Agreement;
(2) Any representation or warranty by any Merchant in any Agreement with BG that has not been terminated proves to have been incorrect, false, or misleading in any material respect when made;
(3) Any Merchant fails to provide BG with written notice of any material change in its financial condition, operation, or ownership within seven days thereafter (unless a different notice period is specifically provided for elsewhere in this Agreement;
(4) the sending of notice of termination by any Merchant or Guarantor;
(5) Any Merchant transports, moves, interrupts, suspends, dissolves, or terminates its business without the prior written consent of BG other than a bankruptcy filing;
(6) Any Merchant transfers or sells all or substantially all of its assets without the prior written consent of BG;
(7) Any Merchant makes or sends notice of any intended bulk sale or transfer by any Merchant without the prior written consent of BG;
(8) Any Merchant uses multiple depository accounts without the prior written consent of BG;
(9) Any Merchant changes the Account without the prior written consent of BG;
(10) BG is not provided with updated login or password information for the Account within one business day after any such change is made by any Merchant;
(11) Any Merchant fails to send bank statements, merchant account statements, or bank login information for the Account within two business days after a written request for same is made by BG;
(12) Any Merchant performs any act that reduces the value of any Collateral granted under this Agreement;
(13) Any Merchant fails to deposit its Receivables into the Account;

**I have read and agree to the terms and conditions set forth above:**

Name and Title: EDMILSON RAMOS   Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

(14) Any Merchant causes any ACH debit to the Account by BG to be blocked or stopped without providing any advance written notice to BG, which notice may be given by e-mail to bruce@brickstonefund.com; or

(15) Any Merchant prevents BG from collecting any part of the Receivables Purchased Amount;

(16) Any Merchant causes any ACH debit to the Account to be stopped or otherwise returned that would result in an ACH Return Code of R08, R10, or R29 and that Merchant does not within two business days thereafter provide BG with written notice thereof explaining why that Merchant caused the ACH debit to be stopped or otherwise returned, which notice may be given by e-mail to bruce@brickstonefund.com; or

(17) Any Merchant defaults under any of the terms, covenants, and conditions of any other agreement with BG.

**35. Remedies.** In case any Event of Default occurs and is not waived, BG may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement, or other provision contained herein, or to enforce the discharge of each Merchant's obligations hereunder, or any other legal or equitable right or remedy. All rights, powers, and remedies of BG in connection with this Agreement, including each Protection listed in Section 17, may be exercised at any time by BG after the occurrence of an Event of Default, are cumulative and not exclusive, and will be in addition to any other rights, powers, or remedies provided by law or equity. In addition to the foregoing, in case any Event of Default occurs and is not waived, BG will be entitled to the issuance of an injunction, restraining order, or other equitable relief in BG's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to BG as a result of the Event of Default, and each Merchant will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without BG being required to furnish a bond or other undertaking in connection with the application.

**36. Required Notifications.** Each Merchant is required to give BG written notice at least one day prior to any filing under Title 11 of the United States Code. Merchant(s) are required to give BG at least seven days' written notice prior to the closing of any sale of all or substantially all of any Merchant's assets or stock.

**37. Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of BG, which consent may be withheld in BG's sole discretion. BG may assign, transfer, or sell its rights under this Agreement, including, without limitation, its rights to receive the Receivables Purchased Amount, and its rights under Section 33 of this Agreement, the Guarantee, and any other agreement, instrument, or document executed in connection with the transactions contemplated by this Agreement (a "Related Agreement"), or delegate its duties hereunder or thereunder, either in whole or in part. From and after the effective date of any such assignment or transfer by BG, whether or not any Merchant has actual notice thereof, this Agreement and each Related Agreement shall be deemed amended and modified (without the need for any further action on the part of any Merchant or BG) such that the assignee shall be deemed a party to this Agreement and any such Related Agreement and, to the extent provided in the assignment document between BG and such assignee (the "Assignment Agreement"), have the rights and obligations of BG under this Agreement and such Related Agreements with respect to the portion of the Receivables Purchased Amount set forth in such Assignment Agreement, including but not limited to rights in the Receivables, Collateral and Additional Collateral, the benefit of each Guarantor's guaranty regarding the full and prompt performance of every obligation that is a subject of the Guarantee, BG's rights under Section 17 of this Agreement (Protections Against Default), and to receive damages from any Merchant following a breach of this Agreement by any Merchant. In connection with such assignment, BG may disclose all information that BG has relating to any Merchant or its business. Each Merchant agrees to acknowledge any such assignment in writing upon BG's request.

**38. Notices.** All notices, requests, consents, demands, and other communications hereunder shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation to the respective parties to this Agreement at their addresses set forth in this Agreement and shall become effective only upon receipt. Written notice may also be given to any Merchant or Guarantor by e-mail to the E-mail Address listed on the first page of this Agreement. Each Merchant must set its spam or junk mail filter to accept e-mails sent by bruce@brickstonefund.com and its domain. This Section is not applicable to service of process or notices in any legal proceedings.

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS  Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**39. Choice of Law.** Each Merchant acknowledges and agrees that this Agreement was made in the State of New York, that the Purchase Price is being paid by BG in the State of New York, that the Receivables Purchased Amount is being delivered to BG in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by this Agreement. This Agreement and the relationship between BG, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**40. Forum and Venue Selection.** Any litigation relating to this Agreement or involving BG on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Agreement encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Agreement that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to BG may be commenced and maintained in any other court of competent jurisdiction.

**41. Jury Waiver.** The parties agree to waive trial by jury in any dispute between them.

**42. Counterclaim Waiver.** In any litigation or arbitration commenced by BG, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**43. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against BG within one year of its accrual will be time barred.

**44. Costs.** Each Merchant and each Guarantor must pay all of BG's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement and the enforcement thereof, including but not limited to collection agency fees, attorney fees, which may include a contingency fee of up to 40% of the amount claimed, expert witness fees, and costs of suit.

**45. Prejudgment and Postjudgment Interest.** If BG becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then BG will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**46. Legal Fees.** If BG prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay BG's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**47. Class Action Waiver.** BG, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**48. Arbitration.** Any action or dispute relating to this Agreement or involving BG on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS    Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Merchant and each Guarantor consents to BG making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in BG's favor, subject to court and arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to BG as a result of the Event of Default.

Each Merchant acknowledges and agrees that this Agreement is the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under this Agreement will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that this Agreement therefore evidences a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in this Agreement to the contrary, all matters of arbitration relating to this Agreement will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of BG.

**49. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of this Agreement or any other address(es) provided in writing to BG by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by BG demonstrating that BG was provided with notice of a change in the Contact Address.

**50. Survival of Representation, etc.** All representations, warranties, and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**51. Waiver.** No failure on the part of BG to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**52. Independent Sales Organizations/Brokers.** Each Merchant and each Guarantor acknowledge that it may have been introduced to BG by or received assistance in entering into this Agreement or its Guarantee from an independent sales organization or broker ("ISO"). Each Merchant and each Guarantor agree that any ISO is separate from and is not an agent or representative of BG. Each Merchant and each Guarantor acknowledge that BG is not bound by any promises or agreements made by any ISO that are not contained within this Agreement. Each Merchant and each Guarantor exculpate from liability and agree to hold harmless and indemnify BG and its officers, directors, members, shareholders, employees, and agents from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by any Merchant or any Guarantor resulting from any act or omission by any ISO. Each Merchant and each Guarantor acknowledge that any fee that they paid to any ISO for its services is separate and apart from any payment under this Agreement. Each Merchant and each Guarantor acknowledge that BG does not in any way require the use of an ISO and that any fees charged by any ISO are not

**I have read and agree to the terms and conditions set forth above:**

Name and Title: EDMILSON RAMOS   Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

required as a condition or incident to this Agreement.

**53. Modifications; Agreements.** No modification, amendment, waiver, or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

**54. Severability.** If any provision of this Agreement is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Agreement is deemed void, all other provisions will remain in effect.

**I have read and agree to the terms and conditions set forth above:**

Name and Title: EDMILSON RAMOS    Date: 02/14/2022

Page 12 of 19

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

55. **Headings.** Headings of the various articles and/or sections of this Agreement are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

56. **Attorney Review.** Each Merchant acknowledges that it has had an opportunity to review this Agreement and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

57. **Entire Agreement.** This Agreement, inclusive of all addenda, if any, executed simultaneously herewith constitutes the full understanding of the parties to the transaction herein and may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Agreement and any other document preceding it, this Agreement will govern. This Agreement does not affect any previous agreement between the parties unless such an agreement is specifically referenced herein. This Agreement will not be affected by any subsequent agreement between the parties unless this Agreement is specifically referenced therein. BG will not be permitted to enforce any of its rights under this Agreement if so expressed by in writing by Gene Rosen's Law Firm.

58. **Counterparts; Fax and Electronic Signatures.** This Agreement may be executed electronically and in counterparts. Facsimile and electronic copies of this Agreement will have the full force and effect of an original.

### EACH UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS AGREEMENT

FOR THE MERCHANT/OWNER (#1)

By: **EDMILSON RAMOS**

(Print Name and Title)

(Signature)

SS# _____

Driver License Number _____

FOR THE MERCHANT/OWNER (#2)

By: _____

(Print Name and Title)

(Signature)

SS# _____

Driver License Number _____

Approved for BRICKSTONE GROUP LLC by: _____

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

## GUARANTEE

**G1. Personal Guarantee of Performance.** This is a personal guaranty of performance, dated _02/14/2022_____, of the Standard Merchant Cash Advance Agreement, dated _02/14/2022_____ ("Agreement"), inclusive of all addenda, if any, executed simultaneously therewith, by and between BRICKSTONE GROUP LLC ("BG") and _TOP LINE GRANITE DESIGN INC._____ ("Merchant"). Each undersigned Guarantor hereby guarantees each Merchant's performance of all of the representations, warranties, and covenants made by each Merchant to BG in the Agreement, inclusive of all addenda, if any, executed simultaneously herewith, as the Agreement may be renewed, amended, extended, or otherwise modified (the "Guaranteed Obligations"). Each Guarantor's obligations are due at the time of any breach by any Merchant of any representation, warranty, or covenant made by any Merchant in the Agreement.

**G2. Communications.** BG may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Guarantor gives BG permission to call or send a text message to any telephone number given to BG in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Guarantor also gives BG permission to communicate such information to them by e-mail. Each Guarantor agrees that BG will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Guarantor acknowledges that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that BG has no liability for any such charges.

**G3. Guarantor Waivers.** If BG considers any Event of Default to have taken place under the Agreement, then BG may enforce its rights under this Guarantee without first seeking to obtain payment from any Merchant, any other guarantor, or any Collateral, Additional Collateral, or Cross-Collateral BG may hold pursuant to this Guarantee or any other agreement or guarantee. BG does not have to notify any Guarantor of any of the following events and Guarantor(s) will not be released from its obligations under this Guarantee even if it is not notified of: (i) any Merchant's failure to pay timely any amount owed under the Agreement; (ii) any adverse change in any Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) BG's acceptance of the Agreement with any Merchant; and (v) any renewal, extension, or other modification of the Agreement or any Merchant's other obligations to BG. In addition, BG may take any of the following actions without releasing any Guarantor from any obligations under this Guarantee: (i) renew, extend, or otherwise modify the Agreement or any Merchant's other obligations to BG; (ii) if there is more than one Merchant, release a Merchant from its obligations to BG such that at least one Merchant remains obligated to BG; (iii) sell, release, impair, waive, or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under the Agreement. Until the Receivables Purchased Amount and each Merchant's other obligations to BG under the Agreement and this Guarantee are paid in full, each Guarantor shall not seek reimbursement from any Merchant or any other guarantor for any amounts paid by it under the Agreement. Each Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against any Merchant, any other guarantor, or any collateral provided by any Merchant or any other guarantor, for any amounts paid by it or acts performed by it under this Guarantee: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**G4. Joint and Several Liability.** The obligations hereunder of the persons or entities constituting each Guarantor under this Guarantee are joint and several.

**G5. Injunctive Relief.** In case any Event of Default occurs and is not waived, BG will be entitled to the issuance of an injunction, restraining order, or other equitable relief in BG's favor, subject to court or arbitrator approval,

I have read and agree to the terms and conditions set forth above:

Name and Title: _EDMILSON RAMOS_____    Date: _02/14/2022____

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

restraining each Guarantor's accounts and/or receivables up to the amount due to BG as a result of the Event of Default, and each Guarantor will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without BG being required to furnish a bond or other undertaking in connection with the application.

**G6. Choice of Law.** Each Guarantor acknowledges and agrees that the Agreement and this Guarantee were made in the State of New York, that the Purchase Price is being paid by BG in the State of New York, that the Receivables Purchased Amount is being delivered to BG in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by the Agreement and this Guarantee. This Guarantee and the relationship between BG, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**G7. Forum and Venue Selection.** Any litigation relating to this Agreement or this Guarantee or involving BG on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Guarantee encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Guarantee that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to BG may be commenced and maintained in any other court of competent jurisdiction.

**G8. Jury Waiver.** Each Guarantor agrees to waive trial by jury in any dispute with BG.

**G9. Counterclaim Waiver.** In any litigation or arbitration commenced by BG, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**G10. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against BG within one year of its accrual will be time barred.

**G11. Costs.** Each Merchant and each Guarantor must pay all of BG's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement or this Guarantee and the enforcement thereof, including but not limited to collection agency fees, expert witness fees, and costs of suit.

**G12. Prejudgment and Postjudgment Interest.** If BG becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then BG will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**G13. Legal Fees.** If BG prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay BG's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**G14. Class Action Waiver.** BG, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**G15. Arbitration.** Any action or dispute relating to this Agreement or this Guarantee or involving BG on one

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS    Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement or this Guarantee must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Guarantor consents to BG making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in BG's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to BG as a result of the Event of Default.

Each Guarantor acknowledges and agrees that the Agreement and this Guarantee are the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under the Agreement and this Guarantee will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that the Agreement and this Guarantee therefore evidence a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in the Agreement or this Guarantee to the contrary, all matters of arbitration relating to the Agreement or this Guarantee will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of BG.

**G16. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of the Agreement or any other address(es) provided in writing to BG by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of the Agreement if it does not furnish a certified mail return receipt signed by BG demonstrating that BG was provided with notice of a change in the Contact Address.

**G17. Severability.** If any provision of this Guarantee is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Guarantee is deemed void, all other provisions will remain in effect.

**G18. Survival.** The provisions of Sections G2, G3, G4, G5, G6, G7, G8, G9, G10, G11, G12, G13, G14, G15, G16, G17, G18, G19, G20, G21, and G22 shall survive any termination of this Guarantee.

**G19. Headings.** Headings of the various articles and/or sections of this Guarantee are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**G20. Attorney Review.** Each Guarantor acknowledges that it has had an opportunity to review this Guarantee, the Agreement, and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**G21. Entire Agreement.** This Guarantee, inclusive of all addenda, if any, executed simultaneously herewith may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS       Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

Guarantee and any other document preceding it, this Guarantee will govern. This Guarantee does not affect any previous agreement between the parties unless such an agreement is specifically referenced in the Agreement or herein. This Guarantee will not be affected by any subsequent agreement between the parties unless this Guarantee is specifically referenced therein.

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS     Date: 02/14/2022

EXHIBIT B

| | | | | | |
|---|---|---|---|---|---|
| Brickstone Group | Check | 02/16/2022 | EFT | 2,313.83 | Ace #8092 |
| Brickstone Group | Check | 02/17/2022 | EFT | 2,313.83 | Ace #8092 |
| Brickstone Group | Check | 02/18/2022 | EFT | 2,313.83 | Ace #8092 |
| Brickstone Group | Check | 02/22/2022 | EFT | 2,313.83 | Ace #8092 |
| Brickstone Group | Check | 02/22/2022 | EFT | 2,313.83 | Ace #8092 |
| Brickstone Group | Check | 02/23/2022 | EFT | 2,313.83 | Ace #8092 |
| Brickstone Group | Check | 02/24/2022 | EFT | 2,313.83 | Ace #8092 |
| Brickstone Group | Check | 02/25/2022 | EFT | 2,313.83 | Ace #8092 |
| Brickstone Group | Check | 02/28/2022 | EFT | 2,313.83 | Ace #8092 |
| Brickstone Group | Check | 03/02/2022 | EFT | 2,313.83 | Ace #8092 |
| Brickstone Group | Check | 03/07/2022 | EFT | 2,313.83 | Acc#8092 |
| Brickstone Group | Check | 03/08/2022 | EFT | 2,313.83 | Acc#8092 |
| Brickstone Group | Check | 03/09/2022 | EFT | 2,313.83 | Acc#8092 |
| Brickstone Group | Check | 03/10/2022 | EFT | 2,313.83 | Ace #8092 |
| Brickstone Group | Check | 03/11/2022 | EFT | 2,313.83 | Ace #8092 |
| Brickstone Group | Check | 03/14/2022 | EFT | 2,313.83 | Ace #8092 |
| Brickstone Group | Check | 03/15/2022 | EFT | 2,313.83 | Ace #8092 |
| Brickstone Group | Check | 03/16/2022 | EFT | 2,313.83 | Ace #8092 |
| Brickstone Group | Check | 03/17/2022 | EFT | 2,313.83 | Ace #8092 |
| Brickstone Group | Check | 03/18(2022 | EFT | 2,313.83 | Ace #8092 |
| Brickstone Group | Check | 03/21/2022 | EFT | 2,313.83 | Ace #8092 |
| Brickstone Group | Check | 03/23/2022 | EFT | 2,313.83 | Ace #8092 |
| Brickstone Group | Check | 03/24/2022 | EFT | 2,313.83 | Ace #8092 |
| Brickstone Group | Check | 03/25/2022 | EFT | 2,313.83 | Ace #8092 |
| | | | | **55,531.92** | |

**EXHIBIT C**



## SHATZ, SCHWARTZ AND FENTIN
COUNSELORS AT LAW

July 11, 2023

<u>By UPS Overnight Mail</u>
Steven Berkovitch, Esquire
Berkovitch & Bouskila, PLLC
80 Broad Street, Suite 3303
New York, NY 10004

Re: Top Line Granite Design, Inc.
<u>Case No. 22-40216-EDK</u>

Attorney Berkovitch:

This letter is directed to your attention, as you filed a proof of claim on behalf of Brickstone Group, LLC in this case. If I should direct this letter to your client directly, please let me know.

As you know, on March 25, 2022 (the "Petition Date") Top Line Granite Design, Inc. (the "Debtor") filed a petition for relief under subchapter V of Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Massachusetts. I was appointed as the subchapter V Trustee. On April 28, 2023 the Bankruptcy Court entered an order removing the debtor in possession, and expanding my authority, pursuant to Bankruptcy Code § 1183(b)(5). On June 29, 2023 the case was converted to a case under Chapter 7, and I was appointed as chapter 7 Trustee. A copy of my appointment is enclosed.

As Trustee, it is my duty to investigate the Debtor's affairs, and to recover transfers that may constitute preferential or fraudulent transfers under the applicable provisions of the Bankruptcy Code and Massachusetts law.

My investigations to date indicate that on February 14, 2022, Brickstone Group, LLC and the Debtor entered into a "Standard Merchant Cash Agreement" (the "Agreement"). Under the terms of the Agreement, your client purported to pay the Debtor $75,000,00 to acquire accounts receivables from the Debtor in the amount of $108,750.00. A copy of the Agreement is enclosed with this letter.

While the Agreement purports to constitute a purchase agreement, and not a loan, it is my contention that the transaction actually constitutes a disguised loan transaction; indeed, an addendum to the Agreement provides your client with a security interest in the Debtor's accounts receivables and proceeds. However, it appears that the security interest is unperfected, inasmuch as it was filed with the Massachusetts Secretary of State after the Petition Date.

*Springfield Office:*
1441 Main Street, Suite 1100
Springfield, MA 01103

Tel: 413-737-1131

*Northampton Office:*
64 Gothic Street
Northampton, MA 01060

Tel: 413-584-1600

*Albany Office:*
6 Automation Lane
Albany, NY 12205

Tel: 800-737-4178

ssfpc.com

The Debtor's records indicate that your client received transfers totaling $55,531.92 in the 90 days before the Chapter 11 petition was filed. An itemized list of the payments is also enclosed herein. It is my view that these payments constitute preferential transfers withing the meaning of 11 U.S.C. § 547. The reasons for my belief that the transfers are avoidable are that they were made:

1. To or for the benefit of a creditor;
2. On account of an antecedent debt;
3. Within 90 days before the Petition Date;
4. While the Debtor was insolvent; and
5. If not voided, will enable your company to receive more than it would in liquidation under Chapter 7 of the Bankruptcy Code.

To the extent that the Agreement is determined to be a loan, the effective interest rate may well be usurious under applicable law. In Massachusetts interest on a loan may not exceed twenty (20) percent, unless the lender has registered with the Massachusetts Attorney General. If your company has registered, please provide proof of such registration. I reserve the rights of the Debtor and the bankruptcy estate to seek to have the entire transaction voided and seek all available legal and equitable remedies in the event the transaction is determined to be a usurious loan.

Additionally, during the course of the case the Bankruptcy Court entered an order (which was not appealed, the "Order") ordering Brickstone to pay the sum of $21,625.90 for its willful violation of the automatic stay. A copy of the Order is also enclosed herein. Brickstone has not complied with the order.

Demand is hereby made upon Brickstone Group, LLC for the payment of the sum of $77,157.82 payable to "Steven Weiss, Trustee" on or before August 7, 2023. If payment is not received by that date, it is my intention to file an adversary proceeding against Brickstone in the United States Bankruptcy Court for the District of Massachusetts to recover the transfers and the amounts due under the Order and seek all available relief. Until this matter is resolved, I reserve all rights and remedies available to the bankruptcy estate.

This letter is an attempt to collect a debt and any information received will be used for that purpose.

Yours truly,

/s/ *Steven Weiss*

Steven Weiss

Cc: Andrew Lizotte, Esquire
Alan Braunstein, Esquire

22\0137\Avoidance Claims\5.Brickstone.1601

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

---

In Re:   Top Line Granite Design Inc. ,
         Debtor

Chapter: 7
Case No: 22–40216
Judge Elizabeth D. Katz

---

### CERTIFICATE OF APPOINTMENT OF INTERIM TRUSTEE
### AND FIXING OF BOND

Pursuant to 11 U.S.C. § 701(a)(1)

Steven Weiss
Steven Weiss, Trustee
Shatz,Schwartz & Fentin
1441 Main Street
Suite 1100
Springfield, MA 01103

is hereby appointed as Interim Trustee in the above–referenced proceeding and is designated to preside at the
meeting of creditors. The Trustee's bond is fixed under the general blanket bond heretofore approved. The Trustee
shall notify the United States Trustee immediately in the event that the liquid assets exceed $1,000,000.

Pursuant to FRBP 2008 the Trustee will be deemed to have accepted this appointment unless it is rejected within
five (5) days of receipt of this notice. Unless another trustee is elected the Interim Trustee appointed herein shall
serve as Trustee without further appointment as provided by 11 U.S.C. § 702(d).

Date:6/30/23

William K. Harrington
U.S. Trustee
(617) 788–0400

Original filed with Bankruptcy Court
Copy to trustee

---

**REJECTION**

I, Steven Weiss , hereby REJECT appointment as Trustee.
Dated: This day of _____ .

Steven Weiss

Original filed with Bankruptcy Court
Copy to United States Trustee

436

## BRICKSTONE GROUP LLC
1201 N Orange Street STE 7140, Wilmington, DE 19801
(347) 620-1905

# STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Agreement dated 02/14/2022 _____ by and between BRICKSTONE GROUP LLC ("BG") and each merchant listed below ("Merchant").

Merchant's Legal Name: TOP LINE GRANITE DESIGN INC.

D/B/A: TOP LINE GRANITE DESIGN                                          Fed ID #: ▮▮▮▮▮

Type of Entity:
◉ Corporation  ○ Limited Liability Company  ○ Limited Partnership  ○ Limited Liability Partnership  ○ Sole Proprietor

Business Address: 347 MIDDLESEX RD          City: TYNGSBORO     State: MA     Zip: 01879
Contact Address: 290 MASSAPOAG RD           City: TYNGSBORO     State: MA     Zip: 01879
E-mail Address: ramosedmilson@hotmail.com   Phone Number: 9783601199

| | |
|---|---|
| **Purchase Price**<br>*This is the amount being paid to Merchant(s) for the Receivables Purchased Amount (defined below).* | $ 75,000.00 |
| **Receivables Purchased Amount**<br>*This is the amount of Receivables (defined in Section 1 below) being sold.* | $ 108,750.00 |
| **Specified Percentage**<br>*This is the percentage of Receivables (defined below) to be delivered until the Receivables Purchased Amount is paid in full.* | 25 % |
| **Net Funds Provided**<br>*This is the net amount being paid to or on behalf of Merchant(s) after deduction of applicable fees listed in Section 2 below.* | $ 67,500.00 |
| **Initial Estimated Payment**<br>*This is only applicable if an Addendum for Estimated Payments is being signed. This is the initial amount of periodic payments collected from Merchant(s) as an approximation of no more than the Specified Percentage of the Receivables and is subject to reconciliation as set forth in Section 4 below.* | $ 2,313.83<br><br>per day |

### TERMS AND CONDITIONS

**1. Sale of Future Receipts.** Merchant(s) hereby sell, assign, and transfer to BG (making BG the absolute owner) in consideration of the funds provided ("Purchase Price") specified above, all of each Merchant's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of each merchant's business), for the payment of each Merchant's sale of goods or services until the amount specified above (the "Receivables Purchased Amount") has been delivered by Merchant(s) to BG. Each Merchant hereby acknowledges that until the Receivables Purchased Amount has been received in full by BG, each Merchant's Receivables, up to the balance of the Receivables Purchased Amount, are the property of BG and not the property of any Merchant. Each Merchant agrees that it is a fiduciary for BG and that each Merchant will hold Receivables in trust for BG in its capacity as a fiduciary for BG.

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS                    Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

The Receivables Purchased Amount shall be paid to BG by each Merchant irrevocably authorizing only one depositing account acceptable to BG (the "Account") to remit the percentage specified above (the "Specified Percentage") of each Merchant's settlement amounts due from each transaction, until such time as BG receives payment in full of the Receivables Purchased Amount. Each Merchant hereby authorizes BG to ACH debit the specified remittances from the Account on a daily basis as of the next business day after the date of this Agreement and will provide BG with all required access codes and monthly bank statements. Each Merchant understands that it will be held responsible for any fees resulting from a rejected ACH attempt or an Event of Default (see Section 2). BG is not responsible for any overdrafts or rejected transactions that may result from BG's ACH debiting the Specified Percentage amounts under the terms of this Agreement.

**2. Additional Fees.** In addition to the Receivables Purchased Amount, each Merchant will be held responsible to BG for the following fees, where applicable:

A. $ 7,500.00       - to cover underwriting and the ACH debit program, as well as related expenses. This will be deducted from payment of the Purchase Price.

B. Wire Fee - Merchant(s) shall receive funding electronically to the Account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH. This will be deducted from payment of the Purchase Price.

C. Blocked Account/Default - $2,500.00 - If BG considers an Event of Default to have taken place under Section 34.

D. UCC Fee - $195.00 – to cover BG filing a UCC-1 financing statement to secure its interest in the Receivables Purchased Amount. A $195.00 UCC termination fee will be charged if a UCC filing is terminated.

E. Court costs, arbitration fees, collection agency fees, attorney fees, expert fees, and any other expenses incurred in litigation, arbitration, or the enforcement of any of BG's legal or contractual rights against each Merchant and/or each Guarantor, if required, as explained in other Sections of this Agreement.

**3. Cap on Collection of the Receivables Purchased Amount.** The amount that BG will collect from Merchant(s) towards the Receivables Purchased Amount during any specific  day      will be capped at $ 2,313.83              (the "Cap"). If the Specified Percentage of all Receivables for a specific  day      is less than the Cap, then in addition to the Specified Percentage of Receivables for that  day     , BG will be permitted to collect any Receivables it did not previously collect due to the Cap such that the total amount collected during that  day      does not exceed the Cap. The Cap is not applicable to make up for a business day on which BG is closed and does not ACH debit the Account, to subsequent attempts to collect a rejected or blocked ACH payment, or for the collection of any of the fees listed in Section 2 or if any Event of Default listed in Section 34 is considered by BG to have taken place.

**4. Reconciliations.** Any Merchant may give written notice to BG requesting that BG conduct a reconciliation in order to ensure that the amount that BG has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A reconciliation may also be requested by e-mail to bruce@brickstonefund.com and such notice will be deemed to have been received if and when BG sends a reply e-mail (but not a read receipt). If such reconciliation determines that BG collected more than it was entitled to, then BG will credit to the Account all amounts to which BG was not entitled within seven days thereafter. If such reconciliation determines that BG collected less than it was entitled to, then BG will debit from the Account all additional amounts to which BG was entitled within seven days thereafter. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. BG will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

**5. Prepayments.** Although there is no obligation to do so, any Merchant may prepay any amount towards the Receivables Purchased Amount. There will be no penalty for any prepayment made by any Merchant. Any Merchant may elect to terminate this Agreement by prepaying BG the amount of the balance of the Receivables Purchased Amount at that time.

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS        Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**6. Merchant Deposit Agreement.** Merchant(s) shall appoint a bank acceptable to BG, to obtain electronic fund transfer services and/or "ACH" payments. Merchant(s) shall provide BG and/or its authorized agent with all of the information, authorizations, and passwords necessary to verify each Merchant's Receivables. Merchant(s) shall authorize BG and/or its agent(s) to deduct the amounts owed to BG for the Receivables as specified herein from settlement amounts which would otherwise be due to each Merchant and to pay such amounts to BG by permitting BG to withdraw the Specified Percentage by ACH debiting of the account. The authorization shall be irrevocable absent BG's written consent.

**7. Term of Agreement.** The term of this Agreement is indefinite and shall continue until BG receives the full Receivables Purchased Amount, or earlier if terminated pursuant to any provision of this Agreement. The provisions of Sections 4, 6, 7, 8, 10, 11, 13, 14, 15, 17, 18, 19, 22, 23, 28, 31, 32, 33, 34, 35, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, and 58 shall survive any termination of this Agreement.

**8. Ordinary Course of Business.** Each Merchant acknowledges that it is entering into this Agreement in the ordinary course of its business and that the payments to be made from each Merchant to BG under this Agreement are being made in the ordinary course of each Merchant's business.

**9. Financial Condition.** Each Merchant and each Guarantor (Guarantor being defined as each signatory to the Guarantee of this Agreement) authorizes BG and its agent(s) to investigate each Merchant's financial responsibility and history, and will provide to BG any bank or financial statements, tax returns, and other documents and records, as BG deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. BG is authorized to update such information and financial profiles from time to time as it deems appropriate.

**10. Monitoring, Recording, and Electronic Communications.** BG may choose to monitor and/or record telephone calls with any Merchant and its owners, employees, and agents. By signing this Agreement, each Merchant agrees that any call between BG and any Merchant or its representatives may be monitored and/or recorded. Each Merchant and each Guarantor grants access for BG to enter any Merchant's premises and to observe any Merchant's premises without any prior notice to any Merchant at any time after execution of this Agreement.

BG may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Merchant(s), Owner(s) (Owner being defined as each person who signs this Agreement on behalf of a Merchant), and Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Merchant, each Owner, and each Guarantor gives BG permission to call or send a text message to any telephone number given to BG in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Merchant, each Owner, and each Guarantor also gives BG permission to communicate such information to them by e-mail. Each Merchant, each Owner, and each Guarantor agree that BG will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Merchant, each Owner, and each Guarantor acknowledge that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that BG has no liability for any such charges.

**11. Accuracy of Information Furnished by Merchant and Investigation Thereof.** To the extent set forth herein, each of the parties is obligated upon his, her, or its execution of the Agreement to all terms of the Agreement. Each Merchant and each Owner signing this Agreement represent that he or she is authorized to sign this Agreement for each Merchant, legally binding said Merchant to its obligations under this Agreement and that the information provided herein and in all of BG's documents, forms, and recorded interview(s) is true, accurate, and complete in all respects. BG may produce a monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant(s) to BG. An investigative report may be made in connection with the Agreement. Each Merchant and each Owner signing this Agreement authorize BG, its agents and representatives, and any credit-reporting agency engaged by BG, to (i) investigate any references given or any other statements obtained from or about each Merchant or any of

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS   Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as any Merchant and/or Owners(s) continue to have any obligation to BG under this Agreement or for BG's ability to determine any Merchant's eligibility to enter into any future agreement with BG. Any misrepresentation made by any Merchant or Owner in connection with this Agreement may constitute a separate claim for fraud or intentional misrepresentation.

*Authorization for soft pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to BG under the Fair Credit Reporting Act, authorizing BG to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes BG to obtain such information solely to conduct a pre-qualification for credit.

*Authorization for hard pulls:* Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to BG under the Fair Credit Reporting Act, authorizing BG to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes BG to obtain such information in accordance with a merchant cash advance application.

**12. Transactional History.** Each Merchant authorizes its bank to provide BG with its banking and/or credit card processing history.

**13. Indemnification.** Each Merchant and each Guarantor jointly and severally indemnify and hold harmless each Merchant's credit card and check processors (collectively, "Processor") and Processor's officers, directors, and shareholders against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by Processor resulting from (a) claims asserted by BG for monies owed to BG from any Merchant and (b) actions taken by any Processor in reliance upon information or instructions provided by BG.

**14. No Liability.** In no event will BG be liable for any claims asserted by any Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect, or consequential damages, each of which is waived by each Merchant and each Guarantor.

**15. Sale of Receivables.** Each Merchant and BG agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from BG to any Merchant. BG is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in BG not receiving the Receivables Purchased Amount. Each Merchant agrees that the Purchase Price in exchange for the Receivables pursuant to this Agreement equals the fair market value of such Receivables. BG has purchased and shall own all the Receivables described in this Agreement up to the full Receivables Purchased Amount as the Receivables are created. Payments made to BG in respect to the full amount of the Receivables shall be conditioned upon each Merchant's sale of products and services and the payment therefor by each Merchant's customers in the manner provided in this Agreement. Although certain jurisdictions require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, those disclosures do not change the fact that the transaction encompassed by this Agreement is not a loan and does not have an interest rate.

**16. Power of Attorney.** Each Merchant irrevocably appoints BG as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to BG, or, if BG considers an Event of Default to have taken place under Section 34, to settle all obligations due to BG from each Merchant, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (which is defined in Section 33); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign each Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to BG; and (v) to file any claims or take any action or institute any proceeding which BG may deem necessary for the collection of any of the unpaid Receivables Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Receivables Purchased Amount.

**17. Protections Against Default.** The following Protections 1 through 7 may be invoked by BG, immediately and without notice to any Merchant in the event:

(a) Any Merchant takes any action to discourage the use of methods of payment ordinarily and customarily used

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS   Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

by its customers or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks and credit cards for the purchase of any Merchant's services and products;

(b) Any Merchant changes its arrangements with any Processor in any way that is adverse to BG;

(c) Any Merchant changes any Processor through which the Receivables are settled to another electronic check and/or credit card processor or permits any event to occur that could cause diversion of any Merchant's check and/or credit card transactions to another such processor;

(d) Any Merchant interrupts the operation of its business (other than adverse weather, natural disasters, or acts of God) or transfers, moves, sells, disposes, or otherwise conveys its business or assets without (i) the express prior written consent of BG and (ii) the written agreement of any purchaser or transferee to the assumption of all of any Merchant's obligations under this Agreement pursuant to documentation satisfactory to BG; or

(e) Any Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for any Merchant's goods or services with any means other than checks and/or credit cards that are settled through Processor. These protections are in addition to any other remedies available to BG at law, in equity, or otherwise available pursuant to this Agreement.

(f) BG considers any Event of Default listed in Section 34 to have taken place.

Protection 1: The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately.

Protection 2. BG may enforce the provisions of the Guarantee against Guarantor.

Protection 3. BG may enforce its security interest in the Collateral identified in Section 33.

Protection 4. BG may proceed to protect and enforce its rights and remedies by litigation or arbitration. Protection 5. If requested by BG, Merchant shall deliver to BG an executed assignment of lease of each Merchant's premises in favor of BG. Upon breach of any provision in this Section 17, BG may exercise its rights under such assignment of lease.

Protection 6. BG may debit any Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on any Merchant's bank account or otherwise, in an amount consistent with the terms of this Agreement.

Protection 7. BG will have the right, without waiving any of its rights and remedies and without notice to any Merchant and/or Guarantor, to notify each Merchant's credit card and/or check processor of the sale of Receivables hereunder and to direct such credit card processor to make payment to BG of all or any portion of the amounts received by such credit card processor on behalf of each Merchant. Each Merchant hereby grants to BG an irrevocable power-of-attorney, which power-of-attorney will be coupled with an interest, and hereby appoints BG and its representatives as each Merchant's attorney-in-fact to take any and all action necessary to direct such new or additional credit card and/or check processor to make payment to BG as contemplated by this Section.

**18. Protection of Information.** Each Merchant and each person signing this Agreement on behalf of each Merchant and/or as Owner, in respect of himself or herself personally, authorizes BG to disclose information concerning each Merchant, Owner and/or Guarantor's credit standing and business conduct to agents, affiliates, subsidiaries, and credit reporting bureaus. Each Merchant, Guarantor, and Owner hereby waives to the maximum extent permitted by law any claim for damages against BG or any of its affiliates relating to any (i) investigation undertaken by or on behalf of BG as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**19. Confidentiality.** Each Merchant understands and agrees that the terms and conditions of the products and services offered by BG, including this Agreement and any other BG documents (collectively, "Confidential Information") are proprietary and confidential information of BG. Accordingly, unless disclosure is required by law or court order, Merchant(s) shall not disclose Confidential Information of BG to any person other than an attorney, accountant, financial advisor, or employee of any Merchant who needs to know such information for the purpose of advising any Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising any Merchant and first agrees in writing to be bound by the terms of this Section 19.

**20. D/B/As.** Each Merchant hereby acknowledges and agrees that BG may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between BG and each Merchant, including the filing of UCC-1 financing statements and other notices or filings.

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS        Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**21. Financial Condition and Financial Information.** Each Merchant represents, warrants, and covenants that its bank and financial statements, copies of which have been furnished to BG, and future statements which will be furnished hereafter at the request of BG, fairly represent the financial condition of each Merchant at such dates, and that since those dates there have been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of any Merchant. Each Merchant has a continuing affirmative obligation to advise BG of any material adverse change in its financial condition, operation, or ownership.

**22. Governmental Approvals.** Each Merchant represents, warrants, and covenants that it is in compliance and shall comply with all laws and has valid permits, authorizations, and licenses to own, operate, and lease its properties and to conduct the business in which it is presently engaged.

**23. Authorization.** Each Merchant represents, warrants, and covenants that it and each person signing this Agreement on behalf of each Merchant has full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**24. Insurance.** Each Merchant represents, warrants, and covenants that it will maintain business-interruption insurance naming BG as loss payee and additional insured in amounts and against risks as are satisfactory to BG and shall provide BG proof of such insurance upon request.

**25. Electronic Check Processing Agreement.** Each Merchant represents, warrants, and covenants that it will not, without BG's prior written consent, change its Processor, add terminals, change its financial institution or bank account, or take any other action that could have any adverse effect upon any Merchant's obligations under this Agreement.

**26. Change of Name or Location.** Each Merchant represents, warrants, and covenants that it will not conduct its business under any name other than as disclosed to BG or change any place(s) of its business without prior written consent from BG.

**27. Estoppel Certificate.** Each Merchant represents, warrants, and covenants that it will, at any time, and from time to time, upon at least two day's prior notice from BG to that Merchant, execute, acknowledge, and deliver to BG and/ or to any other person or entity specified by BG, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Receivables Purchased Amount or any portion thereof have been paid.

**28. No Bankruptcy.** Each Merchant represents, warrants, and covenants that as of the date of this Agreement, it does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against any Merchant. Each Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. Each Merchant further warrants that there will be no statutory presumption that it would have been insolvent on the date of this Agreement.

**29. Unencumbered Receivables.** Each Merchant represents, warrants, and covenants that it has good, complete, and marketable title to all Receivables, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with this Agreement or adverse to the interests of BG, of which any for which BG has actual or constructive knowledge as of the date of this Agreement.

**30. Stacking.** Each Merchant represents, warrants, and covenants that it will not enter into with any party other than BG any arrangement, agreement, or commitment that relates to or involves the Receivables, whether in the form of a purchase of, a loan against, collateral against, or the sale or purchase of credits against Receivables without the prior written consent of BG.

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS   Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**31. Business Purpose.** Each Merchant represents, warrants, and covenants that it is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and each Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family, or household purposes.

**32. Default Under Other Contracts.** Each Merchant represents, warrants, and covenants that its execution of and/or performance under this Agreement will not cause or create an event of default by any Merchant under any contract with another person or entity.

**33. Security Interest.** To secure each Merchant's payment and performance obligations to BG under this Agreement and any future agreement with BG, each Merchant hereby grants to BG a security interest in collateral (the "Collateral"), that is defined as collectively: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by any Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC. The parties acknowledge and agree that any security interest granted to BG under any other agreement between any Merchant or Guarantor and BG (the "Cross-Collateral") will secure the obligations hereunder and under this Agreement. Negative Pledge: Each Merchant agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Cross-Collateral, as applicable.

Each Merchant agrees to execute any documents or take any action in connection with this Agreement as BG deems necessary to perfect or maintain BG's first priority security interest in the Collateral and the Cross-Collateral, including the execution of any account control agreements. Each Merchant hereby authorizes BG to file any financing statements deemed necessary by BG to perfect or maintain BG's security interest, which financing statements may contain notification that each Merchant has granted a negative pledge to BG with respect to the Collateral and the Cross-Collateral, and that any subsequent lienor may be tortiously interfering with BG's rights. Each Merchant shall be liable for and BG may charge and collect all costs and expenses, including but not limited to attorney fees, which may be incurred by BG in protecting, preserving, and enforcing BG's security interest and rights. Each Merchant further acknowledges that BG may use another legal name and/or D/B/A or an agent when designating the Secured Party when BG files the above-referenced financing statement(s).

**34. Events of Default.** An "Event of Default" may be considered to have taken place if any of the following occur:

(1) Any Merchant violates any term or covenant in this Agreement;

(2) Any representation or warranty by any Merchant in any Agreement with BG that has not been terminated proves to have been incorrect, false, or misleading in any material respect when made;

(3) Any Merchant fails to provide BG with written notice of any material change in its financial condition, operation, or ownership within seven days thereafter (unless a different notice period is specifically provided for elsewhere in this Agreement);

(4) the sending of notice of termination by any Merchant or Guarantor;

(5) Any Merchant transports, moves, interrupts, suspends, dissolves, or terminates its business without the prior written consent of BG other than a bankruptcy filing;

(6) Any Merchant transfers or sells all or substantially all of its assets without the prior written consent of BG;

(7) Any Merchant makes or sends notice of any intended bulk sale or transfer by any Merchant without the prior written consent of BG;

(8) Any Merchant uses multiple depository accounts without the prior written consent of BG;

(9) Any Merchant changes the Account without the prior written consent of BG;

(10) BG is not provided with updated login or password information for the Account within one business day after any such change is made by any Merchant;

(11) Any Merchant fails to send bank statements, merchant account statements, or bank login information for the Account within two business days after a written request for same is made by BG;

(12) Any Merchant performs any act that reduces the value of any Collateral granted under this Agreement;

(13) Any Merchant fails to deposit its Receivables into the Account;

I have read and agree to the terms and conditions set forth above:

Name and Title: **EDMILSON RAMOS**    Date: **02/14/2022**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

(14) Any Merchant causes any ACH debit to the Account by BG to be blocked or stopped without providing any advance written notice to BG, which notice may be given by e-mail to bruce@brickstonefund.com; or

(15) Any Merchant prevents BG from collecting any part of the Receivables Purchased Amount;

(16) Any Merchant causes any ACH debit to the Account to be stopped or otherwise returned that would result in an ACH Return Code of R08, R10, or R29 and that Merchant does not within two business days thereafter provide BG with written notice thereof explaining why that Merchant caused the ACH debit to be stopped or otherwise returned, which notice may be given by e-mail to bruce@brickstonefund.com; or

(17) Any Merchant defaults under any of the terms, covenants, and conditions of any other agreement with BG.

**35. Remedies.** In case any Event of Default occurs and is not waived, BG may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement, or other provision contained herein, or to enforce the discharge of each Merchant's obligations hereunder, or any other legal or equitable right or remedy. All rights, powers, and remedies of BG in connection with this Agreement, including each Protection listed in Section 17, may be exercised at any time by BG after the occurrence of an Event of Default, are cumulative and not exclusive, and will be in addition to any other rights, powers, or remedies provided by law or equity. In addition to the foregoing, in case any Event of Default occurs and is not waived, BG will be entitled to the issuance of an injunction, restraining order, or other equitable relief in BG's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to BG as a result of the Event of Default, and each Merchant will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without BG being required to furnish a bond or other undertaking in connection with the application.

**36. Required Notifications.** Each Merchant is required to give BG written notice at least one day prior to any filing under Title 11 of the United States Code. Merchant(s) are required to give BG at least seven days' written notice prior to the closing of any sale of all or substantially all of any Merchant's assets or stock.

**37. Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of BG, which consent may be withheld in BG's sole discretion. BG may assign, transfer, or sell its rights under this Agreement, including, without limitation, its rights to receive the Receivables Purchased Amount, and its rights under Section 33 of this Agreement, the Guarantee, and any other agreement, instrument, or document executed in connection with the transactions contemplated by this Agreement (a "Related Agreement"), or delegate its duties hereunder or thereunder, either in whole or in part. From and after the effective date of any such assignment or transfer by BG, whether or not any Merchant has actual notice thereof, this Agreement and each Related Agreement shall be deemed amended and modified (without the need for any further action on the part of any Merchant or BG) such that the assignee shall be deemed a party to this Agreement and any such Related Agreement and, to the extent provided in the assignment document between BG and such assignee (the "Assignment Agreement"), have the rights and obligations of BG under this Agreement and such Related Agreements with respect to the portion of the Receivables Purchased Amount set forth in such Assignment Agreement, including but not limited to rights in the Receivables, Collateral and Additional Collateral, the benefit of each Guarantor's guaranty regarding the full and prompt performance of every obligation that is a subject of the Guarantee, BG's rights under Section 17 of this Agreement (Protections Against Default), and to receive damages from any Merchant following a breach of this Agreement by any Merchant. In connection with such assignment, BG may disclose all information that BG has relating to any Merchant or its business. Each Merchant agrees to acknowledge any such assignment in writing upon BG's request.

**38. Notices.** All notices, requests, consents, demands, and other communications hereunder shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation to the respective parties to this Agreement at their addresses set forth in this Agreement and shall become effective only upon receipt. Written notice may also be given to any Merchant or Guarantor by e-mail to the E-mail Address listed on the first page of this Agreement. Each Merchant must set its spam or junk mail filter to accept e-mails sent by bruce@brickstonefund.com and its domain. This Section is not applicable to service of process or notices in any legal proceedings.

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS   Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**39. Choice of Law.** Each Merchant acknowledges and agrees that this Agreement was made in the State of New York, that the Purchase Price is being paid by BG in the State of New York, that the Receivables Purchased Amount is being delivered to BG in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by this Agreement. This Agreement and the relationship between BG, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**40. Forum and Venue Selection.** Any litigation relating to this Agreement or involving BG on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Agreement encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Agreement that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to BG may be commenced and maintained in any other court of competent jurisdiction.

**41. Jury Waiver.** The parties agree to waive trial by jury in any dispute between them.

**42. Counterclaim Waiver.** In any litigation or arbitration commenced by BG, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**43. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against BG within one year of its accrual will be time barred.

**44. Costs.** Each Merchant and each Guarantor must pay all of BG's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement and the enforcement thereof, including but not limited to collection agency fees, attorney fees, which may include a contingency fee of up to 40% of the amount claimed, expert witness fees, and costs of suit.

**45. Prejudgment and Postjudgment Interest.** If BG becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then BG will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**46. Legal Fees.** If BG prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay BG's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**47. Class Action Waiver.** BG, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**48. Arbitration.** Any action or dispute relating to this Agreement or involving BG on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS    Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Merchant and each Guarantor consents to BG making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in BG's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to BG as a result of the Event of Default.

Each Merchant acknowledges and agrees that this Agreement is the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under this Agreement will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that this Agreement therefore evidences a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in this Agreement to the contrary, all matters of arbitration relating to this Agreement will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of BG.

**49. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of this Agreement or any other address(es) provided in writing to BG by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by BG demonstrating that BG was provided with notice of a change in the Contact Address.

**50. Survival of Representation, etc.** All representations, warranties, and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**51. Waiver.** No failure on the part of BG to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**52. Independent Sales Organizations/Brokers.** Each Merchant and each Guarantor acknowledge that it may have been introduced to BG by or received assistance in entering into this Agreement or its Guarantee from an independent sales organization or broker ("ISO"). Each Merchant and each Guarantor agree that any ISO is separate from and is not an agent or representative of BG. Each Merchant and each Guarantor acknowledge that BG is not bound by any promises or agreements made by any ISO that are not contained within this Agreement. Each Merchant and each Guarantor exculpate from liability and agree to hold harmless and indemnify BG and its officers, directors, members, shareholders, employees, and agents from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by any Merchant or any Guarantor resulting from any act or omission by any ISO. Each Merchant and each Guarantor acknowledge that any fee that they paid to any ISO for its services is separate and apart from any payment under this Agreement. Each Merchant and each Guarantor acknowledge that BG does not in any way require the use of an ISO and that any fees charged by any ISO are not

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS    Date: 02/14/2022

Page **11** of **19**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

required as a condition or incident to this Agreement.

**53. Modifications; Agreements.** No modification, amendment, waiver, or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

**54. Severability.** If any provision of this Agreement is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Agreement is deemed void, all other provisions will remain in effect.

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS    Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**55. Headings.** Headings of the various articles and/or sections of this Agreement are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**56. Attorney Review.** Each Merchant acknowledges that it has had an opportunity to review this Agreement and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**57. Entire Agreement.** This Agreement, inclusive of all addenda, if any, executed simultaneously herewith constitutes the full understanding of the parties to the transaction herein and may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Agreement and any other document preceding it, this Agreement will govern. This Agreement does not affect any previous agreement between the parties unless such an agreement is specifically referenced herein. This Agreement will not be affected by any subsequent agreement between the parties unless this Agreement is specifically referenced therein. BG will not be permitted to enforce any of its rights under this Agreement if so expressed by in writing by Gene Rosen's Law Firm.

**58. Counterparts; Fax and Electronic Signatures.** This Agreement may be executed electronically and in counterparts. Facsimile and electronic copies of this Agreement will have the full force and effect of an original.

### EACH UNDERSIGNED HEREBY ACCEPTS THE TERMS OF THIS AGREEMENT

FOR THE MERCHANT/OWNER (#1)

By: **EDMILSON RAMOS**

(Print Name and Title)

(Signature)

SS# _____

Driver License Number _____

FOR THE MERCHANT/OWNER (#2)

By: _____

(Print Name and Title)

(Signature)

SS# _____

Driver License Number _____

Approved for BRICKSTONE GROUP LLC by: _____

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

## GUARANTEE

**G1. Personal Guarantee of Performance.** This is a personal guaranty of performance, dated 02/14/2022 , of the Standard Merchant Cash Advance Agreement, dated 02/14/2022 ("Agreement"), inclusive of all addenda, if any, executed simultaneously therewith, by and between BRICKSTONE GROUP LLC ("BG") and TOP LINE GRANITE DESIGN INC. ("Merchant"). Each undersigned Guarantor hereby guarantees each Merchant's performance of all of the representations, warranties, and covenants made by each Merchant to BG in the Agreement, inclusive of all addenda, if any, executed simultaneously herewith, as the Agreement may be renewed, amended, extended, or otherwise modified (the "Guaranteed Obligations"). Each Guarantor's obligations are due at the time of any breach by any Merchant of any representation, warranty, or covenant made by any Merchant in the Agreement.

**G2. Communications.** BG may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Guarantor gives BG permission to call or send a text message to any telephone number given to BG in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Guarantor also gives BG permission to communicate such information to them by e-mail. Each Guarantor agrees that BG will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Guarantor acknowledges that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that BG has no liability for any such charges.

**G3. Guarantor Waivers.** If BG considers any Event of Default to have taken place under the Agreement, then BG may enforce its rights under this Guarantee without first seeking to obtain payment from any Merchant, any other guarantor, or any Collateral, Additional Collateral, or Cross-Collateral BG may hold pursuant to this Guarantee or any other agreement or guarantee. BG does not have to notify any Guarantor of any of the following events and Guarantor(s) will not be released from its obligations under this Guarantee even if it is not notified of: (i) any Merchant's failure to pay timely any amount owed under the Agreement; (ii) any adverse change in any Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) BG's acceptance of the Agreement with any Merchant; and (v) any renewal, extension, or other modification of the Agreement or any Merchant's other obligations to BG. In addition, BG may take any of the following actions without releasing any Guarantor from any obligations under this Guarantee: (i) renew, extend, or otherwise modify the Agreement or any Merchant's other obligations to BG; (ii) if there is more than one Merchant, release a Merchant from its obligations to BG such that at least one Merchant remains obligated to BG; (iii) sell, release, impair, waive, or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under the Agreement. Until the Receivables Purchased Amount and each Merchant's other obligations to BG under the Agreement and this Guarantee are paid in full, each Guarantor shall not seek reimbursement from any Merchant or any other guarantor for any amounts paid by it under the Agreement. Each Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against any Merchant, any other guarantor, or any collateral provided by any Merchant or any other guarantor, for any amounts paid by it or acts performed by it under this Guarantee: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**G4. Joint and Several Liability.** The obligations hereunder of the persons or entities constituting each Guarantor under this Guarantee are joint and several.

**G5. Injunctive Relief.** In case any Event of Default occurs and is not waived, BG will be entitled to the issuance of an injunction, restraining order, or other equitable relief in BG's favor, subject to court or arbitrator approval,

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS          Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

restraining each Guarantor's accounts and/or receivables up to the amount due to BG as a result of the Event of Default, and each Guarantor will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without BG being required to furnish a bond or other undertaking in connection with the application.

**G6. Choice of Law.** Each Guarantor acknowledges and agrees that the Agreement and this Guarantee were made in the State of New York, that the Purchase Price is being paid by BG in the State of New York, that the Receivables Purchased Amount is being delivered to BG in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by the Agreement and this Guarantee. This Guarantee and the relationship between BG, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**G7. Forum and Venue Selection.** Any litigation relating to this Agreement or this Guarantee or involving BG on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Guarantee encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Guarantee that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to BG may be commenced and maintained in any other court of competent jurisdiction.

**G8. Jury Waiver.** Each Guarantor agrees to waive trial by jury in any dispute with BG.

**G9. Counterclaim Waiver.** In any litigation or arbitration commenced by BG, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**G10. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against BG within one year of its accrual will be time barred.

**G11. Costs.** Each Merchant and each Guarantor must pay all of BG's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement or this Guarantee and the enforcement thereof, including but not limited to collection agency fees, expert witness fees, and costs of suit.

**G12. Prejudgment and Postjudgment Interest.** If BG becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then BG will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a postjudgment rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**G13. Legal Fees.** If BG prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay BG's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**G14. Class Action Waiver.** BG, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**G15. Arbitration.** Any action or dispute relating to this Agreement or this Guarantee or involving BG on one

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS    Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement or this Guarantee must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Guarantor consents to BG making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in BG's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to BG as a result of the Event of Default.

Each Guarantor acknowledges and agrees that the Agreement and this Guarantee are the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, that the transactions contemplated under the Agreement and this Guarantee will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that the Agreement and this Guarantee therefore evidence a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in the Agreement or this Guarantee to the contrary, all matters of arbitration relating to the Agreement or this Guarantee will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of BG.

**G16. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of the Agreement or any other address(es) provided in writing to BG by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of the Agreement if it does not furnish a certified mail return receipt signed by BG demonstrating that BG was provided with notice of a change in the Contact Address.

**G17. Severability.** If any provision of this Guarantee is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Guarantee is deemed void, all other provisions will remain in effect.

**G18. Survival.** The provisions of Sections G2, G3, G4, G5, G6, G7, G8, G9, G10, G11, G12, G13, G14, G15, G16, G17, G18, G19, G20, G21, and G22 shall survive any termination of this Guarantee.

**G19. Headings.** Headings of the various articles and/or sections of this Guarantee are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**G20. Attorney Review.** Each Guarantor acknowledges that it has had an opportunity to review this Guarantee, the Agreement, and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**G21. Entire Agreement.** This Guarantee, inclusive of all addenda, if any, executed simultaneously herewith may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this

**I have read and agree to the terms and conditions set forth above:**

Name and Title: EDMILSON RAMOS      Date: 02/14/2022

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

Guarantee and any other document preceding it, this Guarantee will govern. This Guarantee does not affect any previous agreement between the parties unless such an agreement is specifically referenced in the Agreement or herein. This Guarantee will not be affected by any subsequent agreement between the parties unless this Guarantee is specifically referenced therein.

I have read and agree to the terms and conditions set forth above:

Name and Title: EDMILSON RAMOS    Date: 02/14/2022

| Brickstone Group | Check | 02/16/2022 | EFT | 2,313.83 | Ace #8092 |
|---|---|---|---|---|---|
| Brickstone Group | Check | 02/17/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 02/18/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 02/22/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 02/22/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 02/23/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 02/24/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 02/25/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 02/28/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/02/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/07/2022 | EFT | 2,313.83 | Acc#8092 |
| Brickstone Group | Check | 03/08/2022 | EFT | 2,313.83 | Acc#8092 |
| Brickstone Group | Check | 03/09/2022 | EFT | 2,313.83 | Acc#8092 |
| Brickstone Group | Check | 03/10/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/11/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/14/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/15/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/16/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/17/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/18/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/21/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/23/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/24/2022 | EFT | 2,313.83 | Acc #8092 |
| Brickstone Group | Check | 03/25/2022 | EFT | 2,313.83 | Acc #8092 |
| | | | | 55,531.92 | |



## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS

*In re:*

TOP LINE GRANITE DESIGN INC.,          Ch. 11
    Debtor                              22-40216-EDK

### Order

The "Motion of Debtor for an Order against Brickstone Group LLC for Willful Violation of the Automatic Stay by Placing Postpetition Lien on DIP Account" [Docket #146] (the "Motion") filed by the debtor Top Line Granite Design Inc. (the "Debtor") having come before the Court for hearings on July 29, 2022, September 29, 2022, November 8, 2022, and January 19, 2023 (the "Hearings"); the Debtor and the Subchapter V Trustee having filed affidavits of damages in support of the Motion [Docket #s 173, 230, and 254] (the "Affidavits"); sufficient notice of the Motion, the Hearings, and relevant Court Orders having been made as reflected in the affidavits and certificates of service filed with the Court and the representations made by Debtor's counsel at the Hearings; no objection having been filed to the Motion; and Brickstone Group LLC ("Brickstone") having failed to appear at the Hearings; upon consideration of the unopposed Motion, the Affidavits, and the record of this case, the Court GRANTS the Motion and finds that Brickstone, with notice of the Debtor's bankruptcy case, violated the automatic stay of 11 U.S.C. § 362(a) by placing a postpetition lien on the Debtor's DIP account.

Pursuant to 11 U.S.C. § 105, see Spookyworld, Inc. v Town of Berlin (In re Spookyworld, Inc.), 346 F.3d 1, 8, 10 (1st Cir. 2003), the Court awards damages as sanctions for the stay violation in favor of the Debtor and against Brickstone in the total amount of $21,625.90, comprised of $18,850.50 in Debtor's Counsel's fees, $62.40 in Debtor's Counsel's expenses, $2,185 in fees and expenses of the Subchapter V Trustee, $428 interest on the DIP borrowed funds levied on the DIP account, and $100 in nonsufficient funds fees charged to the Debtor.

Brickstone is ORDERED to pay the sum of $21,625.90 to Debtor's counsel within thirty (30) days of service of this Order.

Upon receipt of the funds, counsel to the Debtor shall disburse to the Subchapter 5 Trustee the sum of $2,185 and the sum of $18,912.90 to Debtor's Counsel. The remainder of the funds shall be deposited in the Debtor's DIP account.

Debtor's counsel is ORDERED to serve Brickstone with a copy of this Order in accordance with

Fed. R. of Bankr. P. 7004 and to file an affidavit of service reflecting such service has been made by February 9, 2023.

Dated: 2/2/2023                                    By the Court,

                                                   *Elizabeth D. Katz* (signature)

                                                   Elizabeth D. Katz
                                                   United States Bankruptcy Judge